THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DARREN DONAHUE,

               Plaintiff,

     v.

RED ROBIN INTERNATIONAL, INC., a
Nevada Corporation; RED ROBIN GOURMET
BURGERS, INC., a Delaware Corporation; and
HAROLD HART and his marital community,

               Defendants.

No. 2:17-cv-00023-JLR

DECLARATION OF RICHARD E.
GOLDSWORTHY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR:
April 20, 2018

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - (Cause No. 2:17-cv-00023-JLR)
Page i

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

I, Richard E. Goldsworthy, being duly sworn on oath under penalty of perjury under the laws of the United States and Washington State depose and say:

1.       I am an attorney at The Blankenship Law Firm, P.S., counsel of record for Plaintiff Darren Donahue in the above-captioned matter.

2.       Attached as Exhibit A is a true and correct copy of Defendants' Answer to First Amended Complaint for Damages dated March 15, 2017 (Dkt. 12).

3.       Plaintiff served his First Set of Interrogatories and Requests for Production to Defendants on April 5, 2017.  Defendants served their objections and answers on May 5, 2017. Attached as Exhibit B is a true and correct copy of the relevant pages from Defendants' Answers to First Set of Interrogatories and Requests for Production dated May 5, 2017.

4.       Attached as Exhibit C is a true and correct copy of excerpts from the deposition of Harold Hart on January 18, 2018.

5.       Attached as Exhibit D is a true and correct copy of excerpts from the deposition of Claire Simpson on February 7, 2018.

6.       Attached as Exhibit E is a true and correct copy of excerpts from the deposition of Julie Rivera on February 8, 2018.

7.       Attached as Exhibit F is a true and correct copy of excerpts from the deposition of Tim Mei on February 13, 2018.

8.       Attached as Exhibit G is a true and correct copy of excerpts from the deposition of Kate Hersel on February 14, 2018.

9.       Attached as Exhibit H is a true and correct copy of excerpts from the deposition of Darren Donahue on January 24, 2018.

10.       Attached as Exhibit I is a true and correct copy of a screenshot of medical leaves taken by Darren Donahue while he was employed by Red Robin.

11.       Attached as Exhibit J is a true and correct copy of a document reflecting Darren Donahue's need for accommodations at work due to his disability in February 2012.

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - (Cause No. 2:17-cv-00023-JLR)
Page 1

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

12.     Attached as Exhibit K is a true and correct copy of a letter from Darren Donahue's doctor dated January 13, 2012 received by Red Robin.

13.     Attached as Exhibit L is a true and correct copy of the job description for General Manager at Red Robin.

14.     Attached as Exhibit M is a true and correct copy of Darren Donahue's 2012 performance review.

15.     Attached as Exhibit N is a true and correct copy of an email string from October 2013 regarding Darren Donahue's interest in applying for a promotion.

16.     Attached as Exhibit O is a true and correct copy of a document reflecting Darren Donahue's need for accommodations at work due to his disability in March 2013.

17.     Attached as Exhibit P is a true and correct copy of an email string regarding Darren Donahue's need for accommodations at work due to his disability in March 2013.

18.     Attached as Exhibit Q is a true and correct copy of Darren Donahue's 2013 performance review.

19.     Attached as Exhibit R is a true and correct copy of an email sting from January 2014 regarding Darren Donahue's complaint of retaliation and discrimination.

20.     Attached as Exhibit S is a true and correct copy of an EthicsPoint complaint generated due to Darren Donahue's January 2014 complaint of retaliation and discrimination.

21.     Attached as Exhibit T is a true and correct copy of an email sting from January and February 2015 regarding Red Robin's elimination of the Special Needs Program for disabled employees.

22.     Attached as Exhibit U is a true and correct copy of an email sting from March 2015 between employees in HR regarding Darren Donahue.

23.     Attached as Exhibit V is a true and correct copy of an email sting from November 2014 regarding submitting payment to employee Christopher Ferguson.

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - (Cause No. 2:17-cv-00023-JLR)
Page 2

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

24.     Attached as Exhibit W is a true and correct copy of Darren Donahue's EEOC Charge of Discrimination submitted December 9, 2015.

25.     Attached as Exhibit X is a true and correct copy of the relevant pages from Defendants' Reponses to First Requests for Admission.

26.     Attached as Exhibit Y is a true and correct copy of a Red Robin PeopleReport from February 2011 which reflects that Darren Donahue was "ready for promotion within 6 months."  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

27.     Attached as Exhibit Z is a true and correct copy of a Red Robin Scorecard from October 2013 which reflects that Darren Donahue's Auburn restaurant was ranked first out of the other restaurants Eric Yates' region. Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

28.     Attached as Exhibit AA is a true and correct copy of a Red Robin PeopleReport from March 2014 which reflects that Darren Donahue was a "Real Risk."  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

29.     Attached as Exhibit BB is a true and correct copy of a Red Robin Scorecard from December 2014 which reflects that Darren Donahue's Auburn restaurant was mostly in the "green" for the year. Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

30.     Attached as Exhibit CC is a true and correct copy of a Red Robin Scorecard from November 2013 which reflects that Darren Donahue's Auburn restaurant was mostly in the "green" for the year. Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - (Cause No. 2:17-cv-00023-JLR)
Page 3

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

31.     I certify that I conferred by telephone with defense counsel, Catharine Morisset, on March 27, 2018 regarding Defendants' confidential designation of certain documents and to determine if Defendants would be willing to remove the confidential designation for Exhibits Y, Z, AA, BB, and CC. Defense counsel responded that Defendants' position is that the documents should remain confidential under the parties' Stipulated Protective Order.

I declare under penalty of perjury under the laws of the United States and Washington State that the foregoing is true and correct to the best of my knowledge and belief.

SWORN TO this 27th day of March, 2018 at Seattle, Washington.

By: _s/ Richard E. Goldsworthy____
Richard E. Goldsworthy

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT - (Cause No. 2:17-cv-00023-JLR)
Page 4

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

1

2

3

4

5

6

## DECLARATION OF SERVICE

I hereby certify under penalty of perjury under the laws of the State of Washington that on the date and in the manner listed below I caused delivery of a true copy of the attached document to the following attorneys for Defendants:

7

8

9

10

11

12

13

14

15

16

Catharine M. Morisset, WSBA No. 29682
Margaret Burnham, WSBA No. 47860
Fisher & Phillips LLP
1201 Third Ave, Suite 2750
Seattle, WA 98101
Telephone: (206) 682-2308
Facsimile: (206) 682-7908
Email: cmorisset@fisherphillips.com
        mburnham@fisherphillips.com

☐ by Electronic Mail
☐ by Facsimile Transmission
☐ by First Class Mail
☐ by Hand Delivery
☐ by Overnight Delivery
☒ by Notification via E-filing System

*Attorneys for Defendants*

17

DATED this 27th day of March, 2018, at Seattle, Washington.

18

19

20

21

22

 s/ Richard E. Goldsworthy
Richard E. Goldsworthy, WSBA No. 40684
The Blankenship Law Firm, P.S.
1000 Second Avenue, Suite 3250
Seattle, WA 98104
Telephone: (206) 343-2700
Facsimile: (206) 343-2704
Email:  rgoldsworthy@blankenshiplawfirm.com

23

24

25

26

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - (Cause No. 2:17-cv-00023-JLR) Page 5

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

# Exhibit A

THE HONORABLE JAMES L. ROBART

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

DARREN DONAHUE,

10
                              Plaintiff,

11
            vs.

12
RED ROBIN INTERNATIONAL INC., a
Nevada Corporation, RED ROBIN
13
GOURMET BURGERS, INC., a Delaware
Corporation, and HAROLD HART and his
14
marital community,

15
                              Defendants.

NO. 2:17-cv-00023 JLR

DEFENDANTS' ANSWER TO
FIRST AMENDED COMPLAINT
FOR DAMAGES

16    Defendants Red Robin International, Inc., Red Robin Gourmet Burgers, Inc., and Harold

17   Hart (collectively "Defendants"), answer Plaintiff Darren Donahue's Complaint using

18   like-numbered paragraphs:

19                          **I.      NATURE OF ACTION**

20       1.     To the extent that Paragraph 1 is merely a list of Plaintiff's causes of action,

21   personal intentions, or legal conclusions, no response is required. Defendants admit that Plaintiff

22   is a former employee. Defendants deny any remaining allegations contained in Paragraph 1.

23       2.     Paragraph 2 consists solely of legal conclusions, thus no response is required. To

24   the extent that a response is required: Denied.

25   /////

26   /////

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 1

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32617628.5

3.      Paragraph 3 is merely a list of Plaintiff's desired forms of relief, thus no response is required. To the extent that a response is required: Denied. Plaintiff should take nothing by this action.

## II.      JURISDICTION AND VENUE

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted; jurisdiction is proper.

8.      Admitted; jurisdiction is proper.

9.      Admitted.

10.      Admitted; venue is proper.

11.      Admitted; jurisdiction is proper.

12.      Admitted; venue is proper.

13.      Defendants admit that Plaintiff was employed at one point during his tenure in King County, Washington and that jurisdiction is proper in this case. The balance of any allegations contained in Paragraph 13 are denied.

14.      Paragraph 14 consists solely of legal conclusions, thus no response is required. To the extent that a response is required: Defendants admit that jurisdiction is proper. The balance of any allegations are denied.

15.      Admitted.

16.      Admitted.

## III.      STATEMENT OF CLAIMS

17.      To the extent that Paragraph 17 merely restates and reincorporates past Paragraphs' allegations, Defendants restate and reincorporate their responses to Paragraphs 1 through 16.

/////

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 2

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

18.     To the extent that Paragraph 18 consists solely of legal conclusions, no response is required. To the extent that a response is required: Defendants admit that Plaintiff was terminated on or about June 15, 2015. The balance of any allegations are denied.

19.     Defendants admit that Plaintiff began work for Defendants as an Assistant Manager in 2008 and became a General Manager. Defendants deny the allegations regarding "failing restaurants," "underperforming restaurants," "highly successful," or "the most profitable" as these terms are vague, susceptible to different interpretations, and based on Plaintiff's own subjective opinions rather than objective facts that can be admitted or denied. Any remaining allegations not specifically admitted are denied.

a.     Defendants admit that Plaintiff was the General Manager for the Tacoma, Washington Red Robin Gourmet Burgers from approximately September 2008 through May 2009.  As for the balance of Plaintiff's claims, Defendants are without information or knowledge at this time sufficient to form a belief as to the accuracy of Plaintiff's allegations regarding the restaurant's rankings despite reasonable inquiry, and thus they deny them on those grounds.

b.     Defendants admit that Plaintiff was the General Manager for the Lakewood Towne Center, Washington Red Robin Gourmet Burgers from approximately May 2009 until July 2011. Defendants deny that the restaurant became "highly successful," as this term is vague, susceptible to different interpretations, and based on Plaintiff's own subjective opinions rather than objective facts that can be admitted or denied. Any remaining allegations are denied.

c.     Defendants admit that Plaintiff was the General Manager for the Auburn, Washington Red Robin Gourmet Burgers from approximately July 2011 through June 2015. Deny that Auburn was ranked "331 out of 337" in 2014 and the "2014 Most Profitable Restaurant." Defendants also deny that Plaintiff "achieved great success" as this allegation is vague, susceptible to different interpretations, and is Plaintiff's own subjective

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 3

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32617628.5

opinion rather than objective facts that can be admitted or denied. Any allegations not specifically admitted are denied.

       d.     Defendants admit that Plaintiff worked at the Southcenter Red Robin, but deny that Plaintiff conducted an "overhaul" of Southcenter "successfully" as allegations are vague, susceptible to different interpretations, and state Plaintiff's own subjective opinion rather than objective facts that can be admitted or denied. Deny any remaining allegations.

       e.     Plaintiff's alleged "success" is a vague term, subject to different interpretations, and based his own subjective opinion rather than objective facts that can be admitted or denied, and Defendants thus deny this allegation. Defendants are without information or knowledge at this time sufficient to form a belief as to the accuracy of Plaintiff's remaining allegations despite reasonable inquiry, and thus they deny them on those grounds.

       f.     Defendants admit Auburn was at one time a "training restaurant" and that Plaintiff was at one time a "training manager." Otherwise, deny the allegations.

       g.     Plaintiff may have been asked to present a piece of Team Leader Focus Group meetings from time to time, along with other GMs. Otherwise, deny.

       h.     To the extent that Paragraphs 19(a) – (h) alleges Plaintiff's own subjective opinions rather than objective facts that can be admitted or denied, they are denied. Admitted that Plaintiff received some positive performance feedback at times during his employment. Otherwise, deny.

20.     Defendants admit that they repeatedly accommodated Plaintiff with several leaves of absence. The balance of any allegations in Paragraph 20 are denied.

21.     Defendants admit that they repeatedly accommodated Plaintiff with several leaves of absence. The balance of any allegations in Paragraph 21 are denied.

/////

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 4

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

22.     Defendants admit that they repeatedly accommodated Plaintiff with several leaves of absence. The balance of any allegations in Paragraph 22 are denied.

23.     Defendants admit that they repeatedly accommodated Plaintiff, a General Manager of several years, with leaves of absence. The balance of any allegations in Paragraph 23 are denied.

24.     Denied.

25.     To the extent that Paragraph 25 consists solely of legal conclusions, no response is required. To the extent that a response is required: Denied.

    a.      To the extent that Paragraph 25(a) consists solely of legal conclusions, no response is required. To the extent that a response is required: Defendants admit that at times, Plaintiff took medical leave in 2011 and 2012 for bladder issues. Defendants admit that Plaintiff was reinstated at one point. The balance of any allegations in Paragraph 25(a) are denied.

    b.      To the extent that Paragraph 25(b) consists solely of legal conclusions, no response is required. To the extent that a response is required: Defendants admit that Plaintiff had medical restrictions at times during his employment, which they accommodated. The balance of any allegations in Paragraph 25(b) are denied.

    c.      To the extent that Paragraph 25(c) consists solely of legal conclusions, no response is required. To the extent that a response is required: Defendants admit that Defendant was granted medical leave in 2013 and that Plaintiff fared poorly on his sanitation score in 2013. The balance of any allegations in Paragraph 25(c) are denied.

    d.      Denied.

    e.      Denied.

/////

/////

/////

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 5

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

f. Defendants admit that Plaintiff received a "Does Not Meet Expectations" performance review in January 2014 due to 2013 performance issues and that he did not receive a raise in 2014. The balance of any allegations contained in Paragraph 25(f) are denied.

g. Denied.

h. Plaintiff's allegation that he "had been successful" is vague, subject to different interpretations, and based his own subjective opinion rather than objective facts that can be admitted or denied, and Defendants thus deny this allegation.

i. Denied.

26. To the extent that Paragraph 26 consists solely of legal conclusions, no response is required. To the extent that a response is required: Defendant admits that Plaintiff was upset by the negative performance review that he earned. The balance of any allegations are denied.

a. Admit that Plaintiff sent Julie Rivera an email on January 10, 2014, where the "re" line read: "I feel that I am being retaliated against," in which he complained "This evaluation came out of nowhere and was driven as a way to get back at me for going to Harold for advice." All remaining allegations are denied.

27. Paragraph 27 consists solely of legal conclusions, thus no response is required. To the extent one is required, denied.

a. Denied.

b. Admit that Plaintiff was eligible to apply for promotions. Otherwise, denied.

c. Admit that Plaintiff was eligible to apply for promotions. Otherwise, denied.

d. Defendant admits that Plaintiff received a "meets expectations" performance review in 2014. The balance of any allegations are denied.

e. Denied.

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 6

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32617628.5

f.    Paragraph 27(f) is too ambiguous to be admitted or denied without additional verbiage and clarification, therefore it is denied on those grounds.

g.    Denied. Red Robin does not have a program or award that would result in a "certificate for the Most Profitable Restaurant."

h.    Defendant admits that Plaintiff protested his 2014 performance review. The balance of allegations are denied.

i.    Defendant admits that Plaintiff protested his 2014 performance review and contacted Mr. Hart regarding it. The balance of allegations are denied.

j.    Denied.

28.    Paragraph 28 consists solely of legal conclusions, thus no response is required.

a.    Defendants admit that its "special needs" program ended. Otherwise, denied.

b.    Denied.

c.    Admit that Plaintiff objected to the end of the "special needs" program. Otherwise, denied.

29.    Denied.

30.    Denied.

31.    Admitted.

32.    Defendants admit that Plaintiff was fired for a payroll and timecard-related integrity issue. Defendants deny any remaining allegations contained in Paragraph 32.

33.    Defendants admit that Plaintiff was fired for a payroll and timecard-related integrity issue. Defendants deny any remaining allegations contained in Paragraph 33.

34.    Denied.

35.    Paragraphs 35 through 42 consist solely of legal conclusions, thus no response is required.  To the extent a response is required, the allegations are denied.

/////

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 7

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32617628.5

## IV.  RESERVATION OF RIGHTS

43.    To the extent that Plaintiff's Paragraph 43 is merely a reservation of rights, no response is required. To the extent that a response is required, all allegations therein are denied.

44.    To the extent that Plaintiff's Paragraph 44 is merely a reservation of rights, no response is required. To the extent that a response is required, all allegations therein are denied.

## V.  ANSWER TO "PRAYER FOR RELIEF"

Defendants deny that Plaintiff is entitled to any form of relief in this action.

## VI.  GENERAL DENIAL

Any allegations or statements in the Complaint, including Plaintiffs' Prayer for Relief, not expressly admitted are denied.

## VII.  AFFIRMATIVE DEFENSES

By way of further answer and without waiving any allegations previously denied, Defendants assert the following affirmative defenses:

1.    Defendants acted with *bona fide* reasons for believing that their conduct complied with the law and without malice or recklessness toward Plaintiff's legal rights, so that Defendants cannot be held liable for punitive, exemplary, or liquidated damages.

2.    Defendant's actions or omission were taken in good faith and the honest belief that its actions complied with the law.

3.    Pending discovery of his asserted disability and need for accommodation, Plaintiff's alleged accommodation requests may be proven an undue hardship.

4.    Plaintiff failed to request a reasonable accommodation or cooperate with Defendants in the interactive process.

5.    Plaintiff was not a qualified individual with a disability.

6.    Plaintiff has failed to mitigate any alleged damages.

7.    Plaintiff lacks standing to assert his claims, including a cause of action based on a "pattern and practice."

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 8

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

8.      If an impermissible factor played a role in any alleged adverse employment action affecting Plaintiff, which Defendants expressly deny, Plaintiff's claims for damages arising out of that action are barred in whole or part because Defendants would have taken the same action regardless of the impermissible factor.

9.      The injuries and damages, if any, claimed by Plaintiff were proximately caused or contributed by the fault of Plaintiff, his own negligence or any other actions.

10.     Without assuming any burden of proof not imposed by law, Defendants state that its actions with regard to the events about which Plaintiff complains were reasonable and were taken in good faith for legitimate, non-discriminatory business reasons.

11.     Pending further discovery, Plaintiff's claims may be barred by the doctrines of estoppel, laches, statute of limitations, or waiver.

12.     Subject to further discovery, any and all claims for such conduct asserted by Plaintiff is barred to the extent that Plaintiff unreasonably failed to avail himself of the policies and procedures adopted by his employer, and Plaintiff cannot recover damages for any such alleged wrongful conduct under the avoidable consequences doctrine.

## VIII.    RESERVATION OF RIGHTS

Defendants reserve the right to add additional defenses and make further claims as may be warranted by discovery.

## IX.    PRAYER FOR RELIEF

WHEREFORE, having fully answered Plaintiff's Complaint, Defendants pray:

1.      That Plaintiff takes nothing by the Complaint and that it be dismissed with prejudice;

2.      That Defendants should be awarded attorneys' fees, costs and expenses incurred; and

/////

/////

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 9

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32617628.5

3.      For such other and further relief as this Court may deem just and equitable.

DATED this 15th day of March 2017.

FISHER & PHILLIPS LLP

By    *s/ Catharine M. Morisset*
     Catharine M. Morisset, WSBA #29682
     Anne M. Milligan, WSBA #48994
     1201 Third Avenue, Suite 2750
     Seattle, WA 98101
     Telephone:  (206) 682-2308
     Facsimile: (206) 682-7908
     *cmorisset@fisherphillips.com*
     *amilligan@fisherphillips.com*
     *Attorneys for Defendants*

DEFENDANTS' ANSWER TO FIRST AMENDED
COMPLAINT FOR DAMAGES (17-0023) - Page 10

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32617628.5

1                       **CERTIFICATE OF SERVICE**

2       I hereby certify under the penalty of perjury of the laws of the United States that on the

3 date below written, I electronically filed the foregoing with the Clerk of the Court using the

4 CM/ECF system and caused to be served a true and correct copy of same by the method

5 indicated below and addressed as follows:

6   Scott C.G. Blankenship, WSBA #21431

7   Robin J. Shishido, WSBA #45926
  The Blankenship Law Firm, P.S.

8   1000 Second Avenue, Suite 3250
  Seattle, WA 98104

9   Phone: 206-343-2700
  Fax: 206-343-2704

10   sblankenship@blankenshiplawfirm.com
  rshishido@blankenshiplawfirm.com

11   *Attorneys for Plaintiff*

12       Executed on this 15th day of March, 2017.

13

14                  Renee A. Riley

15

16

17

18

19

20

21

22

23

24

25

26

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32617628.5

# Exhibit B

1   THE HONORABLE JAMES L. ROBART

2

3

4

5

6

7   UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

9   DARREN DONAHUE,                              NO. 2:17-cv-00023 JLR

                        Plaintiff,
10                                               DEFENDANTS' OBJECTIONS AND
                                                 FIRST RESPONSES TO
11      vs.                                      PLAINTIFF'S FIRST SET OF
                                                 INTERROGATORIES AND
12  RED ROBIN INTERNATIONAL INC., a              REQUESTS FOR PRODUCTION TO
    Nevada Corporation; RED ROBIN               DEFENDANTS
13  GOURMET BURGERS, INC., a Delaware
    Corporation; and HAROLD HART and his
14  marital community

15                      Defendant.

16          Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, Defendants hereby object

17  and respond to Plaintiff's First Interrogatories and Requests for Production of Documents to

18  Defendants.  Defendants reserve the right to revise and supplement their responses if, in the

19  course of discovery, information becomes available that would require revision or

20  supplementation in order to correctly or adequately respond to the requests.

21          **INTERROGATORIES AND REQUESTS FOR PRODUCTION**

22  **INTERROGATORY NO. 1: Identify and** supply current phone numbers **and** addresses, **or**

23  last known phone number **and** addresses if no current contact information is in **Defendants'**

24  possession, custody **or** control, for each employee who worked directly with **Plaintiff** from

25  January 1, 2010 through the present (including supervising, reviewing, **or** disciplining

26

DEFENDANTS' OBJECTIONS AND FIRST                         FISHER & PHILLIPS LLP
RESPONSES TO PLAINTIFF'S FIRST SET OF                   1201 THIRD AVENUE, SUITE 2750
INTERROGATORIES AND REQUESTS FOR                            SEATTLE, WA 98101
PRODUCTION TO DEFENDANTS - Page 1                            (206) 682-2308

FPDOCS 32864156.1

complaints of **harassment or discrimination or retaliation), or** his allegations in this case **or** that reference his name. This includes but is not limited to, notes, memoranda, letters, correspondence, emails, text messages **and/or** instant messages.

**RESPONSE**:

> Objection. Overly broad, unduly burdensome, vague, not reasonably calculated to lead to the discovery of admissible evidence (e.g., "parental leave" when no such claim is made in this case), and unreasonably encroaches upon the reasonable privacy expectations of third-parties who are not participants in this litigation. The Request seeks documents relating to communications of "any" employee. The Request also seeks documents regarding communications relating to Plaintiff's "personality."

> Without waiving any objections, and pursuant to their May 1, 2017 discovery conference with plaintiff's counsel, Plaintiff seeks records of complaints about Plaintiff. Defendant's production will be limited to 2011-2015 and limited to the custodians identified in RFP I.  Defendants will disclose custodians and search terms. Counsel may confer further regarding the scope and burden of this request. The parties agreed to a rolling production, and Defendants will supplement.

**INTERROGATORY NO. 11:** If **Defendants** contend that **Defendants** are not liable to **Plaintiff** for damages, state the factual basis **and** circumstances for such contention(s) **and identify** with particularity all facts which **you** contend support **or relate to** any affirmative defenses (Note: If you fail to list specific facts or object as to any affirmative defense, **Plaintiff** will move to dismiss the affirmative defense based upon **your** answer to this interrogatory.).

**ANSWER**:

> Objection. The Interrogatory calls for attorney-client privileged communications, work product, a legal conclusion, and/or the mental impressions of counsel. Without waiving any objections, Defendants state as follows: Defendants' actions did not violate the law and it had legitimate business reasons for terminating Plaintiff's employment. *See* witnesses and documents produced in Initial Disclosures.

**REQUEST FOR PRODUCTION NO. P:** Produce all **documents,** which **relate to,** support **or** refute **Defendants'** answer to the previous interrogatory, **and** all **documents** that **relate to** the claims **and** defenses in this case, whether **or** not they were authored by **Plaintiff,** including

DEFENDANTS' OBJECTIONS AND FIRST
RESPONSES TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION TO DEFENDANTS - Page 15

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32864156.1

1    but not limited to, the **documents you** may utilize at trial in support of the claims **or** defenses

2    in this case **or** the impeachment of witnesses at trial.

3    **RESPONSE**:

4           Objection. The Interrogatory calls for attorney-client privileged communications, work
5           product, a legal conclusion, and/or the mental impressions of counsel. Without waiving
6           any objections, Defendants state as follows: Defendants' actions did not violate the law.
             See documents produced in Initial Disclosures.

7    **INTERROGATORY NO. 12: Identify** all individual(s) **and** their titles who were notified,

8    responded to, **or** took any action with respect to any notice **or complaints** of **harassment** of

9    **discrimination or retaliation,** including complaints **or** allegations made by **or** about **Plaintiff.**

10   **ANSWER**:

11          Objection. Overly broad, unduly burdensome, is not reasonably calculated to lead to the
12          discovery of admissible evidence, and unreasonably encroaches upon the reasonable
             privacy expectations of third-parties who are not participants in this litigation. Seeks
13          information regarding "any" notice or complaint of harassment, discrimination, or
             retaliation regardless of the type of complaint. Plaintiff has not alleged discrimination
14          or harassment on the basis of a protected status other than disability.

15          Without waiving any objections, and pursuant to their May 1, 2017 discovery
16          conference with plaintiff's counsel, Plaintiff seeks records regarding complaints about
             Plaintiff. Defendant's production will be limited to 2011-2015 and Plaintiff's
17          complaints or complaints about Plaintiff. The parties agreed that Defendants will start
             with the Custodians identified in RFP I for the period 2011-2015, and that they may
18          need to confer in the future regarding search terms. Defendants will disclose search
19          terms used.  The parties have agreed to a rolling production and Defendants will
             supplement.

20

21   **REQUEST FOR PRODUCTION NO. Q:** Produce all **documents** that **relate to,** support,

22   refute, **or** memorialize **Defendants'** answer to the previous interrogatory, including but not

23   limited **to, any documents relating to** investigation(s), **or** actions taken by **Defendants** in

24   response, **and any documents or** other tangible things which constitute **or** memorialize any

25   **statements** made by **Plaintiff relating to** any of his **complaints**, concerns, **or** issues about co-

26

DEFENDANTS' OBJECTIONS AND FIRST
RESPONSES TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION TO DEFENDANTS - Page 16

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32864156.1

1

## ATTORNEY'S CR 26 CERTIFICATION

The undersigned attorney certifies pursuant to Civil Rule 26(g) that she has read each answer, response and objection to these discovery requests and that, to the best of her knowledge, information, and belief formed after a reasonable inquiry, each is (1) consistent with the Civil Rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the costs of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

DATED this 5th day of May, 2017.

_____

Catharine M. Morisset, WSBA #29682

DEFENDANTS' OBJECTIONS AND FIRST
RESPONSES TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR
PRODUCTION TO DEFENDANTS - Page 42

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
(206) 682-2308

FPDOCS 32864156.1

# Exhibit C

```
 1                 UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF WASHINGTON

 3                         AT SEATTLE

 4   _____

 5   DARREN DONAHUE                    )
                                       )
 6              Plaintiff,             )
                                       )
 7              vs.                    ) No. 2:17-cv-00023-JLR
                                       )
 8                                     )
     RED ROBIN INTERNATIONAL, INC.,    )
 9   a Nevada Corporation; RED ROBIN   )
     GOURMET BURGERS, INC., a Delaware )
10   Corporation; and HAROLD HART      )
     and his martial community,        )
11              Defendants.            )
     _____

12
                  DEPOSITION UPON ORAL EXAMINATION OF
13                         HAROLD HART
                        January 18, 2018
14                      Seattle, Washington
     _____

15

16

17

18

19

20

21

22

23        REPORTED BY:  Michelle L. Patton, CCR
                        Washington License No. 2500
24

25
```

WITNESS:  HAROLD HART    1/18/2018

Page 20

1   Q   Just to understand, at some point you began

2       supervising Darren Donahue in 2014; am I right?

3   A   I had supervised him prior to 2014.

4   Q   Okay.  When was the first time you supervised Darren

5       Donahue?

6   A   2010.

7   Q   In what capacity?

8   A   Darren was the general manager of the Lakewood Towne

9       Center.  I was the regional director.

10  Q   Okay.  And how many other general managers did you

11      oversee as the regional manager?

12  A   I believe in 2010 I had seven total general managers

13      I oversaw.

14  Q   And did you provide Mr. Donahue with some type of

15      performance review in 2010?

16  A   Yes.

17  Q   Okay.  What is the purpose of providing an employee

18      with a performance review?

19  A   Let them know where they stand.

20  Q   And is it important to let an employee know where

21      they stand?

22  A   Yes.

23  Q   Okay.  As a regional -- it's called ROD, Regional

24      Operations Director, right?

25  A   Yes.

WITNESS:  HAROLD HART    1/18/2018

Page 21

1   Q   And you also referred to it as "regional manager,"

2       right?

3   A   Yes.

4   Q   So can we use those terms interchangeably in this

5       deposition?

6   A   Yes.

7   Q   Good.

8           All right.   Did you review each of the general

9       managers, in 2010, as the regional operations

10      director?

11  A   Yes.

12  Q   Okay.   And do you recall any of the other general

13      managers, restaurant managers, that you reviewed in

14      2010?

15  A   Do I recall them?

16  Q   Their names.

17  A   No.

18  Q   Okay.   Do you recall -- as you sit here right now,

19      can you tell me exactly what Darren Donahue's scores

20      are, in 2010?

21  A   Not off the top of my head.

22  Q   Well, why not?

23  A   I would need the document.

24  Q   Okay.   So in order for you to testify accurately and

25      fully about Darren Donahue's performance review, you

WITNESS:  HAROLD HART      1/18/2018

Page  22

1      would actually have to see it, right?

2  A   Yes.

3  Q   You would need to refresh your recollection with that

4      document?

5  A   Yes.

6  Q   And would that also be true with -- it seems to me

7      that without those reviews you can't even give me a

8      list, right?

9  A   Yes.

10 Q   Okay.

11               MS. MORISSET:  A list of what?

12 Q   (By Mr. Blankenship) An accurate list of the general

13     managers that you oversaw and reviewed; am I right?

14 A   Yes.

15 Q   Okay.  And would the same be true with 2014?

16         I know that is sooner in time, but would you be

17     able to tell me exactly how you scored, and the

18     comments that you made, related to Darren Donahue,

19     without having that performance review in front of

20     you?

21 A   No.

22 Q   What about, can you give me a list of the other

23     general managers that you reviewed in 2014 --

24 A   No.

25 Q   -- other than Darren Donahue?

**WITNESS:  HAROLD HART    1/18/2018**

Page 23

1            Can you name any of them?

2    A    2014?  Let's see, Raul Ramirez, Ryan Matson, Jason

3         Whitlock, Graylin Huggard, Travis DeGraffenreid.

4         That is it.

5    Q    Okay.  So that is one, two, three, four, five.  And

6         then would Mr. Donahue, Darren Donohue, be the sixth?

7    A    Yes.

8    Q    Were there seven or six, in 2014?

9    A    Not sure.

10   Q    What would you need to be sure; the reviews?

11   A    People Report.

12   Q    Okay.  What is a "People Report"?

13   A    People Report is a list of managers within each

14        region and within the division.

15   Q    Okay.  So you get -- this People Report would give

16        you a list of the managers in the region and the

17        division.

18            And is the division larger than the region?

19   A    Yes.

20   Q    And who manages the division?

21   A    When?

22   Q    What's that?

23   A    When?

24   Q    2014.

25   A    2014 would have been Roger Byers.

```
 1   Q    And what about 2015?
 2   A    Tim Mei.
 3   Q    Okay.  And so, basically, let me ask you; let's go to
 4        2014.  You identified -- you are not sure that
 5        there's six individuals, without looking at the
 6        People Report, right?
 7   A    Correct.
 8   Q    And -- with respect to 2014.
 9            And can you tell me what scores -- and you would
10        need to look at each of the individual reviews to
11        really get into any detail about the six people that
12        we have listed here, for 2014, right?
13   A    Correct.
14   Q    Without that, you would be guessing, right?
15   A    Yes.
16   Q    Now, so with respect to the individuals you listed,
17        we know that -- Darren Donahue was fired, right?
18   A    Correct.
19   Q    Okay.  Was anyone else fired from this list, that you
20        basically gave me, for 2014?
21            MS. MORISSET:  Object as to form.
22   Q    (By Mr. Blankenship) We have got Darren Donahue,
23        Raul, was it Rollins?
24   A    Ramirez.
25   Q    Ryan Matson or something?
```

WITNESS:  HAROLD HART    1/18/2018

Page 26

```
 1    A    I'm sorry.  Yes.

 2    Q    "Uh-huh" is probably just fine there, but just to be

 3         clear.

 4              All right.  So tell me what your understanding

 5         was of the health problems that Darren Donahue had

 6         when he -- when you supervised him.

 7    A    When Darren first came to me, he told me that he

 8         needed time to take care of himself, that he was very

 9         ill.

10              We have a process, which is he doesn't need to

11         explain in any detail, to me, what the issues are.

12         Matter of fact, I prefer not to know the detail.

13              For Darren, I was concerned for his health, and

14         I instructed him to contact our Leave of Absence;

15         which, they handle that process.  And at that point

16         all I was really interested in is how much time he

17         needed away from the restaurant, so that I could

18         cover the restaurant.

19    Q    Okay.  And at any point -- so you knew he had a

20         health condition that impacted his ability to work at

21         that point, right?

22    A    Yes.

23    Q    And I want to hear about when you learned about

24         Darren's health condition.  Do you remember how you

25         learned that?
```

**WITNESS:  HAROLD HART    1/18/2018**

Page 27

1                     MS. MORISSET:   Object as to form.

2    A   Directly from Darren.

3    Q   (By Mr. Blankenship) And do you remember, as you sit

4        here today, can you remember the conversation?

5    A   Not exactly.   All I can say is when Darren told me

6        that he had a health condition that needed, possibly,

7        surgery, I just talked to him about the process.   And

8        just really was sad for him, and wanted him to take

9        care of himself and get time that he needed.

10   Q   Do you remember what that health condition was?

11   A   Cancer of some kind.

12   Q   Okay.   Was it your understanding that you, as a

13       manager, had a duty to accommodate Mr. Donahue's --

14       any needs he might have, related to his cancer?

15   A   My position needed to instruct Darren to talk to our

16       Leave of Absence, and they would instruct him what to

17       do next.

18   Q   Do you remember who the Leave of Absence person was,

19       that Darren would have reached out to at that point?

20   A   No.

21   Q   Do you remember what kind of training the

22       leave-of-absence person has?

23   A   No, no idea.

24   Q   Can you identify any leave-of-absence persons that

25       you dealt with, or know of, in the last four years?

WITNESS: HAROLD HART   1/18/2018

Page 28

 1   A   No.

 2   Q   Do you know who the leave-of-absence person is now?

 3   A   No.

 4   Q   Have you ever had a health condition that required

 5       you to reach out to the leave-of-absence persons?

 6   A   No.

 7   Q   Let's go back to the list of people in 2014 that you

 8       listed.  The only person in that list that was fired

 9       has been Darren Donahue.

10           Do you know whether or not any of those

11       individuals, that you listed as general managers in

12       2014, took any medical leave for health conditions?

13   A   Not that I am aware of.

14   Q   And so let's -- I want to ask you some questions

15       about what you did to prepare for today's deposition.

16           So I'm going to ask these questions in a way

17       where -- I don't want to hear about discussions that

18       you had with your lawyer.  I just want to ask you

19       about what you did to prepare, without revealing any

20       communications that you had with your lawyer.

21           Do you understand that?

22   A   Yes.

23   Q   Okay.  So at what point did you learn that you would

24       be sitting for a deposition in this lawsuit?

25   A   A week and a half ago.

WITNESS:  HAROLD HART    1/18/2018

Page 54

1   A   That would be correct.

2   **Q   I mean, part of the reason you are sitting in this**

3       **chair as a defendant, is the defendant has identified**

4       **you as the decision maker; that you were the person**

5       **that decided to fire Darren Donahue.**

6           **Is that true:  You were the person who decided**

7       **to fire Darren Donahue?**

8   A   No.

9               MS. MORISSET:  Hold on.  Object to the

10          form.

11              MR. BLANKENSHIP:  Okay.  Let me ask it

12          this way.  I'm going to except the preface, okay?

13          Fair point, Counsel.

14              MS. MORISSET:  Yeah.  Thank you.

15  **Q   (By Mr. Blankenship) Sir, was it your decision to**

16      **fire Darren Donahue?**

17  **A   Not solely.**

18  **Q   Okay.  Was it your idea to fire Darren Donahue?**

19  **A   It was a group decision.**

20  **Q   Okay.  So let's talk about the decision to fire**

21      **Darren Donahue.**

22          **You originally said "no," when I asked you if it**

23      **was your decision to fire Darren Donahue.  We've got**

24      **that on video.**

25          **And then your counsel objected, and you, kind**

**WITNESS:  HAROLD HART    1/18/2018**

Page 55

1    of, backed off, and said, "Well."

2         Are you kind of saying, "Kind of, sort of," or

3    "It was a group decision"; is that your

4    clarification?

5              MS. MORISSET:   Object as to form.

6    Q   (By Mr. Blankenship) Let me just start over.

7    A   Okay.

8    Q   At some point when I asked you the question, "Was it

9        your decision to fire Darren Donahue," you said,

10       "No."

11            Why did you answer "no" initially when I asked

12       that question?

13   A   Because it wasn't like I -- I -- I didn't have

14       additional information and additional counsel, within

15       HR and my supervisor.

16   Q   Okay.  So, I mean, you are not an HR person, are you?

17   A   No.

18   Q   And the only two managers involved would be, you

19       know, from a store-management perspective, or

20       restaurant-management perspective, would be you and

21       Tim Mei, right?

22   A   Yes.

23   Q   And so let's talk about who the other people that

24       were -- so basically you were the

25       lower-management-level person involved in the

WITNESS:  HAROLD HART     1/18/2018

Page 56

1   decision, right?

2   A   Yes.

3   Q   And so I want to know, who else do you believe was

4       involved in the decision to terminate Darren Donahue?

5   A   We had a recommendation from HR, Claire Simpson, that

6       termination, because it's a black-and-white offense;

7       and Tim Mei was in agreement; and then I was in

8       agreement.

9   Q   And so just to get the list, you have got -- okay.

10      So you believe that the decision was originally

11      suggested by HR, Claire Simpson; and that basically

12      you and Tim Mei agreed with the conclusion.  And the

13      conclusion, she said, "This is just a black-and-white

14      situation," right?

15               MS. MORISSET:  Object as to form.

16  A   That was my statement.

17  Q   (By Mr. Blankenship) Okay.  You said it was a

18      "black-and-white situation," or Claire Simpson said

19      it was "black and white"?

20  A   I did.

21  Q   And have you told me all the reasons that you

22      believed at the time that it was black and white?

23  A   Yes.

24  Q   Okay.  And we just went over that, right?

25  A   Yes.

**WITNESS:  HAROLD HART     1/18/2018**

Page 57

1   Q   But am I correct to assume that HR -- that HR, Claire

2       Simpson, made the recommendation for termination?

3   A   Yes.

4   Q   And do you remember what reasons, if any, she gave

5       for basically thinking that what Darren Donahue did

6       basically warranted a termination?

7   A   A failing to pay a team member hours worked.

8   Q   Anything else?

9   A   Nope.

10  Q   Okay.  And was there, like, a meeting or a phone

11      conference where this recommendation was made and you

12      all discussed this?

13  A   It was a phone conference.

14  Q   Okay.  Do you remember when that phone conference

15      occurred?

16  A   No, sir.

17  Q   Was that before or after you met with Darren Donahue?

18  A   It was after.

19  Q   Okay.  All right.  And so can you tell me everything

20      you recall being said in this phone conference, that

21      -- let me ask it this way, just to see if I can

22      isolate the time.

23          Within the time frame for -- we know that this

24      happened sometime after you basically met with Darren

25      Donahue and read the questions that someone else

WITNESS:  HAROLD HART    1/18/2018

Page 58

1      wrote for you to ask him, right?

2   A  Correct.

3   Q  And between that time and the date of his

4      termination, right?

5   A  Yes.

6   Q  Do you remember how long this phone conference took

7      between -- that involved Claire Simpson, Tim Mei, and

8      you?

9   A  Maybe five minutes.

10  Q  And do you remember anything that you said in that

11     five-minute phone conference, where the

12     recommendation was made by HR to fire Darren Donahue,

13     and you and Tim Mei agreed?

14             MS. MORISSET:  Object as to form.

15  A  I just agreed.  I was -- at the very end, I just

16     agreed with the termination.

17  Q  (By Mr. Blankenship) So were you the last person that

18     basically -- were you the last person to agree?

19         I mean, was -- that's the impression; where you

20     got HR saying, "Hey, I think he should be

21     terminated"; can you tell me what exactly Clair

22     Simpson said, or the rest of the --

23             MS. MORISSET:  Object as to form.

24             MR. BLANKENSHIP:  Yeah, let me start

25     over.  That's a mixed -- a bobble; not a great

```
 1   A   Again, I would have to look at a People Report.
 2   Q   Okay.  A People Report would reflect if you had
 3       oversight over Auburn; am I right?
 4   A   Correct.
 5   Q   Okay.  And there is data and graphs and stuff that
 6       would basically tell us how a store did, whether it
 7       was yellow, green, red, based on a store-wide basis,
 8       right; is that the Scorecard?
 9   A   We do have a Scorecard that measures that way.
10   Q   All right.  Do you remember why you ended up getting
11       the Auburn restaurant in 2014?
12   A   I was told there was conflict between Darren and
13       Eric.  And to relieve the conflict, that I would be
14       getting the restaurant.
15   Q   Who told you that?
16   A   Roger buyers.
17   Q   Do you remember how that was communicated to you; was
18       that by e-mail, did you speak with him in person?
19   A   It was on the phone.
20   Q   Okay.  Do you remember what he told you?
21   A   Just pretty much what I've told you.
22   Q   So that is basically the extent of the detail?
23   A   Didn't go into a lot of detail, no.
24   Q   Do you remember ever sitting down with Darren at the
25       end of 2013, or beginning of 2014, somewhere around
```

Page 142

```
1    A    Yes.

2    Q    Yeah.  And ultimately, you ended up with it through

3         the -- 2014, when you began, and you took over that

4         restaurant from Eric Yates, right?

5    A    Yes.

6    Q    And is Eric Yates still employed by Red Robin?

7    A    No.

8    Q    Do you know why he is no longer employed?

9    A    No.

10   Q    Were you involved in any decisions relating to his

11        separation?

12   A    No.

13   Q    Okay.  So are you still basically the ROD over the

14        Auburn store?

15   A    Yes.

16   Q    How do you recall the Auburn store performing as to,

17        you know, scores, on the Scorecard, under Darren

18        Donahue's leadership?

19             MS. MORISSET:  Object as to form.

20   A    Yeah.  If you give me a Scorecard I can tell you

21        exactly how he performed.

22   Q    (By Mr. Blankenship) Okay.  When Darren was the

23        general manager of Auburn, I believe you testified he

24        would be responsible for, basically, the four walls,

25        and, you know, what happened within that store; is
```

WITNESS: HAROLD HART    1/18/2018

Page 143

1       that right?

2   A   Correct.

3   Q   And to the extent that restaurant was successful,

4       that would be under his leadership, wouldn't it?

5   A   Successful at what?

6   Q   Successful in generating -- successful on the

7       Scorecard, and generating profits, and those criteria

8       that we discussed earlier about the Scorecard?

9   A   Yeah, we would have been rated successful in those

10      areas.

11  Q   Okay.  Do you recall overall how successful he was in

12      those areas, on these Score Cards, versus other

13      managers in your region during that time frame, 2014

14      through June of 2015?

15  A   Again, I don't have exact numbers, but he was a top

16      performer on the Scorecard.

17  Q   He was the top, right?

18  A   I don't know about "the top" but he was a top

19      performer.

20  Q   You don't recall him being the top performer in your

21      region?

22          MS. MORISSET:  Object as to form.

23  Q   (By Mr. Blankenship) With respect to the Scorecard,

24      do you recall him being the top performer in your

25      region?

WITNESS:  HAROLD HART   1/18/2018

Page 194

1                    MS. MORISSET:  Got it.

2                    MR. BLANKENSHIP:  -- four pages.

3                    MS. MORISSET:  Thank you.

4    Q   (By Mr. Blankenship) Okay.  So let's go back to this

5        meeting.  Did you have a copy of the review in front

6        of you when Eric Yates was going over it with Darren?

7    A   I did not.

8    Q   Okay.  So where were you -- was this at a table in

9        the restaurant?

10   A   I believe so.

11   Q   And were there customers in the restaurant then?

12   A   I don't recall what time of the day it was.

13   Q   And you said the reason that Eric Yates wanted you

14       there is because he didn't think Darren would take it

15       well, right?

16   A   Correct.

17   Q   And this review, basically, overall, says, "does not

18       meet expectations," right?

19   A   Yes.

20   Q   And so did you, you know -- if I understand your

21       testimony, did you not weigh in on -- is it true that

22       you did not weigh in on the scoring that occurred

23       here?

24   A   True.

25   Q   And do you remember anything that Mr. Yates said

WITNESS: HAROLD HART    1/18/2018

Page 195

1      about this to Darren Donahue?

2   A  All I can recall is that he had the paper in front of

3      him, and it looked like he was reading off the paper.

4   Q  Okay.  And do you recall anything that Darren Donahue

5      said in response?

6   A  I don't recall.

7   Q  Do you recall Darren Donahue saying that he thought

8      this was retaliation?

9   A  At that meeting?

10  Q  At that meeting.

11  A  I don't recall that.

12  Q  Do you recall Darren Donahue asking why he was being

13     targeted at that meeting?

14  A  I don't recall that.

15  Q  Do you remember what -- did Darren Donahue take this

16     "doesn't exceed expectations" -- what is it; "does

17     not meet expectations" review well?

18  A  Darren was very quiet during the review.

19  Q  Okay.  So he remained professional, correct?

20  A  To my knowledge, and to my recollection.

21  Q  Okay.  And do you recall any questions that Darren

22     Donahue may have asked Eric Yates at this meeting?

23  A  No, I don't recall.

24  Q  All right.  So did you review -- did you review this

25     review, in preparation for the deposition?

WITNESS:  HAROLD HART    1/18/2018

Page 296

1                    C E R T I F I C A T E

2

   STATE OF WASHINGTON )
3                      ) ss.
   COUNTY OF MASON     )

4
        I, the undersigned Washington Certified Court Reporter,
5   pursuant to RCW 5.28.010 authorized to administer oaths and
    affirmations in and for the State of Washington, do hereby
6   certify:

7        That the annexed and foregoing deposition transcript of
    the witness named herein was taken Stenographically before me
8   and reduced to a typed format under my direction; that the
    transcript is a full, true and complete transcript of the
9   proceedings, including all questions, objections, motions and
    exceptions of counsel, made and taken at the time of the
10  foregoing proceedings, to the best of my abilities;

11       That I am not a relative, employee, attorney or counsel
    of any party to this action or relative or employee of any
12  such attorney or counsel, and that I am not financially
    interested in the said action or the outcome thereof;
13
        That the witness, before examination, was by me duly
14  sworn, and the transcript was made available to the witness
    for reading and signing upon completion of transcription,
15  unless indicated herein the waiving of signature;

16       I further certify that I am sealing the deposition in an
    envelope with the title of the above cause and the name of
17  the witness visible, and I am delivering the same to the
    appropriate authority;
18
        I further advise you that as a matter of firm policy,
19  the Stenographic notes of this transcript will be destroyed
    three years from the date appearing on this Certificate
20  unless notice is received otherwise from any party or counsel
    hereto on or before said date;
21
        IN WITNESS WHEREOF, I have hereunto set my hand on this
22  1st day of February 2018 at Shelton, Washington.

23

24
                        _____
25                      Michelle L. Patton, CCR # 2500

# Exhibit D

Page 1

```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
 2                      AT SEATTLE

 3    Case No. 2:17-cv-00023-JLR

 4    _____

      VIDEOTAPE DEPOSITION OF:   CLAIRE SIMPSON
 5                               February 7, 2018

 6    _____

      DARREN DONAHUE,
 7
      Plaintiff,
 8
      v.
 9
      RED ROBIN INTERNATIONAL, INC., a Nevada Corporation;
10    RED ROBIN GOURMET BURGERS, INC., a Delaware
      Corporation; and HAROLD HART and his marital
11    community,

12    Defendants.

13    _____

               PURSUANT TO NOTICE, the videotape
14    deposition of CLAIRE SIIMPSON was taken on behalf of
      the Plaintiff at 1900 Grant Street, Suite 1025,
15    Denver, Colorado 80203, on February 7, 2018, at
      9:05 a.m., before Marchelle Hartwig, Certified
16    Shorthand Reporter and Notary Public within Colorado.

17

18

19

20

21

22

23

24

25
```

CLAIRE SIMPSON - 2/7/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 147

1  Basically -- so this is an investigation that looks

2  like -- this is a true and correct copy of the

3  EthicsPoint that --

4                MR. BLANKENSHIP:  Counsel, you can assure

5  me that that was -- is this a true and correct copy of

6  the EthicsPoint, the attachments, assuming that we

7  have produced everything?

8                MS. MORISSET:  I'm not going to testify,

9  but this -- you asked for a copy of the EthicsPoint

10  documents and we did our best to produce it.

11                Q.  (BY MR. BLANKENSHIP)  And so you said --

12  is this an investigation of Darren Donahue?

13                A.  Yes.  This is, yes.  Uh-huh.

14                Q.  And so -- and it appears that this

15  investigation was opened -- if we look at the first

16  page of your case snapshot -- on -- is that June 4,

17  2015?

18                A.  What I'll say is that's the date that

19  this is originally entered into the system.  If we go

20  through the documentation and we look at when things

21  occurred -- it doesn't mean that the investigation was

22  opened on that date.  What it means is that the

23  investigation was entered into the system on that

24  date.

25                Q.  So what date did the investigation start

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 227

1            This was -- this is about a year after my

2    mother had cancer, and I was very empathetic to the

3    situation.

4            Q.   Okay.  So do you know if any documents

5    went out basically reflecting that there was some

6    accommodation process around the time that Darren was

7    returning to work in January 2012?

8            A.   So what I'm reading here when I look at

9    the e-mail from Tara is she said she tried to reach

10   out by phone and mail, both e-mail and hard copy.  So

11   when you're asking if documents went out, I would

12   presume that those would be those documents that went

13   out in both e-mail and hard copy.

14           Q.   Do you know -- have you seen any evidence

15   that they did, in fact, other than the reference to it

16   here in this e-mail to Darren from Tara?

17           A.   I don't recall.

18           Q.   Did you ever engage in any type of

19   interactive process with Darren Donahue regarding

20   accommodations?

21           A.   I personally did not.  That was not my

22   role.

23           Q.   Okay.  Did you play any role in creating

24   the job description for Darren Donahue or for the GM

25   position?

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 384

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           ) ss.
CITY AND COUNTY OF DENVER  )

   I, MARCHELLE HARTWIG, Certified Shorthand
Reporter and Notary Public, ID 20014012312, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said
CLAIRE SIMPSON was duly sworn by me to testify to the
truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

   I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

   IN WITNESS WHEREOF, I have affixed my
signature this 13th day of February, 2018.

   My commission expires April 19, 2021.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

# Exhibit E

1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
2                            AT SEATTLE

3     Case No. 2:17-cv-00023-JLR

4     _____

      VIDEOTAPED DEPOSITION OF:   JULIA RIVERA
5                                 February 8, 2018

6     _____

      DARREN DONAHUE,
7
      Plaintiff,
8
      v.
9
      RED ROBIN INTERNATIONAL, INC., a Nevada Corporation;
10    RED ROBIN GOURMET BURGERS, INC., a Delaware
      Corporation; and HAROLD HART and his marital
11    community,

12    Defendants.

13    _____

                       PURSUANT TO NOTICE, the videotaped
14    deposition of JULIA RIVERA was taken on behalf of the
      Plaintiff at 1900 Grant Street, Suite 1025, Denver,
15    Colorado 80203, on February 8, 2018, at 9:14 a.m.,
      before Marchelle Hartwig, Certified Shorthand Reporter
16    and Notary Public within Colorado.

17

18

19

20

21

22

23

24

25

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 24

1         A.   I briefly recall Claire telling me more

2    of like in an informative way that there was an

3    investigation being done in regards to Darren Donahue.

4         **Q.   What do you recall her telling you about**

5    **the investigation?**

6         A.   Nothing.  We didn't speak any details of

7    the investigation.

8         **Q.   At the time that Darren Donahue was**

9    **terminated by Red Robin, you were the vice president**

10   **of human resources.  Am I correct?**

11        **A.   What date was he terminated?**

12        **Q.   It was June of 2015.**

13        **A.   Correct.**

14        **Q.   Okay.  And who did you report to at that**

15   **time?**

16        **A.   Cathy Cooney, the chief people officer.**

17        **Q.   Okay.  And chief people officer is Red**

18   **Robin-speak for basically the head of all of human**

19   **resources?**

20        **A.   Correct.**

21        **Q.   With respect to -- did Claire Simpson**

22   **report directly to you at that time?**

23        **A.   Yes.**

24        **Q.   2015?**

25        **A.   Yes.**

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 29

1    forward.

2          Q.    What about when Red Robin received a

3    charge from the EEOC December 2015, did you take any

4    efforts to preserve any documents at that time?

5          A.    Once the legal hold from our in-house

6    legal team came out, yes.

7          Q.    And when did that come out?

8          A.    I don't recall.

9          Q.    Did you text any -- let me see.

10         Have you at any point searched for

11   documents related to Darren Donahue with respect to

12   any of his claims in this case or any of the defenses?

13         A.    Yes.

14         Q.    Okay.  Did you provide them to your

15   attorneys?

16         A.    Yes.

17         MR. BLANKENSHIP:  Is the pace okay?

18         (Deposition Exhibit 76 was marked.)

19         Q.    (BY MR. BLANKENSHIP)  Let me hand you

20   what is marked as Exhibit 76.  I'll represent to you

21   that this was something we printed off of LinkedIn for

22   you.  I wanted to ask you a few questions about it.

23   Did you prepare your LinkedIn profile?

24         A.    Yes.

25         Q.    Okay.  And it has some experience here

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 30

1    and I wanted to just ask you if the overview of your

2    experience and your education is true and accurate.

3            A.    Yes.

4            Q.    And according to this LinkedIn, you began

5    as the director of human resources in February 2008;

6    is that right?

7            A.    I was an employee relations -- I think my

8    title was actually HR manager.  It might have been

9    employee relations manager for my first eight months

10   at Red Robin.

11           Q.    And then from there it went to HR

12   manager?

13           A.    Director of HR.

14           Q.    Director of HR?

15           A.    Yeah.

16           Q.    And that was in February 2008 when you

17   became the director of HR?

18           A.    No, no, no.  February 2008 is my hire

19   date with Red Robin.

20           Q.    Oh, I'm sorry.  It's interesting here.

21   We have got 2005 at Boston Market, and then you -- you

22   basically started as the manager but became the

23   director, you think, relatively soon afterwards?

24           A.    Oh, yeah, very soon.  Yeah.

25           Q.    Okay.  And then according to this -- what

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 31

1    you wrote here, in basically January 2015 to the

2    present, you became the vice president of human

3    resources, right?

4          A.    Correct.

5          Q.    At any point did you leave your

6    employment at Red Robin?

7          A.    Yes.

8          Q.    When did you leave your employment at Red

9    Robin?

10          A.    I don't recall the dates.

11          Q.    How long were you --

12          A.    32 days.

13          Q.    You've got to let me finish, because

14    we're going to try that again just so you let me

15    answer.  You totally got the question, but . . .

16                MS. MORISSET:  It's hard when you

17    anticipate questions.  It's not like a conversation.

18          Q.    (BY MR. BLANKENSHIP)  All right.  So

19    there was a point that you said that you were not

20    employed with Red Robin.  And how long was that time?

21          A.    32 days.

22          Q.    And why did you leave Red Robin?

23          A.    I was going to pursue a different career

24    with another company.

25          Q.    And what was that career you were going

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 79

1    e-mails that you're copied on.  Did you see this in

2    preparation for your deposition?

3         A.   I did.

4         Q.   Okay.  And really the questions that I

5    have about it is just generally.  According to this,

6    it appears that at some point Darren Donahue was sent

7    an auto termination letter when he was out with

8    cancer, right?

9         A.   Uh-huh.

10        Q.   Is that a yes?

11        A.   Yes.

12        Q.   And is that basically -- is that what Red

13   Robin typically does, automatically terminates

14   employees when they run out of FMLA leave?

15        A.   It's an automatic process for a letter,

16   correct.

17        Q.   There is a reference in this to -- let's

18   move on.

19             You knew, though, at some point that

20   Darren Donahue needed accommodations for a disability,

21   right?

22        A.   Yes.

23        Q.   And can you explain to us what the -- if

24   an employee needs an accommodation, is there something

25   that is called the "interactive process" that needs to

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 85

1   able to provide that for him so he could basically do

2   his job, right?

3           A.    I believe so.

4                 (Deposition Exhibit 84 was marked.)

5           Q.    Let me hand you Exhibit 84.  Why don't

6   you take a look at that.  Are you ready to -- have you

7   had an opportunity to review this document?

8           A.    I have.

9           Q.    Okay.  So it appears that you were copied

10  on this e-mail string, right?

11          A.    Yes.

12          Q.    And there are a couple of attachments

13  that were attached to this e-mail.  One is a Temporary

14  Work Restriction Assignment Agreement and that is

15  stamped Donahue 002613, and the second document is

16  basically a February 13, 2013, doctor note from

17  Dr. Gensheimer, resident physician in radiation

18  oncology from the University of Washington Medicine --

19  School of Medicine, right?

20          A.    Correct.

21          Q.    And so -- and are you disputing that you

22  received this?

23          A.    No.

24          Q.    Okay.  And basically from reading this

25  note from the doctor, you knew at the time that Darren

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 86

1    Donahue basically was treated with radiation therapy

2    for cancer of the bladder, right?  If you turn to the

3    last page of the exhibit, you can see that from the

4    doctor, right?

5             A.    Correct.

6             Q.    And you also see that the doctor had put

7    a lifting restriction to 20 pounds or less, according

8    to this, until March 15, 2012, right?

9             A.    Yes.

10            Q.    And he needed to stand no longer than

11   four hours and could -- unless he has a 15-minute

12   break, right?

13            A.    Correct.

14            Q.    Okay.  And I want to know from you

15   what -- do you know what accommodations, if any, that

16   Red Robin did to make sure that Darren Donahue had

17   these accommodations?

18            A.    I don't understand the question.

19            Q.    Well, do you know what actions Red Robin

20   took, if any, to make sure that Darren Donahue got

21   these accommodations, the lifting -- for the 20 pounds

22   lifting and the breaks?

23            A.    Darren Donahue was the general manager of

24   his location.  He controlled his own schedule.  He

25   controlled his entire day.

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 87

1          Q.    Okay.  So you expected him to -- because

2    he can control his day, that he would have had the

3    opportunity to limit his lifting and limit his breaks,

4    right?

5          A.    He had to.

6          Q.    Okay.  And he had to because why?

7          A.    Because there is nobody there over -- as

8    oversight of Darren.

9          Q.    So basically it's your testimony that

10   Darren had control of his environment because he was a

11   general manager, right?

12         A.    Correct.

13         Q.    Do you know if Red Robin did anything to

14   assist him with any of the lifting duties?

15         A.    He's not the only person in the building.

16         Q.    Okay.  Do you know if anyone sat down

17   with him and asked him if there were situations where

18   he basically needed assistance or staffing to help him

19   with lifting?

20         A.    I do not.

21         Q.    You would expect, though, that to the

22   extent that someone knew that he had to lift and

23   didn't have the support, that someone would have

24   reached out to him and let him know that Red Robin

25   would have made an accommodation like that?

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 88

1          Or let me ask it this way:  If Darren
2   Donahue had needed someone to help with lifting, let's
3   say when deliveries came in in the morning, is that
4   something that Red Robin would have provided for him?
5               MS. MORISSET:  Object as to form.
6          Q.   (BY MR. BLANKENSHIP)  Hired an additional
7   person to help him or have an additional person come
8   in to basically assist him with lifting when
9   deliveries came in?
10              MS. MORISSET:  Object as to form.
11         A.   There is already an additional person in
12  the building.
13         Q.   (BY MR. BLANKENSHIP)  How many people
14  would be in the building when deliveries come in the
15  morning when -- well, there is one other person,
16  right, typically than the manager?
17         A.   It depends on what the general manager
18  schedules.
19         Q.   Okay.  So did Darren Donahue have the
20  power to basically schedule another person to work on
21  the day that it was just him and another employee and
22  deliveries came in?
23         A.   Yes, he did.
24         Q.   And how was he supposed to do that?
25         A.   Put it on the schedule.

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 89

1          Q.   So he could schedule whoever he wants
2     that morning?
3          A.   He could.
4          Q.   Okay.  So given that it was that simple,
5     you wouldn't think that basically accommodating Darren
6     Donahue was any type of undue hardship to Red Robin,
7     would you?
8          A.   No.
9               (Deposition Exhibit 85 was marked.)
10         Q.   Let me hand you what has been marked as
11    Exhibit 85.  Do you recognize this document?
12         A.   It looks like the GM job description.
13         Q.   And I'm not seeing a date on it, but it
14    does appear that it was faxed somewhere around
15    March 15, 2015, right?
16         A.   Well, it looks like it was signed in
17    2013.
18         Q.   Okay.  I don't know what the fax -- do
19    you know why it was faxed on March 15, 2013?  Do you
20    see the top of the first page in the left-hand corner?
21         A.   Do I know?
22         Q.   Yeah.
23         A.   No.
24         Q.   I'm just asking.  I didn't necessarily
25    expect you to know.  But it does appear from the

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 118

1    absence on or around the late fall of 2013?

2           A.    Again, I wasn't involved in these

3    e-mails.  I sent an e-mail talking about the process.

4           Q.    Okay.  So did you know that Darren

5    Donahue -- would you have known if Darren Donahue went

6    on a leave of absence during that time frame at the

7    time?

8           A.    I would assume so.

9           Q.    Okay.  Do you know what the process would

10   be when a general manager was out on a leave of

11   absence, how that position would be filled in the

12   meantime?

13          A.    It depends.

14          Q.    Okay.  Do you -- what does it depend on?

15   Like if it's six weeks or something, let's just pick

16   that hypothetically, how does a restaurant typically

17   handle filling in for a general manager when a general

18   manager leaves?

19          A.    It depends on the talent and the

20   restaurant.

21          Q.    Okay.  Do you remember what happened with

22   respect to any of Darren Donahue's basic medical

23   leaves?

24          A.    I do not.

25          Q.    And did it create a hardship on Red Robin

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 119

1    to have Darren Donahue take several medical leaves?

2          A.    No.

3          Q.    Okay.   So you didn't think that was a

4    problem?

5          A.    No.

6          Q.    And as the director of HR, you would know

7    if it were a problem, right?

8                MS. MORISSET:   Object as to form.

9          Q.    (BY MR. BLANKENSHIP)   Do you think?

10         A.    It's a not a problem for our team members

11   to get well and return to their jobs.

12         Q.    Okay.   So you believe that you're in a

13   position to say that on behalf of Darren Donahue here

14   in this case that it wasn't a problem?

15         A.    I'm sorry.   What's the question?

16         Q.    I just want to -- I want to make sure.

17   You've never perceived that Darren Donahue taking a

18   medical leave of absence was a problem for Red Robin.

19   Is that your --

20         A.    No.   Correct.

21         Q.    Thank you.

22               (Deposition Exhibit 92 was marked.)

23         Q.    Let me hand you Exhibit 92.

24               MR. DONAHUE:   Exhibit 94.

25               MS. MORISSET:   92.

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 150

```
 1          A.   Correct.

 2          Q.   And at this point, was that where your

 3  office was?

 4          A.   Correct.

 5          Q.   And so as of January 28, 2015, when this

 6  was sent out, were you aware that this program was

 7  being eliminated?

 8          A.   I would assume so.

 9          Q.   Okay.  And Rochelle Means would have been

10  someone that ultimately reported to you, right?

11          A.   No.

12          Q.   Well, she would be under -- wouldn't she

13  be within the chain of command of you?

14          A.   So there was director level in between.

15  I just -- I don't think that we had a director of the

16  West Coast at that time.

17          Q.   Okay.  So who would she -- if there was

18  not a director of the West Coast, she reported

19  directly to you.  Am I right?

20          A.   Correct.

21          Q.   Okay.  And this e-mail actually does say

22  that the position is going to be eliminated, right?

23          A.   It does.

24          Q.   It tells people how to meet with these

25  special needs TMs and how to -- what to say to them
```

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 151

1  and to separate them and, you know, et cetera, right?

2  　　　A.　That's what it says.

3  　　　Q.　I want to direct your attention to the

4  second page of the e-mail where it starts with the

5  word "Now." Are you with me?

6  　　　A.　Yes.

7  　　　Q.　It reads, quote, Now, if you have a TM

8  that can perform the functionalities detailed in our

9  job description and your restaurant is in need of

10  hiring, we can consider keeping the TM, however we

11  will need to update their job code in the system.  If

12  this is your situation, please reach out to me to

13  discuss next steps prior to making any decisions or

14  changes with the TM.

15  　　　　　Did I read that correctly?

16  　　　A.　You did.

17  　　　Q.　So basically at this point, if a general

18  manager could take one of these special needs team

19  members and they can perform the functionalities

20  detailed in the job descriptions, then they could be

21  hired, right?

22  　　　A.　Correct.

23  　　　Q.　But in order to do that, they first had

24  to get -- double-check with Rochelle Means first,

25  right?

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 152

1          MS. MORISSET:   Object as to form.

2          A.   It says reach out to discuss next steps.

3          Q.   (BY MR. BLANKENSHIP)   Okay.   So is that

4   typically what happens?   For example, if a general

5   manager wants to hire a team member who's qualified

6   for the position, do they have to run it by basically

7   the -- you know, the west division human resource

8   manager first?

9          A.   No.

10          Q.   Okay.   And let's take a look at what they

11   are saying here.   Is there any reference here to

12   making any accommodations for this disabled team

13   member -- these special needs team members in that

14   paragraph?

15          A.   I don't see her saying it.

16          Q.   Okay.   And isn't it true that under the

17   law that someone with a limitation -- there could be

18   reasonable accommodations that are made to allow them

19   to perform the essential functions of the job, right?

20          A.   Absolutely.

21          Q.   And are you aware of any team members

22   that received accommodations so they could remain

23   employed for any of the jobs that they were hired for?

24          MS. MORISSET:   Object as to form.

25          Q.   (BY MR. BLANKENSHIP)   I'm talking about

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 153

1   disabled team members referenced here.

2        A.   I know that we moved team members in the

3   special need category into busser and host positions.

4        Q.   Do you think it would be important in a

5   message like this to inform the general managers that

6   basically a special needs team member could be hired

7   not just if they can perform the functionalities

8   detailed in their job description, but they could be

9   done so with reasonable accommodations?

10       A.   Sure.

11       Q.   Okay.  Do you know why that wasn't in

12   here?

13       A.   I have no idea.

14       Q.   You would agree that that is an important

15   omission here, isn't it?

16            MS. MORISSET:  Object as to form.

17       A.   I don't doubt that we -- that we looked

18   at that they could accommodate the job with or without

19   accommodation.

20       Q.   (BY MR. BLANKENSHIP)  But it doesn't say

21   that, does it?

22       A.   It does not say it in the e-mail.

23       Q.   And then let's take a look at Darren

24   Donahue's reaction at the top of the page of

25   Exhibit 6.  Do you see that?

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 186

1    to promote within the company?

2          A.    To promote within?

3          Q.    Yeah.

4          A.    It's not Alex's decision.

5          Q.    Okay.  But --

6          A.    She's a recruiter.

7          Q.    So what does a recruiter do?

8          A.    They hire.  They recruit, select, hire.

9    The operations team hires.

10          Q.    And that would be for succession planning

11   that they would be recruiting?

12          A.    If there is an opening, if there's a

13   need.

14          Q.    What is attached here is a spreadsheet

15   that, I guess -- we looked at one earlier.  It's

16   called a "People Report," right?

17          A.    Correct.

18          Q.    And the people listed in the People

19   Report appear to be current employees, right?

20          A.    Correct.

21          Q.    So I guess maybe I'm wrong, but I assume

22   that if the director of acquisition was sending this

23   to -- like to Roger Byers, that would be looking at

24   who might be eligible for a promotion?

25          A.    It's regarding staffing needs.  This is

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 187

1   an internal staffing document regarding staffing

2   needs, where we need to recruit positions for.

3          Q.   Okay.   And that has the same readiness

4   code we went over earlier where you've got R, ready

5   for promotion within one month; R6, ready for

6   promotion within six months; R12, ready for promotion

7   within 12 months and it goes down to an X, which is at

8   risk/performance issues and then an M, which is

9   maintain in position.   Do you see that?

10         A.   Yes.

11         Q.   Okay.   And it appears here that Darren

12  Donahue was at an M.   Do you see that?

13         A.   Yes.

14         Q.   And that's different than the other

15  spreadsheet I showed you where he was an R6, correct?

16         A.   Correct.

17         Q.   And instead of him being a green, low

18  risk, at this point it appears that his status code is

19  designated red, real risk.   Am I right?

20         A.   Correct.

21         Q.   Do you know why he was coded a real risk

22  as of this date?

23         A.   My guess would be that if we weren't sure

24  that he was going to be able to return from leave or

25  have permanent -- if there was anything permanent

JULIA RIVERA - 2/8/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 188

1  going on, that that's why they had it as a red in case
2  they needed to ever backfill.
3          Q.  Okay.
4          A.  We had an open position.  I don't know --
5  I don't know what Darren's status was when this was
6  written.  But, again, if there was concern about him
7  not being able to return from leave, that could
8  definitely put somebody marked red at risk.
9          Q.  Okay.  So if somebody basically had
10  some -- like Darren did, some health issues that might
11  prevent them from returning to their position, that
12  could be a real risk under this status code and would
13  be red, right?
14          MS. MORISSET:  Object as to form.
15          Q.  (BY MR. BLANKENSHIP)  Is that what you
16  meant?
17          A.  It could be.
18          Q.  Do you recall at the same time that right
19  around this was -- I believe this People Report,
20  according to this e-mail, was sent on March 3, 2014.
21  Are you aware that Darren's scorecard was pretty high
22  during that time frame?
23          A.  I'm not aware.
24          (Deposition Exhibit 104 was marked.)
25          Q.  Let me hand you Exhibit 104.  Take a

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 276

### REPORTER'S CERTIFICATE

STATE OF COLORADO           )
                            ) ss.
CITY AND COUNTY OF DENVER   )

       I, MARCHELLE HARTWIG, Certified Shorthand
Reporter and Notary Public, ID 20014012312, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said JULIA RIVERA
was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

       I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

       IN WITNESS WHEREOF, I have affixed my
signature this 13th day of February, 2018.

       My commission expires April 19, 2021.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

# Exhibit F

```
 1                  UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF WASHINGTON

 3                         AT SEATTLE

 4  _____

 5  DARREN DONAHUE                    )
                                      )
 6             Plaintiff,             )
                                      )
 7             vs.                    ) No. 2:17-cv-00023-JLR
                                      )
 8                                    )
    RED ROBIN INTERNATIONAL, INC.,    )
 9  a Nevada Corporation; RED ROBIN   )
    GOURMET BURGERS, INC., a Delaware )
10  Corporation; and HAROLD HART      )
    and his martial community,        )
11             Defendants.            )
    _____
12
                  DEPOSITION UPON ORAL EXAMINATION OF
13                             TIM MEI
                          February 13, 2018
14                        Seattle, Washington
    _____
15

16

17

18

19

20

21

22

23       REPORTED BY:  Michelle L. Patton, CCR
                       Washington License No. 2500
24

25
```

WITNESS: TIM MEI   2/13/2018

Page 78

1   submitted.

2   Q   **And that ticket got punched right, he got fired?**

3       MS. MORISSET:  Object as to form.

4   A   The IT ticket supported our decision and gave us some

5       confidence in the decision that we made to terminate

6       him, yes.

7   Q   **And so you had known at the time, though, that Darren**

8       **Donahue had been out on -- that he had a disability**

9       **from cancer; did you know that?**

10  A   I knew that he had cancer, yes.

11  Q   **And that basically he had had several surgeries that**

12      **caused him to miss time, right?**

13  A   Yes, I do.

14  Q   **Was that -- and how did Red Robin basically deal with**

15      **Darren Donahue being gone for those surgeries; what**

16      **in particular -- do you know what efforts Red Robin**

17      **had to make when Darren Donahue had a surgery?**

18      MS. MORISSET:  Object as to form,

19      foundation.  I don't know what timeline you are

20      talking about.

21  Q   **(By Mr. Blankenship) Well, you know, how many times**

22      **do you recall Darren Donahue having to have a surgery**

23      **when you were in charge of Harold Hart, in that**

24      **region?**

25  A   I don't know if I recall any surgeries during the

Page 96

1   A   No, I do not.

2   Q   You are no longer regional vice president?

3   A   No.

4   Q   What is your position?

5   A   Director of operations.

6   Q   Okay.  And is that -- is that basically similar to

7       Harold Hart's position?

8   A   No.  No, it's above.

9   Q   What does director of operations do; what is the

10      duties of that position, versus the regional vice

11      president?

12  A   It's pretty similar to regional-vice-president

13      position, during that time.  What we did, is we added

14      another layer in there just recently, so.

15  Q   Was it a demotion?

16  A   From a technical standpoint, yes, but the offer was

17      for me to be the VP if I wanted to move, so I chose

18      not to move my family.

19  Q   So you would have had to move where?

20  A   Out East.

21  Q   Okay.  So you decided to take a demotion rather than

22      move your family; is that right?

23  A   Yes.

24  Q   Did your pay change?

25  A   From a salary basis, yeah.  But pay structure and

1   bonus structure changed also.

2  Q   What is the area that your -- as the, you said,

3      regional -- what is it called?

4  A   Director of operations.

5  Q   Director of operations.

6  A   Yeah.

7  Q   Are there other directors of operations?

8  A   Yep.

9  Q   Okay.

10 A   Six of them, total.

11 Q   And what is your area that you are overseeing as the

12     director of operations?

13 A   Right now I have all of Washington, I have all of

14     I've got Coeur d'Alene, Idaho, I have all of Oregon,

15     and I have all of Canada.

16 Q   Are there Red Robins in Canada?  Apparently there

17     are, right?

18 A   Yeah.

19 Q   Yeah.  Okay.  So you have got, sort of, the

20     Northwest, basically, right, not all of it, but a

21     large portion of it?

22 A   A good chunk of it, right.

23 Q   Okay.  So your part of your oversight would include,

24     like, for example, as we discussed earlier,

25     Northgate, right?

WITNESS: TIM MEI    2/13/2018

Page 343

1                      C E R T I F I C A T E

2    STATE OF WASHINGTON )
                          ) ss.
3    COUNTY OF MASON     )

4        I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
5    oaths and affirmations in and for the State of Washington,
     do hereby certify:
6
         That the annexed and foregoing deposition transcript
7    of the witness named herein was taken Stenographically
     before me and reduced to a typed format under my direction;
8    that the transcript is a full, true and complete transcript
     of the proceedings, including all questions, objections,
9    motions and exceptions of counsel, made and taken at the
     time of the foregoing proceedings, to the best of my
10   abilities;

11       That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
12   of any such attorney or counsel, and that I am not
     financially interested in the said action or the outcome
13   thereof;

14       That the witness, before examination, was by me duly
     sworn, and the transcript was made available to the witness
15   for reading and signing upon completion of transcription,
     unless indicated herein the waiving of signature;
16
         I further certify that I am sealing the deposition in
17   an envelope with the title of the above cause and the name
     of the witness visible, and I am delivering the same to the
18   appropriate authority;

19       I further advise you that as a matter of firm policy,
     the Stenographic notes of this transcript will be destroyed
20   three years from the date appearing on this Certificate
     unless notice is received otherwise from any party or
21   counsel hereto on or before said date;

22       IN WITNESS WHEREOF, I have hereunto set my hand on
     this 27th day of February 2018 at Shelton, Washington.
23

24
                      _____
25                    Michelle L. Patton, CCR # 2500

# Exhibit G

```
 1                 UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF WASHINGTON

 3                        AT SEATTLE

 4   _____

 5   DARREN DONAHUE                    )
                                       )
 6             Plaintiff,              )
                                       )
 7             vs.                     ) No. 2:17-cv-00023-JLR
                                       )
 8                                     )
     RED ROBIN INTERNATIONAL, INC.,    )
 9   a Nevada Corporation; RED ROBIN   )
     GOURMET BURGERS, INC., a Delaware )
10   Corporation; and HAROLD HART      )
     and his martial community,        )
11             Defendants.             )
     _____
12
               DEPOSITION UPON ORAL EXAMINATION OF
13                         KATE HERSEL
                        February 14, 2018
14                      Seattle, Washington
     _____
15

16

17

18

19

20

21

22

23        REPORTED BY:  Michelle L. Patton, CCR
                        Washington License No. 2500
24

25
```

WITNESS: KATE HERSEL    2/14/2018

Page 15

1    established fact, that Darren Donahue was fired on

2    June 15th.

3  A   Okay.

4  Q   So that would be --

5              MS. MORISSET:  June, 2015.

6              MR. BLANKENSHIP:  June 15, 2015.

7              MS. MORISSET:  Yeah.  I didn't hear you

8        say the year.  Sorry.

9  Q   (By Mr. Blankenship) June 15, 2015.

10  A   Yeah.

11  Q   So it seems like that would be, what, three and a

12    half years approximately?

13  A   Somewhere in there.

14  Q   So you left a manager that you thought was abusive

15    and called you in early and was disrespectful, Dave

16    Owens.

17       And then you wanted to go move to be under the

18    leadership of Darren Donahue?

19  A   Yes.

20  Q   And at that time you had stepped down to be a server

21    or a team member?

22  A   Yes.

23  Q   What was it like working with Darren Donahue?

24  A   I liked -- I actually liked working with him; that is

25    why I did transfer with him.  I respected him.  I

WITNESS:  KATE HERSEL    2/14/2018

Page 16

1    thought he was a great boss.  And so that is the

2    whole reason I'd wanted to transfer.

3         I learned a lot from him in the beginning.  He

4    kept me better, just because he always just drilled

5    me.  Every day I would come in, and he would knock

6    over peppers, saying they weren't full, or:  "This

7    didn't have 14 in them."  And it made me better,

8    because it made me think about things, so.

9    Q  So did he mentor you?

10   A  He did.  He did.

11   Q  And did you think that he was respectful of you?

12   A  Absolutely, yes.

13   Q  And what -- you know, have you worked with other

14      general managers, besides Darren Donahue and Dave

15      Owens?

16   A  Yes.

17   Q  And how did -- who else -- what other general

18      managers did you work with?

19   A  Raul Ramirez.  Luis, I can't remember his last name.

20   Q  Luis something, right?

21   A  Yeah.  He was in Woodinville.

22   Q  Okay.  Woodinville.

23   A  Hernandez.  Yes.

24   Q  Okay.  And any other general managers?

25   A  From Red Robin?  No, I don't think so.

1   Q   At this point, you are the general manager.

2   A   Yeah.  So since then -- because I was only with Raul

3       for a month, and then I got promoted, so.

4   Q   Tell me how Darren Donahue, how would you compare him

5       to the other general managers?

6   A   I think they are all different in their own ways.

7           Raul is straight to the point, gets it done,

8       very -- same on that aspect, but not as personable;

9       where Darren was more personable.

10          He -- the team loved him and thought he was

11      great, so -- but they both got the job done, I guess,

12      but in their own ways.

13  Q   And what about, you said Luis Hernandez, was it a

14      shorter period?

15  A   It was only a couple of months.  It wasn't that long.

16  Q   How did he compare to Darren Donahue?

17  A   I -- I don't remember much about him, because I

18      didn't work much with him.  I was kind of more of a

19      fill-in, helping him out, so I didn't work much with

20      him.

21  Q   I may have asked this, so I apologize if I did, but

22      what about:  When were you promoted to the

23      general-manager position?

24  A   I started as an AGM about a few weeks after they let

25      Darren go.  And I was only there, maybe, three weeks,

**WITNESS: KATE HERSEL    2/14/2018**

Page 30

```
 1  Q  And do you recall, I represented to you that Darren
 2     was fired on June 15, 2015.
 3        Do you remember the weeks that led up to his
 4     termination?
 5  A  Not in detail, no.
 6  Q  Okay.  I'm going to hand you a calendar.  And you can
 7     show your counsel.  I just kind of --
 8        MR. BLANKENSHIP:  I wrote some
 9        information on hers, just so you can see, filled
10        in on, under the 8th, I have got, that's --
11  Q  (By Mr. Blankenship) June 8th was when Darren Donahue
12     was questioned by Harold Hart and Marilee Smith.
13  A  Uh-huh.
14  Q  And on the 15th, he was terminated.
15        Prior to that time, do you recall having a
16     meeting with Harold Hart, where you -- where Harold
17     Hart was interviewing you about you potentially
18     becoming an AGM?
19  A  Yes.
20        MS. MORISSET:  Hold on.
21        Object as to form.
22  Q  (By Mr. Blankenship) And can you -- do you remember
23     about when that was, on the calendar, if you look at
24     that?
25  A  It's about the same time frame, because I believe it
```

WITNESS:  KATE HERSEL    2/14/2018

Page 31

1    was within a week or two of him being fired that I

2    had the interview with Harold.

3 Q  Do you remember it being a Thursday or Friday, before

4    the time frame?

5 A  I don't remember exact dates.  That is three years

6    ago.

7 Q  Would you have remembered it better in July of 2015

8    than you remember it now?

9 A  Probably.

10          MS. MORISSET:  Object as to form.

11 A  Yes.

12 Q  (By Mr. Blankenship) Okay.  And do you remember

13    speaking with an investigator from my office,

14    sometime around the time that Mr. Donahue was

15    terminated?

16 A  Yes, someone called me.

17 Q  And do you remember giving a recorded statement to

18    that person?

19 A  Yes.

20 Q  Okay.  Would it refresh your recollection if I were

21    to play the recorded statement for you?

22 A  I -- that's fine, yes.  Yeah.

23 Q  Okay.

24          MR. BLANKENSHIP:  And although I'm going

25    to play it off my computer, why don't we mark, as

**WITNESS:  KATE HERSEL    2/14/2018**

Page 33

1              MR. BLANKENSHIP:  I have to be careful

2        how I ask this.

3              MS. MORISSET:  Yeah, you do.

4           Sorry.  I was about to make an objection, but

5        Scott caught it.

6              MR. BLANKENSHIP:  Yeah, I know you well

7        enough to know.

8    Q   **(By Mr. Blankenship) About how much time do you think**

9        **you spent talking to Ms. Morisset?**

10   A   Maybe 30 minutes combined, somewhere in there.

11   Q   **Have you spoken to any other lawyers --**

12   A   No.

13   Q   **-- that represent Red Robin?**

14   A   No.

15              MR. BLANKENSHIP:  Okay.  We are going to

16        do a little audio test here before I play the

17        whole thing.

18                    (Audio Recording played for test)

19                        (Discussion off the record)

20              THE VIDEOGRAPHER:  We are on.

21   Q   (By Mr. Blankenship) Okay.  Before I start, you

22        recall talking to one of my investigators, right?

23   A   Yes.

24   Q   And did you -- do you feel as though you are able to

25        speak your mind freely about what --

**WITNESS:  KATE HERSEL    2/14/2018**

Page  34

1    A    Okay.

2    Q    **And you feel that you are able to answer the**

3         **questions accurately and truthfully?**

4    A    Back then I would have remembered more than I do now,

5         because it's been so long, but, yes.

6    Q    Okay.  **Did you feel remotely pressured by him?**

7    A    No.  I -- I felt like I was, kind of, in a hard

8         place, just because I work for the company, and

9         don't -- but I care for Darren, so it was, kind of, a

10        hard spot to be in.

11   Q    Okay.  **And, you know, basically, we heard a little**

12        **snippet of it, but you were basically driving, and he**

13        **was talking to you over the phone, right?**

14   A    Uh-huh, yes.

15   Q    **And if you had wanted to hang up the phone, you could**

16        **have, right?**

17   A    Yes.  Yes.  And I only know part of situation of what

18        happened, so I only heard what I -- or what I

19        presume, from being in that interview with Harold,

20        and then what happened after.  So I don't know,

21        100-percent, the reasons.  I don't -- the company

22        doesn't tell you the reasons.  I just know what

23        happened that day, and from there on, so.

24   Q    Okay.  **That is fair.**

25             **And do you understand that the law protects you**

WITNESS: KATE HERSEL   2/14/2018

Page 35

1       from any retaliation --

2    A  Yes.

3    Q  -- for basically testifying on behalf of someone

4       that, you know, is bringing a discrimination case?

5    A  Yes.

6    Q  Okay.  So you understand that you can speak freely

7       here, without fear of retaliation?

8    A  Yes.

9    Q  Okay.

10   A  Or else, just not be working, right?

11              MR. BLANKENSHIP:  You can call me if

12       something happens.  Okay?  All right.

13              MS. MORISSET:  Yes:  The law protects you

14       from retaliation.

15              THE WITNESS:  I like vacations.

16              MR. BLANKENSHIP:  All right.  Well, let

17       me -- let's get started on the taped statement.

18

19              RECORDED-AUDIO PLAYBACK STARTED

20              "Q.  All right.  Am I talking too loud,

21       or not loud enough; can you hear me all right?

22              "A.  Yeah, you are fine.

23              "Q.  Okay.  And you are in the car with

24       hands free, and you are safe.  Is that correct?

25              "A.  Yes.

**WITNESS:  KATE HERSEL    2/14/2018**

Page 36

1            "All right.  I do need to say that my

2    name is Greg Roth; I'm the legal investigator at

3    the Blankenship Law Firm, in Seattle, Washington.

4          "Today is the 9th of July 2015.  It's

5    approximately ten minutes in front of 6:00 p.m.

6          "I am speaking with Ms. Kate Hersel.

7          "Did I get that right?

8            "A.  Yes.

9            "Q.  Is it Hersel?

10           "A.  Yes.

11           "Q.  H-E-R-S-E-L?

12           "A.  Yes.

13           "Q.  All right.  And Ms. Hersel, do I

14   have your voluntary consent to take your taped

15   statement today?

16           "A.  Yes.

17           "Q.  All right.  And you are aware that

18   we are exploring, potentially, having Darren

19   -- I'm losing his last name -- let's see --

20   Darren Donahue as a client.  And I was just doing

21   some preliminary investigation in an employment

22   matter versus Red Robin's Restaurant.

23        "You are aware that we may be representing

24   Darren; is that correct?

25           "A.  Yes.

**Harvard Bell 206-629-8773 www.harvardbell.com**

WITNESS:  KATE HERSEL    2/14/2018

Page 37

1          "Q.   All right.   And you had formerly

2     worked with him.   As you are aware, he has been

3     recently terminated.

4          "You formerly worked with him at Red Robin,

5     at the Auburn, Washington location for

6     approximately five years?

7          "A.   Not at Auburn, but I worked over a

8     span of five years with him.   In Auburn, it was

9     about two and a half years.

10          "Q.   Okay.   And prior to that, what

11     location did you work with him at?

12          "A.   Lakewood, Washington.

13          "Q.   All right.   And did he -- was he

14     the -- was he a general manager there, and did he

15     hire you?

16          "A.   Yes, he was actually my hiring

17     manager, our GM.

18          "Q.   All right.   And did he train you,

19     help train you, or was it somebody else who

20     trained you?

21          "A.   It was Darren.

22          "Q.   All right.   And you worked -- since

23     you have worked with him for some total of five

24     years, were you able to form an opinion of his

25     abilities, as general manager?

**WITNESS: KATE HERSEL    2/14/2018**

Page 38

1    "A.  Oh, yes.  He is, by far, one of the

2    top GMs I have ever worked with, and that is why

3    I chose to transfer with him, to Auburn.

4    "Q.  All right.  So you think he did well

5    for the bottom line of both stores where you and

6    he had worked?

7    "A.  Oh, absolutely.  At both stores I

8    was with him, we were the top stores in the

9    region, and in the top three of the company, so,

10   yeah, absolutely.

11   "Q.  And did it appear that upper

12   management was pleased, at least initially, at

13   the Lynnwood -- you started out at Lynnwood; is

14   that correct?

15   "A.  Lakewood.

16   "Q.  'Lakewood,' rather.

17   "At the Lakewood location, did it appear that

18   upper management was pleased with Mr. Donahue's

19   service?

20   "A.  Yeah.  I always thought they were.

21   Yeah, at Lakewood especially.  And then Auburn, I

22   know he was switched to regional a couple of

23   times, but I always thought he did an awesome

24   job.  And he definitely proved himself.

25   "Even being out as much as he was, he still

WITNESS:  KATE HERSEL    2/14/2018

Page  39

```
 1            proved himself with his numbers.
 2                      "Q.   And do you think he increased
 3            revenue when he moved to the Auburn location,
 4            was --
 5                      "A.   Yes.
 6                      "Q.   Go ahead.
 7                      "A.   Yes.   Yes, he did.
 8                 "The only time it dropped was when another GM
 9            took over for a short period of time when he was
10            out, and then our numbers dropped; but then he
11            got them back as soon as he came back."
12                      RECORDED-AUDIO PLAYBACK STOPPED
13
14   BY MR. BLANKENSHIP:
15   Q    All right.  So I had asked you about that today.
16   A    Uh-huh.
17   Q    Did that refresh your recollection, that the numbers
18        dropped, when there was another GM --
19   A    Yes.
20   Q    -- and came back when Darren Donahue --
21   A    Yes.
22   Q    -- when Darren Donahue --
23   A    I forgot somebody even came in for a little bit.
24        Because usually it was shorter spans, where I would
25        just work his shifts for him, so I forgot about that.
```

**WITNESS:  KATE HERSEL    2/14/2018**

Page 44

1          he had cancer, yes.

2                  "He went to Auburn before I did; and then I

3          requested a transfer shortly after.

4                      "Q.  All right.  And we spoke a little

5          bit earlier, and you said that -- you said that

6          he was -- initially, when he had first discovered

7          that he had cancer, that he was -- he had missed

8          some work; is that right?

9                      "A.  He did initially.  He was out -- I

10         want to say it was, like, six months, he was out.

11                 "And then he came back, briefly.  And then he

12         was out a little bit more.

13                 "So off and on for, like, a couple of years,

14         he was out a good bit.  And then he came back.

15         And every time he seemed like he came back, he

16         had to be out again.  And so it was just, kind

17         of, up and down with him, on his health.

18                 "And then he finally got better.  I think he

19         hasn't been out of work since six months, I want

20         to say; and then he just found out he has to have

21         surgery again in September.  Because he just told

22         me that he had to be out again; that is why he

23         was training me to take over --

24                     "Q.  Okay.

25                     "A.  -- while he was out.

WITNESS:  KATE HERSEL    2/14/2018

Page 45

1          "Q.  So you were going to take over for

2     him as interim general manager?

3          "A.  Yeah, just for while he was out for

4     the month with his surgery.  And then that is

5     when I told Harold that Darren was going be to

6     out.  And that is why we were in a hurry and

7     trained me.  And he was totally shocked about

8     that, I guess you could say.

9          "Q.  So just to be clear, Darren Donahue

10    had told you that he was going -- he had -- well,

11    first of all, after intermittently missing quite

12    a bit of work, dealing with his cancer, there was

13    like six months straight when he didn't miss any

14    work, and --

15         "A.  Yes.

16         "Q.  And then he informed you that he had

17    gone to the physician, and to his oncologist or

18    whoever the medical expert he is dealing with,

19    and he was told he needed a hernia surgery.

20         "A.  Yes.

21         "Q.  All right.  And you were in a

22    meeting with, is it Harold Hunt?

23         "A.  Yeah, Harold Hart.

24         "Q.  'Hart,' I beg your pardon; the

25    regional manager, Harold Hart.  And this

**WITNESS:  KATE HERSEL    2/14/2018**

Page 46

1    was -- was this fairly recent?  Was it last

2    month; or how long ago was it?

3        "A.  Yeah.  It was, like, July -- it was

4    right before I went on vacation.  So I went on

5    vacation July 17th -- I'm sorry; June 17th.  So

6    it was, like, June 11th, somewhere in there.  It

7    was, like, the week before I went on vacation.

8        "Q.  Okay.  And you were in a meeting

9    with Harold Hart, the regional manager.  And was

10   it -- I mean, was it a meeting, or were you just

11   having a conversation with him, or when did

12   you --

13       "A.  It was actually an interview.

14       "Actually, it might have been before that.  I

15   kind of remember:  Darren was let go that

16   Tuesday, and I left that Wednesday.  So it was

17   the Thursday before, is when I was in the meeting

18   with Harold.

19       "Q.  Okay.

20       "A.  So --

21       "Q.  In June?

22       "A.  Yeah.  There was -- in June, yes.

23       RECORDED-AUDIO PLAYBACK STOPPED

24

25   BY MR. BLANKENSHIP:

WITNESS: KATE HERSEL    2/14/2018

Page 47

1  Q   Okay.  So you think it was Thursday before, the

2      meeting with Harold, in June -- let me have that

3      document back.

4               MR. BLANKENSHIP:  I'm going to mark it as

5          Exhibit 125.

6                            (Exhibit No. 125 marked)

7  Q   (By Mr. Blankenship) So let me hand this back to you,

8      Exhibit 125.

9          So on there I have got "Darren Donahue's

10     termination," on the 15th, 2015.

11         Do you remember a time when Harold Hart and

12     Marilee Smith came in and questioned Darren Donahue?

13 A   I was not there that day.

14 Q   Do you know, did you speak to Harold Hart before he

15     questioned Darren Donahue about, you know, this whole

16     thing with the timecard issue?

17               MS. MORISSET:  Object as to form.

18 A   I don't know if it was before or after.  Because I

19     said on there, it was the Thursday before they let

20     him go, so I don't know if it was the 11th or

21     the 4th.  I mean --

22 Q   (By Mr. Blankenship) Well, so -- okay.  So was --

23     were Darren and Harold Hart cordial and just getting

24     along great when you had the interview?

25 A   Yes.

1    Q    Okay.

2    A    Yes, I thought so.

3    Q    And had you heard anything about this whole thing,

4         with respect to Christopher Ferguson, basically, you

5         know, swiping in on the badge card, and Darren being

6         accused, with the date that you interviewed with

7         Harold Hart?

8    A    I -- I knew the situation of that before, just

9         because I was there.  But I did not hear it from

10        Harold or anything, or anything about Marilee and him

11        coming in, about it.

12   Q    Okay.  But when Harold Hart met with you and

13        interviewed you.  Tell me about that:  Where were you

14        when that occurred?

15   A    I was at Auburn, in Red Robin, and we were sitting at

16        one of the booths, just talking, and he was

17        interviewing me.

18   Q    Okay.  And he was interviewing you for...?

19   A    An AGM position.

20   Q    Okay.

21             MS. MORISSET:  Can we just stop for just

22        a quick second?

23             THE VIDEOGRAPHER:  The time is 10:03, and

24        we are going off the record.

25                                    (Off the record)

**WITNESS: KATE HERSEL    2/14/2018**

Page 49

1              THE VIDEOGRAPHER:  The time is 10:05 and

2         we are back on the record.  Please continue.

3    Q    (By Mr. Blankenship) Okay.  So the timing of when

4         Harold Hart interviewed you is important.  And I want

5         to ask you some contextual questions.

6              So Darren Donahue was in the restaurant that

7         day, right?

8    A    When I was being interviewed?

9    Q    Yes.

10   A    I believe so.

11   Q    Okay.

12   A    I believe so.

13   Q    And you were being interviewed by Harold Hart, the

14        regional operations director, for -- you were being

15        interviewed for, I think you said, the

16        assistant-manager position?

17   A    Yes.

18   Q    It's also called the "AGM," right?

19   A    Yes.

20   Q    And here is what I'm trying to figure out:  I know

21        that you knew about what happened with the badge

22        swipe before, and with -- the gentleman's name was

23        Christopher Ferguson; because that all happened back

24        in the fall the year before, right?

25   A    Yes.  I knew about the situation, just because I was

**Harvard Bell 206-629-8773 www.harvardbell.com**

**WITNESS:  KATE HERSEL     2/14/2018**

Page 50

1    there, but Darren was off when it happened.  It was

2    on the weekend.  And he came in and couldn't clock

3    in.  Something happened with his transfer; it

4    wouldn't work, his -- so one of the managers had him

5    run under her.

6              MS. MORISSET:  Move to strike the

7        non-responsive part of the answer.

8    Q   (By Mr. Blankenship) Okay.  And so you said that one

9        of the -- so, basically, you didn't think that Darren

10       knew anything about -- that this guy swiped in with

11       her manager's badge swipe; is that your recollection?

12   A   Not to my knowledge, just because he wasn't there on

13       the weekend.

14          Whether they let him know, I don't know that.

15          So I just know he wasn't there at the time,

16       because it was just Renato and Katie -- or and

17       Kathryn there, at the time.

18   Q   Okay.  So when we are going back to early June, what

19       I'm trying to figure out, was there, you know -- at

20       some point you learned -- did Darren tell you that he

21       was questioned about what had happened back in the

22       fall, by Harold Hart and Marilee Smith?

23   A   Not -- I can't remember the time frame.  He did tell

24       me, but I think it was after he was let go; I think

25       it was the time he told me.

1    Q    Okay.

2    A    I don't think it was before.  But I can't remember

3         exactly when, if it was before or after --

4    Q    Okay.

5    A    -- but I know he did tell me at some point.

6    Q    All right.  So at the time, though, did it appear

7         that Mr. Hart and Mr. Donahue were interacting

8         pleasantly, prior to you getting interviewed?

9    A    Yes, I thought so.

10   Q    And Mr. Donahue has testified that happened prior to

11        him, basically, hearing anything about happened with

12        Christopher Ferguson.

13             And so what I'm asking you is, given that, do

14        you believe it was before Darren Donahue was

15        questioned; when you say "Wednesday or Thursday,"

16        would you mean the first week of June?

17                        MS. MORISSET:   Object as to form.

18   A    I know it was before he was let go.  I don't know the

19        exact dates, but I don't remember hearing anything

20        about Marilee or Harold, then, at the interview, or

21        any time before, so most likely it was before.  But I

22        can't tell you 100-percent sure.

23   Q    (By Mr. Blankenship) I mean, Darren and Harold seemed

24        to be cordial at that point, right?

25   A    Yeah, they seemed to be.

Page 52

1          MR. BLANKENSHIP:   Okay.   Let's go back on

2     the recorder -- go back on the tape.

3

4          RECORDED-AUDIO PLAYBACK STARTED

5          "Q.   And so you were, sort of,

6     interviewing for a different position?

7          "A.   Yeah, for AGM; and Darren -- so I

8     could take over for him when he was out on leave.

9          "Q.   Okay.   You were interviewing for --

10          "A.   Well, Harold was telling me he

11     wanted me to wait until September for training.

12     And I told him that Darren wanted me to do it in

13     August, because I was going to take over for him

14     in September, because he was going to be out.

15          "And Harold said he didn't realize he was

16     going to be out.

17          "Q.   So Harold Hart was pretty surprised

18     when you had informed him that Mr. Donahue was

19     going to be out in September for hernia surgery?

20          "A.   Yes.   Yes.   He didn't know at all.

21     And he was like, 'Oh, really?'

22          "So I am, like, 'yes.'

23          "Q.   He indicated he didn't know.   Did he

24     act surprised?

25          "A.   Yes.   Yes.   He was very surprised.   He was

**WITNESS:  KATE HERSEL    2/14/2018**

Page 53

1    like, 'Oh, really?'  Just kind of like -- I don't

2    know.  The look on his face was just like, 'Oh.'

3         Like it almost, like -- I don't want to like,

4    state what -- he was just almost like, 'Oh,

5    really?  Again?'  Like, I was --

6              "Q.  And it came as if --

7              "A.  And I told him, I was like, 'I

8    didn't rat you out.  I'm sorry.'

9              "Q.  Because you weren't aware that

10   Darren Donahue had -- had not informed the

11   regional manager, Harold Hart?

12             "A.  I had no idea, or I wouldn't have

13   said anything.

14        "I assumed they knew, because he was trying

15   to push for me to train, and that is why I

16   assumed they knew.

17             "Q.  And what did Harold Hart say about

18   your training then; did he say you could

19   accelerate and start it earlier?

20             "A.  Yes, I train in two weeks, so yeah.

21             "Q.  How soon after Harold Hart finding

22   out that Darren Donahue was, again, going to miss

23   work due do his cancer, a surgery related to his

24   cancer, how soon after that was Darren Donahue

25   fired?

Page 54

1              "A.  Like not even a week and a half, a

2       week.  Because I want to say it would have been

3       exactly a week, because he came in, looking for

4       Darren that next Friday when I was there; and he

5       was annoyed that Darren wasn't there.  And I -- "

6              RECORDED-AUDIO PLAYBACK STOPPED

7

8    BY MR. BLANKENSHIP:

9    Q    Okay.  So does that help establish, you said -- you

10        said, "like, not even a week and a half, a week,

11        because I want to say it would have been exactly a

12        week, because he came looking for Darren the next

13        Friday when I was there."

14             The next Friday, if it was exactly a week, it

15        would be -- Darren was fired on Monday.  And I can

16        tell you the testimony has been that they tried to

17        fire him --

18   A    The Friday before.

19   Q    Yeah, the 12th.

20   A    The -- Friday the 12th.  So then it would have been

21        Thursday the 4th then.

22   Q    Do you mind writing on the exhibit, that that was the

23        day that you spoke to Harold Hart about Darren's

24        surgery?

25             And then you think it was the next Friday

WITNESS: KATE HERSEL   2/14/2018

Page 58

1        So, you know, the fact that someone didn't come

2    on Saturday to do the -- kind of, message to you,

3    that --

4  A    "Let's get through the busy weekend."

5  Q    All right.

6              MR. BLANKENSHIP:   So let's go back on the

7         tape.

8

9              RECORDED-AUDIO PLAYBACK STARTED

10             "Q.   All right.   And Ms. Hersel, could

11        you describe a little bit about -- because I

12        think that you were made aware by Darren, the

13        reason that they gave for firing him.   And can

14        you -- can you speak a little bit to that issue,

15        the --

16             "A.   Yes.

17             "Q.   Okay.

18             "A.   Yes.   There was a guy named Michael

19        (sic) Ferguson, I want to say, was his name.   It

20        was back in, I want to say, November.   He came to

21        work, transferred to us from the Pier.   He was

22        with us not even a week or two.

23          "He wasn't in the system, because somebody in

24        corporate messed up the transfer and transferred

25        him to New York instead of us, so we had no way

**Harvard Bell 206-629-8773 www.harvardbell.com**

WITNESS:  KATE HERSEL    2/14/2018

1          to put him in the system until that was dealt

2          with.

3              "And it was a weekend, so we couldn't do

4          anything.  So the manager on shift let him run

5          under their number.  And it happened twice, under

6          their number.

7              "And Darren, anyway, doesn't work weekends,

8          so he wasn't there on a Saturday/Sunday, when it

9          happened.

10             "And so it was -- Kathryn and Renato were the

11         two managers that let him work under their

12         numbers.  And Darren had no knowledge of it, and

13         didn't even know, because he wasn't there.

14             "And then, that is what they came back with,

15         saying that that was the reason he was being

16         fired, because that was unprofessional, that he

17         should never let team members work without being

18         clocked in."

19                 RECORDED-AUDIO PLAYBACK STOPPED

20

21    BY MR. BLANKENSHIP:

22    Q    All right.  So who told you about the reason they let

23         Darren Donahue go; was it Harold Hart?

24    A    Darren.

25    Q    Okay.

WITNESS:  KATE HERSEL    2/14/2018

Page 123

```
 1                    C E R T I F I C A T E

 2   STATE OF WASHINGTON )
                         ) ss.
 3   COUNTY OF MASON     )

 4        I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
 5   oaths and affirmations in and for the State of Washington,
     do hereby certify:
 6
          That the annexed and foregoing deposition transcript
 7   of the witness named herein was taken Stenographically
     before me and reduced to a typed format under my direction;
 8   that the transcript is a full, true and complete transcript
     of the proceedings, including all questions, objections,
 9   motions and exceptions of counsel, made and taken at the
     time of the foregoing proceedings, to the best of my
10   abilities;

11        That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
12   of any such attorney or counsel, and that I am not
     financially interested in the said action or the outcome
13   thereof;

14        That the witness, before examination, was by me duly
     sworn, and the transcript was made available to the witness
15   for reading and signing upon completion of transcription,
     unless indicated herein the waiving of signature;
16
          I further certify that I am sealing the deposition in
17   an envelope with the title of the above cause and the name
     of the witness visible, and I am delivering the same to the
18   appropriate authority;

19        I further advise you that as a matter of firm policy,
     the Stenographic notes of this transcript will be destroyed
20   three years from the date appearing on this Certificate
     unless notice is received otherwise from any party or
21   counsel hereto on or before said date;

22        IN WITNESS WHEREOF, I have hereunto set my hand on
     this 27th day of February 2018 at Shelton, Washington.
23

24
                    _____
25                  Michelle L. Patton, CCR # 2500
```

# Exhibit H

1             IN THE UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4   _____

5   DARREN DONAHUE,            )
            Plaintiff,         )
6       vs.                    )
    RED ROBIN INTERNATIONAL,   )
7   INC., a Nevada             )
    Corporation; RED ROBIN     )  No. 2:17-cv-00023 JLR
8   GOURMET BURGERS , INC., a  )
    Delaware Corporation; and  )
9   HAROLD HART and his        )
    marital community          )
10           Defendants.       )
    _____

11

12       VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

13                         OF

14                   DARREN DONAHUE

15  _____

16                    9:09 a.m.

17                January 24, 2018

18                 1201 Third Ave

19              Seattle, Washington

20

21

22

23

24  REPORTED BY: Margaret Walkky, CCR, RPR, RMR, CRR

25  Court Reporter, License No. 2540

Darren Donahue                                        January 24, 2018

```
 1              A.   Okay.

 2              Q.   But other than that, we'll make it

 3    work, okay?

 4              A.   Sounds great.

 5              Q.   The other thing is that Mr. Blankenship

 6    and I have agreed that an objection as to form of a

 7    question preserves any objections as to form the

 8    question.  If I feel that I want more information

 9    from Mr. Blankenship, I'll ask, and foundation as

10    well.

11                   How long did you work at Red Robin?

12              A.   I believe it was seven years, three

13    months.

14              Q.   You started in what, 2008?

15              A.   Correct.

16              Q.   And what was your prior job before

17    that?

18              A.   I was selling cars for Lexus of

19    Bellevue.

20              Q.   And you'd been there just not quite a

21    year, right?

22              A.   Around a year.

23                   (Exhibit-30 marked.)

24              Q.   The court reporter is going to hand you

25    what's been marked as Exhibit-30.  Do you recognize
```

Darren Donahue                                     January 24, 2018

Page 77

1          A.    Because again, I'd never been through

2     what I went through.  I never had my bladder out

3     before.  I never had an iliac conduit stuck to my

4     stomach and a bladder put on the outside of my

5     stomach.  My doctors are experts in that field and

6     they're saying this is what you need.

7                So I mean, do I have knowledge of what

8     I can and can't do in this new condition that I'm in?

9     I again would refer to an expert who has dealt with

10    this for many years rather than me just saying that I

11    know exactly what I need to do.

12         Q.    Your doctor signed this, right?

13         A.    One of them did.

14         Q.    Dr. Liao is one of your physicians,

15    correct?

16         A.    He's my radiologist, yes.

17         Q.    Do you have any reason to doubt these

18    are the accommodations that Dr. Liao was

19    recommending?

20         A.    I don't.

21         Q.    You understand that you've made a claim

22    in this case that Red Robin failed to accommodate;

23    isn't that true?

24                MR.  BLANKENSHIP:  And I'm going to

25    object to form and foundation to the extent it calls

**Darren Donahue**                                    **January 24, 2018**

Page 89

1    Red Robin.  Other than that time, not that I recall.

2                Q.    Thank you for the clarification.

3                      When did you -- do you recall when you

4    talked to Harold about the time off in September 2015

5    that you were going to need?

6                A.    I do.

7                Q.    When was that?

8                A.    It was on June 4th.

9                Q.    Is there a reason you remember the date

10   so specifically?

11               A.    Yes.

12               Q.    What is that?

13               A.    I had put one of my hourly employees up

14   for a management position and he came in the

15   restaurant on that day to do an interview.  It was on

16   or about that day, and he interviewed her for a

17   management position, and -- do you want to ask

18   another question?  Is that --

19               Q.    Are you talking about Kate Hersel?

20               A.    Yes.

21               Q.    So Harold met with Kate that day.  Were

22   you in the meeting with the two of them?

23               A.    I was not.  I was in the restaurant but

24   not in the meeting.

25               Q.    Did you ask Harold about specifically

**Darren Donahue**                                    *January 24, 2018*

Page 90

```
 1    needing the time off on June 4?
 2              A.   I did.
 3              Q.   And when did that occur?
 4              A.   After his interview with Kate Hersel,
 5    she came running back to me.  I was in the office and
 6    she goes I think I got you in trouble.  And I said
 7    why?  And she goes well, I told Harold that I wanted
 8    to be done with management training by September so I
 9    could come back and help you in the Auburn restaurant
10    because you needed to get your hernia repaired, and
11    she said he was -- he seemed very upset about that
12    and taken back.  And she said that she even said I
13    didn't mean to get Darren in trouble.
14              And so she told me about that exchange,
15    and so I went up to Harold, who was sitting at the
16    same booth where they did the interview, and I said
17    how did the interview go?  And he said oh, it went
18    great, you know, and then he said is it true that you
19    are going to need your hernia repaired in September?
20              And I said yes.  Well, I'm going to try
21    and -- I have my goal is to schedule in September
22    since it's a slower time of the year and I've saved
23    all my vacation for the year so that I could get that
24    done, but I have -- you know, I have a double hernia
25    and I need to get it repaired.
```

**Darren Donahue**                                    **January 24, 2018**

Page 91

1            And he says, he asked me how long I was

2     going to be out.   And I said well, if they just

3     repair the hernia, then it would be about four weeks.

4     But they're thinking about moving my stoma from my

5     right side to my left, so that would be pretty

6     extensive surgery and I would probably need to be out

7     for six weeks.   And he said, "Oh, okay," but he

8     seemed kind of like a dazed "oh, okay" and he left.

9            Q.   Why do you describe Harold as dazed?

10           A.   He seemed taken back by the

11    conversation, by me having to take a leave.

12           Q.   Did he say something that led you to

13    reach the conclusion that he seemed taken aback?

14           A.   I've known him for a couple of years,

15    so he didn't act -- it was an odd way for him to act.

16           Q.   But it wasn't something that he said?

17               MR.  BLANKENSHIP:  Object to the form.

18           A.   Just the way he said, "Oh, okay."

19           Q.   I'm just trying to find out if there

20    was another comment that he made, Mr. Donahue.

21           A.   No, that was it that day.

22           Q.   Did he talk to you about filling out

23    the paperwork with the leave of absence group?

24           A.   He did not.

25           Q.   You'd done that before, though, right?

**Darren Donahue**                                              **January 24, 2018**

Page 257

1            C E R T I F I C A T E

2

3     STATE OF WASHINGTON      )ss.

4     COUNTY OF KING           )

5

6

7     I, Margaret Walkky, the undersigned Registered Merit
      Reporter and an officer of the Court for the State of
8     Washington, hereby certify that the foregoing
      deposition upon oral examination of DARREN DONAHUE
9     was taken before me on January 24, 2018 and
      transcribed under my direction;

10
      That the witness was duly sworn by me pursuant to RCW
11    5.28.010 to testify truthfully; that the transcript
      of the deposition is a full, true, and correct
12    transcript to the best of my ability; that I am
      neither attorney for, nor a relative or employee of,
13    any of the parties to the action or any attorney or
      counsel employed by the parties hereto, nor
14    financially interested in its outcome;

15    I further certify that in accordance with CR 30(e),
      the witness was given the opportunity to examine,
16    read, and sign the deposition, within 30 days, upon
      its completion and submission, unless waiver of
17    signature was indicated in the record.

18    IN WITNESS WHEREOF, I have hereunto set my hand and
      seal this date: January 31, 2018.

19

20

21

22            .............................
              Margaret Walkky, Registered Merit Reporter
23            Certified Court Reporter No. 2540 License
              expires July 18, 2018

24

25

# Exhibit I



# Exhibit J

<u>TM: Darren Donahue</u>

*Note: This agreement applies to restricted work assignments made as a result of a personal injury, illness or other reasons <u>unrelated</u> to on-the-job-injuries.*

Dear Darren,

In certain circumstances Team Members may be offered temporary restricted work assignments or alternative jobs. These assignments are made with the following conditions in mind: 1) staffing levels, 2) availability of modified duty work, 3) a Team Member's physical restrictions, and 4) the number of other Team Members who may already be on a restricted work assignment. These assignments are never guaranteed, are granted based upon business need as well as manager's approval and may be ended at any time.

If you are unable to return to work after your temporary assignment, you may be eligible for additional leave of absence time. Please speak to your manager or Human Resources to determine if you are eligible.

In order for a restricted work assignment or alternative job to be granted you must provide your manager with a letter from your physician which outlines your physical restrictions. All Company and restaurant policies apply while you are on temporary assignment. Please sign on the signature line below indicating that you understand the terms of your restricted work assignment.

Your current restrictions are no standing for more than 4 hours at a time without a 15 minute break in between, and to not lift greater than 20 lbs.

Date assignment begins:   <u>February 13, 2012</u>
Date assignment ends.      <u>March 1, 2012 for the standing restriction</u>
                                       <u>March 15 for the lifting restriction</u>

DARREN J DONAHUE                                                    2-13-12
Print: Team Member Name          Team Member Signature          Date

HAROLD HART                                                             2-13-12
Print: Manager Name                  Manager Signature             Date

RR_000027

# Exhibit K

UW Medicine
SCHOOL OF MEDICINE

January 13, 2012

To Whom It May Concern:

Darren Donahue is under my care at the University of Washington Medical Center. He is being treated with radiation therapy for cancer of the bladder. Because of his recent surgery and radiation therapy, he should rest at home until Feb. 13, 2012, at which point he will be safe to return to work. He should restrict himself to lifting 20 pounds or less until March 15, 2012. He should stand for no longer than three hours per day until March 1, 2012.

Let me know if I can be of any further assistance in this matter.

Sincerely,

Michael Gensheimer M.D.
Resident Physician in Radiation Oncology
Phone: 206-598-4101

Department of Radiation Oncology
1959 NE Pacific St.   Box 356043   Seattle, WA 98195-6043   206-598-4100   Fax 206-598-6218

RR_000028

# Exhibit L

## POSITION DESCRIPTION

| | | | |
|---|---|---|---|
| **Position Title:** | General Manager | **Job Code:** | |
| **Department:** | Operations | **Grade:** | |
| **Reports To:** | Regional Operations Director | **Status:** | Exempt |

### SUMMARY

Responsible for total operations of single Red Robin restaurant including building sales all aspects of profit and loss, hiring and training of both management and hourly team, daily execution of safety/sanitation, quality food preparation and guest service. Responsible for cleanliness, repair and maintenance of the building and equipment. The GM is responsible for these areas whether on or off the premises. Responsible for communicating and administering all company policies and procedures.

### ESSENTIAL FUNCTIONS

- Effectively and efficiently manage restaurant by following the best practices of the Company and Brand Equity Standards to ensure Guest satisfaction and profit maximization
- Manage all restaurant operations including scheduling, planning and forecasting while upholding and championing standards, product quality and cleanliness
- Optimize profit by ensuring that labor is scheduled efficiently and food and supplies are ordered to maintain appropriate inventory
- Prepare reports and analyze metrics to identify opportunities and act promptly to correct
- Builds year over year sales by promoting restaurant locally, ensuring guest satisfaction and prompt problem resolution
- Exemplify and recognize legendary acts of leadership and quality to ensure 100% Guest satisfaction
- Ensure the environment in the restaurant supports our core values of honor, integrity, seeking knowledge, and having fun
- Exercise good judgment and decision making in escalating concerns and aggressively resolve issues
- Responsible for compliance with OSHA, local health and safety codes as well as Company safety and security policies. Emphasize safety, sanitation and security awareness, and ensure that Team Members are properly trained to create safe situations
- Ensure adherence to Company cash handling and payment processing procedures
- Conduct line checks in accordance with Company standards
- Maintain adequate staffing levels and responsible for the selection, on boarding and retention of Team Members through motivation, recognition, coaching and development.
- Require operational excellence and develop management staff in all areas of restaurant leadership and Company standards
- Set performance expectations and monitor training process to ensure quality of training
- Regularly measure and evaluate service standards by using various feedback tools to develop and implement plans for continuous service improvement
- Adhere to Federal, State and local laws in addition to Company policy (regulate compliance with work authorization/ liquor service/wage and hour laws and, where applicable, break requirements), holds team members and managers accountable to these standards
- Prepare and conduct performance appraisals and one to ones with management staff and Team Members and take any necessary disciplinary action in line with Company standards
- Responsibly delegate and follow up on tasks while remaining accountable overall for restaurant and Team Members



Exhibit No.: 85
Deponent: Rivera
Date/RPR: 2/8/18
Hunter + Geist, Inc. mh

RR_000030

- Ensure Company standards on equipment, facility, and grounds are maintained by using a preventative maintenance program
- Ensure complete and timely execution of corporate & local restaurant marketing programs
- Directly supervise up to 4 salaried managers, and managerial authority for approximately 100 Team Members and their development
- Champion and adhere to all Company standards and policies including the Code of Conduct, Attendance and Uniform and Appearance policy
- Resolution oriented/ protects Company assets; prevent/diffuse situations that create potential risks to the organization
- Be a mentor and devote time to training, coaching and developing others by adapting to individual learning styles and motivational needs

## ADDITIONAL FUNCTIONS
- Perform all FOH/ HOH functions including food preparation, cooking, cleaning, serving and greeting Guests
- Other duties as assigned by supervisor

## REQUIREMENTS
- Must be at least 21 years of age
- Minimum of 2 years full service restaurant experience at a Kitchen Manager or Assistant General Manager level required
- State and local alcohol enforcement, where applicable
- Record of maintaining high standards in restaurant cleanliness, sanitation, food quality, and guest satisfaction
- High school diploma or equivalent required, some college preferred
- Passion for the business and compassion for people
- Highly-Energetic, self motivated, goal oriented and dependable
- Excellent oral and written communication skills, and outstanding leadership, interpersonal and conflict resolution skills
- Basic business math and accounting skills, and strong analytical/decision-making skills
- Basic personal computer literacy
- Must be able to work a flexible schedule including opening, closing, weekends and holidays
- Must be willing to work 55 hours per week. Reliable transportation required
- Serv Safe Certified
- P&L and Sales Building experience preferred

## PHYSICAL DEMANDS

| Daily Activities | Average Hours per day |
|---|---|
| Sitting | up to 5 hours |
| Walking | up to 10 hours |
| Standing | up to 10 hours |
| Bending | up to 10 hours |
| Squatting | up to 8 hours |
| Climbing | up to 8 hours |
| Kneeling | up to 8 hours |
| Twisting | up to 8 hours |
| Repetitive use of hands | up to 10 hours |
| Simple grasping with hand | up to 10 hours |
| Power grasping with hand | up to 10 hours |

RR_000031

20Mar. 15. 2013ɔ 1:43PM Robin 213 263-804-6571                                        No. 3512    P.  4

| Pushing & Pulling | up to 8 hours |
| Reaching | up to 10 hours |
| Lifting | |
| 0-10 lbs. | |
| 11-25 lbs. | up to 10 hours |
| 26-75 lbs. | up to 10 hours |
| Carrying | up to 10 hours |
| 0-10 lbs. | |
| 11-25 lbs. | up to 10 hours |
| 26-75 lbs | up to 10 hours |
| Working around equipment and machinery | up to 10 hours |
| Exposure to extremes in temperature | up to 10 hours |
| (walk-in freezer/ kitchen line) | up to 4 hours |
| Frequent hand washing required | |

NOTE: This job description is not intended to be an exhaustive list of all duties, responsibilities or qualifications associated with the job.

I CAN MEET THE ESSENTIAL FUNCTIONS OF THE POSITION WITH OR WITHOUT ACCOMMODATION. SHOULD I REQUIRE ACCOMMODATION I WILL CONTACT THE HUMAN RESOURCES DEPARTMENT.

Team Member                                                               Date   5-12-13

RR_000032

# Exhibit M

## Manager

**\*\*This form should be used for all Restaurant Managers and Home Office Team Members below Director level with direct reports\*\***

| Name: | Darren Donahue | | Position: | General Manager |
|---|---|---|---|---|
| Most Recent Hire Date: | 4/8/2008 | | Restaurant/Department: | Auburn Super Mall # 213 |

| | |
|---|---|
| Team Member ID: | 166280 |
| Review Type: | Year End 2012 |
| Reviewer/Supervisor Name: | Erik Yates |

**Philosophy:** Red Robin views the Performance Review process as an honest discussion between you and your supervisor regarding your job performance. This process is a formal opportunity for you to be certain your performance is aligned with the goals and objectives of the Company. The Competency Summary is designed to provide feedback relating to individual strengths and development opportunities. The review should reflect a sound and objective assessment of your job performance and responsibilities for the review period.

**Performance Rating Definitions:** Evaluate the Team Member on each section based on the following:

**(E) Exceeding – Consistently Exceeds Performance Expectations (4 points)**
- Team Member is clearly and consistently exceeding performance objectives
- Team Member has developed skills and abilities to exceed the demands of the job

**(P) Performing – Consistently Meets (and sometimes exceeds) Performance Expectations (3 points)**
- Team Member's performance is solid and consistently meets (and sometimes exceeds) performance objectives
- Team Member has developed skills and abilities to effectively meet job requirements

**(U) Underperforming – Needs Improvement to Meet Performance Expectations (2 points)**
- Team Member's performance sometimes meets performance objectives
- Team Member needs to work on improving and developing skills and abilities to consistently meet job requirements

**(D) Deficient – Not Meeting Performance Expectations (1 point)**
- Team Member does not meet job requirements and performance is below established standards
- Team Member is not demonstrating the skills and/or abilities to successfully perform the job

**Instructions:** Select the appropriate rating from the drop down box and press Tab to calculate the number of points for each rating. IMPORTANT: You must press the Tab key after colecting the rating for the points and total score to calculate correctly.

In the *Supporting Comments* section, provide specifics and examples for each rating given.

| Competencies | Rating | Points | Supporting Comments |
|---|---|---|---|
| **UNDERSTANDING AND EVOLVING THE RED ROBIN BRAND AND PROCESSES**<br>• Identifies opportunities and needs for the Brand.<br>• Implements organizational strategies to further improve the Brand.<br>• Champions change initiatives and ensures the team is fully bought in and engaged in implementation.<br>• Demonstrates professionalism and personal integrity. | Exceeding | 4 | I strive for best in class results at all times.<br><br>I look to improve my restaurant, my region, and my pod.<br><br>Auburn raises the bar on professionalism. |
| **LEADING AND MOBILIZING THE ORGANIZATION**<br>• Leverages departmental and team needs and capabilities.<br>• Attracts, selects and develops top performers.<br>• Leverages capabilities across the team.<br>• Motivates others by creating a culture of high performance. | Exceeding | 4 | We look to leverage our team by allowing them to be in the Driver's Seat of their careers.<br>We hire goal oriented people who want more out of life.<br>We crosstrain in all departments.<br>We promote a "best in class" mentality. |
| **ENGAGING AND WINNING WITH OTHERS**<br>• Develops synergistic relationships with peers and internal customers.<br>• Collaborates with peers and internal customers to create solutions that best serve the Guest.<br>• Offers advice and assists peers in accomplishing their goals.<br>• Develops a team with Guest centric mentality and sets clear expectations for Guest support and engagement. | Exceeding | 4 | Region 9 is tight among it's GM's and there is a feeling of family among the group.<br>I reach out to my fellow region 9 managers on a regular basis to collaborate.<br>I am a mentor to a couple of the GM's in our region. |

REV 11.2012 HR

RR_000098

| PERSONAL LEADERSHIP AND TEAM CONTRIBUTIONS<br>• Positively impacts the business through sound and timely decision making.<br>• Communicates effectively and influences other in the department and team.<br>• Demonstrates poise and courage when faced with opposition.<br>• Responds professionally to pressure and stress. | Exceeding | 4 | We moved the bar at Auburn this year dramatically. Scorecard results have improved.<br>I willing to have the tough conversations to get everyone on the same page. |
| DRIVING AND DELIVERING RESULTS<br>• Supports a culture of high performance and accountability for achieving results.<br>• Sets objectives and goals that positively impact the direction and results of the department and team.<br>• Sets a good example to the department and team by working hard and achieving consistent results.<br>• Critically evaluates own performance and the performance of direct reports to constantly improve performance. | Performing | 3 | We promote a best in class attitude and strive for best in class results.<br>Goals have been set for departments and team, results are improved but not where we need them to be.<br><br>I try to set an example of what a manager should be.<br>I am my own biggest critic. |

| | Total Points: | 19 | Total Points should equal the sum of all 5 competencies above. Pressing the Tab key after selecting the rating on each competency will ensure an accurate calculation of Total Score. |
| | # of Lines: | 5 | |
| | Total Score: | 3.8 | |

Based on the Total Score, select the Overall Performance Rating using the scale below:

3.60 to 4.00 = Exceeds
2.61 to 3.59 = Performing
1.00 to 2.60 = Underperforming

**Overall Performance Rating**
**Exceeds**

**Competency Summary:** Use the area below for comments. Both the Team Member and the supervisor should indicate strengths and development opportunities and identify the competency that is impacted. Action plan steps should identify specific, measurable actions that support the development opportunities.

**Self Comments**

**Strengths:**
Team player, communication with team, goal setting, best in class mentality

**Development Opportunities:**
BER knowledge, corporate communication

**Action Plan Steps:**
Continue to train MIT's and gain knowledge along with them.

**Supervisor Comments**

**Strengths:**
A high commitment to excellence in his results, leverages others around him to seek knowledge when there is he wants to be better at. Darren is a role model for his peers and has many great ideas.p

**Development Opportunities:**
Needs to ensure excellent results in his managers 18steps especially with HOH systems, ie labeling, food quality, and cleanliness.Inspect what you expect.Assume positive intent with corporate support and partner with them.

**Action Plan Steps:**

**Acknowledgements:** Team Member's signature indicates knowledge and understanding of the contents of the performance summary. The summary has been reviewed with the Team Member and the Team Member has been given the opportunity to comment.

_____
Team Member's Signature

1-23-13
Date

_____
Supervisor's Signature

1-23-13
Date

Once you have completed the performance review and discussed it with your Team Member both of you need to sign it.  Scan the signed copy to yourself and save to a location on the computer you can easily remember.   NAME the file as *LastName_FirstName_YearEnd2012.doc* (for example:  Brown_Charlie_YearEnd2012.doc) and click the SAVE button.

When all reviews are complete, COMPOSE a new e-mail in Outlook to performancemgmt@redrobin.com. Select ATTACH FILE and find your saved files, select files and click the INSERT button.  Click on the SEND button to send.

REV 11 2012 HR

RR_000099

# Exhibit N

REDACTED - Spousal Privilege

On Wednesday, October 9, 2013 9:54 AM, Erik Yates <eyates@redrobin.com> wrote:
Darren

I have spoken to Roger and we both agree you may apply.

Erik

Erik Yates
Red Robin Gourmet Burgers
eyates@redrobin.com
206-409-6597


On Oct 8, 2013, at 10:28 PM, "darren donahue" <ajtdonahue@yahoo.com> wrote:

Hi Erik,

I appreciate everything you have done for me over the last few years.  Your support has been exactly what I have needed during this challenging time.  I feel together we have partnered to achieve some great results.  I really like working for Red Robin and would love to finish my career here.

I feel I can impact the company at the next level now.  I would like your support to pursue the ROD position open in Sacramento.  I don't want to leave Washington, but the timing here is not my favor.

Thank you for your consideration,

Darren

# Exhibit O

### Accommodations needed  for Darren Donahue because of permanent hernia.

| Position Title: | General Manager | Department: | Operations |
|---|---|---|---|
| Reports to: | Regional Operations Director | | |

| | Accommodation |
|---|---|
| **SUMMARY:** | None |
| **ESSENTIAL FUNCTIONS:** | None |
| **ADDITIONAL FUNCTIONS:** | 4 hours then 1/2 hour off feet...Repeat |
| **REQUIREMENTS:** | None |

**PHYSICAL DEMANDS:**

| Daily Activities: | Requirement | Accommodation |
|---|---|---|
| Sitting | up to 5 hours | None |
| Walking | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| Standing | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| Bending | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| Squatting | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Climbing | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Kneeling | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Twisting | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Repetitive use of hands | up to 10 hours | None |
| Simple grasping with hand | up to 10 hours | None |
| Power grasping with hand | up to 10 hours | None |
| Pushing & Pulling | up to 8 hours | No more than 20 pounds...4 hours then 1/2 hour off feet...Repeat |
| Reaching | up to 10 hours | None |
| **Lifting:** | | |
| 0 - 10 lbs. | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| 11 - 25 lbs | up to 10 hours | No more than 20 pounds...4 hours then 1/2 hour off feet...Repeat |
| 26 - 75 lbs | up to 10 hours | Do not attempt. |
| **Carrying:** | | |
| 0 - 10 lbs. | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| 11 - 25 lbs | up to 10 hours | No more than 20 pounds...4 hours then 1/2 hour off feet...Repeat |
| 26 - 75 lbs | up to 10 hours | Do not attempt. |

RR  000033

## PHYSICAL DEMANDS: Continued

| | | |
|---|---|---|
| Working around equipment and machinery | up to 10 hours | None |
| Exposure to extremes in temperature (walk-in freezer / kitchen line) | up to 4 hours | None |
| Frequent hand washing required | | None |

I CAN MEET THE ESSENTIAL FUNCTIONS AND REQUIREMENTS OF THE POSITION WITHOUT ACCOMMODATION. I DO REQUIRE THE ACCOMMODATIONS LISTED ABOVE IN ORDER TO MEET THE ADDITIONAL FUNCTIONS AND PHYSICAL DEMANDS OF THE POSITION.

Team Member _____        Date    3·12-13

DUE TO DARREN DONAHUE'S PHYSICAL CONDITION RESULTING FROM SURGERY TO REMOVE HIS BLADDER, I FEEL THE ACCOMMODATIONS LISTED WITHIN ARE NECESSARY FOR HIM TO COMPLETE THE TASKS DESCRIBED IN THE POSITION DESCRIPTION.

Physician _____        Date    3/15/13

Jay J. Liao, M.D.
Assistant Professor
Department of Radiation Oncology

**UW Medicine ~ School of Medicine**
1959 NE Pacific Street ~ Box 356043 ~ Seattle, WA 98195-6043 ~ (206) 598-4100 ~ Fax (206) 598-3766

# Exhibit P

| | |
|---|---|
| **From:** | Julie Rivera <jrivera@redrobin.com> |
| **Sent:** | Tuesday, March 26, 2013 12:40 PM |
| **To:** | Leave Of Absence |
| **Cc:** | Julie Rivera |
| **Subject:** | RE: Accommodations - Darren Donahue |

Sounds good Tara!


Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*It's always the right time to do the right thing."*
                          *-Martin Luther King Jr.*


**From:** Leave Of Absence
**Sent:** Tuesday, March 26, 2013 11:13 AM
**To:** Julie Rivera
**Cc:** Leave Of Absence
**Subject:** RE: Accommodations - Darren Donahue

I reached him today. Restrictions are permanent and are no >20 lb lifting & taking a half hour to sit & prop his feet up
every 4 hours. I would say it's reasonable to accommodate – if there are no concerns on your end, I'll create an
accommodation letter.

Tara Jurhs
Leave of Absence
Red Robin International, Inc.
(303) 846-6074 (phone)
(720) 493-2733 (fax)
LOA@redrobin.com

**From:** Julie Rivera
**Sent:** Sunday, March 24, 2013 9:25 PM
**To:** Leave Of Absence
**Cc:** Julie Rivera
**Subject:** RE: Accommodations - Darren Donahue

1

RR_000035

Hi Tara.

Please try again tomorrow morning...Monday mornings are usually a guarantee to reach the GM.  Let me know and I will intervene if you still have no luck.


Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*"It's always the right time to do the right thing."*
*-Martin Luther King Jr.*

---

**From:** Leave Of Absence
**Sent:** Friday, March 22, 2013 4:52 PM
**To:** Julie Rivera
**Cc:** Leave Of Absence
**Subject:** RE: Accommodations - Darren Donahue

Hi, Julie,

I haven't been able to reach him. I've left messages on Wednesday & today on his cell, and I tried him at the restaurant today but was told he was too busy at that moment to speak with me.

Tara Jurhs
Leave of Absence
Red Robin International, Inc.
(303) 846-6074 (phone)
(720) 493-2733 (fax)
LOA@redrobin.com

---

**From:** Julie Rivera
**Sent:** Friday, March 22, 2013 7:34 AM
**To:** Leave Of Absence
**Cc:** Tara Jurhs; Julie Rivera
**Subject:** RE: Accommodations - Darren Donahue

Hi Tara.

2

RR  000036

Please let me know where we are at on this and how your conversations with Darren went.

Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*"It's always the right time to do the right thing."*
*-Martin Luther King Jr.*

---

**From:** Julie Rivera
**Sent:** Monday, March 18, 2013 7:23 PM
**To:** Leave Of Absence
**Cc:** Erik Yates; Leave Of Absence
**Subject:** Re: Accommodations - Darren Donahue

believe they are permanent but please verify with him.

Thanks.
JR

On Mar 18, 2013, at 7:19 PM, "Leave Of Absence" <LOA@redrobin.com> wrote:

Hi, Julie,

I wouldn't have a problem allowing someone with these physical issues returning to a temporarily restricted role, but I don't see in here if the restrictions are temporary or permanent. Do we know if this is supposed to be permanent? If we don't know, is Darren working tomorrow for me to call him?
Thanks!

Tara Jurhs
Leave of Absence
Red Robin International, Inc.
(303) 846-6074 (phone)
(720) 493-2733 (fax)
LOA@redrobin.com

**From:** Julie Rivera
**Sent:** Friday, March 15, 2013 2:42 PM
**To:** Tara Jurhs
**Cc:** Leave Of Absence; Erik Yates; Julie Rivera
**Subject:** Accommodations - Darren Donahue

3

RR_000037

Hi Tara.

We had some concerning conversations with Darren a couple weeks ago regarding possible restrictions so I sent him the job description and asked him to review with his doctor. Attached is what he has given us today. Can you please review this, provide any thoughts and document accordingly with Darren?

Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*"It's always the right time to do the right thing."*
*-Martin Luther King Jr.*

4

RR_000038

# Exhibit Q

| Name: | Darren Donahue | Position: | | GM |
|---|---|---|---|---|
| Date of Hire: | 4-8-2008 | Restaurant/Department: | | Auburn |
| Completion Date: | 1-7-14 | Supervisor Name: | | Erik Yates |

## Behavior Competency #1 – Accountability

### Personal Leadership and Team Contributions

**Metrics:**
Solves problems and makes decisions, including the insights of others when needed.  Communicates effectively and influences others. Maintains a balance between flexibility and taking a firm stance on issues.  Demonstrates poise and courage when faced with opposition. Responds professionally to pressure, stress and work demands.

**Results: Does Not Meet Expectations**
Darren was instrumental at providing great leadership and contributions when asked to support in Bellevue and did an incredible job at getting us staffed. Thank you.  Has a very high aptitude for influencing others in the region and is a mentor to many in the division, however has struggled at finding ways to influence his own managers to deliver the results and is intimidating to where they are reluctant to voice their opinion without fearing backlash from him. Darren's leadership style seems to have changed to having high expectations for his managers however doesn't appear to be coaching/teaching and utilizing the coaching model including the feedback steps. He seems to just expect his managers to "do it" and "do it" the right way. His responses to the pressure of work demands has continuously worsened

## Behavior Competency #2 – Innovation

### Understands and Evolves the Red Robin Brand and Processes

**Metrics:**
Adapts to changing needs and demands of the business. Overcomes barriers and obstacles to ensure success. Seeks and identifies opportunities to improve processes, methods and systems. Ensures consistent execution of the Red Robin brand promise by following established process and procedure, modeling Core Values and demonstrating professionalism.

**Results: Does Not Meet Expectations**
Would like to see you respond more positively with the high work demands and focus your energy on "how your going to get the results through your team. Would like to see you respond more positively with the high work demands/Team members in your restaurants throughout the years and would like to see that again. I am hoping the conference You have inspired so many managers/Team members in your restaurants throughout the years and would like to see that again. Darren is always trying to this year will provide you some guidance/inspiration as I know you are disappointed in the results/performance of your restaurant. Darren is always trying to look for new ways to improve processes, methods, and systems but tends to want to do things outside of the SOP without first asking for my approval. Darren needs to ensure he is following all systems and processes of Red Robin.  Auburn has had continuous issues in my visits on both cleanliness of the restaurant as well as labeling and following proper shelf lives of raw product and has been coached on this on several occasions throughout the year. Would like to see Darren get innovative on how to get the best out of his managers other than hoping they will take his lead. How can you get your managers inspired this year? Darren needs to ensure that all emails/Correspondence to the corporate office are professional, Darren tends to react with his emotions and needs to take the needed time as to not be condascending in his remarks.

## Goal #1:

RR 000101

**Descrip . . .:** . . . Drive Guest frequency to retain and increase "heavy user" Gu. . .
Red Robi. . .s Royalty program differentiates our brand from the competition. The expectations is that every Guest/table is asked if they are a Red Robin Royalty member at the beginning of their experience, informed of the program and its benefits if they are not and receive credit for their experience prior to leaving.

**Metrics:**
➢ Royalty Registrations
➢ Royalty Sales as a Percentage of Total Sales
➢ Increased Guest Counts

**Results:** Exceeds Expectations
Royalty sales as percentage of total sales= Green every period of the year.
Increased guest counts= 2.26%, -.23, 2.5% and Q4 6.19%, nice job finishing the year strong

---

**Goal #4:**

**Description: Fuel the growth of the Company through successful talent management and new restaurant openings where applicable.**
Red Robin expects all supervisors to actively develop Team Members by ensuring all training and development tools available are used and that additional initiative is taken to ensure continued development. NRO's are an opportunity to make an impression in a community. The teams and preparation are a top priority. Talent management, bench strength development and strategic people planning are all expectations of the leaders in our Company.

**Metrics:**
➢ Manager Staffing Levels
➢ Bench Strength
➢ NRO sustained opening week sales
➢ Seasoned GM's identified
➢ Normalization of key operations metrics
➢ Guest Voice score of 80% or better

**Results:** Does Not Meet Expectations
This is an area that our region as a whole has struggled with. Not having our own GM's to promote as well as a bench of mids/AKM's with a clear development path to help strengthen the company/TM's in restaurants that have a desire to move up. We need to do a better job at the development of our high level TM's and managers.

In addition, our ability to execute the key operations metrics when it comes to the BTI standard changes needs improvement. See attached

Exceeds Expectations:
Team Member is clearly and consistently exceeding performance objectives
Team Member has developed skills and abilities to exceed demands of the job

Meets Expectations:
Team Member performance is solid and consistent in meeting and exceeding performance objectives
Team Member has developed skills and abilities to effectively meet job requirements

Does Not Meet Expectations:
Team Member's performance sometimes meets performance objectives
Team Member needs to work on improving and developing skills and abilities to consistently meet job requirements

Overall Performance Rating
Does Not Meet Expectations

**Acknowledgements:** Team Member's signature indicates knowledge and understanding of the contents of the performance summary. The summary has been reviewed with the Team Member and the Team Member has been given the opportunity to comment.

**Description:** Deployment, implementation and adoption of Team Member Foundations, Brand Transformation, Triple R Service & Labor Management initiatives.

Throughout 2013, restaurants had the responsibility of deploying critical initiatives. Meeting expectations is defined by thoroughly preparing yourself and your Team Members by following all provided training, ensuring policies and procedures are properly communicated and trained, and following through with the initiative until adoption is assured.

**Metrics:**
➢ CLC Certification
➢ CLC Pars
➢ Completed Team Member Surveys
➢ Guest Voice
➢ BER Metrics
➢ Team Member Staffing Levels
➢ Variance to Standard Hours

**Results:** Does Not Meet Expectations

CLC's= With a couple of people leaving us, we are down to just 5 CLC's (Will, Sam, Tiffany, Emily, and John.) Let's get a few more for the next bootcamp.

Guest Voice- 8 Periods of green, 2 yellow, and 2 red for the year. Some great results in the middle of the year.

BER- Passed

Staffing levels- Darren has always been able to maintain a high staffing level in his restaurant and typically has great retention. Turnover results=YTD, 2 periods of yellow in p.1 and p2 followed by 5 green, but has seen a decline from period 8-12 with 5 consecutive periods of red.

Variance to standard hours- P.12= 103% P.13= 102%

**Goal #2:**

**Description:** Drive PPA, recapture "Burger Authority" and evolve service by successfully deploying the Brand Transformation initiative.
Meeting expectations is described by thoroughly embracing Triple R Service standards, properly training Team Members, leveraging the Coaching Model and consistently holding Team Members to the standards until full adoption is evident. Food preparation and execution meets all presentation standards, PTA's are at nine minutes or less and quality exceeds expectations of our Guests.

**Metrics:**
➢ PPA Increase
➢ Appetizer and Dessert Order Rate
➢ Beverage Order Rate
➢ Sales Increase Over Prior Year
➢ Overall Guest Satisfaction
➢ Negative Guest Complaints
➢ BER Metrics

**Results:** Meets Expectations

PPA increase-+$.57/ 4.4%

App and Dessert Rate= 6 Green/6 yellow for the year.

Bev order rate 6/8 periods green for the year. Great job.

Sales increase over prior year Q.1= +3.55% Q2= +4.10% Q3= +6.04% Q4= +10.14%, Nice job!

Guest voice- 8 Green periods, 2 yellow, and 2 red periods for the year, again the middle half of the year was your best results.

Negative guest complaints- 4 Green, 7 Yellow, and 1 red for the year.

BER: Passed, big focus again this year with BTI execution and adherence.

**Goal #3:**

Team Member Signature

Date   1-10-14

Supervisor's Signature

Date   1-10-14

Once you have completed the performance review and discussed it with your Team Member both of you need to sign it. Scan the signed copy to yourself and save to a location on the computer you can easily remember. **NAME** the file as *LastName_FirstName_YearEnd2013* (for example: Brown_Charlie_YearEnd2013) and click the **SAVE** button.

When all reviews are complete, **COMPOSE** a new e-mail in Outlook to performancemam@redrobin.com. Select **ATTACH FILE** and find your saved files, select files and click the **INSERT** button. Click on the **SEND** button to send.   *Send only finalized and signed reviews to Performance Management.*

**Team Member Comments:**

INTERESTING TEAM I WENT FROM A PEARFECT EXCEEDS EXPECTATIONS IN EVERY CATEGORY TO DOES NOT MEET EXPECTATIONS IN ANY ALMOST EVERY CATEGORY THIS YEARR.

FOR SUCH A POOR PERFORMING GM'S HIGHLIGHTS THIS YEAR WERE

1. NUMBER 1 RESTAURANT ON THE SCORECARD DURING PERIOD 5.

2. TOP RESTAURANT IN REGION ON SCORECARD FOR 2013.

3. WAS #2 IN NORTHWEST FOR THE YEAR UNTIL MANAGEMENT TEAM WAS CHANGED.

4. TRAINED 5 MANAGERS AS TRAINING RESTAURANT

5. PROMOTED A TM TO MANAGEMENT

6. SUPPORTED 2 NRO's WITH 4 TRAINER.

I APPRECIATE THE CRITIQUE AND WILL ASPIRE 20 IMPROVE.

# Exhibit R

**Goldfarb, Judy**

| | |
|---|---|
| **From:** | GM AuburnOutletCollection <gm213@redrobin.com> |
| **Sent:** | Saturday, January 11, 2014 8:26 AM |
| **To:** | Julie Rivera |
| **Subject:** | RE: I feel I am being retaliated against. |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Thank you.

**From:** Julie Rivera
**Sent:** Saturday, January 11, 2014 7:27 AM
**To:** GM AuburnOutletCollection
**Cc:** 'ajtdonahue@yahoo.com'; Julie Rivera
**Subject:** RE: I feel I am being retaliated against.

Hi Darren.

Sorry I was unable to get back to you yesterday due to meetings but I did get your message.  I will give you a call on Monday morning to discuss this.


 hanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com


*"It's always the right time to do the right thing."*
                    *-Martin Luther King Jr.*


**From:** GM AuburnOutletCollection
**Sent:** Saturday, January 11, 2014 12:44 AM
**To:** Julie Rivera
**Cc:** 'ajtdonahue@yahoo.com'
**Subject:** I feel I am being retaliated against.

. fi Julie,

I have attached my year end reviews for 2012 and 2013.

1

Exhibit No.: 102
Deponent: Rivera
Date/RPR: 2/8/8
Hunter + Geist, Inc.

At the end of 2012, Erik had me rated as exceeding expectations in every category.  On the attached review the final category is marked meets expectations because I talked him down to that.

Through the first half of this year, Auburn was the number 1 ranked restaurant in region 9 and the Northwest division.  At that point, I offered my services to help in Bellevue because I had heard from managers working there that things were really bad.  Erik confirmed that and agreed that I should go and help.  I feel the results in Bellevue were what was needed and after 5 weeks returned back to Auburn on July 29th.

While I was away, Rachel Philbrook was moved to Auburn to support the acting GM Travis Degraffenreid.

I came back to hear that there was a lot of unprofessionalism between the two and not a lot of support.  The restaurant morale was way down, my manager Kelly Regalado, who loved Red Robin when I went to Bellevue, suddenly could not stand working here.  Before I left to Bellevue, Kelly told me, "How ever much they pay you; it needs to be more".  The turnover rate had gone from the best in our region to the worst and we went from a 19 on the scorecard to an 11.

I had to start over and build back up the restaurant.

During this time, my hernia was really starting to act up and my surgeons felt it was time to operate.  So, in mid October, I went under the knife and because of the complications due to my previous cancer, I was out for 4 weeks.  During that time, Rachel Philbrook was put in charge of the restaurant by Erik and myself.  She had told me that she was all in for Red Robin and was looking forward to my return so she could be continue to be developed by me.  Two weeks into my absence, Rachel put in her two week notice.  The managers here all feel she did not finish well and showed no leadership.  That is what I came back to in mid November.

Again, in my absence, we lost a number of TM's and do poor handling of NTM's we lost a couple who only went through orientation, thus again killing our turnover rate.  As we rolled into the golden times morale was not where it needed to be.  I did my best to hire and motivate, but we were a manager down until period 13 week 2 and were busy.

When I returned from my surgery, I put in for an exception on the 3rd quarter bonus.  I kept trying to get Erik's help on this, but I felt he did not want to help me.  I have supporting emails on my home computer where I let him know that I did not feel he was supportive.  After about 2 ½ weeks of trying to figure out how to do the exception (I had never done one before), Erik submitted it.  To this day, I have not heard yes or no.

I think that is where Erik started to change his opinion of me.

Last week, I reached out to Harold Hart for advice because I felt that Erik's personal issues were affecting his work and our relationship.  He recommended that I reach out to Roger.  I knew I had my review scheduled so I decided to wait and tell Erik my feelings.  At my original evaluation on Tuesday, January 7, 2014, I started to tell Erik how I have been disappointed recently by our relationship and the performance of some of my managers.  I told him that I felt that he was not as responsive to me as he used to be and that I had reached out to Harold for advice.  We talked about a lot of things including transferring one of the managers on my team.  We were to have a conference call today and look at moving some managers around.

On my day off on Thursday, I received a text from Erik saying he would like to do my evaluation on Friday at 9am and that Harold Hart would be joining him.  I thought that odd because Harold was not with him on Tuesday when he came in to do my review.  My wife and I joked, that I was getting fired (apparently, not too far from the truth).

Back to the End of Year Evaluation;

I was absolutely floored by this evalution, Erik knew I would be so he brought Harold to do it with him.  I am 100% positive he changed it from Tuesday until Friday.  So, voicing my opinion and telling him my frustrations with him, cost me on my evaluation.  At this point, I would like to review some facts that I have email support if you would like it.

1.  Auburn Red Robin was the best in Region 9 on the scorecard for 2013, not mentioned in my review.
2.  Auburn Red Robin was the most profitable restaurant in Region 9 for 2013.
3.  In late June of this year, I was asked to help get Bellevue back on it's feet.
4.  We trained 5 managers in 2013…not in my evaluation.
5.  We promoted a TM to management in 2013 (Cassidy Bailey), not mentioned in my review.
6.  Promoted a manager to AGM in 2013, not mentioned in my review.
7.  We were the only training restaurant in the region, not mentioned in my review.

2

RR_000113

8. I was asked to mentor Des Moines in May of this year by Erik, not mentioned in my review.
9. I am currently mentoring 3 GM's and am reached out to by many.
10. In **October of 2013**, I was given approval from Erik and Roger to apply for a Rod position in Sacramento.  Why would they give a poor performer approval?
11. In **December of 2013**, Erik and Marilee Smith were trying to set Auburn up for recertification as a training restaurant.  Why would he want such a mean, "intimidating" GM to be a training GM.

If my leadership was so deplorable as stated in my revised evaluation, starting when I returned from Bellevue as Erik has stated, why would points 10 and 11 be on my list?

This evaluation came out of nowhere and was driven as a way to get back at me for going to Harold for advice.

In the leadership section of the evaluation he states, "Has a very high aptitude for influencing others in the region and is a mentor to many in the division, however **has struggled at finding ways to influence his own managers to deliver the results and is intimidating to where they are reluctant to voice their opinion without fearing backlash from him."**  I would like this investigated.  This is a random, inflammatory comment that is ridiculous.  Please interview my managers and see if this is true.

He goes on to say, "He just seems to expect his managers to "do it" and "do it" the right way.  That is not my opinion and I do not appreciate him putting the two words "do it" in quotations as if that is my recognized style.

I would like to see, if possible, IT pull my review as it sat on Tuesday, January 7th, before I voiced my disappointment in our relationship, and see the difference as to how it reads now.

There had to be a reason why all of a sudden Harold had to be at my evaluation today and did not need to be there on Tuesday.  If it changed in the 3 days that would surely show retaliation because the evaluation is based on last year.

Thank you for your time.

Respectfully,

Darren Donahue

3

RR_000114

# Exhibit S

## Case: RB426 - E-mail
## Roger Byers
## Treatment

### Case Snapshot

**Opened:** 1/11/2014
**Days open:** 26
**Last modified:** 5/12/2014 9:20 PM
**Date closed:** 2/6/2014 1:00 AM
**Intake method:** E-mail
**Status:** Closed
**Alert:** None

### General Case Information

**Case number:** RB426
**Received/Reported date:** 1/11/2014
**Language:** English
**Assigned tier:** Roger Byers
**Creator:** Rivera, Julie jrivera@redrobin.com

**Issue**
**Primary issue:** Treatment
**Summary:** GM alleges ROD is retaliating against him by giving him a poor performance review. He alleges this is due to him expressing concern that the ROD was not focused and ineffective due to personal issues.

### Case Details

**Reported tier information**
**Case type:** Allegation
**Intake method:** E-mail

**Location**
**Location/Address:** Auburn Super Mall - 213
1002 Super Mall Way
**City:** Auburn
**State/province:** WA
**ZIP/postal code:** 98001
**Country:** USA

**Reporter contact information**
**Reporter anonymous:** No
**Reporter first name:** Darren
**Reporter last name:** Donahue

**Case Information**
**Please identify the person(s) engaged in this behavior:** Erik Yates
**Do you suspect or know that a supervisor or management is involved?** Yes
**If yes, then who?** Erik Yates, ROD
**Is management aware of this problem?** Don't Know / Don't Wish To Disclose
**How long do you think this problem has been going on?** 1 to 3 months



Exhibit No.: 53
Deponent: Simpson
Date/RPR: 2/7/18
Hunter + Geist, Inc. /h 1/

**How did you become aware of this violation?** It happened to me

**Details:** Allegation that ROD Erik Yates is retaliating against GM Darren Donahue because he has questioned his effectiveness due to personal issues.

**Legacy information**

## Assignments & Access

**Case assignee(s):** Means, Rochelle; Redmond, Saundra; Rivera, Julie; Simpson, Claire; Webber, Kellye
**Restricted access:** None
**Case access list:** Brooks, Karen; Clouser, Greg; Cooney, Cathy; Everett, June; Foley, Lenee; Fountain, Kate; Jenson, Sara; Johnson, John; Kaplan, Michael; Lowery, Teri; Pagnotta, Jamie; Reynolds, Rene; Rivera, Julie; settles, diane; Simpson, Claire; Sullivan, Shellie; Timmerman, Joan

## Participants

| Name | Relationship | Role | Results | Notes |
|---|---|---|---|---|
| Darren Donahue | General Manager | Reporter | Coaching and counseling | |
| Erik Yates | ROD | Implicated Person | Coaching and counseling | |

## Items

None

## Attachments

None

## Synopsis

**Outcome of case**
**Primary outcome:** Investigated
**Secondary outcome 1:** Frivolous/Unfounded
**Secondary outcome 2:** Pending
**Action taken:** Coaching and Counseling

**Additional details**
**Potential next steps:** Will move Auburn under another ROD.
**Synopsis notes:** Retaliation allegation is unfounded however, GM is aware of many personal issues ROD is having which makes the ability to performance manage the GM difficult and ineffective.

## Tasks

None

## Case Notes

None

## Related Cases

**Cases marked as related to this case**
None

**Cases in which this case has been marked as related**
None

# Exhibit T

**From:** GM AuburnOutletCollection
**Sent:** Monday, February 2, 2015 3:06 PM
**To:** Harold Hart
**Cc:** Rochelle Means
**Subject:** RE: Special Needs TM - Job Code 70

This brings tears to my eyes.  It is a sad day.  As the parent of a child with Down syndrome, it breaks my heart.
Darren

**From:** Harold Hart [mailto:hhart@redrobin.com]
**Sent:** Monday, February 02, 2015 9:42 AM
**To:** GM Kennewick; GM Yakima; GM BonneyLake; GM AuburnOutletCollection; GM Puyallup; GM Federalway; GM South Puyallup
**Subject:** FW: Special Needs TM - Job Code 70
**Importance:** High

Team
Please reach out if you have questions?  This needs to be done within two weeks, can be done sooner than later.
HH

**From:** Rochelle Means
**Sent:** Wednesday, January 28, 2015 3:36 PM
**To:** Craig Ollis; Erik Yates; Harold Hart; Matt Distler; Sean McFall; Shane Plant
**Cc:** Rochelle Means; Tim Mei
**Subject:** Special Needs TM - Job Code 70
**Importance:** High

Hello ROD's,

Okay team, it has taken me a while to complete this email, as I wanted to make sure I included all of the needed information to empower the **GM's** on the action required.  Please read the attached email and feel free to forward it to your restaurants for follow up.  Please make sure only the GM's are having the conversations and following the below.  Even if you do not have a restaurant that has a Special Needs TM, I would encourage you to still forward the email, in case they get calls or questions about hiring a Special Needs TM or to support a program of such.

If you have any questions, please do not hesitate to reach out.

Hello team,

Many of our restaurants throughout the organization have been fortunate to have the support of our Special Needs TM's, to support the business.

Since implementing the partnership of this program, we have had many RR operational initiatives and rollouts i.e. Watson and the Silverware Program.  As a result of these changes, we have made the decision to eliminate the Special Needs programs(TM's) in your restaurants.  Attached is a report for 2014 and the most recent in 2015 of TM's that may fall in this category (regretfully is not based on the new ROD alignment, however you can locate the TM by name and restaurant).

Outside of the Maintenance job code, we do not have a specific job code identifying the TM's and the job functions they support or are responsible for in the restaurants – which are functions and responsibilities that are usually outside of the published RR Host/Busser or Server job description.  We know that many of you have long time relationships with your TM's and this is may be a difficult conversation to prepare to have, however it is necessary

1

EXHIBIT
6
1-18-18
Hart, H.
PENGAD 800-631-6989

RR_000655

and actions will be required by you to make sure we make this transition as smooth as possible for the TM, their coach, their organization and you.

Now, if you have a TM that can perform t*he functionalities detailed in our job description* and your restaurant is in need of hiring, we can consider keeping the TM, however we will need to update their job code in the system. If this is your situation, please reach out to me to discuss next steps prior to making any decisions or changes with the TM.

Below, you will need to follow the below as it is detailed, any issues that are situational must be discussed with me ASAP.

**So what is next for you and the TM?**

1. **Scheduling the meeting:**
   Schedule a meeting with the TM and their coach, program representative and or parent. Please do not have this conversation with the TM only (NO EXCEPTIONS). It is best to schedule the meeting during non-peak hours as you want to give the meeting your full attention as it is a sensitive matter for all parties involved. The meeting needs to be in the dining areas, as coaches, program representatives and or parents are not allowed in the back office.

2. **Conversations:**
   Explain why we have made the decision and this is not in any way a reflection of their performance or lack of contributions to the restaurant. Inform them that we are sensitive to their need to prepare for this change and as a result, if needed, we can give the TM a week notice before their last day of employment. If it is determined a 2 week notice is not required and you can agree on a soon last day (before the 2 weeks), no problem. You are welcome to let them know, if our business needs change, we will be sure to keep the TM in mind. If you are asked for additional time, please let them know you will look into it and contact me so we can talk it through. When possible, include the TM in the conversation as much as possible, remember this is about them – so including them when possible goes a long way. If you have a coach, parent or representative that is possibly challenging the companies decision or is asking for more information in writing or verbally, please get their contact information and let them know you have someone contact them about their concerns. Immediately contact me, provide me with the details and I will connect with them. If they insist on getting a contact name and # from you, please provide them with mine (but only after you have followed the above).

3. **Separation:**
   If the TM is earning RR wages, you will need to follow RR's separation process (separation documentation and separation meeting and payment (for those applicable).
   *In the separation documentation, you will state "based on the needs of the business, the TM's job has been eliminated, effective xx/xx/xxxx.*
   If the coach or representative request a letter of reference or recommendation, please let me know and we can work on accommodating the request. However, we need to make sure the language in the letter is consistent with our separation practices. Make sure the TM signs the separation documentation and be sure they get a copy.

While this is a needed business decision, we want to make sure these conversations are done with respect, dignity and in a timely manner. Some conversations will be fairly easy and others possibly not so much because of how long the TM has been with us, but please know, we are going to do all we can to give the TM the best opportunity possible and within business reasons to move them forward.

I have been asked, can you do something nice (cake, small celebration, etc.) for the TM on or before their last day, and in advance we are saying.....***absolutely you can,*** as I am sure it will go a long way with the TM and their representative. We only ask that you keep the business peak hours in mind and make sure it is attention the TM feels comfortable with having by their peers.

2

RR_000656

If there is anything I can do to further support your efforts, please do not hesitate to reach out.

**Rochelle D. Means**
West Division Human Resource Manager | Red Robin International, Inc.
6312 S. Fiddlers Green Circle, Suite 200N
Greenwood Village, CO 80111
**Remote Office: 909.272.8919| Email: rmeans@redrobin.com**
This email transmission is intended only for the use of the person to whom it is addressed and may be privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, please delete this message and notify the sender via e-mail as soon as possible.

3

RR_000657

# Exhibit U

| From: | Julie Rivera(/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=78590635A3D44CF58A6E73F3D7B041B3-JULIE RIVER) |
|---|---|
| To: | Claire Simpson |
| CC: | |
| BCC: | |
| Subject: | RE: TM Spreading False information about Me and trying to rally troops to back her. |
| Sent: | 3/20/2015 05:08:41 PM 0000 (GMT) |
| Attachments: | |

That is interesting!!

Thanks.

Have a great day!

~Julie

Julie Rivera, PHR

C: 720-244-5534

jrivera@redrobin.com

"It's always the right time to do the right thing."

-Martin Luther King Jr.

*The information contained in this transmission contains attorney-client privileged and attorney work-product confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

**From:** Claire Simpson
**Sent:** Friday, March 20, 2015 8:34 AM
**To:** Julie Rivera
**Subject:** RE: TM Spreading False information about Me and trying to rally troops to back her.

His linked in says he works at a car dearship. I was hopeful.

**From:** Julie Rivera
**Sent:** Friday, March 20, 2015 8:32 AM
**To:** Claire Simpson
**Subject:** Re: TM Spreading False information about Me and trying to rally troops to back her.

Why is he still here!

iPhone thumbs....excuse any typos

On Mar 20, 2015, at 8:11 AM, Claire Simpson <csimpson@redrobin.com> wrote:

Don't you miss Darren?

**From:** GM AuburnOutletCollection [mailto:gm213@redrobin.com]
**Sent:** Thursday, March 19, 2015 7:24 PM
**To:** HR Advisor
**Cc:** GM AuburnOutletCollection
**Subject:** TM Spreading False information about Me and trying to rally troops to back her.

Hi

On Thursday night 3/12/15 at 8:30 the shift went the wrong direction.

Here are my notes from the shift:

"

Things were great until 8:30 when we mysteriously ended up on a 2 floor. By the time I got back to the floor after giving the cooks breaks there was kaos and upset guests everywhere. I made the servers who were standing around watching Olivia and Kym getting killed reengage and get back out and help the guests. I pulled Pairy back on in section 6 and sat her 5 more tables until things were back under control at about 9pm. Very disappointing and unneccesary.

Maybe my worst shift at Red Robin. I suck! D2

I had just returned to the floor, from giving 2 breaks to cooks in the HOH. When I stepped back on the floor I could tell things

EXHIBIT
25
1-18-18
Hart, H.
PENGAD 800-631-6989

were not good. I didn't understand why since we were on a 4 floor an there were about 14 tables in the restaurant. I quickly found out that my mid-manager had phased to a 2 floor and the remaining servers were obviously overwhelmed....especially Kym. There were still 3 other servers finishing side work. I was immediately hit with a reopen check for some mistake and another phased server asking me if the server who I transferred her table to was going to offer dessert to the table. What? This is from when I went from a 5 floor to a 4 floor before I gave HOH breaks.

I then noticed how stressed Kym was and how my mid manager had run over to take the order of a table that had been sitting for at least 5 minutes. I started aggressively going to each of the tables to make sure they were being taken care of. I noticed that table 58 had not been greeted and ran and got Mallory REDACTED to greet them. I brought my section 5 server back on because she is the one I trust the most to focus on the guests and not worry about what time she would be getting off the clock (Pairy). I had to do another comp do to lack of attention and was very frustrated because there were 2 servers doing sidework and not helping as the others were struggling. When I did the comp I was in a hurry to get back to the guests and was having difficulty pressing the right button on the terminal. I also wanted to show some emotion to get the team back in service mode. I aggressively pushed the exit button with 2 fingers and walked away saying, "this is pathetic!"

Today, Monday, March 16, 2015, I receive word from my KM Renato, that Mallory was telling everyone that I punched the terminal and told her, "You are pathetic".

This is not true. She asked at least one TM, one that was not even there (Debbie REDACTED to back up her story to "HR". Mallory has been counseled two times recently for altercations with an expo (Jasmine REDACTED I truly feel she is trying to divert her shortcomings by attacking me.

Anyway, I would like her to stop spreading exaggerations and falsehoods about me.

Thanks,

Darren Donahue
GM ~ Auburn Outlet Collection # 213
Mallory REDACTED (253) 797-REDACTED
Debbie REDACTED (253) 797-REDACTED
Pairy REDACTED (858) 335-REDACTED
Kym REDACTED (253) 737-REDACTED
Olivia REDACTED (253) 217-REDACTED
Kristina REDACTED (206) 856-REDACTED Olivia's Trainee
Jasmine REDACTED (206) 981-REDACTED
Richard REDACTED (206) 419-REDACTED Mid Manager on duty
Branden REDACTED (253) 680-REDACTED Busser on duty
Farren REDACTED (425) 829-REDACTED Server on duty
Will REDACTED (253) 590-REDACTED Expo on duty

# Exhibit V

**From:**    Mara Coursey(/O=RED ROBIN GOURMET BURGERS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MCOURSEY)
**To:**    AuburnOutletCollection #213
**CC:**
**BCC:**
**Subject:**    RE: Christopher ▆▆▆▆▆
**Sent:**    11/4/2014 11:27:13 PM 0000 (GMT)
**Attachments:**Kronos_Punch Edit Request Form.pdf;

*Thanks for your help with this Darren!! Here is a Punch Edit form if needed.*
Thanks,
Mara Coursey
Payroll Specialist
Red Robin Gourmet Burgers, Inc.
mcoursey@redrobin.com
Phone : 303-846-6191
Fax : 303-846-6073

**From:** Mara Coursey
**Sent:** Tuesday, November 04, 2014 11:56 AM
**To:** AuburnOutletCollection #213; Henrietta #481
**Subject:** Christopher Ferguson
*Hello,*

*I just received a call from Christopher ▆▆▆▆▆▆▆. He said he is missing hours from the dates below:*
*10/12/14 missing 4 hours*
*10/17, 10/18, 10/19 - He stated that he was working with Darren and Katherine. He used a managers key to work as a server when he was not able to clock in.*
*I will need Punch Edits from the restaurant that he worked at during those days. He also stated that he is termed, but I am still showing him as active. He needs to be termed in HR Manager.*
*Please advise.*
***Thanks,***
***Mara M Coursey***
***Corp Payroll Specialist***
***Red Robin Gourmet Burgers, Inc***
***6312 S. Fiddlers Green Circle***
***Suite 200 N***
***Greenwood Village, CO 80111***



***Phone : 303 846 6191***
***Fax : 303 846 6073***

CONFIDENTIAL                                                 

# Exhibit W

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 551-2016-00475 |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Darren Donahue** | 2504 | |

Street Address      City, State and ZIP Code

**Maple Valley, WA 98038**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Red Robin Gourmet Burgers, Red Robin International, Inc.** | 500+ | (303) 846-6000 |

Street Address      City, State and ZIP Code

**6312 South Fiddler's Green ~~RECEIVED~~ ...nwood Village, CO 80111**

DEC 9 2015

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address      City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ RETALIATION ☐ AGE ☒ DISABILITY ☐ GENETIC INFORMATION ☐ OTHER (Specify) | Earliest **1/10/2014**  Latest **6/15/2015**    ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began working for Respondent as an Assistant Manager in April 2008 and was promoted to General Manager in September 2008. Due to my strong performance, Respondent asked me to transfer into struggling restaurants and turn them around, and I succeeded in converting them to the best and most profitable restaurants in Washington and nationally. One of the restaurants I turned around became a training restaurant for new General Managers.

I have a disability that required me to take several leaves of absence for surgeries and hospitalization. Respondent discriminated against me based on my disability, including a false negative review. I opposed the discrimination and was retaliated against, including denial of a promotion for which I was qualified. I opposed the retaliation, including complaints to HR and higher management, but Respondent continued to discriminate and retaliate against me, including terminating my employment for false reasons.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 12-7-15     _[signature]_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date     Charging Party Signature | |

DONAHUE 02039

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 551-2016-00475 |
| | | and EEOC |

*State or local Agency, if any*

**I believe that I have been subjected to illegal discrimination based on my disability under the Americans with Disabilities Act of 1990, as amended, and in retaliation for opposing disability discrimination.**

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 12-7-15       *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date | |

DONAHUE 02040

# Exhibit X

1

2       THE HONORABLE JAMES L. ROBART

3

4

5

6

7

8                  UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON - AT SEATTLE
9

10   DARREN DONAHUE,                          NO. 2:17-cv-00023 JLR

                        Plaintiff,
11

12        vs.

13   RED ROBIN INTERNATIONAL INC., et al.     PLAINTIFF'S FIRST REQUESTS FOR
                                              ADMISSION AND <u>ANSWERS</u>
14                      Defendants.           <u>THERETO</u>

15        **TO:    Defendants Red Robin International, Inc., Red Robin Gourmet Burgers,**

16   **Inc., and Harold Hart;**

17        **AND TO:     Catharine Morisset, attorney for Defendants.**

18
                              **INSTRUCTIONS**
19

20        Pursuant to Federal Rules of Civil Procedure 26 and 36, you are hereby served with the

21   following Requests for Admission. You are requested to answer the following Requests for

22   Admission in writing and under oath within the space provided or using additional space, if

23   necessary, and thereafter to serve a copy of same upon counsel for Plaintiff within thirty (30)

24   days after service thereof. If the response to any of these requests is anything other than an

25   unqualified admission of the facts stated in the request, the response shall admit each fact that

26   is true and qualify or deny the remainder of the fact stated in the request. All the facts forming

PLAINTIFF'S FIRST REQUESTS FOR              FISHER & PHILLIPS LLP
ADMISSION AND <u>ANSWERS</u> (17-00023) –        1201 THIRD AVENUE, SUITE 2750
Page 1                                         SEATTLE, WA 98101
                                        Phone: (206) 682-2308 Fax: (206) 682-7908

1

2 **REQUEST FOR ADMISSION NO. 23.:** Admit that, according to the Audit Report

3 produced at RR 006469-6543, Mr. Donahue's card was not used to purchase any food for

4 customers on October 12, 2014, October 17, 2014, October 18, 2014 and October 19, 2014.

5 **RESPONSE**:   Deny.   Admit that RR _006469-6543 shows no activity for Mr.

6 Donahue's manager identification number for October 12, 2014, October 17, 2014, October 18,

7 2014 and October 19, 2014.

8

9 **REQUEST FOR ADMISSION NO. 24.:** Admit that the document produced by

10 Defendants identified as RR 006612 is a record of an act, condition, or event that was made in

11 the regular course of business, at or near the time of the act, condition, or event, thus falling

12 within the regularly conducted activity exception to the hearsay rule.

13 **RESPONSE**:   Admit that RR 00612 is a business record, and admit it is an exception

14 to the hearsay rule if offered to prove there was no activity under Darren Donanhue's

15 identification number on this report.

16

17 **REQUEST FOR ADMISSION NO. 25.:** Admit that the document produced by

18 Defendants identified as RR_006612 is a true and correct copy of the "Server Sales Report" for

19 Darren Donahue on "10/17/2014."

20 **RESPONSE**:   Admit that document produced by Defendants identified as

21 RR_006612 is a true and correct copy of the "Server Sales Report" dated 10/17/14 for Darren

22 Donahue's identification number."

23

24 **REQUEST FOR ADMISSION NO. 26.:** Admit that the document produced by

25 Defendants identified as RR 006612 reflects all food and beverage sales using Darren

26 Donahue's swipe card on October 17, 2014.

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND ANSWERS (17-00023) –
Page 9

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

1      **RESPONSE:**  Admit that the lack of activity on the audit report shows that nothing was

2  ordered using Darren Donahue's swipe card.

3

4

5      **REQUEST FOR ADMISSION NO. 27.:**  Admit that the document produced by

6  Defendants identified as RR_006612 reflects that Darren Donahue's swipe card was not used

7  to make any purchases on October 17, 2014.

8      **RESPONSE:**  Admit.

9

10      **REQUEST FOR ADMISSION NO. 28.:**  Admit that Christopher Ferguson did not use

11  Darren Donahue's swipe card to make purchases in the Auburn restaurant on October 17, 2014.

12

13      **RESPONSE:**  Admit that the Aloha records do not reflect that Christopher Ferguson

14  used Darren Donahue's manager identification to make food sales purchases in the Auburn

15  restaurant on October 17, 2014.

16

17      **REQUEST FOR ADMISSION NO. 29.:**  Admit that Christopher Ferguson did not use

18  Darren Donahue's swipe card to make purchases in the Auburn restaurant on any day that Mr.

19  Ferguson worked at the Auburn restaurant.

20

21      **RESPONSE:**  Admit that the Aloha records do not reflect that Christopher Ferguson

22  used Darren Donahue's manager identification to make food sales purchases in the Auburn

23  restaurant from October 12-19, 2014.

24

25

26

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND ANSWERS (17-00023) –
Page 10

FPDOCS 33785934.1

1    **REQUEST FOR ADMISSION NO. 34.:** Admit that Darren Donahue's assigned

2    identification number was not 75547.

3        **RESPONSE:** Admit.

4

5

6    **REQUEST FOR ADMISSION NO. 35.:** Admit that Darren Donahue's Team Member

7    identification number was 166280.

8        **RESPONSE:** Admit.

9

10   **REQUEST FOR ADMISSION NO. 36.:** Admit that, according to that the document

11   produced by Defendants identified as RR_006545, Darren Donahue did not approve

12   Christopher Ferguson's time card for the date range of "10/06/2014 — 10/12/2014."

13

14       **RESPONSE:** Admit that the document RR_006545 does not reflect an entry under Mr.

15   Donahue's Team Member identification number.

16

17   **REQUEST FOR ADMISSION NO. 37.:** Admit that, according to that the document

18   produced by Defendants identified as RR 006545, Darren Donahue did not approve Christopher

19   Ferguson's time card for the date range of "10/13/2014 — 10/19/2014."

20       **RESPONSE:** Deny that Plaintiff did not ever approve time worked for Mr. Ferguson

21   for that date range for payroll purposes.  Admit that the document RR 006545 does not reflect

22   an entry under Mr. Donahue's Team Member identification number.

23

24

25   **REQUEST FOR ADMISSION NO. 38.:** Admit that Defendants' Auburn restaurant

26   was designated a "training" restaurant during the year of 2013.

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 12

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1    **RESPONSE**: Admit that the Auburn restaurant was designated a training restaurant in

2    2012 or 2013.

3

4    **REQUEST FOR ADMISSION NO. 39.**: Admit that Mr. Donahue was designated a

5    Training General Manager during the year of 2013.

6

7    **RESPONSE**: Admit that Mr. Donahue was designated a Training General Manager

8    during the years 2012 or 2013.

9

10   **REQUEST FOR ADMISSION NO. 40.**: Admit that, in order to be eligible for the

11   designation of Training General Manager, a General Manager had to obtain formal training,

12   including a multi-week course.

13

14   **RESPONSE**: Deny there was a "formal" or multi week "course." Admit there was an

     evaluation and approval process that included an education session and required completion of

15   training on the coaching model for the managers, and trainers.

16

17

18   **REQUEST FOR ADMISSION NO. 41.:** Admit that Mr. Donahue took the course to

19   become a Training General Manager in 2012.

20   **RESPONSE:** After reasonable inquiry, Defendants have been unable to confirm when

21   Mr. Donahue completed the education session and training for managers and trainers.

22

23

24   **REQUEST FOR ADMISSION NO. 42.**: Admit that Defendants asked Mr. Donahue

25   to work as the General Manager of the Bellevue restaurant in 2013.

26

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 13

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1      **RESPONSE**:  Admit that it is a business record, but deny that all of the statements

2  contained within it are an exception to the hearsay rule if offered for the truth of the matter

3  asserted.

4

5      **REQUEST FOR ADMISSION NO. 99**.: Admit that the image of the IT incident report

6

7  produced by Defendants at RR_004707-708 reflects that Auburn Manager Kathryn Matteson

contacted IT on October 17, 2014 with the short description: "Christopher ferguson has been

8  removed from our system . . ."

9

10      **RESPONSE:**  Admit.

11

12      **REQUEST FOR ADMISSION NO. 100.:** Admit that the image of the IT incident

13  report produced by Defendants at RR_004707-708 reflects that Auburn Manager Kathryn

14  Matteson contacted IT on October 17, 2014 with the short description: "Christopher ferguson

15  has been removed from our system . . ."

16      **RESPONSE**:  Admit that the image of the IT incident report produced by Defendants

17  at RR_004707-708 reflects that Auburn Manager Kathryn Matteson contacted IT on October

18  17, 2014 and contains the short description: "Christopher ferguson has been removed from our

19  system . . ."

20

21

22      **REQUEST FOR ADMISSION NO. 101**.: Admit that the image of the IT incident

23  report produced by Defendants at RR_004707-708 reflects under "Additional comments

24  (SHARED)" that Auburn Manager Kathryn Matteson reported Christopher Ferguson was

25  "[n]ever fully transferred to our restaurant. Not fully sure where his paperwork is."

26      **RESPONSE**:  Admit.

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 30

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1    **RESPONSE**: Deny.

2

3    DATED this 22nd day of February, 2018.

4

5                                        By

6                                           Catharine M. Morisset, WSBA #29682

7                                           FISHER & PHILLIPS LLP
                                            *Attorneys for Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND ANSWERS (17-00023) –
Page 40

FPDOCS 33785934.1

# Exhibit Y

# Filed Under Seal

# Exhibit Z

# Filed Under Seal

# Exhibit AA

# Filed Under Seal

# Exhibit BB

Filed Under Seal

# Exhibit CC

# Filed Under Seal