1

2

THE HONORABLE JAMES L. ROBART

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

DARREN DONAHUE,

| | |
|---|---|
| DARREN DONAHUE,<br><br>            Plaintiff,<br><br>        v.<br><br>RED ROBIN INTERNATIONAL, INC., a<br>Nevada Corporation; RED ROBIN GOURMET<br>BURGERS, INC., a Delaware Corporation; and<br>HAROLD HART and his marital community,<br><br>            Defendants. | No. 2:17-cv-00023-JLR<br><br>DECLARATION OF RICHARD E.<br>GOLDSWORTHY IN SUPPORT OF<br>PLAINTIFF'S OPPOSITION TO<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT<br><br>NOTE ON MOTION CALENDAR:<br>April 13, 2018 |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page i

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

I, Richard E. Goldsworthy, being duly sworn on oath under penalty of perjury under the laws of the United States and Washington State depose and say:

1.      I am an attorney at The Blankenship Law Firm, P.S., counsel of record for Plaintiff Darren Donahue in the above-captioned matter.

2.      Attached as Exhibit A is a true and correct copy of the Declaration of Joey Dunivan dated March 22, 2018.

3.      Attached as Exhibit B is a true and correct copy of excerpts from the deposition of Darren Donahue on January 24, 2018.

4.      Attached as Exhibit C is a true and correct copy of excerpts from the deposition of Harold Hart on January 18, 2018.

5.      Attached as Exhibit D is a true and correct copy of excerpts from the deposition of Claire Simpson on February 7, 2018.

6.      Attached as Exhibit E is a true and correct copy of excerpts from the deposition of Julie Rivera on February 8, 2018.

7.      Attached as Exhibit F is a true and correct copy of excerpts from the deposition of Tim Mei on February 13, 2018.

8.      Attached as Exhibit G is a true and correct copy of excerpts from the deposition of Kate Hersel on February 14, 2018.

9.      Attached as Exhibit H is a true and correct copy of the Red Robin offer letter to Darren Donahue in April 2008.

10.     Attached as Exhibit I is a true and correct copy of the People Report dated June 19, 2011, which reflects that Darren Donahue was "ready for promotion within 6 months." Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page 1

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

11.     Attached as Exhibit J is a true and correct copy of a letter from Darren Donahue's doctor dated January 13, 2012 received by Red Robin.

12.     Attached as Exhibit K is a true and correct copy of a document reflecting Darren Donahue's need for accommodations at work due to his disability in February 2012.

13.     Attached as Exhibit L is a true and correct copy of a screenshot of medical leaves taken by Darren Donahue while he was employed by Red Robin.

14.     Attached as Exhibit M is a true and correct copy of the job description for General Manager at Red Robin.

15.     Attached as Exhibit N is a true and correct copy of a January 11, 2012 letter from Red Robin to Darren Donahue regarding his termination after his medical leave expired.

16.     Attached as Exhibit O is a true and correct copy of an email string from January 2012 after Darren Donahue received a letter regarding his termination when his medical leave expired.

17.     Attached as Exhibit P is a true and correct copy of the relevant pages from Defendants' Responses to Plaintiff's First Set of Requests for Admission.

18.     Attached as Exhibit Q is a true and correct copy of Darren Donahue's 2012 performance review.

19.     Attached as Exhibit R is a true and correct copy of a document reflecting Darren Donahue's need for accommodations at work due to his disability in March 2013.

20.     Attached as Exhibit S is a true and correct copy of an email string regarding Darren Donahue's need for accommodations at work due to his disability in March 2013.

21.     Attached as Exhibit T is a true and correct copy of an email string from October 2013 regarding Darren Donahue's interest in applying for a promotion and approval by Roger Byers and Erik Yates to apply.

22.     Attached as Exhibit U is a true and correct copy of an email and relevant pages from the Period 11 2013 Scorecard, which reflects that Darren Donahue's Auburn restaurant

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page 2

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

was mostly in the "green" for the year. Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

23.     Attached as Exhibit V is a true and correct copy of Darren Donahue's 2013 performance review.  Darren Donahue received the rating "Does Not Meet Expectations."

24.     Attached as Exhibit W is a true and correct copy of an email sting from January 2014 regarding Darren Donahue's complaint of retaliation and discrimination.

25.     Attached as Exhibit X is a true and correct copy of an email sting related to Darren Donahue's from January 2014 complaint.

26.     Attached as Exhibit Y is a true and correct copy of an EthicsPoint complaint generated due to Darren Donahue's January 2014 complaint of retaliation and discrimination.

27.     Attached as Exhibit Z is a true and correct copy of an email from Darren Donahue to Julie Rivera regarding his 2013 scores.

28.     Attached as Exhibit AA is a true and correct copy of an email and relevant pages from the Period 13 2014 Scorecard.  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

29.     Attached as Exhibit BB is a true and correct copy of the People Report from March 2014, which reflects that Darren Donahue was a "Real Risk."  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

30.     Attached as Exhibit CC is a true and correct copy of 2013 performance reviews of other General Managers within Darren Donahue's region.  No other General Managers received the rating "Does Not Meet Expectations."  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page 3

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

31.     Attached as Exhibit DD is a true and correct copy of the Written Warning issued to Darren Donahue on March 27, 2014.

32.     Attached as Exhibit EE is a true and correct copy of the Food Safety and Sanitation Assessments for Darren Donahue's restaurant in 2014. Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

33.     Attached as Exhibit FF is a true and correct copy of an email string regarding missed pay to Darren Donahue in August 2014.

34.     Attached as Exhibit GG is a true and correct copy of the People Report from August 2014.  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

35.     Attached as Exhibit HH is a true and correct copy of the People Report from December 2014. Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

36.     Attached as Exhibit II is a true and correct copy of the People Report from March 2015.  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

37.     Attached as Exhibit JJ is a true and correct copy of Darren Donahue's 2014 performance review.

38.     Attached as Exhibit KK is a true and correct copy of an email complaint by Darren Donahue regarding his 2014 performance review.

39.     Attached as Exhibit LL is a true and correct copy of an email sting from January and February 2015 regarding Red Robin's elimination of the Special Needs Program for disabled employees.

40.     Attached as Exhibit MM is a true and correct copy of an email sting from March 2015 between employees in HR regarding Darren Donahue.

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page 4

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

41.     Attached as Exhibit NN is a true and correct copy of an email sting from November 2014 regarding submitting payment to employee Christopher Ferguson.

42.     Attached as Exhibit OO is a true and correct copy of an email sting from November 2014 regarding submitting payment to employee Christopher Ferguson.

43.     Attached as Exhibit PP is a true and correct copy of an email sting with Red Robin Payroll in October 2014 and spreadsheet related to the transfer of employee Christopher Ferguson to store #481 in Henrietta, NY.  Defendants have marked this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

44.     Attached as Exhibit QQ is a true and correct copy of an email sting related to the IT ticket submitted on October 17, 2014 related to Christopher Ferguson.

45.     Attached as Exhibit RR is a true and correct copy of an email sting related to the Christopher Ferguson issue.

46.     Attached as Exhibit SS is a true and correct copy of an email sting related to Darren Donahue's email complaint submitted after his termination.

47.     Attached as Exhibit TT is a true and correct copy of an email sting from September 2014 related to Darren Donahue's leave of absence.

48.     Attached as Exhibit UU is a true and correct copy of an email sting related to Darren Donahue's termination.

49.     Attached as Exhibit VV is a true and correct copy of Darren Donahue's termination document dated June 15, 2015.

50.     Attached as Exhibit WW is a true and correct copy of a written warning issued to a General Manager in RVP Mei's division on August 19, 2015.

51.     Attached as Exhibit XX is a true and correct copy of an EthicsPoint Complaint related to a General Manager in RVP Mei's division in August 2015.  Defendants have marked

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page 5

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

this document "Confidential" under the parties' Confidentiality Agreement and therefore, it is therefore being filed under seal.

52.     Attached as Exhibit YY is a true and correct copy of a written warning issued to a General Manager in Defendant Hart's region in April 2015.

53.     I communicated with defense counsel, Catharine Morisset, on April 9, 2018 regarding Defendants' confidential designation of certain documents and to determine if Defendants would be willing to remove the confidential designation for their documents. Ms. Morisset informed me that Defendants were not willing to allow these documents to be filed publicly so Plaintiff is filing these documents under seal: Exhibits I, U, AA, BB, CC, EE, GG, HH, II, PP, and XX.  Additionally, the Court has already granted Plaintiff's Motion to Seal many of the PeopleReports and Scorecards.  See Dkt.  39.

I declare under penalty of perjury under the laws of the United States and Washington State that the foregoing is true and correct to the best of my knowledge and belief.

SWORN TO this 9th day of April, 2018 at Seattle, Washington.

By:   s/ Richard E. Goldsworthy
Richard E. Goldsworthy

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page 6

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

## DECLARATION OF SERVICE

I hereby certify under penalty of perjury under the laws of the State of Washington that on the date and in the manner listed below I caused delivery of a true copy of the attached document to the following attorneys for Defendants:

| | |
|---|---|
| Suzanne Kelly Michael, WSBA No. 14072 | ☐ by Electronic Mail |
| Catharine M. Morisset, WSBA No. 29682 | ☐ by Facsimile Transmission |
| Margaret Burnham, WSBA No. 47860 | ☐ by First Class Mail |
| Fisher & Phillips LLP | ☐ by Hand Delivery |
| 1201 Third Ave, Suite 2750 | ☐ by Overnight Delivery |
| Seattle, WA 98101 | ☒ by Notification via E-filing System |
| Telephone: (206) 682-2308 | |
| Facsimile: (206) 682-7908 | |
| Email:  smichael@fisherphillips.com | |
|        cmorisset@fisherphillips.com | |
|        mburnham@fisherphillips.com | |

*Attorneys for Defendants*

DATED this 9th day of April, 2018, at Seattle, Washington.

 s/ Richard E. Goldsworthy
Richard E. Goldsworthy, WSBA No. 40684
The Blankenship Law Firm, P.S.
1000 Second Avenue, Suite 3250
Seattle, WA 98104
Telephone: (206) 343-2700
Facsimile: (206) 343-2704
Email:  rgoldsworthy@blankenshiplawfirm.com

DECLARATION OF RICHARD E. GOLDSWORTHY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Cause No. 2:17-cv-00023-JLR)
Page 7

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

# Exhibit A

1

2                             THE HONORABLE JAMES L. ROBART

3

4

5

6

7                      UNITED STATES DISTRICT COURT

               WESTERN DISTRICT OF WASHINGTON

8                            AT SEATTLE

9 DARREN DONAHUE,

                                 No. 2:17-cv-00023-JLR

10            Plaintiff,

                               DECLARATION OF JOHN DUNIVAN

11     v.

12 RED ROBIN INTERNATIONAL, INC., a

Nevada Corporation; RED ROBIN GOURMET

13 BURGERS, INC., a Delaware Corporation; and

HAROLD HART and his marital community,

14

            Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

I, John Dunivan, being duly sworn under penalty of perjury under the laws of the United States and State of Washington do depose and say:

1.     I am over the age of eighteen and competent to testify on the matters set forth herein based on my own personal knowledge.

2.     I began working for Red Robin in July of 2005 and worked for them continuously from approximately 2007 to 2014. Throughout this timeframe, I have held every position in a Red Robin restaurant at one point or another other than Kitchen Manager, Assistant General Manager, and General Manager. This means everything from host, server, bartender, and managing service (servers like waiters and waitresses) and managing bar (maintaining inventory, supervising bartenders and servers, and liquor costs with my own budget line). In these positions I worked with many managers, and in my management positions I worked with the General Manager, who is the manager who is charge of running a restaurant.

3.     In addition to the positions I held within the home restaurant (I was assigned to one restaurant at a time), I also had responsibilities as a Regional Trainer, someone who trains new trainers at a common site in order to teach them how properly train employees ("Team Members") at their home restaurants.

4.     I was later promoted to the position of New Restaurant Opening Trainer ("NRO"), a trainer that assists with opening new Red Robin locations. This meant training an entirely new staff and departments (such as hosts and bussers) when a new restaurant opened. I would then see them through the process until the new staff was ready to run the restaurant on their own.

5.     Red Robin has hundreds of restaurants. It ranks each of them by region, division, and in addition to a national ranking in areas such a labor, productivity, guest voice (meaning customer service feedback), sales, food costs, liquor costs, amongst others. These categories were weighed against other restaurants. GM's like Mr. Donahue on at least a weekly

DECLARATION OF JOEY DUNIVAN (Cause No. 2:17-cv-00023-JLR)
Page 1

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

basis shared this information with the entire team by posting it in the Team Member break area.

6.      How each restaurant stacked up against other restaurants was openly shared. There were no secrets on the restaurant performance, and Red Robin set up standards so that all of the restaurants were competing with each other. It was a demanding environment to say the least.

7.      I worked closely with Mr. Donahue and other General Managers while I worked at Red Robin. I worked under five General Managers including him. In my opinion, Darren Donahue was an excellent General Manager, and none of the other managers were able to lead and drive results like him.

8.      I saw Mr. Donahue take charge of three restaurants (four if you count Bellevue discussed below) and lead the team to make them successful. He did this through demanding excellent customer service. He connected directly with me and other team members to personally help us reach our full potential, which drove these positive results.

9.      In my observation, Mr. Donahue was always focused on making sure that the Team at the restaurant did well because if we did, then the restaurant would be successful.

10.     He led by example, and I watched him wash dishes, clean bathrooms, and even cook in the kitchen if that's what it took to get the job done. When you watch him work with his attention to detail, and the quality of his work, it would trickle down. When you saw his plate presentation from a dish he plated (which was excellent), we wanted to emulate him.

11.     I worked with Mr. Donahue at Red Robin's Tacoma, Lakewood, and Auburn restaurants. Mr. Donahue was always my GM at all these locations. Front of house is host, busser, server, and bartender. Heart of house includes dishwashing, cooking, and prepping.

12.     At the Tacoma location, I worked under Mr. Donahue in front of house and heart of house positions including working as a server, mid-manager (paid hourly), and as a trainer.

DECLARATION OF JOEY DUNIVAN (Cause No. 2:17-cv-00023-JLR)
Page 2

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

13.     At the Lakewood location, I did everything that I did at Tacoma but was promoted to lead trainer, again under Mr. Donahue's leadership as the GM.

14.     At the Auburn location, I worked under Mr. Donahue as one of up to five salaried managers overseeing the hosts, bussers, bar, kitchen, service, and up to about 35 employees at the time in my department that I managed directly in a restaurant that had about 90 employees total.

15.     I had an opportunity through working with Mr. Donahue on a near daily basis to observe his skill and ability as a General Manager for all of these Red Robin restaurants.

16.     When Mr. Donahue took over the Tacoma restaurant, under his direction as GM, he led that same team from one of the worst performing restaurants nationwide (ranked near last) to one of the best within a year (in the top 20).

17.     Mr. Donahue mentored and led many other Team Members like me to do well.

18.     Under Mr. Donahue's direction and mentorship, I was able to achieve a goal of mine and was selected Team Member of the Year for my region in 2008, which was made up of six restaurants at the time out of than 500 employees. Although Mr. Donahue nominated me, the Regional Manager personally had to select me amongst other candidates for this honor.

19.     In 2009, I moved with Mr. Donahue when he was asked to open a new restaurant at the Lakewood Town Center. Red Robin had to select the best GMs to open new restaurants. Opening new restaurants is a huge task, where a new staff needs to be hired and trained.

20.     In 2012, I transferred to the Auburn restaurant, where Mr. Donahue was already working as the General Manager.

21.     In 2013, I learned that Mr. Donahue was asked to go to the Bellevue restaurant to help turn around its performance. At the time, the Auburn restaurant was doing extremely well. I was at Auburn when he left, and after he returned.

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

22.     While Mr. Donahue transferred temporarily to the Bellevue location, an Assistant General Manager, Travis Degraffenried, took over managing the Auburn restaurant in Mr. Donahue's absence.

23.     When Mr. Degraffenried took over Mr. Donahue's General Manager responsibilities, I was a part of what was a rough transition for the Team Members and for the Restaurant. I personally liked him, but as an Assistant General Manager acting in the role of a GM he did not seem to get the same respect from Team Members as Mr. Donahue did. From my understanding, this was the first time he worked in the role of a GM and did not have the same experience leading the team.

24.     I saw firsthand that Mr. Degraffenried's management style negatively affected the morale of the Team Members and the restaurant.

25.     His management style was very different from Mr. Donahue. It appeared to me that he had a lot of trouble gaining the respect of the employees and managers some of whom voiced their concerns to me. He was not on the floor a lot more (instead of in the office) and he did not have the same of direct management style, in addition to weaker coaching skills from less experience. The restaurant was not run as well under Mr. Degraffenried and he did not command the same respect as Mr. Donahue.

26.     During the time that Mr. Degraffenried was in charge of the Auburn restaurant, Red Robin conducted internal surveys to gauge employee satisfaction called Team Member Voice. To the best of my recollection, Red Robin conducted these surveys about twice a year.

27.     After Mr. Donahue left and Mr. Degraffenried started managing the location, the Auburn restaurant received a low score on a Team Member Voice survey. The survey has 21-day window for employees to call in and voice any comments about the current state of the restaurant. As a result, the Team Member Voice Score that happened under Mr. Degraffenried's leadership was much lower than any Team Member Voice survey that we received while Mr. Donahue was managing the Auburn restaurant.

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700



28.     Having worked for both Mr. Donahue and Mr. Degraffenried and having seen the change in the environment, the low Team Member Voice survey was a direct reflection on Mr. Degraffenried's lack of experience and leadership of the restaurant, as score that happened while Mr. Donahue was gone.

29.     I knew that Mr. Donahue had been diagnosed with cancer and that he had continuing health issues. In fact, I remember on several occasions seeing him lying on the floor in the manager's office because he was in so much pain.

30.     I also knew that Mr. Donahue went on a couple of leaves due to his health issues in 2013 and 2014.

31.     In my experience, Mr. Donahue was detail oriented, goal focused and was a fair manager. I always knew what was expected of me and where I stood with him. I never saw him treat anyone unfairly. He set expectations high and always had an open door. He always appeared willing to help Team Members who were struggling or just wanted to improve. Mr. Donahue would work with anybody who wanted to be developed to be better employee.

32.     In my experience working with Mr. Donahue, the employees he managed who performed well and met Red Robin's expectations were recognized and had the opportunity for promotion. When there were employees who were not performing well, Mr. Donahue was open and straightforward about their performance issues and worked hard to give them opportunities to improve their performance.

33.     In my observation, Mr. Donahue upheld the standards and expectations that Red Robin held him to. As a former manager and long-term Red Robin employee, I am aware of the polices and expectations that Red Robin set for their restaurants. Mr. Donahue implemented the culture and policies that Red Robin put forward, including cultivating a culture of innovation and recognition. He put practices in place so that we could meet and exceed the standards that Red Robin set so that we could be the best in class.

DECLARATION OF JOEY DUNIVAN (Cause No. 2:17-cv-00023-JLR)
Page 5

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

1    I declare under penalty of perjury under the laws of the United States and Washington

2   State that the foregoing is true and correct to the best of my knowledge and belief.

3

4    SWORN TO this 22nd day of March, 2018.

5

6    By: _____

7    JOHN DUNIVAN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JOEY DUNIVAN (Cause No. 2:17-cv-00023-
JLR)
Page 6

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

# Exhibit B

 1              IN THE UNITED STATES DISTRICT COURT

 2                WESTERN DISTRICT OF WASHINGTON

 3                         AT SEATTLE

 4  _____

 5  DARREN DONAHUE,              )
            Plaintiff,           )
 6     vs.                       )
    RED ROBIN INTERNATIONAL,     )
 7  INC., a Nevada              )
    Corporation; RED ROBIN       )  No. 2:17-cv-00023 JLR
 8  GOURMET BURGERS , INC., a )
    Delaware Corporation; and )
 9  HAROLD HART and his          )
    marital community            )
10          Defendants.          )
    _____

11

12      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

13                            OF

14                     DARREN DONAHUE

15  _____

16                       9:09 a.m.

17                   January 24, 2018

18                   1201 Third Ave

19                 Seattle, Washington

20

21

22

23

24  REPORTED BY: Margaret Walkky, CCR, RPR, RMR, CRR

25  Court Reporter, License No. 2540

**Darren Donahue**                                          **January 24, 2018**

Page 42

1          Q.    That's the right Dan?

2          A.    That's the correct Dan.

3          Q.    Was your first -- you were hired in as

4    a general manager at Red Robin; is that correct?

5          A.    Assistant general manager in training.

6          Q.    They had you go through a training

7    period.    How long did the training period last?

8          A.    I believe it was 11 -- or nine or 11

9    weeks, somewhere in there.

10         Q.    What did that training program entail

11   at Red Robin when you went through it?

12         A.    I shadowed the general manager quite a

13   bit and went through a lot of training in the

14   kitchen, trained in all positions of the restaurant.

15   I did some courses I think.    They had a training book

16   and you went through the training book, and I guess

17   when you're done with the training book, you're done

18   with your training.

19         Q.    That was just something you read, the

20   training book?

21         A.    There were exercises in it that the

22   general manager checked off that were complete or

23   they did them with you.

24         Q.    There was no online component at that

25   point?

**Darren Donahue**                                            **January 24, 2018**

Page 76

```
 1                    MS. MORISSET:  He gets to ask me if he
 2    needs clarification, sure.
 3                    MR.  BLANKENSHIP:  You can ask her to
 4    clarify.  There might be times where I think it's
 5    necessary to read back the record, but just if you
 6    could ask her for clarification.
 7            Q.    Please do.  You signed this form,
 8    right?
 9            A.    Yes, I did.
10            Q.    And you signed it under two sentences,
11    right?
12            A.    Yes, I did.
13            Q.    When you signed it, did you disagree or
14    agree with either of those sentences?
15            A.    It's not -- I mean, I agreed with my
16    doctor's advice.
17            Q.    So you're unable to tell me if you
18    agreed or disagreed with of those sentences?
19                    MR.  BLANKENSHIP:  Object to the form,
20    and foundation.
21            A.    To a certain degree, yes.
22            Q.    And why do you say, "To a certain
23    degree"?
24                    MR.  BLANKENSHIP:  Object to
25    foundation.
```

**Darren Donahue**                                  **January 24, 2018**

1          A.   Because again, I'd never been through

2   what I went through.   I never had my bladder out

3   before.   I never had an iliac conduit stuck to my

4   stomach and a bladder put on the outside of my

5   stomach.   My doctors are experts in that field and

6   they're saying this is what you need.

7                So I mean, do I have knowledge of what

8   I can and can't do in this new condition that I'm in?

9   I again would refer to an expert who has dealt with

10  this for many years rather than me just saying that I

11  know exactly what I need to do.

12          Q.   Your doctor signed this, right?

13          A.   One of them did.

14          Q.   Dr. Liao is one of your physicians,

15  correct?

16          A.   He's my radiologist, yes.

17          Q.   Do you have any reason to doubt these

18  are the accommodations that Dr. Liao was

19  recommending?

20          A.   I don't.

21          Q.   You understand that you've made a claim

22  in this case that Red Robin failed to accommodate;

23  isn't that true?

24               MR.  BLANKENSHIP:  And I'm going to

25  object to form and foundation to the extent it calls

Darren Donahue                                          January 24, 2018

Page 78

1    for a legal conclusion as to what his claims are.

2                   MS. MORISSET:  He can answer as to

3    whether he has an understanding of what he's suing

4    Red Robin for.

5           Q.   Do you understand that you've made an

6    allegation in this case, Mr. Donahue?

7                   MR.  BLANKENSHIP:  Same objections.

8           A.   Yes.

9           Q.   What accommodations do you maintain

10   that Red Robin didn't give you?

11          A.   They didn't offer me any help in my

12   day-to-day physical demands of my job.  Because if

13   you recall, the description of my job that you gave

14   me, we had to go over the physical demands, there's

15   quite a few physical demands on here, including

16   lifting up to ten hours a day up to 75 pounds,

17   carrying up to 75 pounds ten hours a day.

18                   There was no one there to do those

19   things when they had to be done and they're essential

20   functions of the Red Robin thing, so they offered me

21   accommodations, but they didn't offer any way to do

22   them.

23          Q.   So is it your testimony you were alone

24   in the restaurant when you needed to lift something?

25          A.   There were many times when there's me

**Darren Donahue**                                    **January 24, 2018**

Page 79

1  and one other person when we got our orders on

2  Tuesdays and Saturdays.  I was allotted three hours

3  before we were open to set up my kitchen and we'd get

4  these orders that took hours to put away, and the

5  other person I had had to not only put away a

6  majority of the order, but they also had to prepare

7  the kitchen for opening and follow all the

8  safety/sanitation procedures, so there was no one

9  else there that could have lifted these things when I

10 was there.

11         Q.    You set the schedule, didn't you,

12 Mr. Donahue?

13         A.    No, I didn't set the schedule.

14         Q.    You couldn't ask, you couldn't have

15 asked for somebody else to be put on the schedule?

16         A.    I did.

17         Q.    Who did you talk to?

18         A.    Harold Hart.

19         Q.    When did you talk to Harold?

20         A.    Or Erik.

21               They set the schedule and they said you

22 get one person for when you get your deliveries to

23 come in.  There was a set guideline on the Watson

24 format of how many people you could have there.

25         Q.    Respectfully, Mr. Donahue, that wasn't

**Darren Donahue**                                                    **January 24, 2018**

Page 80

1   my question.

2                      MR.  BLANKENSHIP:  I'm going to --

3               Q.   My question is this:  Did you ever ask

4   Harold Hart to have somebody else added to the

5   schedule during this period that you're talking

6   about?

7               A.   I believe I did.

8               Q.   And when was that?

9               A.   I don't recall the exact date.  I think

10  I asked, I think I talked to -- I think I talked to

11  Erik and Harold about it.

12              Q.   Did you ever talk to anybody in HR

13  about it?

14              A.   Not that I recall.

15              Q.   So I didn't understand part of your

16  testimony.  Is it your testimony that you had no

17  control over who worked and when?

18              A.   There were pretty rigid guidelines on

19  how many people you could have in the restaurant,

20  they called them opening hours, how many people you

21  could have in your restaurant before the hour of 11

22  o'clock when you opened, and I was not told that I

23  could deviate from that by anyone.

24              Q.   Do you know a woman named Tara Jurhs?

25              A.   I don't know her.  I've seen

Darren Donahue                                    January 24, 2018

                                                        Page 81

 1   correspondence from her.

 2              Q.    You've seen emails with her?

 3              A.    I have seen emails from her.

 4              MR.  BLANKENSHIP:  I'm going to object

 5   to form.  You're talking about since the litigation

 6   began or during his employment?

 7              MS. MORISSET:  He said he's seen

 8   correspondence with her.  I want to know what type of

 9   correspondence.

10              MR.  BLANKENSHIP:  I'm going to object

11   to form and to the foundation.

12         A.    I've seen -- I think I've seen email

13   and I think I've seen, I've seen mail that she sent

14   me and I've seen -- I might have talked to her, I

15   don't know.

16              Q.    Do you recall having any email

17   exchanges with her regarding accommodations for you

18   to be able to perform your job?

19              A.    I don't recall.

20              Q.    Other than this lifting issue, is there

21   any physical adjustment or help, to use your word,

22   that you believe Red Robin didn't provide to you

23   during your tenure related to your health condition?

24              A.    Yes.

25              Q.    What else?

**Darren Donahue**                                                    **January 24, 2018**

Page 82

```
 1              A.   Well, I feel like my budget was more
 2    difficult than other restaurants that were around me
 3    doing comparable sales.   There were higher
 4    expectations on me at all times to produce great
 5    results, and they were looking to reduce my
 6    management and I told them that I didn't think that
 7    was a good idea with my being in the condition I'm
 8    in, and I felt like it was a mistake, but they did it
 9    anyway.
10              Q.   So you believe Red Robin should have
11    given you a bigger budget for your restaurant as an
12    accommodation for your health conditions?
13              A.   I believe that to be true.
14              Q.   Who did you talk to about that?   You
15    said you talked to somebody?
16              A.   I talked to Tim Mei about it at a
17    conference when he was making the decision to cut
18    me -- cut a manager out of my restaurant.   I told him
19    at a conference in Orlando, and we talked and I said
20    Tim, I'm struggling.   It's hard for me to do my job
21    with five managers.   Going down to four would be very
22    difficult for me.   And he said oh, you'll be fine.
23              Q.   What year was that, Mr. Donahue?
24              A.   The beginning of 2015.
25              Q.   I didn't mean to cut you off.   Had you
```

**Darren Donahue**                                    **January 24, 2018**

Page 83

1    finished your answer?

2                A.    I think so.

3                Q.    Okay.  And you said it was a conference

4    in Orlando?

5                A.    I believe it was Orlando, yes.

6                Q.    Was that, can you just -- is there a

7    title to that conference or what was the subject of

8    that conference?

9                A.    General managers conference.

10                Q.    Did you tell Mr. Mei that you needed

11    the other manager as an accommodation for your health

12    conditions?

13                A.    I did.

14                Q.    What health conditions were you

15    suffering from in early 2015?

16                A.    I had a permanent hernia, same one I

17    had on this accommodation list.

18                Q.    Did you talk to anybody in HR in 2015

19    about needing an additional manager as an

20    accommodation for your hernia?

21                A.    I talked to my regional vice-president

22    and my regional manager, Harold Hart, about it.

23                Q.    So the answer to my question is no, you

24    didn't talk to anybody in HR?

25                A.    I think they're part of HR.  I mean, I

**Darren Donahue**                                    **January 24, 2018**

Page 89

```
 1    Red Robin.  Other than that time, not that I recall.

 2              Q.    Thank you for the clarification.

 3                    When did you -- do you recall when you

 4    talked to Harold about the time off in September 2015

 5    that you were going to need?

 6              A.    I do.

 7              Q.    When was that?

 8              A.    It was on June 4th.

 9              Q.    Is there a reason you remember the date

10    so specifically?

11              A.    Yes.

12              Q.    What is that?

13              A.    I had put one of my hourly employees up

14    for a management position and he came in the

15    restaurant on that day to do an interview.  It was on

16    or about that day, and he interviewed her for a

17    management position, and -- do you want to ask

18    another question?  Is that --

19              Q.    Are you talking about Kate Hersel?

20              A.    Yes.

21              Q.    So Harold met with Kate that day.  Were

22    you in the meeting with the two of them?

23              A.    I was not.  I was in the restaurant but

24    not in the meeting.

25              Q.    Did you ask Harold about specifically
```

**Darren Donahue**                                                    *January 24, 2018*

Page 90

1    **needing the time off on June 4?**

2              A.    I did.

3              **Q.    And when did that occur?**

4              A.    After his interview with Kate Hersel,

5    she came running back to me.  I was in the office and

6    she goes I think I got you in trouble.  And I said

7    why?  And she goes well, I told Harold that I wanted

8    to be done with management training by September so I

9    could come back and help you in the Auburn restaurant

10   because you needed to get your hernia repaired, and

11   she said he was -- he seemed very upset about that

12   and taken back.  And she said that she even said I

13   didn't mean to get Darren in trouble.

14              And so she told me about that exchange,

15   and so I went up to Harold, who was sitting at the

16   same booth where they did the interview, and I said

17   how did the interview go?  And he said oh, it went

18   great, you know, and then he said is it true that you

19   are going to need your hernia repaired in September?

20              And I said yes.  Well, I'm going to try

21   and -- I have my goal is to schedule in September

22   since it's a slower time of the year and I've saved

23   all my vacation for the year so that I could get that

24   done, but I have -- you know, I have a double hernia

25   and I need to get it repaired.

**Darren Donahue**                                    **January 24, 2018**

Page 91

1            And he says, he asked me how long I was

2      going to be out.   And I said well, if they just

3      repair the hernia, then it would be about four weeks.

4      But they're thinking about moving my stoma from my

5      right side to my left, so that would be pretty

6      extensive surgery and I would probably need to be out

7      for six weeks.   And he said, "Oh, okay," but he

8      seemed kind of like a dazed "oh, okay" and he left.

9            Q.    Why do you describe Harold as dazed?

10           A.    He seemed taken back by the

11     conversation, by me having to take a leave.

12           Q.    Did he say something that led you to

13     reach the conclusion that he seemed taken aback?

14           A.    I've known him for a couple of years,

15     so he didn't act -- it was an odd way for him to act.

16           Q.    But it wasn't something that he said?

17           MR.  BLANKENSHIP:   Object to the form.

18           A.    Just the way he said, "Oh, okay."

19           Q.    I'm just trying to find out if there

20     was another comment that he made, Mr. Donahue.

21           A.    No, that was it that day.

22           Q.    Did he talk to you about filling out

23     the paperwork with the leave of absence group?

24           A.    He did not.

25           Q.    You'd done that before, though, right?

**Darren Donahue**                                                **January 24, 2018**

Page 121

```
 1                    (Exhibit-34 marked.)

 2          Q.    Mr. Donahue, I'm handing you

 3    Exhibit-34.

 4          A.    Thank you.

 5          Q.    This looks to be several email

 6    exchanges between you and your favorite payroll

 7    specialist, Mara Coursey; is that right?

 8          A.    I don't know if she was my favorite,

 9    but I definitely enjoyed working with her.  Yes, it

10    is.

11          Q.    AuburnOutletCollection #213,

12    Mr. Blankenship even asked this question and I'm

13    confused every time, is that just the GMs or a

14    central box for everybody, or do you not know, in

15    2014?

16          A.    That is a central box for everyone.

17          Q.    So Mara sent an email on November 4 to

18    team member Christopher Ferguson but you replied on

19    that day, correct?

20          A.    Yes.

21          Q.    Is this the first you learned of there

22    being an issue with his time swipes?

23          A.    It is.

24          Q.    When you got this email, did you talk

25    to anybody in your restaurant about it?
```

**Darren Donahue**                                    **January 24, 2018**

Page 122

1           A.   Well, there were no managers -- I
2    believe there were no managers with me that day.   I
3    called Chris Ferguson to confirm with him and then I
4    believe I went back to the managers captain log and
5    looked for any notes.
6           Q.   So it looks like you left a voicemail
7    for Mr. Ferguson on November 4, according to this
8    email.   When do you recall speaking with him?
9           A.   A week later.
10          Q.   Would that have been the same day you
11   sent the top email to Ms. Coursey?
12          A.   Correct.
13          Q.   What did you and Chris talk about?
14          A.   He said he was missing hours from his
15   paycheck and I asked him how many hours he was
16   missing and he said 15.   And I go do you remember the
17   dates?  And he said yes, and I think he sounded very
18   believable.
19          Q.   And then I think you volunteered that
20   you looked at the captain's logs?
21          A.   I did.
22          Q.   Had you reviewed the captain's logs for
23   these days before getting this email?
24          A.   I don't recall, but I don't think I did
25   because when I went back and I looked at them, I

**Darren Donahue**                                                        **January 24, 2018**

Page 123

1   realized that there was a lot of blanks on them.  And

2   if there were blanks, normally I would say something

3   to my managers about what happened on this shift, why

4   aren't there any notes?  So that's why I believe that

5   was the first time I saw them.

6                Q.   Is it part of a general manager's job

7   duties to review the captain's logs when they come in

8   after being out of the restaurant for a couple of

9   days?

10              A.   Yes.

11              Q.   Before I ask you about them, I want to

12  ask another question.

13              Other than looking at the captain's

14  logs, did you look at any other records to verify the

15  15 hours that Mr. Ferguson told you he was missing on

16  his paycheck?

17              A.   I don't think so.

18              Q.   Mara asked you to complete punch edits,

19  correct?

20              A.   Yes.

21              Q.   Related to Mr. Ferguson?

22              A.   That's correct.

23                   (Exhibit-35 marked.)

24              Q.   Here's Exhibit-35.  There's three

25  pages.  One of them is double-sided.

**Darren Donahue**                                                    **January 24, 2018**

Page  124

```
 1              A.    Okay.

 2              Q.    Are these the punch edits you completed

 3    related to Mr. Ferguson and this issue and the email

 4    in Exhibit-34?

 5              A.    Yes.

 6              Q.    When you spoke with Mr. Ferguson, was

 7    he able to tell you which days he worked specifically

 8    by date that he didn't get paid for in his paycheck?

 9                    MR.  BLANKENSHIP:  I'll object to

10    foundation, lack of foundation.

11              A.    I believe he did.

12              Q.    So on Exhibit-34, Ms. Coursey relays

13    four different dates.

14              A.    Uh-huh.

15              Q.    Do you see that in that first email,

16    October 12, October 17, October 18, and October 19th,

17    but when I look at Exhibit-35 I see different dates.

18    October 12 is the same; would you agree?

19                    MR.  BLANKENSHIP:  Object to form.

20              Q.    There's a punch edit for October 12,

21    right?

22              A.    Yes.

23              Q.    There's a punch edit for October 14,

24    correct?

25              A.    Yes.
```

**Darren Donahue**                                    **January 24, 2018**

Page 125

1              Q.    But that's not one of the dates that

2    Ms. Coursey listed, right?

3              A.    Correct.

4              Q.    There's a punch edit for October 15,

5    but that's not one of the dates that Ms. Coursey

6    listed; is that right?

7              A.    That's correct.

8              Q.    What's the reason for the discrepancy,

9    Mr. Donahue?

10             A.    I was talking to Mara on the phone that

11   day too as well as emailing and she -- because I

12   didn't know where to find the sort of punch edit

13   forms in the system, and she said just fill out for

14   15 hours.  There was no specificity that I had to

15   have the exact dates on there or anything, and so I

16   just filled out -- I do a thousand things a day as a

17   general manager.

18                   So I was just trying to get the team

19   member paid as quickly as possible.  So I filled out

20   the forms and I think I asked her, do I need to fill

21   out -- how many do I need to fill out?  And I think

22   she said three.  It wasn't a big deal.  It was just

23   like get the forms in for 15 hours.

24             Q.    So there are dates to get the 15 hours

25   but they're not necessarily the dates that he worked,

**Darren Donahue**                                      **January 24, 2018**

Page 126

1    correct?

2            A.    They're not, no.

3            Q.    Each one of them says 11:00 to 4:00, I

4    believe.

5            A.    Yeah, that was just the hours.

6            Q.    I'm correct that that's what each of

7    them says?  Yes?

8            A.    Sorry.

9            Q.    Sorry.  I know you're anticipating my

10   question.

11                 Is that right?

12           A.    Yes, that's what it says.

13           Q.    And then I think you started to answer

14   my next question, which was, you just put a shift in?

15           A.    That's correct.

16           Q.    Yes, okay.

17                 (Exhibit-36 marked.)

18           Q.    I've handed you what I've marked as

19   Exhibit-36.

20           A.    Okay.

21           Q.    Does that look like a printout of a

22   captain's log?

23           A.    Yes.

24           Q.    And it's for October 12, 2014, correct?

25           A.    May I correct my statement?

**Darren Donahue**                                              **January 24, 2018**

1          Q.   Did you discipline any of your managers

2     related to this Chris Ferguson issue?

3          A.   I'm sure we talked about it after I

4     gained knowledge.  I'm sure we talked about it and I

5     told them you're not allowed to use -- you shouldn't

6     have people under someone else's -- they told me the

7     reasons and it was a very, extremely one-off

8     situation and so I felt talking to them about it was

9     the proper way go about it.

10         Q.   Who is the "they" in your answer?

11         A.   The managers in the restaurant, letting

12    them know.

13         Q.   Who would that be?  Do you have a

14    specific memory of speaking with one of your

15    managers?

16         A.   A specific memory?  I remember talking

17    with Kate Hersel about it I think after I found out

18    about it.  I don't remember specifically talking to

19    all the managers about it individually, but it was

20    something I would do, I think.  Sorry.

21         Q.   Did you tell Kate it was inappropriate

22    for her to let Chris work under her swipe card?

23         A.   I said you should have sent him home.

24         Q.   Do you remember when Harold Hart and

25    Marilee Smith came to talk to you about

**Darren Donahue**                                    **January 24, 2018**

Page 132

1    Mr. Ferguson's pay?

2              A.    Yes.

3              Q.    Do you recall telling Mr. Hart that you

4    felt it was appropriate to let Chris work so he could

5    get his tips?

6              A.    I didn't tell him that.

7              Q.    Did you tell Marilee that?

8              A.    Nope.

9              Q.    So if both of them said that, they're

10   lying?

11             A.    I'd say they didn't remember things

12   accurately.

13             Q.    You recall sending a statement to Steve

14   Carley and Denny Post?

15             A.    I do.

16                   (Exhibit-38 marked.)

17             Q.    Is that the email I was just asking you

18   about?

19             A.    Yes, it's also addressed to other

20   people.

21             Q.    Who else is on the email?

22             A.    Tim Mei, the regional vice-president;

23   Claire Simpson, who was in HR; Harold Hart, my

24   supervisor; and Marilee Smith, who is a human

25   resources business partner.

**Darren Donahue**                                                                          **January 24, 2018**

Page 143

1                            You don't think part of the reason you

2     were moved to Mr. Hart was because of that complaint

3     you made about Mr. Yates and the review?

4                 A.    I'm sure it led to it.

5                       (Exhibit-39 marked.)

6                 Q.    Handing you what's been marked as

7     Exhibit-39, it's Bates number 111 on the bottom.

8     It's just one page.   I asked you some questions

9     earlier this morning about in-person meetings with

10    Emily Thompson?

11                A.    Yes.

12                Q.    Do you recall that?

13                A.    Yes.   I'm sorry.

14                Q.    Do you recall if you had a quality

15    assurance visit by Ms. Thompson in March of 2014?

16                A.    I did.

17                Q.    What is Exhibit-39?

18                A.    It's a written warning.

19                Q.    Is it signed by you?

20                A.    Yes.

21                Q.    It's related to a -- well, it says QA

22    visit.   Did that mean quality assurance visit,

23    Mr. Donahue?

24                A.    It does.

25                Q.    Is that the visit we were just talking

**Darren Donahue**                                        **January 24, 2018**

Page  144

1   about with Ms. Thompson --

2              A.    Yes.

3              Q.    -- that led to this?

4                    You had knowledge that she was going to

5   visit your restaurant in March of 2014 ahead of time,

6   right?

7              A.    I did.

8              Q.    Did you take any steps to get ready for

9   that visit by Ms. Thompson?

10             A.    I don't recall any specific steps to

11  get ready for it.   Just general daily operations.

12             Q.    Was Harold Hart there too?

13             A.    He was.

14             Q.    Anybody else?

15             A.    Yes.

16             Q.    Who?

17             A.    Tim Mei was there and Erik Yates.

18             Q.    In March of 2014?

19             A.    That's correct.

20             Q.    It was Harold, Erik, Emily and Tim?

21  You don't think you're getting the first time you met

22  Emily mixed up with the second one?   I'm not trying

23  to trick you.   I'm really just asking.

24             A.    No, I think this is the second time I

25  met her.

**Darren Donahue**                                    **January 24, 2018**

Page 145

1        Q.   And your testimony is that Tim was
2   there and so was Erik.   Did I understand?
3        A.   And Harold.
4        Q.   And Harold and you?
5        A.   Yes.
6        Q.   What was -- did you -- well, you heard
7   Mr. Hart's testimony about this because you were
8   sitting at the deposition, right?
9        A.   Yes.
10        Q.   He described that you and Emily and
11   himself went around with it sounded like the
12   scorecard rating sheets we talked about earlier.   Do
13   you agree with that?
14             MR.  BLANKENSHIP:   I'll object to form
15   to the extent it mischaracterizes Mr. Hart's
16   testimony.
17        A.   Absolutely not true.
18        Q.   Tell me what happened.
19        A.   Harold even testified that we went
20   around with the yellow sheet of paper.   We just wrote
21   -- the QA visit was, Harold wrote me and there's
22   emails from Emily saying I want to visit Auburn.   I
23   actually emailed Harold back and said why me?   And he
24   said don't worry about it, it's just going to be for
25   fun.   It'll be a learning experience.   Don't worry

**Darren Donahue**                                    **January 24, 2018**

Page 146

1    about it.

2              Q.    **Have you produced that email in this**

3    **case?**

4              A.    I have not seen the email in this case,

5    but I know it exists or I know I sent it.

6                    So we went around and we looked at

7    stuff that we have never looked at before, not be on

8    our report, specific things in the bar area and in

9    the expo area and some things in the kitchen that are

10   not on the beautification scorecard.  And we didn't

11   do a complete beautification.  I mean, there's

12   nothing -- we did nothing close to what the

13   beautification scorecards that are used for front of

14   house and heart of house.

15             Q.    **So if I understand correctly, your**

16   **testimony is neither you nor Emily or Harold had the**

17   **beautification scorecard in front of them?**

18             A.    Nobody did.

19             Q.    **Did anyone, and I'm including Tim in**

20   **this as well, have the Steritech guidelines?**

21             A.    Nope.

22             Q.    **Did you take notes?**

23             A.    I was the one that took notes.

24             Q.    **Did you disagree with any of the issues**

25   **that were pointed out?**

**Darren Donahue**                                    **January 24, 2018**

Page 147

1            MR.  BLANKENSHIP:  I'm going to object

2    to form.  I'm going to move to strike the answer form

3    as vague as to time and what issues are being pointed

4    out where.

5            Q.   We're at the March 2014 visit where

6    everyone, where the four folks that you talked about

7    are walking around with a yellow pad.  Are you with

8    me?

9            A.   Yes.

10           Q.   You said that you looked at some

11   things.  Did anybody, Harold, Emily, yourself, Tim,

12   find any areas that could be improved?

13           A.   Absolutely.

14           Q.   Did you disagree with the

15   identification of any those areas that could be

16   improved?

17           A.   No.

18           Q.   Did you have any separate discussions

19   with Ms. Thompson regarding the findings of this

20   visit?

21           A.   I don't recall any.

22           Q.   Other than -- well, I assume you talked

23   to Harold because you've got the warning here.  Other

24   than -- and did he present this warning to you in

25   person or was it in email?

**Darren Donahue**                                        **January 24, 2018**

Page 148

1                    MR.  BLANKENSHIP:  I'm going to object

2    and move to strike the preface of counsel saying what

3    she's sure about, and object to form and foundation.

4            Q.   Did Harold present this warning to you

5    in person?

6            A.   I believe so.

7            Q.   Is it fair to call that, you met, had a

8    meeting about it?

9            A.   I don't know.  If you considered him

10   coming in and giving me the form a meeting, I guess

11   that's fair.

12           Q.   Other than that occasion that you have

13   in mind, did you and Harold have any discussions

14   about what was discovered on this March 2014 visit

15   you've been talking about?

16                MR.  BLANKENSHIP:  I just want to make

17   a clear point and I want to do it on the record.

18   You're not to guess about what happened.  A guess, I

19   guess we had a meeting or I guess we could call that

20   a meeting, you're not to guess.  You're supposed to

21   answer from your own personal knowledge.

22                MS. MORISSET:  Are you instructing him

23   not to answer if he has to guess?  I don't think that

24   is proper.  If he's telling me he's guessing, I get

25   to ask him if he has a specific recollection or not.

**Darren Donahue**                                          **January 24, 2018**

Page 151

 1                    MS. MORISSET:  And we're going to move

 2     on to a question.  Okay?

 3                    MR.  BLANKENSHIP:  No problem.

 4              Q.    Do you have a specific recollection of

 5     Mr. Hart giving you this warning on Exhibit-39?

 6              A.    I don't have a specific -- I do not.

 7              Q.    Do you have a specific recollection of

 8     any conversation with Mr. Hart about that, the

 9     outcome of that visit in March 2014?

10              A.    I don't have a recollection.

11              Q.    You'd agree getting a written warning

12     from your supervisor is a serious incident, right?

13                    MR.  BLANKENSHIP:  Object to form,

14     foundation.

15              A.    Would I agree getting a written

16     warning, yes, I think that that's -- they wouldn't do

17     it frivolously, yes.

18              Q.    Do you recall talking any steps to

19     improve your restaurant's sanitation after you

20     received this written warning in March 2014?

21              A.    Well, I would say that I didn't agree

22     with the written warning because it was the -- the

23     event was supposed to be done as a learning

24     experience, and I didn't agree with it because it

25     stated that there was a score involved and there was

**Darren Donahue**                                    **January 24, 2018**

Page 152

1    no scorecard used.   So I -- but I did use my notes to

2    clean the restaurant, to clean the areas they asked

3    me to or that we agreed that needed it.

4                Q.   Had you had any counseling, and I'm

5    putting aside we disagree with this, regarding your

6    restaurant's cleanliness in the past?

7                MR.  BLANKENSHIP:  Object to form, move

8    to strike the comments of counsel about what she

9    believes.  Form and foundation.

10               A.   With who?

11               Q.   With any of your supervisors.

12               A.   Everyone, every place I've ever worked,

13   the supervisors come in and to help you, they point

14   out areas where they feel like you could do better.

15               Q.   Including Red Robin, right?

16               A.   Including Red Robin.

17               Q.   Because restaurant cleanliness is

18   really important, right?

19               A.   Yes.

20               Q.   Do you think restaurant cleanliness was

21   more or less important than your scorecard?

22               MR.  BLANKENSHIP:  Object to form,

23   foundation, lack of foundation.

24               A.   Well --

25               MR.  BLANKENSHIP:  Incomplete

**Darren Donahue**                                    **January 24, 2018**

Page 161

1    good.

2              Q.   Do you have any reason to think that

3    that's wrong?

4              A.   No.

5              Q.   Do you recall having any additional --

6    well, let me go back because I don't want to trick

7    you.  I want it to be clear.

8                   Exhibit-34 is the email exchange with

9    Mara that we've discussed previously.

10             A.   Okay.

11             Q.   At the top is your inquiry to her that

12   states, "Can you pay him under TM meetings please?"

13   Do you see that?

14             A.   I do.

15             Q.   Do you recall if you had any

16   discussions either over the telephone or via email in

17   response to that "TM meetings please" request with

18   Ms. Coursey?

19             A.   I don't remember if we did or not.

20             Q.   Before you were terminated, did you

21   know if in fact his time was paid under team meetings

22   or not?

23             A.   Yes, I do know.

24             Q.   What was the answer?

25             A.   He was paid under server because that's

**Darren Donahue**                                          **January 24, 2018**

Page 162

1   what I directed them to do.

2          Q.     Who is the who you directed?

3          A.     Payroll.

4          Q.     So who did you talk to in payroll?  I'm

5   assuming not Mara.  Again, it wasn't supposed to

6   be --

7          A.     If you look at Exhibit-35, I sent in

8   the Kronos punch edit forms, and it says these are

9   the forms I used to punch in the -- his pay.  Under

10  job code position worked, I put server.

11         Q.     Other than the Kronos punch edit form

12  on the exhibit that you're pointing at, --

13                MR.  BLANKENSHIP:  You mean forms,

14  right?

15                MS. MORISSET:  Forms, there's a plural,

16  correct.

17                MR.  BLANKENSHIP:  Yes.

18         Q.     -- Exhibit-35, do you recall any other

19  communications with anybody at payroll to pay him

20  under server?

21         A.     I don't.

22                MS. MORISSET:  I'd like to take a

23  10-minute break.

24                THE WITNESS:  Sounds good.

25                MS. MORISSET:  So let's do that.

Darren Donahue                                    January 24, 2018

1    your communication style?

2                    MR.  BLANKENSHIP:  Object to form,

3    foundation.

4            A.   They got together and decided that my

5    taking FMLA leaves was not a good thing for Red Robin

6    and that we need to find a way to paper him out of

7    the restaurant.

8            Q.   And what's that based on?

9            A.   The reviews versus the results.

10           Q.   That's because you just didn't agree

11   with your reviews, right?

12           A.   They were not objective.  They were not

13   objective.

14           Q.   You thought you deserved exceeds

15   expectations in every single category on every one of

16   your reviews, correct?

17                   MR.  BLANKENSHIP:  Object to form and

18   foundation.

19           A.   Why would you ask me that?

20           Q.   Because you said that.

21           A.   Where?

22           Q.   In emails.

23           A.   I never said that.

24           Q.   Great.  So what did you disagree with

25   about your reviews, Mr. Donahue?

Darren Donahue                                    January 24, 2018

Page 183

1          A.    My results were best in class.   In

2    2013, I was the best, overall best restaurant in

3    Erik's region.   In 2014, I was the best overall

4    restaurant in Harold's region.   I was the only

5    restaurant in the Mei division for both those years,

6    the only restaurant in the Mei division for both

7    those years that was green on their scorecard for

8    both years.

9          Q.    **That's only a scorecard measure that**

10   **you're using, right?**

11              MR.  BLANKENSHIP:  Object to the form,

12   foundation.

13         A.    The scorecard is based on 11 areas of

14   focus.   It's not just a scorecard.   It's

15   profitability, it's Watson hours, it's guest

16   satisfaction.   It encompasses everything, a lot of

17   things in the restaurant, and it was ultra important.

18   Every time a regional manager talked to you, he was

19   talking to you about your scorecard.

20         Q.    **You're basing that on just the**

21   **scorecard, correct?**

22         A.    No, I'm not basing it just on the

23   scorecard.

24         Q.    **Well, you said you were number one in**

25   **the region?**

**Darren Donahue**                                              **January 24, 2018**

Page 216

```
 1    market or sitting?
 2                A.    Sometimes both.   There's down times.
 3    Coolers make good benches.
 4                Q.    So stipulated.
 5                      I want to turn back to applying for ROD
 6    positions.
 7                A.    Okay.
 8                Q.    You said, and you tell me if it's not
 9    what you said, that the process for applying changed
10    for you at some point?
11                A.    Yes.
12                Q.    I remembered that correctly?
13                A.    Yes, you did.
14                Q.    What were you thinking of when you said
15    the process changed?
16                A.    Well, I had a meeting in February of
17    2014 where Roger Byers came into my restaurant with
18    Harold Hart and we sat down at one of the tables in
19    the dining room and he, Roger Byers, was conducting
20    the meeting.   And I was on one side, and Harold Hart
21    and Roger were on the other.   And he told me that
22    Harold Hart is going to be my new regional manager,
23    and I'm never ever allowed to talk about my 2013
24    performance evaluation again to anyone.
25                Q.    You understood that to mean anyone in
```

**Darren Donahue**                                   **January 24, 2018**

Page 217

1    the company?

2              A.    He didn't want -- said he didn't want

3    to hear back that I've been talking about my 2013

4    performance evaluation with anyone.

5              Q.    Sorry for interrupting you.

6              A.    I asked him specifically may I still

7    apply for regional manager positions?   And he said

8    not for a long time.

9              Q.    Did you ask him why he said that?

10             A.    I was a little intimidated by his tone,

11   and the directive he gave me before didn't sound

12   positive, things didn't sound positive for me.   And I

13   had told him the reason why I wanted to be a

14   regional, besides the fact that I felt I could do --

15   produce fantastic results, but it would be much

16   physically easier for me.   The demands of the job are

17   not physically demanding as they are for general

18   manager, and he just said that it wouldn't be for a

19   long time.

20             Q.    And the "he" in all of that was Roger?

21             A.    Roger Byers.

22             Q.    But Harold was sitting there?

23             A.    But Harold was sitting there.

24             Q.    RODs made more than GMs, right?

25             A.    Yes.

Darren Donahue                                    January 24, 2018

Page 229

```
 1                A.   At the end of 2013.
 2                Q.   Did you and Mr. Yates have a
 3    relationship outside of work at any point?
 4                A.   He one time invited me to see his band
 5    play.
 6                Q.   Other than that one occasion, anything
 7    else?
 8                A.   No.  Sometimes he -- if we were going
 9    to the same meeting, he would ask me to pick him up
10    at his house so we could carpool.
11                Q.   Are you aware of the circumstances of
12    his termination from Red Robin?
13                     MR.  BLANKENSHIP:  Object to form.
14                A.   I know when it happened.  I'm not privy
15    to it.
16                Q.   He certainly didn't talk to you about
17    it?
18                A.   I don't think so.
19                Q.   Were you made aware when it happened --
20                A.   No.
21                Q.   -- by anyone?
22                A.   I don't recall when I became aware.
23                Q.   When did you take your leave in 2013?
24                A.   It was in October after I had applied
25    for the regional manager position.
```

**Darren Donahue**                                          **January 24, 2018**

Page  230

1          Q.   That was for some surgery on that

2    occasion, right?

3          A.   I had a hernia repair.   It was the

4    parastomal hernia repair.

5          Q.   Do you remember when you came back to

6    work at the end of 2013?

7          A.   What date?

8          Q.   If you recall, even the month is fine.

9          A.   In November, late November I think.

10              MR.  BLANKENSHIP:   We got records.

11   Well, I think we do.

12         Q.   We have records of that and I asked

13   because I've got things on a couple of different

14   records so I'm seeing if you could remember.   One

15   says December 3.

16         A.   I wouldn't be able to dispute it.

17              Q.   Around the end of November is just

18   fine.

19              MR.  BLANKENSHIP:   I just remember

20   December 3rd.

21              MS. MORISSET:   So did I, but that may

22   be your counsel and I remembering.

23              MR.  BLANKENSHIP:   We just know the

24   documents, right?

25              Q.   How was your relationship with Erik

**Darren Donahue**                                    **January 24, 2018**

Page 233

1  of the managers on my team and whether they were a

2  good fit for the team.

3               And he listened and took notes and said

4  okay, well, we'll definitely do something about this

5  and we'll reschedule your evaluation because we don't

6  have time to do it now, because we talked for

7  probably an hour.

8               Q.   Who was the manager you were having

9  difficulty with?

10              A.   "Difficulty" might be a hard word.

11              Q.   Okay.  Who was the manager you had in

12  mind when you were just describing --

13              A.   Travis Degraffenreid.  I don't know how

14  to spell it.

15              Q.   I think it's D-E-G-R-A-F-F-E-N-R-E-I-D,

16  or close to that.

17              Okay.  And then you also shared, I

18  think you just testified that you shared with Erik

19  you believed you were having some difficulties in

20  your interactions with him?

21              A.   With Erik?

22              Q.   With Erik.

23              A.   (Nods head.)

24              Q.   Did you elaborate on that further for

25  Erik in that meeting?

**Darren Donahue**                                    **January 24, 2018**

Page 234

1              A.    I believe I did.

2              **Q.    What do you recall telling him?**

3              A.    Well, I had told him that in quarter

4    three of the prior year, that Auburn restaurant had

5    missed a bonus, quarterly bonus by really a slim

6    margin.  At the same time he had asked me to go to

7    the Bellevue location to basically save it from

8    imploding in July, and that was part of that quarter.

9    And I'd spent five weeks in July at the Bellevue

10   location and when I came back -- or when I left, we

11   were on track to bonus easily for the quarter, and

12   when I came back, we were behind the eight ball.

13              And we ended up missing it by the

14   smallest of margins and so I asked if it was possible

15   we could do an exception because I'd heard of them.

16   I had never needed to do one before, and could he

17   help me with that.  I had asked that prior to our

18   meeting and I really never felt like he responded to

19   me.

20              Like he said -- I think he said fill

21   out an exception.  And I'm like Erik, I don't know

22   how to do that, I've never done it.  I've never had

23   to do that.  And I just really never felt like he was

24   trying to help me to do that, and so we talked about

25   that.

**Darren Donahue**                                        **January 24, 2018**

                                                          Page 257

```
 1              C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON      )ss.

 4   COUNTY OF KING           )

 5

 6

 7   I, Margaret Walkky, the undersigned Registered Merit
     Reporter and an officer of the Court for the State of
 8   Washington, hereby certify that the foregoing
     deposition upon oral examination of DARREN DONAHUE
 9   was taken before me on January 24, 2018 and
     transcribed under my direction;
10
     That the witness was duly sworn by me pursuant to RCW
11   5.28.010 to testify truthfully; that the transcript
     of the deposition is a full, true, and correct
12   transcript to the best of my ability; that I am
     neither attorney for, nor a relative or employee of,
13   any of the parties to the action or any attorney or
     counsel employed by the parties hereto, nor
14   financially interested in its outcome;

15   I further certify that in accordance with CR 30(e),
     the witness was given the opportunity to examine,
16   read, and sign the deposition, within 30 days, upon
     its completion and submission, unless waiver of
17   signature was indicated in the record.

18   IN WITNESS WHEREOF, I have hereunto set my hand and
     seal this date: January 31, 2018.
19

20

21

22          .............................
            Margaret Walkky, Registered Merit Reporter
23          Certified Court Reporter No. 2540 License
            expires July 18, 2018
24

25
```

# Exhibit C

1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF WASHINGTON

3                             AT SEATTLE

4    _____

5    DARREN DONAHUE                     )
                                        )
6                Plaintiff,             )
                                        )
7                vs.                    ) No. 2:17-cv-00023-JLR
                                        )
8                                       )
     RED ROBIN INTERNATIONAL, INC.,     )
9    a Nevada Corporation; RED ROBIN    )
     GOURMET BURGERS, INC., a Delaware  )
10   Corporation; and HAROLD HART       )
     and his martial community,         )
11               Defendants.            )
     _____

12
                    DEPOSITION UPON ORAL EXAMINATION OF
13                            HAROLD HART
                           January 18, 2018
14                        Seattle, Washington
     _____

15

16

17

18

19

20

21

22

23        REPORTED BY:  Michelle L. Patton, CCR
                        Washington License No. 2500
24

25

**WITNESS:  HAROLD HART    1/18/2018**

Page 54

  1    A    That would be correct.

  2    Q    I mean, part of the reason you are sitting in this

  3         chair as a defendant, is the defendant has identified

  4         you as the decision maker; that you were the person

  5         that decided to fire Darren Donahue.

  6              Is that true:  You were the person who decided

  7         to fire Darren Donahue?

  8    A    No.

  9              MS. MORISSET:  Hold on.  Object to the

 10          form.

 11              MR. BLANKENSHIP:  Okay.  Let me ask it

 12          this way.  I'm going to except the preface, okay?

 13          Fair point, Counsel.

 14              MS. MORISSET:  Yeah.  Thank you.

 15    Q    (By Mr. Blankenship) Sir, was it your decision to

 16         fire Darren Donahue?

 17    A    Not solely.

 18    Q    Okay.  Was it your idea to fire Darren Donahue?

 19    A    It was a group decision.

 20    Q    Okay.  So let's talk about the decision to fire

 21         Darren Donahue.

 22              You originally said "no," when I asked you if it

 23         was your decision to fire Darren Donahue.  We've got

 24         that on video.

 25              And then your counsel objected, and you, kind

**WITNESS:  HAROLD HART    1/18/2018**

Page 55

1   of, backed off, and said, "Well."

2         Are you kind of saying, "Kind of, sort of," or

3   "It was a group decision"; is that your

4   clarification?

5              MS. MORISSET:   Object as to form.

6   Q   (By Mr. Blankenship) Let me just start over.

7   A   Okay.

8   Q   At some point when I asked you the question, "Was it

9       your decision to fire Darren Donahue," you said,

10      "No."

11         Why did you answer "no" initially when I asked

12      that question?

13   A   Because it wasn't like I -- I -- I didn't have

14      additional information and additional counsel, within

15      HR and my supervisor.

16   Q   Okay.   So, I mean, you are not an HR person, are you?

17   A   No.

18   Q   And the only two managers involved would be, you

19      know, from a store-management perspective, or

20      restaurant-management perspective, would be you and

21      Tim Mei, right?

22   A   Yes.

23   Q   And so let's talk about who the other people that

24      were -- so basically you were the

25      lower-management-level person involved in the

**WITNESS:  HAROLD HART     1/18/2018**

Page 56

1    decision, right?

2    A    Yes.

3    Q    And so I want to know, who else do you believe was

4         involved in the decision to terminate Darren Donahue?

5    A    We had a recommendation from HR, Claire Simpson, that

6         termination, because it's a black-and-white offense;

7         and Tim Mei was in agreement; and then I was in

8         agreement.

9    Q    And so just to get the list, you have got -- okay.

10        So you believe that the decision was originally

11        suggested by HR, Claire Simpson; and that basically

12        you and Tim Mei agreed with the conclusion.  And the

13        conclusion, she said, "This is just a black-and-white

14        situation," right?

15                  MS. MORISSET:   Object as to form.

16   A    That was my statement.

17   Q    (By Mr. Blankenship) Okay.  You said it was a

18        "black-and-white situation," or Claire Simpson said

19        it was "black and white"?

20   A    I did.

21   Q    And have you told me all the reasons that you

22        believed at the time that it was black and white?

23   A    Yes.

24   Q    Okay.  And we just went over that, right?

25   A    Yes.

1    Q   But am I correct to assume that HR -- that HR, Claire

2        Simpson, made the recommendation for termination?

3    A   Yes.

4    Q   And do you remember what reasons, if any, she gave

5        for basically thinking that what Darren Donahue did

6        basically warranted a termination?

7    A   A failing to pay a team member hours worked.

8    Q   Anything else?

9    A   Nope.

10   Q   Okay.  And was there, like, a meeting or a phone

11       conference where this recommendation was made and you

12       all discussed this?

13   A   It was a phone conference.

14   Q   Okay.  Do you remember when that phone conference

15       occurred?

16   A   No, sir.

17   Q   Was that before or after you met with Darren Donahue?

18   A   It was after.

19   Q   Okay.  All right.  And so can you tell me everything

20       you recall being said in this phone conference, that

21       -- let me ask it this way, just to see if I can

22       isolate the time.

23           Within the time frame for -- we know that this

24       happened sometime after you basically met with Darren

25       Donahue and read the questions that someone else

WITNESS:  HAROLD HART    1/18/2018

Page 58

1        wrote for you to ask him, right?

2    A   Correct.

3    Q   And between that time and the date of his

4        termination, right?

5    A   Yes.

6    Q   Do you remember how long this phone conference took

7        between -- that involved Claire Simpson, Tim Mei, and

8        you?

9    A   Maybe five minutes.

10   Q   And do you remember anything that you said in that

11       five-minute phone conference, where the

12       recommendation was made by HR to fire Darren Donahue,

13       and you and Tim Mei agreed?

14            MS. MORISSET:  Object as to form.

15   A   I just agreed.  I was -- at the very end, I just

16       agreed with the termination.

17   Q   (By Mr. Blankenship) So were you the last person that

18       basically -- were you the last person to agree?

19            I mean, was -- that's the impression; where you

20       got HR saying, "Hey, I think he should be

21       terminated"; can you tell me what exactly Clair

22       Simpson said, or the rest of the --

23            MS. MORISSET:  Object as to form.

24            MR. BLANKENSHIP:  Yeah, let me start

25       over.  That's a mixed -- a bobble; not a great

WITNESS:  HAROLD HART    1/18/2018

Page 71

1    A    No, I don't.

2    Q    **Do you remember how he responded to you when he saw**

3         **you in the restaurant?**

4    A    He greeted me.

5    Q    **Was he friendly?**

6    A    Absolutely.

7    Q    **Is it fair to say that up to this point you and**

8         **Darren Donahue had a cordial relationship?**

9    A    Yes.

10   Q    **And is it also fair to say that up to this point you**

11        **considered him one of the top performers amongst your**

12        **general managers?**

13            MS. MORISSET:  Object as to form.

14   A    Darren was a good performer.

15   Q    **(By Mr. Blankenship) Okay.  He was one of the most**

16        **productive -- he had one of the most productive**

17        **restaurants at Red Robin, right?**

18            MS. MORISSET:  Object as to form.

19   A    In what area?

20   Q    **(By Mr. Blankenship) Well, in your area:  He was the**

21        **top performer, wasn't he, as far as numbers?**

22            MS. MORISSET:  Object as to form.

23   A    So specifically -- again, you are generalizing.

24        So, specifically, "top performer" in what area?

25   Q    **Was he the top performer in anything?  You are free**

WITNESS: HAROLD HART     1/18/2018

Page 72

1    to say that -- you said he was good.

2          Was there anything that he was excellent at, in

3    your opinion?

4    A   He was very good at Scorecard, and at profit & loss

5    statement.

6    Q   Very good at Scorecard.  And what is Scorecard?

7    A   It's some individual metrics of the restaurant

8    performance.

9    Q   And so it's called a Scorecard because Red Robin

10   tracks it, right?

11   A   Yes.

12   Q   So what are the matrix -- or the "metrics"; did you

13   say "metrics"?

14   A   Yes.

15   Q   So "metrics" are like what; statistics?

16   A   They are measurements of, you know, performance

17   metrics within the restaurant.

18         And Scorecard changes yearly, sometimes twice a

19   year.  So if you are asking me the exact metrics on

20   2014, I couldn't tell you.

21   Q   Okay.  But he was very -- very good at that, right?

22              MS. MORISSET:  Object as to form.

23   Q   (By Mr. Blankenship) Very good at basically driving

24   these metrics, that reflected in the Scorecard,

25   right?

1    A    He was very good at the Scorecard, yes.

2    Q    And what -- I'm not asking you what exactly what

3         might have been on the Scorecard at that time, but

4         what generally is tracked in the Scorecard?

5    A    Sales; labor; back then, probably, Guest Voice;

6         negative comments; cost of goods.

7    Q    Anything else?

8    A    I'm sure I'm leaving something out, but can't recall

9         exact.

10   Q    But what we are talking about, when we talk about,

11        like, sales, labor, Guest Voice, cost of goods, those

12        are -- well, let's talk about sales, labor, cost of

13        goods:  Those are, basically, objective measures that

14        can be tracked mathematically, right?

15   A    Yes.

16   Q    And Guest Voice is what?

17   A    Guest Voice would be a measurement of guest comments.

18   Q    Okay.  And to the extent there's Guest Voice

19        comments, typically, that would be based on, you

20        know, how they were served, or how they were treated

21        by the server, or the person -- the greeter, right?

22   A    It's a combination of whole-restaurant performance,

23        so everything from how they are greeted, cleanliness

24        of the building, service, food, beverage.

25   Q    Okay.  So this is, like, maybe, something you get

**WITNESS:  HAROLD HART     1/18/2018**

```
 1   A    It's a little portable stand-up unit, and -- with a

 2        battery.  And you can actually order non-alcoholic

 3        beverages, appetizers, you can call your server, you

 4        can put in your royalty number, and then you can take

 5        a survey.

 6   Q    Okay.  So at some point that Ziosk came into play;

 7        but prior to that, it would have been online or

 8        through some kind of written card that you got with

 9        your bill, right?

10   A    Right.

11   Q    Okay.  And I understand this list is not exhaustive,

12        but you listed:  Sales, labor, Guest Voice, negative

13        comments, cost of goods.

14             Would that all get, basically -- I was asking

15        you about categories and metrics and Scorecard; would

16        that all get, basically, factored into a score for a

17        specific restaurant?

18   A    Yes.

19   Q    And would this be a situation where you would -- you

20        know, at that time, the store could be green, yellow

21        red; is that part of the Scorecard?

22   A    Yes.

23   Q    Okay.  And if someone got green, for example, it

24        would factor in things like Guest Voice and negative

25        comments, as well as sales, labor, and cost of goods,
```

WITNESS:  HAROLD HART    1/18/2018

Page 77

```
 1       right?

 2   A   Yes.

 3   Q   So it's -- the Scorecard is a summary, not just of

 4       productivity, it also includes the customer

 5       experience, right?

 6   A   On a limited basis, yes.

 7   Q   Okay.  But -- okay.  And you said, you know, when

 8       you -- is it fair to say, when you said -- you said

 9       "Darren did very good on the Scorecard," right?

10   A   I did.

11   Q   Okay.  And the Scorecard ranks restaurants by

12       national -- nationwide, and also by division, and by

13       region, right?

14   A   Yes.

15                MS. MORISSET:  Object as to form.

16   Q   (By Mr. Blankenship) Okay.  And so you would have,

17       what -- you had said, you know, what, six, seven, or

18       eight, restaurants, typically, at a time?

19   A   Yes.

20   Q   And so we could look at a Scorecard and see how, for

21       example, Darren's restaurant ranked, versus other

22       restaurants in your region, right?

23   A   Yes.

24   Q   You can see how Darren's restaurant ranked in

25       Darren's division under Tim Mei, as well, right?
```

**WITNESS:  HAROLD HART    1/18/2018**

Page  78

1    A    Yes.

2    Q    And to the extent there was -- you said there was a

3         different regional vice president prior to Tim Mei.

4         Who was that?

5    A    Roger Byers.

6    Q    And we could look at the Score Cards and see how

7         Darren's -- what Darren's Scorecard would be, versus

8         other restaurants, within Roger Byers' division, as

9         well, right?

10   A    Yes.

11   Q    And these Score Cards would encompass sales, labor,

12        Guest Voice, negative comments, cost of goods; these

13        would be the general metrics, right?

14   A    That would be some of the metrics.

15   Q    All right.  And what others, do you think?

16   A    The only other one that comes to mind, top of the

17        head, is NIBO-X, or NIBO-C.

18   Q    What is NIBO-X, or -- can you spell that for me?

19   A    N-I-B-O-X:  Net Income Before Operating.

20   Q    And what does the net income before operating

21        represent, in more of terms for -- regular words?

22   A    It's the profitability line.

23   Q    "Profit" what?

24   A    Profitability.

25   Q    Okay.

```
 1    A    You know, of the restaurant.
 2    Q    Okay.  So the profitability of the restaurant would
 3         be factored into these Score Cards that Darren did
 4         very good on, right?
 5    A    Yes.
 6    Q    And then you had mentioned that he was very good at
 7         profit & loss.  Can you tell the jury what you mean
 8         when you use "profit & loss," when you are referring
 9         to these very good Score Cards from Darren Donahue?
10    A    "Profit & loss" is the actual P&L.  And that takes a
11         matrix of how well a restaurant does, starting with
12         their sales, through all their costs; and then down
13         to the actual profit line, NIBO.
14    Q    Does the NIBO factor in net profits, like, actually,
15         profitability, at the end of the day?
16    A    Profitability at the restaurant level.
17    Q    At the restaurant level, okay.
18              And the Score Cards also reflect how well your
19         region does, right?
20    A    I am also measured on the Score Card, yes.
21    Q    Okay.  And so you are -- you, just like we can look
22         at these Score Cards and basically figure out, based
23         on the Scorecard, how Darren Donahue's restaurant
24         ranked, versus other restaurants, we would be able to
25         look at those Score Cards and determine how your --
```

WITNESS: HAROLD HART   1/18/2018

1    A    Again, I would have to look at a People Report.

2    Q    **Okay.  A People Report would reflect if you had**

3         **oversight over Auburn; am I right?**

4    A    Correct.

5    Q    **Okay.  And there is data and graphs and stuff that**

6         **would basically tell us how a store did, whether it**

7         **was yellow, green, red, based on a store-wide basis,**

8         **right; is that the Scorecard?**

9    A    We do have a Scorecard that measures that way.

10   Q    **All right.  Do you remember why you ended up getting**

11        **the Auburn restaurant in 2014?**

12   A    I was told there was conflict between Darren and

13        Eric.  And to relieve the conflict, that I would be

14        getting the restaurant.

15   Q    **Who told you that?**

16   A    Roger buyers.

17   Q    **Do you remember how that was communicated to you; was**

18        **that by e-mail, did you speak with him in person?**

19   A    It was on the phone.

20   Q    **Okay.  Do you remember what he told you?**

21   A    Just pretty much what I've told you.

22   Q    **So that is basically the extent of the detail?**

23   A    Didn't go into a lot of detail, no.

24   Q    **Do you remember ever sitting down with Darren at the**

25        **end of 2013, or beginning of 2014, somewhere around**

Page 142

1   A   Yes.

2   Q   Yeah.  And ultimately, you ended up with it through

3       the -- 2014, when you began, and you took over that

4       restaurant from Eric Yates, right?

5   A   Yes.

6   Q   And is Eric Yates still employed by Red Robin?

7   A   No.

8   Q   Do you know why he is no longer employed?

9   A   No.

10  Q   Were you involved in any decisions relating to his

11      separation?

12  A   No.

13  Q   Okay.  So are you still basically the ROD over the

14      Auburn store?

15  A   Yes.

16  Q   How do you recall the Auburn store performing as to,

17      you know, scores, on the Scorecard, under Darren

18      Donahue's leadership?

19          MS. MORISSET:  Object as to form.

20  A   Yeah.  If you give me a Scorecard I can tell you

21      exactly how he performed.

22  Q   (By Mr. Blankenship) Okay.  When Darren was the

23      general manager of Auburn, I believe you testified he

24      would be responsible for, basically, the four walls,

25      and, you know, what happened within that store; is

WITNESS:  HAROLD HART    1/18/2018

Page 143

```
 1        that right?
 2    A   Correct.
 3    Q   And to the extent that restaurant was successful,
 4        that would be under his leadership, wouldn't it?
 5    A   Successful at what?
 6    Q   Successful in generating -- successful on the
 7        Scorecard, and generating profits, and those criteria
 8        that we discussed earlier about the Scorecard?
 9    A   Yeah, we would have been rated successful in those
10        areas.
11    Q   Okay.  Do you recall overall how successful he was in
12        those areas, on these Score Cards, versus other
13        managers in your region during that time frame, 2014
14        through June of 2015?
15    A   Again, I don't have exact numbers, but he was a top
16        performer on the Scorecard.
17    Q   He was the top, right?
18    A   I don't know about "the top" but he was a top
19        performer.
20    Q   You don't recall him being the top performer in your
21        region?
22             MS. MORISSET:  Object as to form.
23    Q   (By Mr. Blankenship) With respect to the Scorecard,
24        do you recall him being the top performer in your
25        region?
```

WITNESS: HAROLD HART    1/18/2018

Page 181

```
 1              When somebody is in the role of an acting -- is
 2         there a time when somebody is acting in the role of
 3         general manager?
 4    A    If the GM is out, then -- for, kind of, an extended
 5         amount of time, there is an acting GM; and then he or
 6         she would have privy to the key in-box.
 7    Q    All right.  What was interesting to me is why it
 8         wouldn't just have Darren Donahue's name on it, like:
 9         "GM Auburn Outlet, Darren Donahue"; why it stays
10         generic.  Is there a reason for that?
11    A    That is just how all the GM boxes are set up in the
12         company.
13    Q    Okay.  So basically, with -- if Darren is moving
14         around to another restaurant, you know, he would
15         basically then just start receiving -- like if he
16         went to Bonney Lake, it would be the GM Bonney Lake
17         restaurant e-mail address for him?
18    A    Correct.
19    Q    Okay.  All right.  So you could see that Darren seems
20         to be -- he writes in response to his receiving this
21         e-mail:  "This brings tears to my eyes.  It's a sad
22         day.  As a parent of a child with Down syndrome, it
23         breaks my heart."
24              Do you see that?
25    A    I do.
```

**WITNESS:  HAROLD HART     1/18/2018**

Page 182

1   Q   Did you know that he has a child with Down syndrome?

2   A   I do.

3   Q   And he writes here that "it brings tears to his

4       eyes."  Did you believe that that is how he felt?

5   A   I believe he was sincere about that.

6   Q   Now, going back to your earlier testimony, about what

7       happens to these individuals that are currently

8       employed, with special needs, you had basically

9       referenced that, you know, if they could still do

10      their job, they could stay, right?

11  A   According to the previous memo.

12  Q   Okay.  And if you turn the page, top of the second

13      page, there is a paragraph here that reads:  "Now, if

14      you have a TM that can't perform the functionalities

15      detailed in our job description, and your restaurant

16      is in need of hiring, we could consider keeping the

17      TM, however we will need to update their job code in

18      the system."

19          Do you know what that is referring to?

20  A   They would no longer be considered "special needs,"

21      and they would be put into a position, whatever that

22      is, a busser, host, cook.

23  Q   So basically they would have to qualify for whatever

24      the new position is, as a team member, as opposed to

25      the special position that helped with the

**WITNESS: HAROLD HART    1/18/2018**

Page 183

1    special-needs employee?

2                    MS. MORISSET:   Object as to form.

3    A   That is what the memo is saying.

4    Q   (By Mr. Blankenship) Are you aware of any of these

5        special-needs employees that actually got moved to,

6        you know, to a TM position, as opposed to a

7        special-needs position; they kept their jobs because

8        they were able to move to a TM position?

9    A   I don't have any solid information on that.

10   Q   Can you identify anyone who kept their job, who was a

11       special-needs employee?

12   A   Again, I can't recall who all were special-needs back

13       then.

14   Q   Let me ask it this way:  Do you have a recollection

15       of anyone not getting fired, who was a special-needs

16       person in your region, who -- after this change in

17       policy happened, within Red Robin?

18                    MS. MORISSET:   Object as to form.

19   A   Yeah, I believe there was some special-needs people

20       that didn't keep their job.

21   Q   (By Mr. Blankenship) That did keep their job?

22   A   That did not.

23   Q   Okay.  And isn't it true that the vast majority of

24       these special-needs employees did not keep their job

25       after this?

**WITNESS:  HAROLD HART    1/18/2018**

Page 184

1              MS. MORISSET:  Object as to form.

2    A    Again, not sure.  I would need a list of those team

3         members.

4    Q    (By Mr. Blankenship) If you look at, on the same

5         page, "What is next for you and the team member,"

6         basically talks about having a conversation, if you

7         look in:  "One:  Schedule a meeting," it basically --

8         it looks like the managers are being directed to

9         basically have this conversation with their

10        coach-program representative and/or parent; do you

11        see that, under, "Schedule a Meeting"?

12   A    Yes.

13   Q    This e-mail basically is to actually eliminate the

14        special-needs program team members in the

15        restaurants, right; that is the purpose, in part?

16              MS. MORISSET:  I'm sorry, Scott.  I

17         didn't hear the whole question.

18   Q    (By Mr. Blankenship) That's fine.

19              The purpose of this e-mail, in part, was to

20        basically announce that Red Robin was making the

21        decision to eliminate the special-need program's TM's

22        in these restaurants, right?

23              MS. MORISSET:  Object as to form.

24   A    Again, that is what it states in the first paragraph

25        of:  "Hello team."

WITNESS:  HAROLD HART    1/18/2018

Page 185

1   Q   (By Mr. Blankenship) Okay.  Thank you.

2          Looking back at this, this e-mail on Exhibit 6,

3       it was sent to you and Rochelle Means; do you see

4       that; Darren sent it to you, where he said that he

5       was upset and it was a sad day; is that correct, if

6       you look at the top of the page?

7   A   On February 2nd?

8   Q   Yeah.

9   A   Yes.

10  Q   Okay.  Did you ever discuss this e-mail with Rochelle

11      Means or anyone else?

12  A   I believe Darren and I spoke about it.

13  Q   What do you recall you and Darren speaking about,

14      with respect to this?

15  A   Just that I understood, you know, that it was pretty

16      personal to him.

17  Q   Anything else you recall, with respect to that

18      conversation?

19  A   No.

20          MR. BLANKENSHIP:  Why don't we take a

21      break?

22          THE VIDEOGRAPHER:  The time is 14:44, and

23      we are going off the record.

24                      (Off the record)

25          THE VIDEOGRAPHER:  The time is 14:58.  We

WITNESS:  HAROLD HART    1/18/2018

Page 194

1                    MS. MORISSET:  Got it.

2                    MR. BLANKENSHIP:  -- four pages.

3                    MS. MORISSET:  Thank you.

4    Q   (By Mr. Blankenship) Okay.  So let's go back to this

5        meeting.  Did you have a copy of the review in front

6        of you when Eric Yates was going over it with Darren?

7    A   I did not.

8    Q   Okay.  So where were you -- was this at a table in

9        the restaurant?

10   A   I believe so.

11   Q   And were there customers in the restaurant then?

12   A   I don't recall what time of the day it was.

13   Q   And you said the reason that Eric Yates wanted you

14       there is because he didn't think Darren would take it

15       well, right?

16   A   Correct.

17   Q   And this review, basically, overall, says, "does not

18       meet expectations," right?

19   A   Yes.

20   Q   And so did you, you know -- if I understand your

21       testimony, did you not weigh in on -- is it true that

22       you did not weigh in on the scoring that occurred

23       here?

24   A   True.

25   Q   And do you remember anything that Mr. Yates said

WITNESS: HAROLD HART    1/18/2018

Page 195

1        about this to Darren Donahue?

2    A   All I can recall is that he had the paper in front of

3        him, and it looked like he was reading off the paper.

4    Q   Okay.  And do you recall anything that Darren Donahue

5        said in response?

6    A   I don't recall.

7    Q   Do you recall Darren Donahue saying that he thought

8        this was retaliation?

9    A   At that meeting?

10   Q   At that meeting.

11   A   I don't recall that.

12   Q   Do you recall Darren Donahue asking why he was being

13       targeted at that meeting?

14   A   I don't recall that.

15   Q   Do you remember what -- did Darren Donahue take this

16       "doesn't exceed expectations" -- what is it; "does

17       not meet expectations" review well?

18   A   Darren was very quiet during the review.

19   Q   Okay.  So he remained professional, correct?

20   A   To my knowledge, and to my recollection.

21   Q   Okay.  And do you recall any questions that Darren

22       Donahue may have asked Eric Yates at this meeting?

23   A   No, I don't recall.

24   Q   All right.  So did you review -- did you review this

25       review, in preparation for the deposition?

WITNESS: HAROLD HART   1/18/2018

1        included that problem in your review; am I right?

2                      MS. MORISSET:   Object as to form.

3   Q    (By Mr. Blankenship) I mean, it could happen

4        under -- while he was the general manager, it would

5        be his problem, right?

6   A    Yes.

7   Q    And if there was a problem with, let's say,

8        cleanliness when he is no longer the general manager,

9        you would hold him accountable, because it's his

10       store during that time frame, right?

11  A    Yes.

12  Q    Okay.  Because that is the way -- okay.  Got it.

13           Because that is consistent with your training at

14       Red Robin, right?

15  A    Yes.

16  Q    And so do you have a recollection of -- personal

17       recollection of some type of Q/A visit by Emily

18       Thompson that occurred during the time that you

19       oversaw Darren, where, you know -- do you remember

20       one happening?

21  A    The March?

22  Q    Okay.  Other than March 14th.

23  A    No.

24  Q    And something like this sounds pretty important,

25       right?  I mean, the Q/A scores, was that important?

Page 208

1  A   Well, this -- again, this is for development,

2      coaching, and support of those leaders.  So, yeah, it

3      was important.

4  Q   But this wouldn't -- I would expect that there would

5      be some kind of Scorecard --

6  A   No.

7  Q   -- of some kind?

8  A   There was not a Scorecard.  This was

9      educational-based.

10  Q   Okay.  So this is basically -- so people walked

11      around, maybe, with what, yellow pads, and just took

12      notes?

13  A   Darren had the yellow pad, and Emily led it.  And as

14      she uncovered issues, Darren took copious notes.  I

15      believe he had three or four pages of exceptions.

16          And there would be explanations of what the

17      exception was, by Emily, to both Darren and I.

18  Q   Okay.  So it sounds like a good process, to be able

19      to, you know, go through and have this educational

20      process?

21  A   It's a great process.

22  Q   And did Darren seem to take it in a positive light?

23  A   Darren was very positive, and glad to get the

24      education.

25  Q   All right.  And so it was -- given the fact that it

**WITNESS:  HAROLD HART    1/18/2018**

Page 209

1     was educational, did Emily -- you said it was

2     "educational."

3          Did you tell Darren that it was educational, and

4     there would be no official Scorecard?

5               MS. MORISSET:  Object as to form.

6   A  Yeah.  I don't believe we talked about what the

7     outcome was going to be.

8   Q  (By Mr. Blankenship) You did tell Darren that it was

9     educational, though, right?

10  A  I did tell him we would be learning quite a bit from

11    this.

12  Q  And so did you tell him that what occurred there, in

13    this, what -- you know, what you said was

14    educational, in your testimony, would basically

15    result in a written warning to him if it didn't go

16    well?

17  A  I did not tell him that.

18  Q  Did you tell him in advance that she was coming?

19  A  Yes, I did.

20  Q  Okay.  So he was the only person whose store was

21    visited in your region, wasn't he?

22  A  Yes.

23  Q  And so, basically, am I correct to assume that, other

24    than Darren's notes, that there would be no record of

25    this inspection, other than, maybe, findings by --

WITNESS: HAROLD HART    1/18/2018

Page 210

 1    and do you know if -- do you know whether or
 2    not -- it sounds to me that Emily Thompson didn't
 3    take any notes; that was Darren, right?
 4  A  I'm not sure if she took notes or not.
 5  Q  But you didn't, right?
 6  A  I did not, no.
 7  Q  But I guess, I think you answered, he was the only
 8    person in the region whose restaurant was reviewed in
 9    your region, right?
10  A  It was -- yeah.  One of five in the division.
11  Q  I didn't ask you that.
12          MR. BLANKENSHIP:  So I'm going to move to
13      strike.
14  Q  (By Mr. Blankenship) Here is my question:  Was he the
15    single GM who basically went through this process in
16    your region?
17  A  Yes.
18  Q  And let me hand you what we are going to mark here,
19    as Exhibit 8.
20                        (Exhibit No. 8 marked)
21          MR. BLANKENSHIP:  Hand you a copy,
22      Counsel.
23          MS. MORISSET:  Thank you.
24  Q  (By Mr. Blankenship) All right.  So do you recognize
25    this document?

**WITNESS: HAROLD HART    1/18/2018**

Page 238

1    A    Yes.

2    Q    Now, you said Darren wasn't happy.  Do you recall him

3         writing you and outlining what his concerns were?

4    A    Yes.

5    Q    Hand you Exhibit 16.

6                              (Exhibit No. 16 marked)

7    Q    (By Mr. Blankenship) All right.  So is this -- this

8         is -- I'm going to skip the last page, which I

9         included, but it was you, basically -- we can start

10        there.  You basically said:  "I was thinking about

11        our conversation last night.  And I think what will

12        help better understand the issue is if you put it in

13        writing."

14             Do you see that?

15   A    Yes.

16   Q    Okay.  So did anybody ask you to ask him to do this?

17   A    No.

18   Q    And you basically -- and so he basically writes you

19        what his concerns are, right?

20   A    Yes.

21   Q    Did you go over any of these concerns with anyone?

22   A    I did.

23   Q    Okay.  Did you go over it with him?

24   A    Did I review it with Darren?  Yes.

25   Q    Okay.  And what do you recall about that meeting?

**WITNESS:  HAROLD HART     1/18/2018**

Page 239

1  A  Just that I listened to his comments, and thanked him

2     for spending the time to put it in writing.

3  Q  Okay.  So I want to just ask you some questions here.

4        Did this impact his raise, the review?

5  A  A "Meets Expectation" would impact a raise.

6  Q  Okay.  So basically part of what he is talking about

7     here is that it actually affected his -- he mentions

8     that his income will be affected by this, right?

9  A  His potential raise would be affected, yes.

10 Q  Okay.  Now, did his performance affect your bonus?

11    It doesn't sound like it did.  That was more based on

12    the metrics, right?

13 A  His performance?  I'm sorry.

14 Q  His, like, issues; when he did well on his

15    -- basically in his Scorecards and stuff, that would

16    be part of what would be included in you getting your

17    bonus, right, just talking about facts, not trying

18    to --

19 A  Not bonus.  It would be part of my review.

20 Q  Okay.

21 A  Because he is -- you know, once that would be put by

22    region.

23 Q  Does him getting low raise impact your raise at all?

24 A  No.

25 Q  Okay.  And I want to ask you about some of the things

WITNESS:  HAROLD HART     1/18/2018

Page 240

1      that he notes here.

2  A  Can we clarify -- I'm sorry.  Can we clarify "low

3      raise"; what do you mean by that?

4  Q  Not "low raise"; but "lower raise" might be a better

5      way of putting it.

6         He writes here -- let me see -- he would get a

7      lower raise with a "Meets Expectation" than an

8      "Exceeds Expectation," right?

9  A  Yeah.  He received the maximum that a "Meets

10     Expectation" would allow.

11  Q  Okay.  I appreciate that clarification.

12  A  You bet.

13  Q  All right.  So let's look at what he writes on

14     assessing the review.  He writes:  Contributed my

15     third GM to region for 4.5 in 2014."

16        Do you dispute that?

17  A  Yeah, I am not sure of the people he promoted.  I can

18     recall two.  I don't know the third one.  But that is

19     a general manager's, hopefully, responsibility, you

20     know, developing and training people.

21  Q  Okay.  So I want to just ask you about the goal

22     number one, "People/Culture," that one, and just turn

23     the page here, under the "Metrics."

24  A  Are we back to the review?

25  Q  No.  Page 2 of his document.  Fair question.

**WITNESS:  HAROLD HART     1/18/2018**

Page 241

1          If you look under the "Reduce Manager Turnover
2      to Division Goal," there's some bullet points here,
3      one of which says:   "All managers that were termed at
4      Auburn 2014, except Kelly Regalado, had nothing to do
5      with Auburn."
6          Would you agree or disagree with that?   Why
7      don't you take a moment to read it?
8   A  Yeah, I couldn't 100-percent agree with it.
9          There were some special circumstances, but, you
10     know, I would have to talk to each one of these
11     individuals to determine that.
12  Q  Okay.   And did you ever do that?
13  A  No.
14  Q  And he mentions, with respect to Luke Prieb, he says:
15     "Luke Prieb was transferred here, even though he was
16     not meeting expectations in Kent, and had serious
17     issues there."
18          If that were true, if that were true, could you
19     understand how that would, you know, basically, seem
20     unfair to Darren Donahue?
21  A  Yeah, I couldn't speculate on that because Kent
22     wasn't my restaurant, and Luke didn't report to me
23     prior.
24  Q  Okay.   And it says here:   "Kelly Regalado was fired
25     for policy reasons when I was out on LOA."

WITNESS:  HAROLD HART    1/18/2018

Page 242

1          Do you see that?

2    A    I do.

3    Q    But based on your previous testimony, it really

4         doesn't matter what happens when he is on a medical

5         leave of absence:  It's his store; and he is held

6         accountable for it, right?

7    A    GMs are responsible, correct.

8    Q    Then it says:  "Patrick, I never worked with," do you

9         see that, "gave two weeks' notice when I got here

10        from Covington."

11         Do you know what that is in reference to?

12   A    Yeah, I believe I remember that.

13   Q    Okay.  So that would be somebody that basically was

14        also there when he wasn't in the store, that left; am

15        I right?

16   A    Yeah, again, I didn't have Covington either.

17   Q    Okay.  Did you do any independent investigation of

18        the information that Darren listed here, or did you

19        just hear him out with respect to it?

20   A    I heard him out.  And then I met with HR and Tim Mei,

21        and had them review his document and review my

22        assessment.

23   Q    Okay.  So you basically followed up with HR and Tim

24        Mei after you received this?

25   A    Yes.

**WITNESS:  HAROLD HART     1/18/2018**

Page 283

1       about -- I was going to get some information on the

2       guy in Kennewick.  I have some documents here.  Let

3       me hand you Exhibit 29.

4                                   (Exhibit No. 29 marked)

5    Q   (By Mr. Blankenship) Well, you know what?  Did I give

6        you the one with holes punched?  That is okay.  We

7        can switch that out.

8    A   Yeah.

9    Q   There you go.

10   A   Thank you.

11   Q   All right.  So let's talk about this.  This appears

12       to be a continuation of the e-mail.  If you look at

13       Exhibit 29, you are -- at some point you are asking

14       about this, quote/unquote, Kate Fountain -- or Claire

15       Simpson; Claire, again, is involved.

16           And she is asking you, on June 22, 2015:

17       "Hello, please could you send us the term doc from

18       last week, so we can get proactive unemployment

19       completed," this is on the second page, "also can you

20       give us some insight into his Kennewick allegations?"

21           Do you see that?

22   A   Yes.

23   Q   Okay.  And you write:  "Hi Claire.  The Kennewick

24       allegations was he heard that two managers from

25       Kennewick stated that the GM had padded ending

**WITNESS:  HAROLD HART    1/18/2018**

Page 284

```
 1    inventory, and he wanted to offer any help if he
 2    needed it.  I told him not to worry about Kennewick,
 3    but thank you.  I'm not sure how he heard about it,
 4    didn't ask.  I do know that Kirsten and Devin
 5    contacted Puyallup to ask what they should do about
 6    Greg telling them he added ending inventory."
 7         Okay.  So what does it mean, to "adding ending
 8    inventory"; what does that mean?
 9  A  That is saying that you have five items, when there
10    should have been four.
11  Q  Okay.  So it's basically misrepresenting something,
12    right?
13  A  Yes.
14  Q  And why would someone do that; why would a general
15    manager do that?
16         MS. MORISSET:  Object as to form.
17  Q  (By Mr. Blankenship) What advantage -- why would
18    someone want to basically not -- would there be any
19    motivation for someone to be inaccurate in ending
20    inventory?
21  A  If they are currently missing cost of goods, it would
22    support, or help, their cost of goods.
23  Q  And it looks like, from this document, that basically
24    there was a -- some kind of 100 -- basically, looks
25    like that what happened here is there was actually
```

WITNESS: HAROLD HART    1/18/2018

Page 285

```
 1        inventory manipulation that really happened, wasn't
 2        there, with this guy in Kennewick, this general
 3        manager?
 4    A   What was found was $190.
 5    Q   My question was --
 6              MR. BLANKENSHIP:  I'm going to move to
 7        strike.
 8    Q   (By Mr. Blankenship)  My question was:  It was
 9        actually true that the general manager in Kennewick
10        engaged in inventory manipulation, right?
11    A   Yes.
12    Q   And that it a form of dishonesty, is it not?
13    A   Yes.
14    Q   But he didn't get fired for that, did he?
15    A   No.
16    Q   He just got a write-up, right?
17    A   A written final warning.
18    Q   That is a write-up, isn't it?
19    A   Yeah.  But it's a severe write-up, meaning a future
20        write-up would be an automatic termination.
21    Q   Okay.  So it's another chance, though, isn't it; that
22        is what a final written warning is; it's, like, "Hey,
23        you know, if you basically engage in dishonesty or
24        inventory manipulation again, we are going to fire
25        you," or something to that effect, right?
```

**WITNESS:  HAROLD HART    1/18/2018**

Page 286

1   A   He was given another chance.

2   Q   Okay.  Kind of like a one-bite rule, if a dog bites

3       once, you know, you basically -- you know, you don't

4       necessarily put him down; he got another -- he got

5       another chance for -- this person -- who is the

6       person, by the way, in Kennewick; what is his name?

7                   MS. MORISSET:  Hold on.

8                   Object as to form.

9   Q   (By Mr. Blankenship) Let's talk about the person in

10      Kennewick.  What was his name?

11  A   Let's see.  I believe this was Greg Blackburn.

12  Q   Greg Blackburn, did he have any disabilities, or was

13      he taking any leave of absence?

14  A   No.

15  Q   And any other complaint about retaliation, to your

16      knowledge?

17  A   Not that I am aware of.

18  Q   Okay.  And so -- but he engaged in, basically,

19      dishonesty here, inventory manipulation, and he got

20      another chance; he didn't get fired for it, did he?

21  A   That's correct.

22  Q   Okay.  But you offered that it was only $190.

23          Do you assume that that is not a big deal,

24      because it's just $190 that he, basically, stole?

25  A   I didn't say "only."  I just gave her the dollar

WITNESS:  HAROLD HART     1/18/2018

Page  287

1       amount.

2   Q   Why did you offer that?

3   A   She asked for it.

4   Q   Okay.  But what I'm wondering is when I questioned

5       you, why did you offer that information?

6           Because I wasn't asking you about what the

7       amount was, in my question, was I?

8               MS. MORISSET:  Object as to form.

9   Q   (By Mr. Blankenship) I'm just wondering why you

10      offered that information.

11              MR. BLANKENSHIP:  I mean, I move to

12          strike it, because that wasn't part of my

13          question at the time.

14  Q   (By Mr. Blankenship) Why was it important to you, to

15      mention that the amount was $190?

16  A   Oh, I'm sorry.  I thought that is what the question

17      was, when Claire asked me:  "How significant was the

18      manipulation?"

19  Q   All right.  But I'm asking you, as a witness in this

20      case, why -- was there something about my question

21      that made you offer that it was only $190, I think,

22      is what -- or something to that effect?

23  A   No, I -- again, I didn't say "only."

24  Q   Okay.  Well, does it matter if it's $190 versus

25      $100,000?

**WITNESS:  HAROLD HART    1/18/2018**

Page 288

1          I mean, isn't that like 89.9?  I mean, theft is

2      theft, dishonesty is dishonesty.

3                MS. MORISSET:  Object to the form of the

4          question.

5   Q   (By Mr. Blankenship) Is that the same deal?

6   A   Again, extenuating, you know, circumstances.

7   Q   Wasn't it -- so you said that, "extenuating

8      circumstances"; of what kind?

9   A   Oh, I would imagine, you know, his tenure came into

10      play, his record, how he was at his previous

11      restaurant.

12   Q   Are you guessing that this guy, basically, was higher

13      on the Scorecard than Darren Donahue?

14                MS. MORISSET:  Object as to form.

15   A   I'm not guessing any of that.

16   Q   (By Mr. Blankenship) Because that wouldn't be a very

17      likely chance of being true, would it?

18   A   No.

19   Q   Okay.  So, again, I want to go back to:  You said,

20      when it was 89.9 percent, that it wouldn't matter;

21      you know:  A violation is a violation.

22          So what I am asking you, sir -- I want you to

23      think carefully about this -- if it were $190,000,

24      versus $190, would that matter to you, as far as the

25      severity of the punishment?

Page 289

1           MS. MORISSET:  Object as to form.

2    A   My reference to the "89.9," that is a fail.  That is

3        a company standard.  Nothing subjective about it.

4            The $190 was, again, reviewed with HR and

5        myself.  And their recommendation was a written final

6        warning.

7    Q   (By Mr. Blankenship) Is that Claire Simpson; was she

8        involved in that one too?

9    A   I'm not sure exactly who put the document together.

10   Q   Do you know who the HR person was that was involved

11       in that?

12   A   No, I don't.

13   Q   Okay.  So, basically, kind of like the situation with

14       Darren, it wasn't just you making the decision; you

15       put your head together with, basically, people, who

16       were HR people, that were in charge of enforcing the

17       policies at Red Robin, right?

18   A   HR is very much involved in any --

19   Q   And basically --

20   A   -- disciplinary.

21   Q   -- when they were looking at a situation, with

22       respect to Darren Donahue, they, basically -- you

23       know, Claire Simpson suggested firing him, right?

24           MS. MORISSET:  Object as to form.

25   Q   (By Mr. Blankenship) And she was a representative

WITNESS:   HAROLD HART        1/18/2018

Page 292

1    Q   Okay.  What did you hear, and what did you learn

2        about this?

3            Was he asking managers to pad inventory, is that

4        what was happening; he was directing others to do

5        this?

6    A   You know, I don't -- I don't fully remember the

7        circumstance, but it ended up being fraudulent

8        inventory of $190.

9    Q   And is that pretty black and white, isn't it?

10   A   Yes.

11   Q   And I want to ask you about:  Do you remember,

12       prior -- do you remember, at some point, learning

13       from Darren, that he was basically going to get a

14       hernia-repair surgery sometime in December? *m*

15   A   He mentioned it to me, yes.                   *September*

16   Q   Okay.

17              MS. MORISSET:  I'm sorry.  Which year?

18   Q   (By Mr. Blankenship)  That would be -- he told you

19       that -- it was early -- it was sometime prior to you

20       learning about all of this stuff with Chris Ferguson,

21       right?

22   A   Yeah.  He mentioned that sometime in the future he

23       would need a hernia surgery.

24   Q   Okay.  And, basically, do you recall -- well, were

25       you surprised to hear that?

Harvard Bell 206-629-8773 www.harvardbell.com

WITNESS: HAROLD HART    1/18/2018

Page 293

1  A  No.  I just told him -- you know, by this point we

2     had -- he had done leave of absence, you know, a few

3     times; and I said, "Well, you know the drill:

4     Contact Leave of Absence.  And I just need to know

5     the dates that you are going to be gone."

6  Q  Didn't you tell him that you had learned about that

7     from Kate Hershel, that you had met with her earlier

8     in that day, and you were -- do you remember talking

9     to Kate Hershel the same day, basically, about her

10    possibly going from an hourly manager to a salaried

11    manager?

12 A  Did I talk to her the same day that Darren said

13    something about his hernia?

14 Q  Yep.

15 A  I'm not sure.

16 Q  Okay.

17 A  Not that I can recall.

18 Q  Okay.  If she were to testify that she is the one who

19    told you about that, would you have any reason to

20    doubt that?

21 A  Again, I don't recall if that is where I heard it

22    from.

23 Q  In your dealings with Kate Hershel, is she someone

24    that appears to you to be honest and truthful?

25 A  Yeah, I have no reason not to believe that.

Page 296

```
 1                    C E R T I F I C A T E

 2

    STATE OF WASHINGTON )
 3                     ) ss.
    COUNTY OF MASON    )

 4
         I, the undersigned Washington Certified Court Reporter,
 5  pursuant to RCW 5.28.010 authorized to administer oaths and
    affirmations in and for the State of Washington, do hereby
 6  certify:

 7       That the annexed and foregoing deposition transcript of
    the witness named herein was taken Stenographically before me
 8  and reduced to a typed format under my direction; that the
    transcript is a full, true and complete transcript of the
 9  proceedings, including all questions, objections, motions and
    exceptions of counsel, made and taken at the time of the
10  foregoing proceedings, to the best of my abilities;

11       That I am not a relative, employee, attorney or counsel
    of any party to this action or relative or employee of any
12  such attorney or counsel, and that I am not financially
    interested in the said action or the outcome thereof;
13
         That the witness, before examination, was by me duly
14  sworn, and the transcript was made available to the witness
    for reading and signing upon completion of transcription,
15  unless indicated herein the waiving of signature;

16       I further certify that I am sealing the deposition in an
    envelope with the title of the above cause and the name of
17  the witness visible, and I am delivering the same to the
    appropriate authority;
18
         I further advise you that as a matter of firm policy,
19  the Stenographic notes of this transcript will be destroyed
    three years from the date appearing on this Certificate
20  unless notice is received otherwise from any party or counsel
    hereto on or before said date;
21
         IN WITNESS WHEREOF, I have hereunto set my hand on this
22  1st day of February 2018 at Shelton, Washington.

23

24
                          _____
25                        Michelle L. Patton, CCR # 2500
```

# Exhibit D

Page 1

1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
2                             AT SEATTLE

3      Case No. 2:17-cv-00023-JLR

4      _____

       VIDEOTAPE DEPOSITION OF:   CLAIRE SIMPSON
5                                 February 7, 2018

6      _____

       DARREN DONAHUE,
7
       Plaintiff,
8
       v.
9
       RED ROBIN INTERNATIONAL, INC., a Nevada Corporation;
10     RED ROBIN GOURMET BURGERS, INC., a Delaware
       Corporation; and HAROLD HART and his marital
11     community,

12     Defendants.

13     _____

                       PURSUANT TO NOTICE, the videotape
14     deposition of CLAIRE SIIMPSON was taken on behalf of
       the Plaintiff at 1900 Grant Street, Suite 1025,
15     Denver, Colorado 80203, on February 7, 2018, at
       9:05 a.m., before Marchelle Hartwig, Certified
16     Shorthand Reporter and Notary Public within Colorado.

17

18

19

20

21

22

23

24

25

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 115

1    look at it.  Again, the expectation of the position

2    was that he did look at it.  So my assumption would be

3    that he did because his job required him to.

4           **Q.    So I guess what --**

5           A.    So I don't know anything beyond that.

6           **Q.    So we could assume that somebody**

7    **intentionally transferred Chris Ferguson to Henrietta**

8    **New York, right?   Someone did it deliberately and**

9    **intentionally.   That's fair, right, based on that**

10   **logic?**

11          MS. MORISSET:   Object as to form.

12          A.    I don't see how the logic follows.

13          **Q.    (BY MR. BLANKENSHIP)   Well, wouldn't**

14   **it --**

15          A.    But what I can say is that Chris Ferguson

16   was transferred to Henrietta, New York.

17          **Q.    And do you know who transferred him to**

18   **Henrietta, New York?**

19          A.    I do now.

20          **Q.    And who's that?**

21          A.    Megan Mantelli.

22          **Q.    Okay.   And Megan Mantelli's job is what?**

23          A.    Her current job?

24          **Q.    What was her job then?**

25          A.    I believe that her title was payroll

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 116

1   specialist.

2       Q.   And isn't it the job of the payroll

3   specialist to make sure that an employee gets

4   transferred to a store that they're actually working

5   in?

6       A.   I'm going to answer that with no.

7       Q.   Okay.  So whose job is it, then, to make

8   sure that an employee gets transferred to a store so

9   they can basically do that very, very important task

10  of being able to swipe in or punch in for their time

11  so they can actually do the job they were hired to do?

12  Who is -- who is responsible for making sure those

13  transfers happen appropriately?

14      A.   I believe it was the general manager's

15  responsibility to do the transfer, but I'm not

16  familiar with transfers in the system.

17      Q.   You know that the general manager that

18  did the transfer, that was not -- that was actually

19  Rick Blankenship?

20          MS. MORISSET:  Object as to form.

21      Q.   (BY MR. BLANKENSHIP)  Rick Blankenship

22  was the manager that did the transfer to Henrietta,

23  Georgia (sic), and Ms. Mantilli entered that data into

24  the system, right?

25          MS. MORISSET:  Object as to form and

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 117

1    lacks foundation.

2         A.   I'm confused by your question.  I'm

3    confused by what you're saying the GM at the Pier did.

4         Q.   (BY MR. BLANKENSHIP)  Well, it's because

5    you're not -- well, let me just put it this way:  So

6    you're also presuming that Darren Donahue -- when you

7    say the GM did the transfer, are you -- is it your

8    testimony that your assumption was that Darren Donahue

9    transferred -- transferred Chris Ferguson to

10   Henrietta, Georgia -- New York?  I spent too much time

11   in the south.

12        A.   So what I can tell you is at the time of

13   the separation, I did not know how the transfer had

14   occurred.  What I knew was that the transfer had

15   occurred, and I knew the transfer had occurred because

16   of the request for the rehire eligibility.

17             So I didn't know how the transfer had

18   occurred, and that's why those are part of the

19   questions that Mr. Donahue was asked.

20        Q.   Did you ever bother to find out who

21   actually created the circumstance that forced

22   Mr. Ferguson to not be able to actually clock in

23   properly at the Auburn Red Robin?

24             MS. MORISSET:  Object as to form.

25        A.   I think we've got two different questions

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 118

1   there.  I think -- I think part of your question is

2   did I ever bother to find out who transferred Chris

3   Ferguson.  Is that accurate?

4            Q.   (BY MR. BLANKENSHIP)  At the time that

5   Darren Donahue was fired, did you ever bother to find

6   out or discover who actually transferred Chris

7   Ferguson to Henrietta, New York?

8            A.   I had no technical knowledge of how to do

9   so at the time that Darren Donahue was terminated.  We

10   asked Mr. Donahue how it happened.

11           Q.   Okay.  So I'm going to ask my question

12   again.  I want you to listen carefully.  It sounds

13   like the answer would be a no.

14                But my question is this:  Did you ever

15   make an effort personally or ask anyone else to

16   confirm who the person was who, in fact, transferred

17   Chris Ferguson to Henrietta, New York, at the time

18   that Darren Donahue was fired?

19           A.   We asked Mr. Donahue how it happened.  As

20   a general manager of the Auburn location, we were

21   interested in his opinions as to how this occurred.

22           Q.   My question was:  Did you ever bother --

23   okay.  Other than that, asking Mr. Donahue -- which I

24   don't have any record of you asking Mr. Donahue.  We

25   have got some notes of other people, but no tape

CLAIRE SIMPSON - 2/7/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 119

1    recordings, no statement from Mr. Donahue of what

2    happened at the meeting.

3                But putting all that aside, did you ever,

4    independent of supposed statements that Mr. Donahue

5    made, ever figure out that it was Megan Mantelli, as

6    you said, who transferred Chris Ferguson to Henrietta,

7    New York?

8         A.    So at the time, Mr. Donahue was able to

9    answer questions about why Chris Ferguson had been

10   terminated as walked off shift.  And if I recall

11   accurately, his recollection was that he was termed as

12   walked off shift because that's what happened.

13               Therefore, if he was able to comment on

14   the separation type, commenting on the location would

15   have been secondary.  He was able to give information

16   at the time that he stated why the individual was

17   terminated.  So irrespective of location, he gave

18   answers as to the termination:  Coding in the system.

19        Q.    What in the world did that have to do

20   with Henrietta, New York?

21        A.    So irrespective of the location that the

22   individual was at, Mr. Donahue answered the questions

23   with regards to the termination type.

24        Q.    What does that have to do -- my question

25   was -- and I'm going to go back to it -- is did you

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 120

1   make any effort to determine who actually transferred

2   Chris Ferguson to Henrietta, New York, other than, you

3   know, your -- other than supposedly asking Darren

4   Donahue, did you or anyone involved with the

5   termination, to your knowledge, make any inquiry as to

6   who, indeed, transferred Chris Ferguson to Henrietta,

7   New York?

8          A.    Questions were asked at the time to the

9   limit of my technical knowledge, which meant that the

10  question needed to be asked of Mr. Donahue.  I did not

11  have technical expertise at that time beyond that to

12  know any other way of ascertaining knowledge.

13         Q.    Okay.  And you thought that -- so other

14  than -- other than -- you thought that Mr. Donahue had

15  the ability to explain how this person basically was

16  transferred to Henrietta, New York.  Is that your

17  testimony?

18         A.    I thought it irrelevant that Mr. Donahue

19  be asked the questions surrounding both the transfer

20  and the termination.

21         Q.    Where in the world are the questions in

22  those -- do you remember the questions that you helped

23  write?  Is there any question in there that talks

24  about anyone asking Mr. Donahue why the guy was

25  transferred to New York?

CLAIRE SIMPSON - 2/7/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 121

1          A.   Please can you give me a copy of the

2    questions and I'll answer your question.

3          Q.   **You would think it would be in there,**

4    **though, right?  Because that seemed to be pretty**

5    **central to your concern.**

6          A.   I don't know.  I don't know.  I would

7    like to read through the list of questions and I would

8    be happy to answer your question.

9          Q.   **Now, you did just testify that you had**

10   **someone ask Mr. Donahue about why this person was**

11   **transferred to Henrietta, New York, right?  Was that**

12   **your testimony?**

13         A.   Please read it back.

14         Q.   **Well, do you recall?  I recall you saying**

15   **that, and we can read the testimony later.  But did**

16   **you expect that someone was going to ask Darren**

17   **Donahue about why Chris Ferguson was transferred to**

18   **Henrietta, New York?**

19         A.   I don't know.  I would be able to give

20   you an answer if I could look at the questions.  I

21   know that there was an e-mail with the questions in.

22   If I could look at that, I could tell you what I

23   expected the questions to be.

24         Q.   **Is there any reason why that e-mail**

25   **wasn't sent to Darren Donahue so he could answer the**

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 147

1   **Basically -- so this is an investigation that looks**

2   **like -- this is a true and correct copy of the**

3   **EthicsPoint that --**

4               MR. BLANKENSHIP:  Counsel, you can assure

5   me that that was -- is this a true and correct copy of

6   the EthicsPoint, the attachments, assuming that we

7   have produced everything?

8               MS. MORISSET:  I'm not going to testify,

9   but this -- you asked for a copy of the EthicsPoint

10  documents and we did our best to produce it.

11          Q.   (BY MR. BLANKENSHIP)  And so you said --

12  **is this an investigation of Darren Donahue?**

13          A.   Yes.  This is, yes.  Uh-huh.

14          **Q.   And so -- and it appears that this**

15  **investigation was opened -- if we look at the first**

16  **page of your case snapshot -- on -- is that June 4,**

17  **2015?**

18          **A.   What I'll say is that's the date that**

19  **this is originally entered into the system.**  If we go

20  through the documentation and we look at when things

21  occurred -- it doesn't mean that the investigation was

22  opened on that date.  What it means is that the

23  investigation was entered into the system on that

24  date.

25          Q.   So what date did the investigation start

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 175

1    were involved.

2        Q.   So nobody alerted you to anything with

3    respect to his pay back in November.  Is that your

4    testimony?

5        A.   I wasn't in the country, I think, at the

6    time of that in November.  I either left on the 11th

7    or was -- I think I had left on the 11th.  I'm not --

8    I can get you information on when I was out of the

9    country if you need it.

10       Q.   So let's look at the next sentence.  It

11   says, quote, After looking into it further, it was

12   discovered that Auburn transferred Christopher to

13   Henrietta to allegedly keep the term from hitting the

14   scorecard.

15            I want to ask you about that.  Who

16   discovered that fact, that supposed fact that Auburn

17   transferred Christopher to Henrietta to allegedly keep

18   the term from hitting their scorecard?

19       A.   I think that was the theory at the time,

20   but I think you would have to talk to Kate as to why

21   she wrote what she wrote.

22       Q.   I mean, does that make any sense at all

23   that basically someone would transfer somebody for

24   walking off the job in advance without knowing that

25   the person walked off the job?

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 176

1              MS. MORISSET:  Object as to form.

2          Q.   (BY MR. BLANKENSHIP)  So first of all, if

3  an employee gets terminated, it can hit the scorecard

4  by basically showing turnover, right?

5          A.   I'm not that familiar with the scorecard,

6  but I believe what you're saying is correct.

7          Q.   Okay.  All right.  But you would have to

8  be really pretty clever if days in advance you put

9  somebody in Henrietta, New York, created a big payroll

10 issue as a result of it where the manager had to use

11 the badge swipe because you could no longer access

12 that person in the system, and then you would have to

13 be almost a criminal genius that you would then send

14 in an IT ticket asking for confusion and then know

15 that that would square you up, though, and the person

16 voluntarily resigned days later, right?

17             MS. MORISSET:  Object as to form.

18         A.   I don't think I could comment on the

19 level of intelligence that it would take.  I don't

20 know.

21         Q.   (BY MR. BLANKENSHIP)  Well, I mean, these

22 are -- do you know -- tell me if these are the facts

23 as you understand them.  Prior to Chris Ferguson

24 giving his two weeks' notice and then walking off the

25 job, he had worked for a number of days under a

CLAIRE SIMPSON - 2/7/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 224

1          Q.   (BY MR. BLANKENSHIP)  What year is that a
2     review for?

3          A.   I believe 2015.

4          Q.   Okay.  Does it appear to be a true and
5     correct copy?  Is it?  Is that a yes?

6          A.   I'm still reading it to make sure.

7          Q.   It was produced by your counsel.

8          A.   Yep.  I'm just -- I'm still reading it
9     just to make sure.

10              MS. MORISSET:  This is 50, correct,
11     Scott?

12              MR. BLANKENSHIP:  50, yes.

13          A.   Yep, that's correct.  This is -- as far
14     as I know, yeah.

15          Q.   (BY MR. BLANKENSHIP)  So with respect
16     to -- did you get a 2016 review as well?

17          A.   Yes, I think so.

18          Q.   All right.  Do you recall a -- do you
19     recall that Darren Donahue was diagnosed with cancer
20     at some point?

21          A.   Yes.

22          Q.   And how did you learn that?  Do you
23     remember?

24          A.   I don't know how I initially learned, no.

25          Q.   And do you remember that the company

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 227

1            This was -- this is about a year after my

2    mother had cancer, and I was very empathetic to the

3    situation.

4            Q.   Okay.  So do you know if any documents

5    went out basically reflecting that there was some

6    accommodation process around the time that Darren was

7    returning to work in January 2012?

8            A.   So what I'm reading here when I look at

9    the e-mail from Tara is she said she tried to reach

10   out by phone and mail, both e-mail and hard copy.  So

11   when you're asking if documents went out, I would

12   presume that those would be those documents that went

13   out in both e-mail and hard copy.

14           Q.   Do you know -- have you seen any evidence

15   that they did, in fact, other than the reference to it

16   here in this e-mail to Darren from Tara?

17           A.   I don't recall.

18           Q.   Did you ever engage in any type of

19   interactive process with Darren Donahue regarding

20   accommodations?

21           A.   I personally did not.  That was not my

22   role.

23           Q.   Okay.  Did you play any role in creating

24   the job description for Darren Donahue or for the GM

25   position?

CLAIRE SIMPSON - 2/7/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 255

1   bullying.  It sounded like directive leadership to

2   force people into consent.

3            And so when I read that section, that

4   reminded me of previous instances that I've had with

5   Darren and I was -- shared it with Julie.  Julie was

6   my safe space.

7        **Q.   So you considered her your safe space?**

8        A.   Yeah.

9        **Q.   You were that close?**

10       A.   Julie has been very important to me

11  throughout my life.  She was very supportive

12  throughout a number of things.  I mean, I've had a

13  number of things happen while I've been at Red Robin

14  and she has always been a place that I could go for

15  solace.

16       **Q.   Okay.  And so then -- so you write --**

17  **when you say "Don't you miss Darren," you mean that**

18  **sarcastically, right?**

19       A.   I did mean it sarcastically, yes.

20       **Q.   And then Julie Rivera writes, "Why is he**

21  **still here" with an explanation point.**

22       A.   Uh-huh.

23       **Q.   Do you see that?**

24       A.   Uh-huh.

25       **Q.   So that's the director of -- that's**

CLAIRE SIMPSON - 2/7/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 256

1    actually the vice president of human resources saying

2    "Why is he still here"?

3            A.    Not at that time.    She was the director

4    of HR.    Oh, no.    Maybe she was VP by then.

5            Q.    She was VP by then.

6            A.    Okay.

7            Q.    And so the vice president of HR for Red

8    Robin basically was saying "Why is he still here" with

9    an explanation point, right?

10           A.    Yeah.    I don't know if she had received

11   the same LinkedIn thing that I had the month prior

12   that suggested that he works at a car dealership.    I

13   think it was the Lexus of Bellevue car dealership.    So

14   I don't know if she was saying that that was

15   conflicting that he -- like Darren is still here?

16   Because in February we had received notification from

17   LinkedIn that he was at Lexus of Bellevue.

18           Q.    So I guess what you're saying is it's

19   possible that she was surprised to see that he was

20   still employed as a GM at Auburn; is that right?

21               MS. MORISSET:  Object as to form.

22           Q.    (BY MR. BLANKENSHIP)  Is that right?

23           A.    Yeah.  I think that's a potential, yeah.

24           Q.    Okay.  So you don't think she would know

25   if Darren had left and gone to start another career at

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 371

1            That's an assumption on your part,

2    correct?

3            A.   I don't know.  I'm sure if I wrote it, I

4    believed it to be true at the time.

5            Q.   Okay.  But we have gone over that, and

6    you don't have any evidence other than --

7            A.   I don't have -- I don't recall.

8            Q.   Okay.  Do you recall -- you know, as

9    somebody -- do you recall a situation where a guy in

10   Kennewick basically -- the managers report that he was

11   padding inventory?

12           A.   I believe there was an e-mail on that

13   afterwards that I sent to Harold to ask him about it.

14           Q.   Okay.  And padding inventory, is that

15   something, you know -- let me hand you that exhibit.

16   I asked Harold Hart about this.

17           A.   Okay.

18           Q.   So basically part -- in Darren Donahue's

19   exit statement, he mentioned a situation where

20   somebody in Kennewick, a GM, had padded inventory.  Do

21   you remember that?

22           A.   Yes.

23           Q.   Okay.  And it looks like you asked -- if

24   you look at the second page of the e-mail, on June 22

25   you asked Harold Hart to -- the second sentence, "Can

CLAIRE SIMPSON - 2/7/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 372

1    you give us some insight into his Kennewick

2    allegations?"

3              Right?

4         A.   Yes.

5         Q.   And he writes about a GM padding

6    inventory and a reference here that "Kirsten and Devin

7    contacted Puyallup to ask what they should do about

8    Greg telling them he added ending inventory.  Raul

9    told them to contact me."

10             Do you see that?

11        A.   I do.

12        Q.   Were you involved in investigating this?

13        A.   No.

14        Q.   Would you agree that this would be a

15   serious violation?

16        A.   It's concerning.

17        Q.   Is it -- you called it inventory

18   manipulation, right?

19        A.   Yeah.  Up above I said, "How significant

20   was the manipulation"?

21        Q.   Okay.  And that would be inventory

22   manipulation where somebody was actually being

23   dishonest with inventory in order to -- right?

24             MS. MORISSET:  Object as to form.

25        A.   I wasn't involved in the situation.

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 373

1          Q.   (BY MR. BLANKENSHIP)   According to what

2     is here, inventory manipulation would be actual

3     dishonesty, wouldn't it?

4               MS. MORISSET:   Object as to form.

5          A.   I wasn't involved in the situation, so

6     I'm finding it really hard to comment on a situation

7     that I don't have any depth in.

8          Q.   (BY MR. BLANKENSHIP)   One thing you do

9     know there, though, is that this guy received a final

10    written warning.   He wasn't fired, was he?

11         A.   According to this, he received a final

12    written warning and HR and Tim were involved.

13         Q.   So do you know who from HR was involved

14    with Tim Mei?

15         A.   I don't.

16         Q.   And with the assistance of Tim Mei and

17    HR, this guy just got a written warning and that's

18    all, right?

19         A.   It was his final written warning.

20         Q.   Have you ever seen the final written

21    warning anywhere?

22         A.   I don't know.

23         Q.   Would it surprise you if no final written

24    warning has been produced from this time frame with

25    respect to Mr. Blackburn?

Page 374

1          A.    Yeah.

2          **Q.    Are you aware of an individual named**

3    **Matthew Cave that was falsifying records, including**

4    **records of time worked by employees?**

5          A.    I don't recall.

6                (Deposition Exhibit 74 was marked.)

7          A.    How much longer do we think we're going

8    to go?  Because I'm going to need to call home.

9          **Q.    You know, I can make this the last the**

10   **exhibit.**

11               MS. MORISSET:  Okay.  Can you do it?

12         A.    Okay.  I just -- I will need to call home

13   soon.

14               MS. MORISSET:  Do you have five minutes,

15   or do you want to stop now and make a phone call?

16               THE DEPONENT:  I can do five minutes, but

17   I need to call home.

18         **Q.    (BY MR. BLANKENSHIP)  Well, do you just**

19   **want to turn the document over and call home and then**

20   **we can -- you can make your call?  Because I don't**

21   **necessarily want to be limited to five minutes.**

22         A.    Well, wait.  We said we would go until

23   20 past and we're at 25, so that would take us to half

24   past, so let's just get through this.

25         **Q.    Okay.  So this document was produced in**

CLAIRE SIMPSON - 2/7/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 375

1    discovery and it involves Matthew Cave, a general

2    manager.  Do you see that?

3            A.   I do.

4            Q.   And why don't you take a moment and read

5    this.

6            A.   Okay.

7            Q.   You've read it?

8            A.   Yes.

9            Q.   Okay.  Did you read this before the

10   deposition?

11           A.   No.

12           Q.   It's a fast read.

13                It appears from this that during an

14   audit, it was determined that this general manager,

15   according to this document, made several time card

16   edits that reduced work time for team members.  Is

17   that a serious violation?

18           A.   Yep.

19           Q.   And it appears that he did not provide an

20   explanation as to why it occurred, right?

21           A.   According to this document.

22           Q.   And that actually would be taking money

23   away from the team members if their time is getting

24   taken out of their paychecks, right?

25           A.   Yep.

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 376

1        Q.    It's basically stealing from those

2    employees, right?

3        A.    It could be considered that.

4        Q.    Did this person get fired, or was this --

5    it appears from this that all this person got was a

6    final -- just a written warning, right?

7               MS. MORISSET:   Object as to form and

8    foundation.

9        Q.    (BY MR. BLANKENSHIP)   This says written

10    warning here, doesn't it?

11        A.    This is a written warning.

12        Q.    It's not a final written warning, is it?

13        A.    No.   This is a written warning.

14        Q.    Okay.

15        A.    But it does say at the end that any

16    further behavior could result in action up to and

17    including termination.   So when you say "final," it

18    wouldn't require further documentation.

19        Q.    Isn't that true with every write-up that

20    they have that language?

21        A.    Yes.   Most should, yes.

22        Q.    So that doesn't necessarily -- that could

23    be just any type of -- so that's not particular to

24    this one.   That's just the standard language, right?

25        A.    That is the standard language.

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 377

1    Q.   And would this person that basically is

2    in Tim Mei's region and -- would this person be under

3    your purview as an HR manager?

4         MS. MORISSET:  Object as to form.

5    A.   I don't know what you mean by that.

6    Q.   (BY MR. BLANKENSHIP)  Well, were you ever

7    asked to investigate this is what I'm asking.

8    A.   I don't recall.

9    Q.   Okay.  And this is basically time card

10   fraud, isn't it?

11   A.   Yes.

12   Q.   And why did you investigate the supposed

13   time card issue with Darren Donahue but not this one

14   with respect to Matthew Cave?

15   A.   I don't know that I was aware of this

16   one.

17   Q.   Now, wouldn't you agree that according to

18   your standards, he should have been fired?

19        MS. MORISSET:  Object as to form.

20   A.   It would have been an outcome that I

21   would have suggested if I was aware.  I don't know

22   that I was aware.

23   Q.   (BY MR. BLANKENSHIP)  Well, let me show

24   you -- I've got one more exhibit that actually does

25   show you're aware, Ms. Simpson.

CLAIRE SIMPSON - 2/7/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 378

1            (Deposition Exhibit 75 was marked.)

2        Q.    This appears to be a document that was

3   created by you regarding the falsification of

4   contracts, reports or records for -- related to this

5   case, right?

6        A.    Yep.

7        Q.    And so basically this was your

8   investigation, wasn't it?

9        A.    I don't know if was mine or Mark

10  Dubberly's.

11       Q.    Well, it looks like you opened the -- you

12  were the creator.   You opened the case, right, the

13  investigation?

14       A.    Yeah, based on the reporter being Mark

15  Dubberly.

16       Q.    So let's take a look at the "Assignees &

17  Access" on the second page.   It looks like you were

18  assigned to -- along with Julie Rivera, you were

19  assigned to this case and had access to it, right?

20       A.    Yep.

21       Q.    And let's look under the synopsis on

22  page 3.

23       A.    Okay.

24       Q.    It says "Outcome of case."   It says it

25  was investigated, and at this point -- the primary

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 379

1    outcome is investigated.  The secondary outcome is

2    pending, outcome 1, outcome 2.  And the action taken

3    is written disciplinary action.  Do you see that?

4         A.   Yep.

5         Q.   And under "Additional details" under

6    "Synopsis notes" what it reads is, quote, Managers

7    have had bad time edit practices in the restaurant.

8    These have not been malicious or intended to falsify

9    their scorecard but as a result all managers involved

10   has received written warnings.

11             Did I read that correctly?

12        A.   Yep.

13        Q.   So even though there were bad time edit

14   practices that we showed earlier that actually

15   resulted in time being taken away from employees that

16   we can see as stealing time, because it wasn't

17   malicious, they just received written warnings?

18        A.   I believe this was an acquisition

19   restaurant who maybe hadn't had the same training as a

20   seven-year GM.

21        Q.   Is there anything in there that says it's

22   an acquisition restaurant?  Now all of a sudden you

23   know a lot about it.  Tell me what you know now.  Do

24   you remember now?

25        A.   That it's Westpark in Boise, Idaho, and

CLAIRE SIMPSON - 2/7/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 380

1    Boise, Idaho, was an acquisition restaurant.

2         Q.    Okay.   And so these -- you're saying that

3    these managers just didn't know that they couldn't

4    basically write off time on managers' time cards --

5    team members' time cards, that basically they stole

6    time from them?

7         A.    I'm saying that I would need to read the

8    interview notes from the manager to be able to give

9    you clarity on what exactly happened in the case.   We

10   obviously don't have them here or the time here today,

11   so I'm going off the synopsis as I wrote there.

12        Q.    All right.   So do you know whether or not

13   this -- that -- if you look on the first page, you've

14   got Jonathan Edwards, Nathan Frazier and then we know

15   you've got a general manager by the name of Matthew

16   Cave.   Do you know if any of those individuals had a

17   disability or had requested medical leave?

18        A.    I don't know.   Don't recall.

19        Q.    Do you if any of them made retaliation

20   complaints?

21        A.    I don't know.

22        Q.    But would you agree that the conduct in

23   here is as bad or worse than what has been alleged

24   against Mr. Donahue?

25             MS. MORISSET:   Object as to form.

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 381

1      A.   I don't know without seeing the issues

2  that actually took place.  I get that it says that

3  we've got bad time card edit practices, but I don't

4  know who that involved, and I believe that that's -- I

5  believe there are differences.

6      Q.   (BY MR. BLANKENSHIP)  So how would it be

7  worse?  How is this worse?  Is it worse than -- from

8  what we have seen on its face, does it in way seem

9  worse than what Darren --

10     MS. MORISSET:  Hold on.  Object as to

11  form and foundation.  She doesn't have the entire

12  investigation file in front of her.  You're going to

13  keep asking questions about it.  It's past 6:30.

14  Scott, you need to wrap up.

15     Q.   (BY MR. BLANKENSHIP)  Here's what I'm

16  saying.  What else would you need to see in order to

17  be able to look at this case that you were involved

18  with that basically resulted in written discipline,

19  not even final written warnings, to compare it to

20  Mr. Donahue's?

21     A.   So this case is from 2015.  I would need

22  to read the interview notes, I believe, to give myself

23  better knowledge of what happened and to look at the

24  Westpark audit concern packet that's the first

25  documentation piece there.

CLAIRE SIMPSON - 2/7/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 382

1      Q.   And this was just -- what's the date of

2    this?   This is 8/7/2015.   That's less than two months

3    after you participated in Mr. Donahue being fired,

4    right?

5         A.   It is.

6              MR. BLANKENSHIP:   That's all I have for

7    now.   We can talk about whether or not we need to

8    reopen this.

9              THE DEPONENT:   Okay.  Thank you.

10              MS. MORISSET:   We're not going back on

11    the record so Mr. Donahue can ask more questions.

12    We're done.

13              THE VIDEOGRAPHER:   The time is 6:34 p.m.

14    and this concludes the deposition of Claire Simpson.

15    The final number of media units used is eight and we

16    are now off the record.

17              WHEREUPON, the within proceedings were

18    concluded at the approximate hour of 6:34 p.m. on the

19    7th day of February, 2018.

20              *       *       *       *       *

21

22

23

24

25

**CLAIRE SIMPSON - 2/7/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 384

REPORTER'S CERTIFICATE

STATE OF COLORADO            )
                             ) ss.
CITY AND COUNTY OF DENVER    )

       I, MARCHELLE HARTWIG, Certified Shorthand
Reporter and Notary Public, ID 20014012312, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said
CLAIRE SIMPSON was duly sworn by me to testify to the
truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

       I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

       IN WITNESS WHEREOF, I have affixed my
signature this 13th day of February, 2018.

       My commission expires April 19, 2021.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

# Exhibit E

```
 1                 UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
 2                        AT SEATTLE

 3   Case No. 2:17-cv-00023-JLR
     _____
 4
     VIDEOTAPED DEPOSITION OF:   JULIA RIVERA
 5                               February 8, 2018
     _____
 6
     DARREN DONAHUE,
 7
     Plaintiff,
 8
     v.
 9
     RED ROBIN INTERNATIONAL, INC., a Nevada Corporation;
10   RED ROBIN GOURMET BURGERS, INC., a Delaware
     Corporation; and HAROLD HART and his marital
11   community,

12   Defendants.
     _____
13
                   PURSUANT TO NOTICE, the videotaped
14   deposition of JULIA RIVERA was taken on behalf of the
     Plaintiff at 1900 Grant Street, Suite 1025, Denver,
15   Colorado 80203, on February 8, 2018, at 9:14 a.m.,
     before Marchelle Hartwig, Certified Shorthand Reporter
16   and Notary Public within Colorado.

17

18

19

20

21

22

23

24

25
```

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 24

1          A.    I briefly recall Claire telling me more

2     of like in an informative way that there was an

3     investigation being done in regards to Darren Donahue.

4          **Q.    What do you recall her telling you about**

5     **the investigation?**

6          A.    Nothing.   We didn't speak any details of

7     the investigation.

8          **Q.    At the time that Darren Donahue was**

9     **terminated by Red Robin, you were the vice president**

10    **of human resources.   Am I correct?**

11         A.    What date was he terminated?

12         **Q.    It was June of 2015.**

13         A.    Correct.

14         **Q.    Okay.   And who did you report to at that**

15    **time?**

16         A.    Cathy Cooney, the chief people officer.

17         **Q.    Okay.   And chief people officer is Red**

18    **Robin-speak for basically the head of all of human**

19    **resources?**

20         A.    Correct.

21         **Q.    With respect to -- did Claire Simpson**

22    **report directly to you at that time?**

23         A.    Yes.

24         **Q.    2015?**

25         A.    Yes.

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 29

1   forward.

2          Q.    What about when Red Robin received a

3   charge from the EEOC December 2015, did you take any

4   efforts to preserve any documents at that time?

5          A.    Once the legal hold from our in-house

6   legal team came out, yes.

7          Q.    And when did that come out?

8          A.    I don't recall.

9          Q.    Did you text any -- let me see.

10         Have you at any point searched for

11   documents related to Darren Donahue with respect to

12   any of his claims in this case or any of the defenses?

13         A.    Yes.

14         Q.    Okay.  Did you provide them to your

15   attorneys?

16         A.    Yes.

17         MR. BLANKENSHIP:  Is the pace okay?

18         (Deposition Exhibit 76 was marked.)

19         Q.    (BY MR. BLANKENSHIP)  Let me hand you

20   what is marked as Exhibit 76.  I'll represent to you

21   that this was something we printed off of LinkedIn for

22   you.  I wanted to ask you a few questions about it.

23   Did you prepare your LinkedIn profile?

24         A.    Yes.

25         Q.    Okay.  And it has some experience here

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 30

1   and I wanted to just ask you if the overview of your

2   experience and your education is true and accurate.

3        A.   Yes.

4        Q.   And according to this LinkedIn, you began

5   as the director of human resources in February 2008;

6   is that right?

7        A.   I was an employee relations -- I think my

8   title was actually HR manager.   It might have been

9   employee relations manager for my first eight months

10  at Red Robin.

11       Q.   And then from there it went to HR

12  manager?

13       A.   Director of HR.

14       Q.   Director of HR?

15       A.   Yeah.

16       Q.   And that was in February 2008 when you

17  became the director of HR?

18       A.   No, no, no.   February 2008 is my hire

19  date with Red Robin.

20       Q.   Oh, I'm sorry.   It's interesting here.

21  We have got 2005 at Boston Market, and then you -- you

22  basically started as the manager but became the

23  director, you think, relatively soon afterwards?

24       A.   Oh, yeah, very soon.   Yeah.

25       Q.   Okay.   And then according to this -- what

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 31

1    you wrote here, in basically January 2015 to the

2    present, you became the vice president of human

3    resources, right?

4           A.    Correct.

5           Q.    At any point did you leave your

6    employment at Red Robin?

7           A.    Yes.

8           Q.    When did you leave your employment at Red

9    Robin?

10          A.    I don't recall the dates.

11          Q.    How long were you --

12          A.    32 days.

13          Q.    You've got to let me finish, because

14   we're going to try that again just so you let me

15   answer.  You totally got the question, but . . .

16          MS. MORISSET:  It's hard when you

17   anticipate questions.  It's not like a conversation.

18          Q.    (BY MR. BLANKENSHIP)  All right.  So

19   there was a point that you said that you were not

20   employed with Red Robin.  And how long was that time?

21          A.    32 days.

22          Q.    And why did you leave Red Robin?

23          A.    I was going to pursue a different career

24   with another company.

25          Q.    And what was that career you were going

JULIA RIVERA - 2/8/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 85

1    able to provide that for him so he could basically do

2    his job, right?

3            A.    I believe so.

4                  (Deposition Exhibit 84 was marked.)

5            Q.    Let me hand you Exhibit 84.  Why don't

6    you take a look at that.  Are you ready to -- have you

7    had an opportunity to review this document?

8            A.    I have.

9            Q.    Okay.  So it appears that you were copied

10   on this e-mail string, right?

11           A.    Yes.

12           Q.    And there are a couple of attachments

13   that were attached to this e-mail.  One is a Temporary

14   Work Restriction Assignment Agreement and that is

15   stamped Donahue 002613, and the second document is

16   basically a February 13, 2013, doctor note from

17   Dr. Gensheimer, resident physician in radiation

18   oncology from the University of Washington Medicine --

19   School of Medicine, right?

20           A.    Correct.

21           Q.    And so -- and are you disputing that you

22   received this?

23           A.    No.

24           Q.    Okay.  And basically from reading this

25   note from the doctor, you knew at the time that Darren

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 86

1    Donahue basically was treated with radiation therapy

2    for cancer of the bladder, right?  If you turn to the

3    last page of the exhibit, you can see that from the

4    doctor, right?

5            A.    Correct.

6            Q.    And you also see that the doctor had put

7    a lifting restriction to 20 pounds or less, according

8    to this, until March 15, 2012, right?

9            A.    Yes.

10           Q.    And he needed to stand no longer than

11   four hours and could -- unless he has a 15-minute

12   break, right?

13           A.    Correct.

14           Q.    Okay.  And I want to know from you

15   what -- do you know what accommodations, if any, that

16   Red Robin did to make sure that Darren Donahue had

17   these accommodations?

18           A.    I don't understand the question.

19           Q.    Well, do you know what actions Red Robin

20   took, if any, to make sure that Darren Donahue got

21   these accommodations, the lifting -- for the 20 pounds

22   lifting and the breaks?

23           A.    Darren Donahue was the general manager of

24   his location.  He controlled his own schedule.  He

25   controlled his entire day.

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 87

1      Q.   Okay.  So you expected him to -- because

2  he can control his day, that he would have had the

3  opportunity to limit his lifting and limit his breaks,

4  right?

5      A.   He had to.

6      Q.   Okay.  And he had to because why?

7      A.   Because there is nobody there over -- as

8  oversight of Darren.

9      Q.   So basically it's your testimony that

10  Darren had control of his environment because he was a

11  general manager, right?

12      A.   Correct.

13      Q.   Do you know if Red Robin did anything to

14  assist him with any of the lifting duties?

15      A.   He's not the only person in the building.

16      Q.   Okay.  Do you know if anyone sat down

17  with him and asked him if there were situations where

18  he basically needed assistance or staffing to help him

19  with lifting?

20      A.   I do not.

21      Q.   You would expect, though, that to the

22  extent that someone knew that he had to lift and

23  didn't have the support, that someone would have

24  reached out to him and let him know that Red Robin

25  would have made an accommodation like that?

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 88

 1              Or let me ask it this way:  If Darren
 2  Donahue had needed someone to help with lifting, let's
 3  say when deliveries came in in the morning, is that
 4  something that Red Robin would have provided for him?
 5              MS. MORISSET:  Object as to form.
 6          Q.  (BY MR. BLANKENSHIP)  Hired an additional
 7  person to help him or have an additional person come
 8  in to basically assist him with lifting when
 9  deliveries came in?
10              MS. MORISSET:  Object as to form.
11          A.  There is already an additional person in
12  the building.
13          Q.  (BY MR. BLANKENSHIP)  How many people
14  would be in the building when deliveries come in the
15  morning when -- well, there is one other person,
16  right, typically than the manager?
17          A.  It depends on what the general manager
18  schedules.
19          Q.  Okay.  So did Darren Donahue have the
20  power to basically schedule another person to work on
21  the day that it was just him and another employee and
22  deliveries came in?
23          A.  Yes, he did.
24          Q.  And how was he supposed to do that?
25          A.  Put it on the schedule.

JULIA RIVERA - 2/8/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 89

1        Q.    So he could schedule whoever he wants
2    that morning?
3        A.    He could.
4        Q.    Okay.  So given that it was that simple,
5    you wouldn't think that basically accommodating Darren
6    Donahue was any type of undue hardship to Red Robin,
7    would you?
8        A.    No.
9              (Deposition Exhibit 85 was marked.)
10       Q.    Let me hand you what has been marked as
11   Exhibit 85.  Do you recognize this document?
12       A.    It looks like the GM job description.
13       Q.    And I'm not seeing a date on it, but it
14   does appear that it was faxed somewhere around
15   March 15, 2015, right?
16       A.    Well, it looks like it was signed in
17   2013.
18       Q.    Okay.  I don't know what the fax -- do
19   you know why it was faxed on March 15, 2013?  Do you
20   see the top of the first page in the left-hand corner?
21       A.    Do I know?
22       Q.    Yeah.
23       A.    No.
24       Q.    I'm just asking.  I didn't necessarily
25   expect you to know.  But it does appear from the

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 120

1              MR. BLANKENSHIP:  92.

2              MR. DONAHUE:   Thank you.

3         Q.   (BY MR. BLANKENSHIP)  All right.  So have

4    you had an opportunity to review Exhibit 92?

5         A.   Yes.

6         Q.   Okay.  So what is it?

7         A.   It's an e-mail from Shay Carver to the

8    field HR managers, myself and Saundra Redmond.

9         Q.   And who's Saundra Redmond?

10         A.   At the time, Saundra Redmond was an HR

11    director for the West Coast.

12         Q.   And the first e-mail on June 26, 2014,

13    that relates to an assessment report.  What is an

14    assessment report?

15         A.   I can only speculate on what we're

16    talking about here.  That it's either the assessment

17    to complete talent review or it was the talent review

18    itself.

19         Q.   What is a talent review?

20         A.   A talent review was our succession

21    planning process.

22         Q.   And so succession planning means what?

23         A.   Succession planning means it -- assessing

24    and developing our bench strength to fill positions

25    throughout our company.

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 121

1        Q.    So part of what, for example, a talent
2    report would assess would be like, for example, is
3    Darren Donahue promotable to move up to the regional
4    operations director, right?
5        A.    Correct.
6        Q.    Okay.
7              MR. BLANKENSHIP:  And Counsel, I don't
8    believe that I have this attachment, so I -- I don't
9    want to mark the record, but make a note that we
10    looked for this and couldn't find it.
11             MS. MORISSET:  We'll look for it.
12             MR. BLANKENSHIP:  I appreciate that.
13             MS. MORISSET:  We'll look.
14             MR. BLANKENSHIP:  All right.  Thank you.
15        Q.   (BY MR. BLANKENSHIP)  So basically
16    Rochelle Means sends an e-mail here and you're copied
17    on it along with Shay Carver and Saundra Redmond,
18    right?
19        A.    Correct.
20        Q.    Who's Shay Carver?
21        A.    She was the HR director for the East
22    Coast.
23        Q.    And who was Rochelle Means?
24        A.    Rochelle Means was the HR manager for the
25    northwest division for the Byers division.

JULIA RIVERA - 2/8/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 132

1        A.   This one is 94.

2             (Deposition Exhibit 95 was marked.)

3        Q.   Let me hand you Exhibit 95.

4        A.   Wow, that's an old name.

5        Q.   All right.  Why don't you take a moment

6   and take a careful look at 95, will you, please.

7             Are you ready?

8        A.   Sure.

9        Q.   Okay.  So Exhibit 95 basically is an

10  attachment of a People Report, right?

11       A.   Yep.

12       Q.   I think you mentioned that a People

13  Report was for succession planning and basically

14  that's a report that would -- that's not it?  What

15  were you talking -- talent.  Talent-something, right?

16       A.   Talent.

17       Q.   What is a People Report?

18       A.   People Report was an internal tool that

19  the recruiters used to assess staffing levels and what

20  they needed to do to ensure we were staffed at the

21  management level.

22       Q.   All right.  So who are recruiters?  Is

23  that internal recruiters within Red Robin?

24       A.   Correct.  Marc Scott.

25       Q.   Okay.  So these are the people that would

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 133

1    be looking at potential people who might get

2    promotions later?

3              A.   This isn't --

4                   MS. MORISSET:   Object as to form.

5              A.   This isn't for promotion.   This is for

6    staffing levels.   If we're going to have a GM opening,

7    if we have enough assistant managers.   This is for

8    staffing levels for the restaurants.

9              Q.   (BY MR. BLANKENSHIP)   Staffing levels.

10   Okay.   Well, let's take a look at the document itself.

11             A.   Sure.

12             Q.   So if you look -- the reason that I

13   thought it might relate to promotion was because of

14   the words that were written on the document itself

15   under the section that's called "Readiness Code."   Do

16   you see "Readiness Codes" at the top of the page?

17             A.   I do.

18             Q.   And under "Readiness Code," "R" stands

19   for, according to this code, ready for promotion

20   within one month.   Did I read that correctly?

21             A.   Correct.

22             Q.   R6 means ready for promotion within

23   six months.   Am I right?

24             A.   Correct.

25             Q.   And so am I wrong to assume that

JULIA RIVERA - 2/8/2018
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 134

1   promotion means that -- ready to promote to the next

2   level?  I mean, that's what a promotion is?

3          A.   Potentially.

4          Q.   Okay.  So if we could take a look at

5   Darren Donahue.  It's in the box that says "Lakewood

6   Towne Center" on the far right-hand side, top box.

7          A.   Yeah.

8          Q.   Do you see that he is in green?

9          A.   I do.

10         Q.   And if you look at the status code for

11  green, that means low risk.  What does low risk mean?

12         A.   Low risk means that they are not -- we

13  don't believe that they are going to exit Red Robin

14  anytime soon.

15         Q.   Okay.  And so the criterion for exit

16  would be what?  Would that be --

17         A.   That they are going to resign.

18         Q.   Or be fired.  If someone had a

19  performance problem, would they be like at red, which

20  is a real risk?

21         A.   Correct.

22         Q.   What if they had health problems?  Would

23  they be coded as a real risk if they had health

24  problems?

25         A.   They would not.

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 135

1      Q.   Okay.  So let's take a look at the
2  Readiness Code.  We had read that R6 is ready for
3  promotion within six months.  If you look under Darren
4  Donahue, he has got an R6 as of September 1, 2010,
5  right?
6      A.   Correct.
7      Q.   And that would mean that he would be
8  ready for a promotion within six months, according to
9  the code, right?
10     A.   Potentially.
11     Q.   I don't see "potentially" there.  It
12  doesn't says ready for a promotion potentially.  It
13  just says ready for a promotion within six months,
14  right?
15     A.   Totally black and white.  Absolutely.
16     Q.   Okay.  Thank you.  Sheri Erickson is
17  coded ready 18 and she's still a general manager.
18          MR. BLANKENSHIP:  I'm going to move to
19  strike to the extent that was nonresponsive.
20          (Deposition Exhibit 96 was marked.)
21     Q.   (BY MR. BLANKENSHIP)  Let me hand you
22  Exhibit 96.
23          All right.  Have you had an opportunity
24  to review Exhibit 96?
25     A.   I have.

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 152

1              MS. MORISSET:  Object as to form.

2         A.    It says reach out to discuss next steps.

3         Q.   (BY MR. BLANKENSHIP)  Okay.  So is that

4    typically what happens?  For example, if a general

5    manager wants to hire a team member who's qualified

6    for the position, do they have to run it by basically

7    the -- you know, the west division human resource

8    manager first?

9         A.    No.

10        Q.    Okay.  And let's take a look at what they

11   are saying here.  Is there any reference here to

12   making any accommodations for this disabled team

13   member -- these special needs team members in that

14   paragraph?

15        A.    I don't see her saying it.

16        Q.    Okay.  And isn't it true that under the

17   law that someone with a limitation -- there could be

18   reasonable accommodations that are made to allow them

19   to perform the essential functions of the job, right?

20        A.    Absolutely.

21        Q.    And are you aware of any team members

22   that received accommodations so they could remain

23   employed for any of the jobs that they were hired for?

24              MS. MORISSET:  Object as to form.

25        Q.   (BY MR. BLANKENSHIP)  I'm talking about

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 153

1  disabled team members referenced here.

2      A.   I know that we moved team members in the

3  special need category into busser and host positions.

4      Q.   Do you think it would be important in a

5  message like this to inform the general managers that

6  basically a special needs team member could be hired

7  not just if they can perform the functionalities

8  detailed in their job description, but they could be

9  done so with reasonable accommodations?

10     A.   Sure.

11     Q.   Okay.  Do you know why that wasn't in

12  here?

13     A.   I have no idea.

14     Q.   You would agree that that is an important

15  omission here, isn't it?

16          MS. MORISSET:  Object as to form.

17     A.   I don't doubt that we -- that we looked

18  at that they could accommodate the job with or without

19  accommodation.

20     Q.   (BY MR. BLANKENSHIP)  But it doesn't say

21  that, does it?

22     A.   It does not say it in the e-mail.

23     Q.   And then let's take a look at Darren

24  Donahue's reaction at the top of the page of

25  Exhibit 6.  Do you see that?

JULIA RIVERA - 2/8/2018
Darren Donahue v. Red Robbin International, Inc., et al.

Page 186

1    to promote within the company?

2            A.   To promote within?

3            **Q.   Yeah.**

4            A.   It's not Alex's decision.

5            **Q.   Okay.  But --**

6            A.   She's a recruiter.

7            **Q.   So what does a recruiter do?**

8            A.   They hire.  They recruit, select, hire.

9    The operations team hires.

10           **Q.   And that would be for succession planning**

11   **that they would be recruiting?**

12           A.   If there is an opening, if there's a

13   need.

14           **Q.   What is attached here is a spreadsheet**

15   **that, I guess -- we looked at one earlier.  It's**

16   **called a "People Report," right?**

17           **A.   Correct.**

18           **Q.   And the people listed in the People**

19   **Report appear to be current employees, right?**

20           **A.   Correct.**

21           **Q.   So I guess maybe I'm wrong, but I assume**

22   **that if the director of acquisition was sending this**

23   **to -- like to Roger Byers, that would be looking at**

24   **who might be eligible for a promotion?**

25           **A.   It's regarding staffing needs.  This is**

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 187

1    an internal staffing document regarding staffing

2    needs, where we need to recruit positions for.

3            Q.   Okay.   And that has the same readiness

4    code we went over earlier where you've got R, ready

5    for promotion within one month; R6, ready for

6    promotion within six months; R12, ready for promotion

7    within 12 months and it goes down to an X, which is at

8    risk/performance issues and then an M, which is

9    maintain in position.   Do you see that?

10           A.   Yes.

11           Q.   Okay.   And it appears here that Darren

12   Donahue was at an M.   Do you see that?

13           A.   Yes.

14           Q.   And that's different than the other

15   spreadsheet I showed you where he was an R6, correct?

16           A.   Correct.

17           Q.   And instead of him being a green, low

18   risk, at this point it appears that his status code is

19   designated red, real risk.   Am I right?

20           A.   Correct.

21           Q.   Do you know why he was coded a real risk

22   as of this date?

23           A.   My guess would be that if we weren't sure

24   that he was going to be able to return from leave or

25   have permanent -- if there was anything permanent

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 188

1   going on, that that's why they had it as a red in case

2   they needed to ever backfill.

3           Q.   Okay.

4           A.   We had an open position.  I don't know --

5   I don't know what Darren's status was when this was

6   written.  But, again, if there was concern about him

7   not being able to return from leave, that could

8   definitely put somebody marked red at risk.

9           Q.   Okay.  So if somebody basically had

10  some -- like Darren did, some health issues that might

11  prevent them from returning to their position, that

12  could be a real risk under this status code and would

13  be red, right?

14          MS. MORISSET:  Object as to form.

15          Q.   (BY MR. BLANKENSHIP)  Is that what you

16  meant?

17          A.   It could be.

18          Q.   Do you recall at the same time that right

19  around this was -- I believe this People Report,

20  according to this e-mail, was sent on March 3, 2014.

21  Are you aware that Darren's scorecard was pretty high

22  during that time frame?

23          A.   I'm not aware.

24          (Deposition Exhibit 104 was marked.)

25          Q.   Let me hand you Exhibit 104.  Take a

**JULIA RIVERA - 2/8/2018**
**Darren Donahue v. Red Robbin International, Inc., et al.**

Page 276

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           ) ss.
CITY AND COUNTY OF DENVER  )

       I, MARCHELLE HARTWIG, Certified Shorthand
Reporter and Notary Public, ID 20014012312, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said JULIA RIVERA
was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.

       I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

       IN WITNESS WHEREOF, I have affixed my
signature this 13th day of February, 2018.

       My commission expires April 19, 2021.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

# Exhibit F

1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF WASHINGTON

3                            AT SEATTLE

4   _____

5   DARREN DONAHUE                    )
                                      )
6              Plaintiff,             )
                                      )
7              vs.                    ) No. 2:17-cv-00023-JLR
                                      )
8                                     )
    RED ROBIN INTERNATIONAL, INC.,    )
9   a Nevada Corporation; RED ROBIN   )
    GOURMET BURGERS, INC., a Delaware )
10  Corporation; and HAROLD HART      )
    and his martial community,        )
11             Defendants.            )
    _____

12

13               DEPOSITION UPON ORAL EXAMINATION OF
                              TIM MEI
                         February 13, 2018
14                       Seattle, Washington
    _____

15

16

17

18

19

20

21

22

23           REPORTED BY:  Michelle L. Patton, CCR
                           Washington License No. 2500
24

25

WITNESS: TIM MEI   2/13/2018

Page 103

1   A   I -- I -- I don't.  It was -- it was -- I think I was

2       a regional director at the time, so I don't know

3       about the timeline.

4   Q   **That is when you were in the VP position you believe?**

5   A   That was when I was in -- the regional director over

6       in Eastern Washington, so I didn't have oversight.

7   Q   **So how many years ago was that?**

8   A   Four or more.

9   Q   **Okay.  Do you know whether or not he had to take any**

10      **medical leave related to his cancer?**

11  A   I believe he did, I believe he did, yes.  And I

12      believe that was during my time as an RVP.

13  Q   **Did he have -- more than once, or was it just for the**

14      **original surgery relating to cancer?**

15  A   Yeah, I -- definitely once, could have been more than

16      once.  I couldn't tell you.

17  Q   **Okay.  Is this a review that you received in 2015?**

18  A   Yes.  It looks like it was received in March of 2015.

19  Q   **Okay.**

20          MS. MORISSET:  Could he have a chance to

21      look through all the pages of the exhibit, Scott,

22      before you start asking him questions about it?

23          MR. BLANKENSHIP:  Sure.

24      Why don't we do that?  Do you want to look at

25      the first page here?

Page 123

1        Scorecard, but there was no Scorecard metric or

2        measurement.

3                    MR. BLANKENSHIP:  Why don't we take a

4            break?

5                    MS. MORISSET:  Sure.

6                    THE VIDEOGRAPHER:  The time is 12:10, and

7            we are going off the record.

8                                        (Off the record)

9                    THE VIDEOGRAPHER:  The time is 13:14.  We

10           are back on the record.  Please continue.

11    Q    (By Mr. Blankenship) I want to ask you some questions

12         about People Reports.

13              Do you know what a People Report is?

14    A    I do.

15    Q    What is it?

16    A    It's a report that gives a chart or just outline of

17         what the regions look like, by restaurant, who the

18         managers are.

19              And we use it to manage the gaps, as far as

20         where we need people.  So it's really kind of like

21         the need report:  Where do we need a manager; what

22         are risks of somebody leaving us; or it might be

23         performance; might be them choosing to leave us;

24         might be different situations.  But it's something we

25         just use to manage our staffing, really, at a

Page 124

1       restaurant level.

2    Q  Okay.  And, you know, going back to your review, do

3       you remember that one of the issues was you needed to

4       find talent in RODs, back in the review that you did

5       in the end of -- December 15, 2015?

6    A  I do remember building that bench strength and talent

7       absolutely.

8    Q  Yeah.  So is part of the People Report looking at

9       what the bench strength and talent is?

10   A  Yeah, it was a part of it, but it was really used

11      more for staffing aspects.

12   Q  I'm going to show you -- okay.  So this is a People

13      Report from Julie Rivera to Claire Simpson, a ways

14      back.

15          You were working at Red Robin during that time

16      frame, right?

17   A  Yeah, I was in a regional-director role.

18   Q  Okay.  And so what -- this has been previously marked

19      as Exhibit 95.  And so -- and it looks like at this

20      time it was sent to the RVP, Roger Byers, from Marc

21      Scott.

22   A  Uh-huh.

23   Q  And there was basically -- and then there was a

24      request for changes, right?

25   A  Yep.

Page 125

1    Q    And let me show you the People Report itself.  I'm

2         going to flip it around here.  All right.  And does

3         that look like a People Report to you?

4    A    It does.  It looks like a People Report.

5    Q    And if you look, it says -- this is for Harold Hart's

6         region, right, which is Region 1?

7    A    Yes.

8    Q    Do you see, left-hand corner?

9    A    Yep.

10   Q    And then, if you look, if you look on -- there is

11        "Readiness Code."  Do you see that?

12   A    I do.

13   Q    And, for example, here you have got -- we'll just

14        take a look a little closer, at the Readiness Code

15        here.  You have got -- what the "readiness codes";

16        what do they mean?

17   A    Well, according to that, they mean ready for

18        promotion within "X" amount of time.

19   Q    That is what it says, right?

20   A    Yeah.

21   Q    And then if you look at the "Status code," it looks

22        like there is "Risks" on there, right?

23   A    Uh-huh.

24   Q    Is that a "yes"?

25   A    Yes.

1    Q    And you have got green is low risk; yellow is

2         situational risk; and red is real risk.

3              What does "real risk" mean?

4    A    Real risk of them not being with us anymore.  And,

5         again, that could be performance-based and driven by

6         us, or it could be them not happy, and maybe they are

7         looking at something different.  It could be a range

8         of -- really, it's just a risk of them not being

9         there anymore.

10   Q    And did you receive these kind of People Reports when

11        you were the RVP for the Northwest?

12   A    Yes.

13   Q    Okay.  So let's -- if we look in the right-hand

14        corner, you have got Darren Donahue listed.  Do you

15        see that?

16   A    I do.

17   Q    And he is, you can see there, with him, that he is a

18        "low risk," right, green?

19   A    Yep.

20   Q    And he is an "R-6," right?

21   A    Yes.

22   Q    For his readiness?

23   A    Yes.

24   Q    And what does "R-6" stand for?

25   A    Ready for promotion within six months.

WITNESS: TIM MEI   2/13/2018

Page 129

1    A    Kitchen manager.

2    Q    **And then there is another one, A-H-I or something?**

3    A    "AM-1"; we rated assistant manager at different

4         levels at that time.  We don't anymore.

5    Q    **Okay.  And "AM"?**

6    A    Assistant Manager.

7    Q    **Okay.  At that point did you have an hourly manager,**

8         **or were they all exempt?**

9    A    Yeah, we had shift supervisors at the time.

10   Q    **Do you remember a time where general managers were**

11        **instructed to fire special-needs employees, in 2015?**

12             MS. MORISSET:  Object as to form.

13   A    Yeah, I don't -- I -- there was a time where we

14        discontinued our special-needs program.

15   Q    **(By Mr. Blankenship) And how can you discontinue the**

16        **special-needs program without firing people with**

17        **special needs?**

18   A    We offer them jobs in other departments:  Could be a

19        host; could be sales-support, a busser position;

20        could be prep cook; could be other positions that are

21        part of the daily operations list.

22   Q    **And is it true or false that a vast majority of the**

23        **special-needs employees ended up getting terminated?**

24             MS. MORISSET:  Object as to form.

25   A    I would say that it's true that a majority of them

**Harvard Bell 206-629-8773 www.harvardbell.com**

1   didn't take another position.

2   Q   (By Mr. Blankenship) Can you remember an e-mail that

3       went out to -- from Rochelle Means, to the people for

4       the -- to the, basically -- to the RODs in your

5       region -- in your division, I mean, announcing that

6       the special-needs position was going to be

7       eliminated?

8   A   Do I remember it specifically?

9   Q   Yeah.

10  A   No, but if I saw it, I might.

11  Q   All right.  So let me --

12  A   Sure.

13  Q   Let me show you -- I've got to switch this around

14      again.

15          Do you see that, what -- I'm showing you here,

16      which has been previously marked as Exhibit 6.  Do

17      you see that there is an e-mail dated January 28,

18      2015 --

19  A   Yes.

20  Q   -- and basically it's from Rochelle Means, and it's

21      to, what I believe -- are those the regional --

22  A   Yes, they are.

23  Q   -- operations directors?

24  A   Yes, they are.

25  Q   Okay.  And then Rochelle Means copies herself and you

WITNESS:  TIM MEI    2/13/2018

Page 131

1    on that, right?

2    A    Yep.

3    Q    Is this a document that you reviewed before it went

4         out?

5    A    Yeah, I'm sure I did, yes.

6    Q    And what did you think of this decision?

7    A    I thought it was a business decision.  There's a lot

8         of special-needs team members that I have had

9         relationships with over the years, that I was -- I

10        was sad to see that as a decision.  But -- but I knew

11        we were offering them positions too.  But, yeah, I

12        mean, we are in the people business.  I -- I -- some

13        good people that I liked, so.

14   Q    Well --

15   A    I understood it; I didn't have to like it, but I

16        understood what they were trying to do too.

17   Q    Did you have any say in this decision?

18   A    No.  No.

19   Q    Did you read this e-mail in preparation for your

20        deposition?

21   A    No.  I haven't seen it since probably January 28th.

22   Q    Do you want to take a moment to read it?

23   A    Sure.

24                  MR. BLANKENSHIP:  Okay.  I'm going to

25        move up to the text here.

1            THE WITNESS:  All right.  Okay.  Okay.

2        I'm on number two, if you want to scroll up.

3            Can I see what you highlighted there really

4        quick?

5            MR. BLANKENSHIP:  Sure.  I'm going to ask

6        you about that.

7            THE WITNESS:  Okay.  Okay.  Okay.  Okay.

8            MR. BLANKENSHIP:  All right.

9    Q   (By Mr. Blankenship) All right.  So was there -- did

10       you see anything in here, about -- correct me if I am

11       wrong, but it appears that this is about terminating

12       the special-needs employees; not necessarily about

13       rehiring them, is it?

14   A   I believe that second highlight had a -- about

15       putting them into a different position and offering

16       that if they could meet the job description out

17       there.

18   Q   We'll get there; that is true.

19           All right.  So it says:  "I wanted to make sure

20       I included all of the information to empower the GMs

21       on the action required."

22           So you would agree that the vast majority of

23       this, besides what I highlighted, was about,

24       basically, how to terminate them, right?

25           MS. MORISSET:  Object as to form.

Page 133

1   Q   (By Mr. Blankenship) That was the GMs' action, right?

2           MS. MORISSET:   Same objection.

3   A   I believe it was about changes in the business

4       organization, and that they were doing business, but

5       there was definitely specific direction on how to

6       handle that, the conversations, and do it, so, yes.

7   Q   (By Mr. Blankenship) All right.   So let's go to the

8       part that I highlighted.   It says here -- that is the

9       paragraph you were talking about, the second

10      highlighting?

11  A   Yes.

12  Q   And what it reads is:   "Now, if you have a

13      TM" -- that is a "team member," right?

14  A   Yes.

15  Q   That is basically -- all Red Robin employees are

16      basically considered "team members," right?

17  A   Yes.

18  Q   "Now, if you have a team member that can perform the

19      functionalities detailed in our job description, and

20      your restaurant is in need of hiring, we can consider

21      keeping the TM, however we will need to update their

22      job code in the system."

23          Did I read that correctly?

24  A   Yes.

25  Q   And basically in bold and highlighted is:   "The

Page 134

1    functionalities detailed in our job description,"

2    correct?

3  A   Yes.

4  Q   So the direction, the charge to the general manager,

5    is that you can consider keeping the team member if

6    they can perform the functionalities detail in our

7    job description, right?

8  A   Yes.

9  Q   "And your restaurant is in need of hiring," right;

10    that is what is says, right?

11  A   That is what it says, yeah.

12  Q   So if both of those conditions succeed, you can

13    actually -- then Red Robin would consider keeping the

14    person, right?

15  A   Yeah, that is the way that reads.

16  Q   Were any of these people, did they have disabilities,

17    the basically -- what are referred to here as

18    "Special Needs TMs"; did the special-needs TMs, did

19    they have disabilities?

20        MS. MORISSET:  Object as to form.

21  Q   (By Mr. Blankenship) Who were the special-needs TMs?

22  A   What would you consider "special needs" or

23    "disability" then?

24  Q   Well, did they have any limitations?

25        Well, let me ask you this:  Do you know what a

Page 135

1    "disability" is; like, what the legal definition of a

2    "disability" is, under the ADA?

3  A   I wouldn't say I know the legal definition of it, no.

4  Q   What is your understanding of what a "disability" is?

5  A   "Disability":  The condition where you physically,

6    or, maybe, mentally, might not be able to perform

7    some of the duties of a job, to the level of somebody

8    without disabilities.

9  Q   Right.  So I think that is a fairly good definition.

10         And so were the special-needs team members

11    people that may have had some -- like people with

12    Down syndrome, or people that had some mental

13    disabilities?

14  A   Yes.

15  Q   Okay.  And are you aware of what the duty to

16    accommodate is, for an employer?

17  A   From the operations standpoint?  It's to understand

18    the request and the needs, and to put that towards

19    the HR department, and, probably, legal, too, and see

20    if it's reasonable accomodation.

21  Q   Okay.  And so somebody can have a disability, and if

22    they can do the job with reasonable accommodations,

23    they can still, even though they need those

24    accommodations, as long as they are reasonable, would

25    you agree, they would, under law, get an opportunity

WITNESS: TIM MEI   2/13/2018

Page 136

1    to work?

2              MS. MORISSET:  Object as to form.

3    A    I would -- I would put that in the hands of HR

4    department, legal department, to decide what is

5    reasonable.  I think that there is still the

6    opportunity for them to decide what is reasonable.

7    Q    (By Mr. Blankenship) Okay.  But what I'm asking you

8    as the former regional vice president for the

9    division, did you have an understanding that Red

10    Robin had a duty to make reasonable accommodations

11    for people with disabilities if they can perform the

12    essential functions of the job?

13    A    Yes.  Yes.

14    Q    Okay.  Can you show me where in here it instructs

15    general managers that they can make accommodations

16    for these special-needs team members?

17    A    In my quick scan of it, I can't --

18              MS. MORISSET:  Are you asking only about

19         this part of the exhibit, or do you want him to

20         look at the whole exhibit?

21    Q    (By Mr. Blankenship) You can look at the whole

22    exhibit if you like.

23         Okay.  It doesn't say that in this paragraph,

24    does it?

25              It simply says, doesn't it, that "if you have a

**WITNESS: TIM MEI   2/13/2018**

Page 137

1  TM that can perform the functionalities detailed in

2  our job description."

3  A  That is true, yeah.

4  Q  Okay.  And you just read the document, and I will let

5  you read it again if you like.

6          Is there somewhere in this document that --

7  basically, that you saw, that basically talks about

8  Red Robin making reasonable accommodations for these

9  special-needs team members?

10  A  I didn't see it on my first look-through.

11  Q  We can do it again, if you like.

12  A  Sure.

13  Q  Why don't we do that?

14  A  Okay.

15  Q  So let's look at these first three paragraphs:

16      Anywhere in there that talks about reasonable

17      accommodations for these special-needs team members?

18  A  Okay.

19  Q  Do you see anything in those first three paragraphs

20      that say anything about accommodating these

21      special-needs team members?

22  A  No, I don't.

23  Q  All right.  Now we are on the second page.  Do you

24      see anything in the end of that paragraph, or the end

25      of the next two paragraphs, that says anything at

WITNESS:  TIM MEI    2/13/2018

Page 138

1    all, whatsoever, about making reasonable

2    accommodations for these disabled team members?

3    A   Nothing in that screenshot.

4    Q   Let's go -- take a look at the rest of the document.

5    A   Okay.

6    Q   Do you see anything in the remainder of the document

7    that says anything about making any reasonable

8    accommodations to the team members' disabilities, in

9    order to keep them as employees?

10   A   No, I don't.

11   Q   In fact, it -- let's take a look at what I am

12   highlighting here.  Isn't that what the documentation

13   is supposed to say?

14   A   That was -- that was the reason for separation, if

15   that is the point we went to.

16   Q   "The team member's job has been eliminated

17   effective," and then you put the date, the effective

18   date, right?

19   A   Yeah.

20   Q   Nothing in there that hits -- that Red Robin had any

21   interest in providing reasonable accommodations to

22   keep those disabled employees, is there?

23          MS. MORISSET:   Object as to form.

24   A   There is nothing in the document that states

25   reasonable accomodation.

WITNESS: TIM MEI   2/13/2018

Page 139

1   Q   And Rochelle Means, she was in human resources,

2       right?

3   A   Yes.

4   Q   And who is -- and it looks like she is the West --

5       she was the West Division Human Resource Manager for

6       Red Robin International, right?

7   A   Yes.

8   Q   So would that be one of the persons that you would go

9       to if you had a question about a reasonable

10      accommodation, as a vice president of a division?

11  A   Could be.

12  Q   Wasn't she the human-resources person assigned to

13      your division?

14  A   Yes.

15  Q   You were in the West division, right?

16  A   Right.

17  Q   And do you feel as though this request from Rochelle

18      Means, to instruct the general managers, fairly

19      advised the general managers how to ask these

20      disabled team members for accommodations?

21              MS. MORISSET:  Object as to form.

22              THE WITNESS:  One more time on that one,

23          please.

24  Q   (By Mr. Blankenship) We read this document.  And you

25      were able to go through it line by line, paragraph by

**WITNESS: TIM MEI    2/13/2018**

Page 140

1    paragraph; and in no way, shape, or form, did it

2    advise the general managers that they were to

3    instruct these disabled team members of their ability

4    to accommodate them if they could perform the

5    essential functions of the job, correct?

6                MS. MORISSET:   Object as to form.

7    A    That is true; it did not mention reasonable

8    accommodations in there.

9    Q    (By Mr. Blankenship) Does that give you any pause or

10   person?

11   A    Not at the time, it didn't.

12   Q    What about now?

13   A    Do I think it should have been -- had it in there?

14   Yeah.

15   Q    Do you know -- can you identify a single disabled

16   employee that was a special-needs team member that

17   got any accommodations to do a job?

18                MS. MORISSET:   Object as to form.

19   A    Yeah, that I -- we are talking about a lot of team

20   members out there.   So I, specifically, in my mind,

21   no.

22        But that is just going off of memory and trying

23   to get a visual of everybody in 70-plus restaurants.

24   Q    (By Mr. Blankenship) So there were -- how many people

25   do you think were impacted in the 70-plus -- how many

Page 141

1    disabled team members do you think got impacted by

2    this job elimination?

3  A  That would be speculation.  I mean, if you just want

4    me to guess, I could guess on it.

5  Q  Did each restaurant typically have, you know, a

6    couple of these?

7  A  Not each restaurant.

8  Q  What is your best estimate?

9          MS. MORISSET:  Object as to form.

10 Q  (By Mr. Blankenship) Of how many disabled employees,

11   or basically these special team members?

12         MS. MORISSET:  Object as to form.

13 A  If I were to guess, maybe 30-ish.

14 Q  (By Mr. Blankenship) Did you ever see Darren

15   Donahue's response to this?

16 A  I can't recall.

17 Q  Did you know that he has a daughter with Down

18   syndrome?

19 A  I think I do recall that from one-off conversations.

20 Q  You said "one-off"?

21 A  Yeah, just friendly conversations.  And --

22 Q  Yeah, when you say "one-off", you mean, you know,

23   something, a unique conversation, right?

24 A  Yeah, just non-business and, you know, just cordial.

25 Q  Okay.  So the rest of the string on Exhibit 6

WITNESS:  TIM MEI    2/13/2018

Page 142

1   includes an e-mail from Harold Hart.  Do you see
2   that?
3   A   I do.
4   Q   And he writes, the second sentence:  "This needs to
5   be done within two weeks.  Can be done sooner than
6   later."
7        Did I read that correctly?
8   A   Yes.
9   Q   And that is forwarding the e-mail from Rochelle
10   Means, right --
11   A   Uh-huh.
12   Q   Is that a "yes"?
13   A   Yes.
14   Q   -- on February 2nd; and Darren Donahue responds:
15   "This brings tears to my eyes.  It is a sad day.  As
16   the parent of a child with Down syndrome, it breaks
17   my heart.  Darren."
18        Do you see that?
19   A   I do.
20   Q   And do you know whether or not Harold Hart ever
21   shared that with you?
22   A   I don't recall it.  He may have shared it with me via
23   phone call or maybe even an e-mail, but, yeah, I
24   don't recall that specifically.
25   Q   Did you feel like Darren wasn't being a team player

Page 143

1       when he basically said that?

2                   MS. MORISSET:   Object as to form.

3   A   No.   I believe he is expressing his feelings.

4   Q   (By Mr. Blankenship) And at this point, you were the

5       region -- you were clearly the regional vice

6       president in charge of that division, right?

7   A   Yes.

8   Q   Did you ever learn -- I believe you mentioned this

9       earlier.   At what point, if ever, did you hear that

10      Darren had sent an e-mail to the vice president of

11      human resources, Rivera, that he wrote, that he was

12      -- felt like he was being retaliated against?

13                  MS. MORISSET:   Object as to form.

14  A   Yeah.  Did --

15  Q   (By Mr. Blankenship) Did you ever see an e-mail or

16      hear about Darren Donahue writing an e-mail in

17      January 11, 2014, where he thought that he was being

18      retaliated against by Eric Yeats?

19  A   Not at all.

20  Q   (By Mr. Blankenship) This is 102, Julie

21      Rivera's -- so on January 11, 2014, did Darren

22      Donahue e-mail Julie Rivera and say:  "Attached is

23      year-end reviews for 2012 and 2013"?

24          And if you can see the subject line there is:

25      "I feel I'm being retaliated against."

1    think we really discussed why she left.  And if we

2    did, it was a quick little blip, and we didn't get

3    into it.

4  Q   Do you know, seems like she wasn't gone very long

5      before she returned, right?

6  A   Yeah, that is true.

7  Q   And do you know what reason, if any, she gave for

8      leaving Red Robin?

9  A   I don't, no.  She was in Denver and I was in Spokane,

10     Washington.

11 Q   Hand you Exhibit 12.  And this appears to be an

12     e-mail that you were copied on, regarding the

13     preliminary Scorecard.

14 A   Yes.

15 Q   And in it there is some discussion about a leave of

16     absence.  Do you see that?

17 A   I do.

18 Q   And if you look down -- and do you remember being

19     copied on this?

20 A   Yeah.  Yeah, looking at it, absolutely.

21 Q   And so at this point, you, in September of 2014, you

22     were -- you had basically been promoted to the

23     vice-president position; am I right?

24 A   Yes.

25 Q   And it looks, from here, that this is all about

1      Darren Donahue, right?

2   A  From what is on the screen that I can see, yes.

3   Q  Okay.  And were you -- do you know why you were

4      copied in an e-mail with Harold Hart, Rochelle Means,

5      and yourself, relating to Darren Donahue's leave of

6      absence?

7                     MS. MORISSET:  Object as to form.

8   Q  (By Mr. Blankenship) Do you agree that this is about

9      Darren Donahue's leave of absence?

10  A  I -- I -- yes, in relation to just our preliminary

11     Scorecards, yes.

12  Q  And with respect to a Scorecard, would -- if Darren

13     was gone on a medical leave of absence, would he be

14     penalized on his Scorecard if the store didn't do as

15     well as when he was there?  Meaning, would -- put it

16     another way:  Was there any allowances made for

17     Darren Donahue and in the review process, to your

18     knowledge, for the fact that he was gone during

19     certain portions of his year?

20  A  No.  No.

21  Q  And what do you recall about this, this Scorecard and

22     Darren Donahue being gone; what was that about?

23  A  I would have to see the rest of the e-mail string on

24     that one, to see it, or else I would be making some

25     guesses.

WITNESS: TIM MEI   2/13/2018

Page 156

1  Q   You have got readiness codes and status codes, right?

2  A   Yep.

3  Q   And can you find Darren Donahue on there?

4  A   Not on the screenshot.

5  Q   Okay.  Let me find him for you.  We would be looking

6      for, at this point, Auburn, right?

7  A   Yes.

8  Q   And let me focus in on that for us.  Is that better

9      for you?

10 A   No.  The other one was better, but it works.

11 Q   Okay.  So if you look here under the -- it looks like

12     the yellow GM, here is Darren Donahue, right?

13 A   Yes.

14 Q   So that means, according to that little box we had,

15     that he was a situational risk, a yellow?

16 A   True.

17 Q   And so basically, of all of the general managers, he

18     would be the most at risk right?

19         MS. MORISSET:  Object as to form.

20 Q   (By Mr. Blankenship) If he is the only one in the

21     yellow?

22 A   He is the only one that is listed as a situational

23     risk, yes.

24 Q   Okay.  And what does "situational risk" mean?

25 A   It means that there is a chance that, from a staffing

**WITNESS:  TIM MEI     2/13/2018**

Page 157

1      standpoint, they might not be with us.  They are kind
2      of in between.  We are figuring it out.  It could be
3      them not happy with us, and maybe looking at some
4      different things; it could be performance; it could
5      be a number of things.
6    Q   Do you have any recollection as to why Darren -- I
7      mean, we have got e-mails from him about taking a
8      leave of absence.
9          My question to you is:  Do you know if his
10     medical leaves of absence had something with him
11     being put down here as a -- as a yellow situational
12     risk?
13   A   I believe that -- I don't recall specifically.  But I
14     believe that if -- leave of absences and health
15     issues out there, that we would put somebody down as
16     a situational risk; that doesn't mean that we are
17     driving it.  It just means that, "Hey, recognize that
18     there's some things going on," and we just need to
19     keep an eye on that.
20   Q   Okay.  So did you assign him a yellow situational
21     risk because of his -- him, you know, having leave of
22     absences and having health issues?
23   A   I did not assign him anything on that.
24   Q   Okay.  Do you know who would have assigned him yellow
25     for situational risk?

Page 158

1   A   That would have been Harold.

2   Q   Okay.  And just going back to the initial e-mail.

3       There -- is there actually discussion of bringing on

4       additional managers?  There; is that what that means?

5   A   Yeah.  It appears that they were already up two, and

6       they were looking at potentially bringing on one

7       more.

8   Q   Do you know if that was because, you know, Darren

9       Donahue was a situational risk and in yellow?

10   A   No, we wouldn't do that for yellow.  It's more of a

11       factor of the industry, being ahead.

12   Q   So were you present when Darren Donahue got his

13       performance review in December 2014?  You were the

14       divisional vice president at that time.  Right?

15   A   I was in position, but I was not present.  I was in

16       position of regional vice president, but I was not

17       present when he received that.

18   Q   Okay.  Fair enough.

19       Did you review Harold Hart's scoring prior to it

20       being given to Darren Donahue?

21   A   No, not prior to.

22   Q   But you saw it at some point after it was given to

23       Darren Donahue, right?

24   A   Yeah.  I remember specifically that Darren had

25       concerns over that, and I believe that, I think it

WITNESS: TIM MEI   2/13/2018

Page 290

1       I wouldn't necessarily say that.

2   Q   You stand by your testimony early this morning?

3   A   Yeah.  Yes.

4   Q   All right.  And you understood my questions when I

5       asked you then, right, or you would have asked me to

6       clarify, if you didn't, right?

7   A   I believe so.

8   Q   All right.  So do you remember receiving an exit -- a

9       letter from Darren Donahue, related to his leaving

10      Red Robin, where he wrote to some people high up in

11      Red Robin, about, you know, kind of why the

12      separation occurred and how he felt it was unfair?

13  A   Yes.  I don't remember if that was directly towards

14      me.  I don't remember the letter.  And that --

15  Q   You don't remember whether or not you were copied on

16      it?

17  A   I don't remember; I would have to see it, but I

18      remember the letter.

19  Q   Okay.  So -- and do you remember, in that letter, he

20      mentioned a person in Kennewick who had padded his

21      inventory?

22  A   I do.

23  Q   Okay.  And tell me what you remember about a manager

24      in Kennewick padding inventory?

25  A   General manager, Greg Blackburn, padded his

**WITNESS:  TIM MEI    2/13/2018**

Page 291

1      inventory.  I don't remember the amount.  I think it

2      was like $130 or $150, on that.  And he did it for

3      his Scorecard or for his -- his food costs, variance

4      on that.  There was an investigation on that, and we

5      ended up not terming him.

6   Q  Right.  Let me show you what I have on that.

7   A  Sure.

8   Q  I've got an e-mail here, from Harold Hart.  And in

9      that e-mail, we have Darren Donahue's e-mail to Steve

10     Carley and Denny Post, pretty high-up folks in the

11     company, right?

12  A  Yes.

13  Q  And basically you see, on the first page of Exhibit

14     29, there is a reference to -- by Claire Simpson, do

15     you see that, on June 22, where she basically

16     writes -- right here.

17  A  Yes.

18  Q  "Thanks, H.H.  Sorry, swamped day.  I did provide

19     Cathy Cooney further details so she could get back to

20     Steve and Denny if they have any questions.  Did we

21     validate any inventory manipulation, and if so, what

22     did we do?"

23        Do you see that?

24  A  I do.

25  Q  And Harold Hart writes:  "Yes, we did a final written

WITNESS:  TIM MEI    2/13/2018

Page 292

1          warning.   HR and Tim involved."

2              Do you see that?

3    A   Yes, I do.

4    Q   So that Tim is you, right?

5    A   Yes.

6    Q   And so this person basically was padding his

7        inventory to basically manipulate the numbers so he

8        looked better?

9    A   Yes.

10   Q   And that is an integrity issue, isn't it?

11   A   Yes.

12   Q   But he didn't get fired, did he?

13   A   No, he didn't.

14   Q   He got a final written warning according to this,

15       right?

16   A   True.

17   Q   Have you actually seen a final written warning that

18       was actually delivered to this person?

19   A   I don't believe I have.   I'm not sure.

20              MR. BLANKENSHIP:   Counsel, we have asked

21       for that.   And we didn't receive a final written

22       warning.

23   Q   (By Mr. Blankenship) But your understanding was, he

24       was he was supposed to get a final written warning

25       for this?

WITNESS: TIM MEI   2/13/2018

Page 293

1   A   Yes.

2   Q   And she asked how significant the manipulation was;

3       and Harold said it was $190.  Does that matter to

4       you, that it was $190, versus you know, 250?

5   A   I don't know where I would draw the line on the

6       significance.  There is -- that was a small

7       manipulation, I would say.

8   Q   But, you know, so -- but a manipulation, nonetheless,

9       right?

10  A   True, absolutely.

11  Q   And wouldn't you think that is pretty black and

12      white?

13              MS. MORISSET:  Object as to form.

14  Q   (By Mr. Blankenship) You said that, with Darren

15      Donahue, it was black and white, and that is why he

16      got fired.

17  A   Yes.

18  Q   This is black and white, and this guy didn't get

19      fired, right?

20              MS. MORISSET:  Object as to form.

21  A   We are talking about two totally different things,

22      though.

23  Q   (By Mr. Blankenship) We are talking about a guy

24      without disability who basically padded inventory, as

25      opposed to the situation, that you testified to, with

Page 297

1    Q    (By Mr. Blankenship) With respect to getting the pay

2         that they are owed by law, that was a practice that

3         occurred across the board, to many people, not just

4         one person, correct?

5                   MS. MORISSET:  Object as to form.

6    A    In regards to Seattle Secured Scheduling?  Yes.

7    Q    (By Mr. Blankenship) And so -- and I think you said

8         that to your knowledge no one got terminated or

9         disciplined for that error, right?

10                  MS. MORISSET:  Object as to form.

11   Q    (By Mr. Blankenship) Seattle Secured Scheduling?

12   A    For the Seattle Secured Scheduling?  No.

13   Q    And so are you familiar with a person by the name of

14        Matthew Cave that basically was taking time away from

15        employees?

16   A    Matthew Cave?  No.  The name might ring a bell, but,

17        yeah, I don't recall.  Sorry.

18   Q    All right.  Well, let me show you what has been

19        marked, in Claire Simpson's deposition, as Exhibit

20        74.  And you see that there is a memo there with

21        respect to Matthew Cave?

22   A    I do.

23   Q    Does that refresh your recollection, because if you

24        look --

25   A    Yes, I remember Matthew Cave right now.

WITNESS:  TIM MEI    2/13/2018

Page 298

1    Q    Your name is there.   You were copied on this, right?

2    A    Yes.

3    Q    And this is August 15th, about two months after

4         Darren Donahue was fired, right?

5    A    Yes.

6    Q    If it was June 15th, that would be about two months,

7         right?

8    A    Yes.   Yes.

9    Q    And it looks like it's a written warning here, right?

10   A    Yes.

11   Q    It's not even a final written warning, is it?

12   A    It doesn't appear to be.

13   Q    It's basically just a written warning in the file,

14        right, as it says here, right?

15   A    Yes.

16   Q    And according to -- who is -- this is Jeff Baranco;

17        that is the ROD, like the Harold Hart equivalent,

18        right?

19   A    Yes.   Yes.

20   Q    Okay.   Now, according to the ROD, it says:   "During a

21        recent audit it was determined that you made several

22        timecard edits that reduced the worked time for team

23        members."

24           Did I read that correctly?

25   A    Yes.

Page 299

1    Q    So what that means is that time was taken away from a

2         team member's timecard, and they were basically not

3         paid for the time they worked, right?

4                        MS. MORISSET:  Object as to form.

5    A    Yeah, that is what it appears.  Yes.

6    Q    Basically stealing from the team members when you do

7         that, right?

8    A    Not paying them for the hours that they worked, yes.

9    Q    That is stealing, isn't it?

10                       MS. MORISSET:  Object as to form.

11   A    It's inaccurately paying them.

12   Q    You don't think that's stealing?

13            If you basically take somebody's timecard and

14        you edit it, and you write down time that they earned

15        from working, you don't believe that that is stealing

16        from the team member?

17                       MS. MORISSET:  Object as to form.

18   A    You are not paying them for the time that they

19        worked.  I don't know if I would use the term

20        "stealing," but --

21   Q    (By Mr. Blankenship) What would you call it?

22        "Theft"?  Is that -- let me ask it this way:  That

23        could be a crime, couldn't it, if you basically take

24        time away from someone that they are owed, and you do

25        it deliberately?

1              MS. MORISSET:  Object as to form.

2              MR. BLANKENSHIP:  It would be a

3         misdemeanor in Washington, Counsel, and you know

4         it.

5              MS. MORISSET:  You are not asking me,

6         Counsel; you are asking the witness.

7    Q    (By Mr. Blankenship) Okay.  Did you know that it's a

8         crime to basically intentionally not pay an employee

9         what they have earned?

10   A    I know that there is agencies that you can go to, for

11        that.  I don't know, for a fact, that it would be a

12        misdemeanor.  I don't know that.

13   Q    Okay.  And you write to Mr. Cave, who was a general

14        manager, same position as Darren Donahue, that:  "You

15        have been unable to provide a reasonable expectation

16        (sic) about why these edits occurred, or any

17        documentation that would support your actions."

18             Did I read that correctly?

19   A    You did.

20   Q    And the next line says:  "This creates considerable

21        legal risk for the company, impacts the TM paychecks,

22        and cannot be tolerated."

23             Did I read that correctly?

24   A    You did.

25   Q    And so what I want to ask you, sir, is did anybody

Page 301

1    correct those team-member paychecks to make sure that

2    those individual team members got paid what they were

3    supposed to get paid, from those edits that -- the

4    card edits that reduced the work time for these team

5    members?

6    A    I couldn't tell you.  I would assume so, but I

7    couldn't tell you.

8    Q    Because that would be the right, decent thing to do,

9    is make sure that these -- if you care about these

10    employees, is make sure that they get paid for the

11    time that they actually worked, right?

12    A    I agree with that, yes.

13    Q    But did you take any action to make sure that

14    occurred?

15    A    Personally?  No.

16    Q    Do you know if anyone did?  You are just assuming,

17    right?  You don't know for a fact that anyone made

18    sure that those team members got paid, right?

19    A    I don't know.

20    Q    And you knew, though, that it's actually illegal to

21    make team members work off the clock, right?

22              MS. MORISSET:  Object as to form.

23    A    Like I said, I know it's against the policy.  I know

24    that there's agencies to go to with that, so, yes.

25    Q    (By Mr. Blankenship) Well, it says here, doesn't

**WITNESS: TIM MEI     2/13/2018**

Page 302

1      it --

2    A    Yeah.

3    Q    -- if you look here?   It says that --

4    A    Yes, I see it.

5    Q    And even though there was an illegal act here, why

6         didn't this person -- this general manager get fired

7         for it?

8    A    Yeah.   I don't know.

9    Q    Why, if this was illegal, didn't this person, at

10        least, get a final written warning, instead of a

11        written warning?

12   A    Again, I don't know.

13   Q    Well, did you speak up or did you have an opinion

14        when you were copied on this?

15   A    I wouldn't say I had an opinion on that one, no.

16   Q    You didn't have an opinion?

17   A    No.

18   Q    But you had one with Darren Donahue, right, that you

19        thought he should be fired, right?

20   A    When the question was asked, when it was presented to

21        me that -- HR's recommendation, and, you know, where

22        Harold was, then yeah.

23   Q    If HR had recommended here that Matthew Cave had been

24        fired, would you have gone along with it?

25             MS. MORISSET:   Object as to form.

WITNESS: TIM MEI    2/13/2018

Page 303

1   A   Yes.

2   Q   (By Mr. Blankenship) And do you know if Claire

3       Simpson was involved in this case?

4   A   Do I know if she was, or I do know that she was; what

5       was the question?

6   Q   Do you know that she was involved with this, this job

7       -- with this Matthew Cave situation, where he was

8       basically stealing time from team members?

9             MS. MORISSET:  Object as to form.

10  Q   (By Mr. Blankenship) What do you want to call it?  I

11      don't want to use "stealing," if you don't think it's

12      stealing.

13          So can we come up with a word to refer to?  Does

14      "timecard fraud" work for you, because I want to

15      reference what Matthew Cave did.

16          Does "timecard fraud" work?

17  A   Yes.

18  Q   Okay.  So do you know what Claire Simpson's

19      involvement was in the timecard fraud, regarding

20      Matthew Cave?

21  A   No.  I -- from -- I think she was copied on that

22      e-mail, or sent that e-mail, or -- I don't know.

23  Q   If you look here, this is -- does this look familiar?

24      This is -- your name is on it, and it's under the

25      heading:  "Falsification of Contracts, Reports or

WITNESS:  TIM MEI    2/13/2018

Page 304

1      Records."  And if you look there, it looks like

2      Claire Simpson created that?

3  A  Yeah.  I have never seen the forms.  I -- I think the

4      assigned tier is just where it falls under, so that

5      doesn't mean I see the form.

6  Q  Why don't we -- let's just compare the summary that

7      was written here by Claire Simpson, to the one that

8      we just read, with respect to Darren Donahue.  I'm

9      talking about here.  Do you see what the summary is

10     there, that Claire Simpson wrote?

11           MS. MORISSET:  Object as to form.

12  A  I do.

13  Q  (By Mr. Blankenship) That is pretty vanilla, isn't

14      it?

15  A  It's shorter, yes.

16  Q  It says -- let me read the summary here.  It says:

17      "Internal audit have identified timekeeping concerns

18      in West Park.  It appears managers are making

19      inappropriate edits."

20       Did I read that correctly?

21  A  You did.

22  Q  And from that document, Claire Simpson created this,

23      right?

24  A  Yes.

25  Q  Do you remember any conversations involving you, with

Page 305

1      respect to John -- Cave's timecard fraud?

2   A   I'm sure that Jeff reached out to me, to keep me

3      apprised of the situation.  As far as beyond that, I

4      don't believe so, but could have been; could have

5      been Marilee Smith.  She was -- I think she was the

6      HRVP at that time.

7   Q   Do you remember that it was more than just the

8      general manager, Matthew Cave, that was involved in

9      the timecard fraud; that there was two other

10      managers?

11  A   No, I don't.

12  Q   Let's take a look at that.  So you mentioned Mark

13      Dubberly as reporting it, right?  Did you say that?

14      Did you mention Mark Dubberly just a second ago?

15  A   No.  4.

16  Q   Okay.

17  A   No, I didn't.

18  Q   Who is Mark Dubberly, do you know?

19  A   Mark Dubberly seems like a real estate guy at

20      corporate office, but I guess there could be two Mark

21      Dubberlys, so I don't know him.

22  Q   And then it says -- it says:  "Identify the persons

23      engaged in this behavior."  And we have got Matthew

24      Cave, Mr. Jonathan Edwards and Nathan Frazier.  Do

25      you see that?

Page 306

1    A    I do.

2    Q    Do you remember that these were both managers?

3    A    Yeah, I don't know if they were both managers or not.

4    Q    Let's take a look.  It says:  "Do you know that a

5         supervisor and management involved?"

6              "Yes."

7              "If 'yes,' then who?"

8              "Matt, Jonathan and Nathan," right?

9    A    Yeah.  And I don't know -- just for clarity, I don't

10        know if that means they were involved in the edits,

11        or if they were involved in the investigation.  I

12        guess it could be either way.  I just don't know

13        that.

14   Q    Looks here, from this, that -- under the question,

15        "Is management aware of this problem," I guess that

16        is an, "Don't know/Don't wish to disclose."

17             "How long (sic) this incident or violation

18        occur?"

19             "West Park."

20             "How long do you think this problem has been

21        ongoing?"

22             "Don't know."

23             "Did you know -- did you become aware of this

24        violation?"

25             "Told to me by co-worker."

Page 307

1              Do you see that?

2     A    I do.

3     Q    And if you read, under the details, it says:

4          "Internal audits Q2 timekeeping audit uncovered

5          issues at West Park."

6     A    Yes.

7     Q    So that got uncovered by some kind of audit; is that

8          what that says?

9     A    It looks like it was reported by somebody, and then

10         there was an audit, and then they uncovered the

11         issues.

12    Q    And it looks -- here it says:  "It appears managers

13         are making improper punch edits."

14             Do you see that?

15    A    I do.

16    Q    We saw some punch edits that Darren Donahue did,

17         right?

18    A    Yes.

19    Q    So that would be using those in an improper way,

20         right?

21    A    Yes.

22    Q    Looking at the allegations, with respect to Matthew

23         Cave and Darren Donahue, whose, do you think, conduct

24         was worse?

25             MS. MORISSET:  Object as to form.

WITNESS: TIM MEI    2/13/2018

```
 1    A    I think we can prove that Matthew's was more

 2         intentional.

 3    Q    More -- that what Matthew did was dishonest, and

 4         actually denied individuals pay, correct?

 5    A    Yes, that is fair.

 6    Q    And is Matthew Cave still employed at Red Robin?

 7    A    No, he is not.

 8    Q    When did his employment end?

 9    A    I couldn't tell you.

10    Q    Was it within the last year?

11    A    It was probably a little bit longer than that.  It

12         was probably -- if I was to guess, it would have been

13         in '16.

14    Q    Do you remember why he was terminated?

15    A    I don't.  I'm sorry.

16              MR. BLANKENSHIP:  I have nothing further

17         for this witness.

18              MS. MORISSET:  I do, but am I going to

19         have to switch spots if we have to use the gizmo?

20         So we should go off the record for a second.

21              THE VIDEOGRAPHER:  The time is 18:21.  We

22         are going off the record.

23                              (Off the record)

24              THE VIDEOGRAPHER:  The time is 18:28.

25         We are back on the record.  Please continue.
```

WITNESS: TIM MEI    2/13/2018

Page 326

1   Q   Okay.  So the Pocket Pal, number three on the Pocket
2       Pal is check the Captain's Log, for a general
3       manager?
4   A   Number -- there is 18 steps.  The first step is walk
5       through.  And the third bullet point underneath that
6       is "check the Captain's Log," or "read the log
7       notes."  I don't know how they phrase it; I'm not
8       sure how they phrase it, but --
9   Q   Okay.  Where does "don't rip off your team members by
10      editing their timecards" fall; is that on the Pocket
11      Pal?
12  A   That is not on the Pocket Pal.
13  Q   Okay.  Maybe -- you think it would have helped
14      Matthew Cave if it had been in his Pocket Pal?
15              MS. MORISSET:  Object as to form.
16  A   I don't know.
17  Q   (By Mr. Blankenship) Does the fact that Matthew Cave
18      was an acquisition somehow excuse the timecard fraud
19      that he engaged in with two other manager at Red
20      Robin?
21  A   I don't believe so.
22  Q   I mean, wouldn't there be some type of on-boarding
23      where Red Robin would inform their general managers
24      not to steal from its employees?
25              MS. MORISSET:  Object as to form.

**Harvard Bell 206-629-8773 www.harvardbell.com**

WITNESS: TIM MEI   2/13/2018

Page 327

1   A   I would have to make assumptions on that.  I would

2       think so, but I don't know.

3   Q   (By Mr. Blankenship) Have you spoken to -- did you

4       personally do anything to investigate the allegations

5       against Darren Donahue yourself?

6   A   Personally investigate?  No.  Just, again, listening

7       to the debrief or brief, whatever you want to call

8       it, from Harold and HR.

9   Q   Are you aware of anybody speaking to Kate Hersel or

10      Kathryn Matteson about what they did or did not tell

11      Darren Donahue, about Chris Ferguson's checking in

12      under the a manager's badge swipe?

13  A   No, I'm not.

14  Q   So you know, when you got a situation like

15      with -- with Sherry Merriman, you know, she is

16      standing there when the bartender is, you know,

17      working off the clock, and there is no question there

18      that she knew about it, was there?

19          MS. MORISSET:  Object as to form.

20  A   I would say there is no question that she should have

21      known that, but she knew it.

22  Q   So did she actually know it, or was that a situation

23      where, you know, she wasn't there when this was

24      occurring?

25  A   No, she knew it.  She was there when it was

Page 343

1                          C E R T I F I C A T E

2     STATE OF WASHINGTON )
                          ) ss.
3     COUNTY OF MASON     )

4          I, the undersigned Washington Certified Court
      Reporter, pursuant to RCW 5.28.010 authorized to administer
5     oaths and affirmations in and for the State of Washington,
      do hereby certify:
6
           That the annexed and foregoing deposition transcript
7     of the witness named herein was taken Stenographically
      before me and reduced to a typed format under my direction;
8     that the transcript is a full, true and complete transcript
      of the proceedings, including all questions, objections,
9     motions and exceptions of counsel, made and taken at the
      time of the foregoing proceedings, to the best of my
10    abilities;

11         That I am not a relative, employee, attorney or
      counsel of any party to this action or relative or employee
12    of any such attorney or counsel, and that I am not
      financially interested in the said action or the outcome
13    thereof;

14         That the witness, before examination, was by me duly
      sworn, and the transcript was made available to the witness
15    for reading and signing upon completion of transcription,
      unless indicated herein the waiving of signature;
16
           I further certify that I am sealing the deposition in
17    an envelope with the title of the above cause and the name
      of the witness visible, and I am delivering the same to the
18    appropriate authority;

19         I further advise you that as a matter of firm policy,
      the Stenographic notes of this transcript will be destroyed
20    three years from the date appearing on this Certificate
      unless notice is received otherwise from any party or
21    counsel hereto on or before said date;

22         IN WITNESS WHEREOF, I have hereunto set my hand on
      this 27th day of February 2018 at Shelton, Washington.
23

24
                          _____
25                        Michelle L. Patton, CCR # 2500

# Exhibit G

1                          UNITED STATES DISTRICT COURT

2                        WESTERN DISTRICT OF WASHINGTON

3                                  AT SEATTLE

4    _____

5    DARREN DONAHUE                        )
                                           )
6                  Plaintiff,              )
                                           )
7                  vs.                     ) No. 2:17-cv-00023-JLR
                                           )
8                                          )
     RED ROBIN INTERNATIONAL, INC.,        )
9    a Nevada Corporation; RED ROBIN       )
     GOURMET BURGERS, INC., a Delaware     )
10   Corporation; and HAROLD HART          )
     and his martial community,            )
11                 Defendants.             )
     _____

12
                      DEPOSITION UPON ORAL EXAMINATION OF
13                                KATE HERSEL
                              February 14, 2018
14                            Seattle, Washington
     _____

15

16

17

18

19

20

21

22

23          REPORTED BY:  Michelle L. Patton, CCR
                          Washington License No. 2500
24

25

Page 14

1   Q   So did you raise these concerns to Harold Hart?

2   A   Uh-huh.  Yes.

3   Q   Is that a "yes"?

4   A   Yes.

5   Q   And what did you -- do you remember what you told

6       him, generally?

7   A   I had just told him how he was treating me, and how

8       disrespectful he was; and he said, "Okay."  And then

9       nothing really happened with it.

10          And then when I called him back again, I said:

11      "I either want to transfer, or I'll no longer be with

12      the company"; and that is when he transferred me.

13  Q   And if I understand your testimony, you asked to be

14      transferred to work with Darren Donahue?

15  A   Yes.

16  Q   And tell me, ultimately, you know that Darren Donahue

17      was fired --

18  A   Yes.

19  Q   -- at some point?

20          How long, approximately, did you work with

21      Darren Donahue?

22  A   Probably three years, three.

23  Q   So you started in 2010 or '11?

24  A   Uh-huh, yes.

25  Q   And then I'm going to represent to you, an

WITNESS:  KATE HERSEL    2/14/2018

Page 15

1    established fact, that Darren Donahue was fired on

2    June 15th.

3  A   Okay.

4  Q   So that would be --

5              MS. MORISSET:  June, 2015.

6              MR. BLANKENSHIP:  June 15, 2015.

7              MS. MORISSET:  Yeah.  I didn't hear you

8      say the year.  Sorry.

9  Q   (By Mr. Blankenship) June 15, 2015.

10  A   Yeah.

11  Q   So it seems like that would be, what, three and a

12    half years approximately?

13  A   Somewhere in there.

14  Q   So you left a manager that you thought was abusive

15    and called you in early and was disrespectful, Dave

16    Owens.

17      And then you wanted to go move to be under the

18    leadership of Darren Donahue?

19  A   Yes.

20  Q   And at that time you had stepped down to be a server

21    or a team member?

22  A   Yes.

23  Q   What was it like working with Darren Donahue?

24  A   I liked -- I actually liked working with him; that is

25    why I did transfer with him.  I respected him.  I

**WITNESS:  KATE HERSEL     2/14/2018**

Page 16

1     thought he was a great boss.  And so that is the

2     whole reason I'd wanted to transfer.

3           I learned a lot from him in the beginning.  He

4     kept me better, just because he always just drilled

5     me.  Every day I would come in, and he would knock

6     over peppers, saying they weren't full, or:  "This

7     didn't have 14 in them."  And it made me better,

8     because it made me think about things, so.

9   Q  So did he mentor you?

10   A  He did.  He did.

11   Q  And did you think that he was respectful of you?

12   A  Absolutely, yes.

13   Q  And what -- you know, have you worked with other

14     general managers, besides Darren Donahue and Dave

15     Owens?

16   A  Yes.

17   Q  And how did -- who else -- what other general

18     managers did you work with?

19   A  Raul Ramirez.  Luis, I can't remember his last name.

20   Q  Luis something, right?

21   A  Yeah.  He was in Woodinville.

22   Q  Okay.  Woodinville.

23   A  Hernandez.  Yes.

24   Q  Okay.  And any other general managers?

25   A  From Red Robin?  No, I don't think so.

WITNESS: KATE HERSEL   2/14/2018

Page 17

1   Q   **At this point, you are the general manager.**

2   A   Yeah.  So since then -- because I was only with Raul

3       for a month, and then I got promoted, so.

4   Q   **Tell me how Darren Donahue, how would you compare him**

5       **to the other general managers?**

6   A   I think they are all different in their own ways.

7           Raul is straight to the point, gets it done,

8       very -- same on that aspect, but not as personable;

9       where Darren was more personable.

10          He -- the team loved him and thought he was

11      great, so -- but they both got the job done, I guess,

12      but in their own ways.

13  Q   **And what about, you said Luis Hernandez, was it a**

14      **shorter period?**

15  A   It was only a couple of months.  It wasn't that long.

16  Q   **How did he compare to Darren Donahue?**

17  A   I -- I don't remember much about him, because I

18      didn't work much with him.  I was kind of more of a

19      fill-in, helping him out, so I didn't work much with

20      him.

21  Q   **I may have asked this, so I apologize if I did, but**

22      **what about:  When were you promoted to the**

23      **general-manager position?**

24  A   I started as an AGM about a few weeks after they let

25      Darren go.  And I was only there, maybe, three weeks,

WITNESS: KATE HERSEL   2/14/2018

Page 18

1    and then I got promoted to GM.

2    Q    And so were you promoted to the GM position at --

3        where are you currently; where is your restaurant?

4    A    Lacey.

5    Q    Okay.  So you were -- after Darren was fired, for

6        three weeks you were an AGM; is that "Assistant

7        General Manager"?

8    A    Yes, just through seasoning, because I stepped down

9        for so long.  So I went through seasoning in Puyallup

10       with Raul.  And they already had me in a GM spot

11       before I finished seasoning; and that was in Federal

12       Way.

13   Q    And how long were you in Federal Way?

14   A    I think eight months.

15   Q    And then after that you went to the Lacey Red Robin?

16   A    Yes.

17   Q    And so it sounds like almost all of your -- well, is

18       it fair to say that most of your training and

19       mentoring was done by Darren Donahue?

20   A    Yes.

21   Q    And was he the person that encouraged you to become

22       an AGM?

23   A    Yes.

24   Q    And three weeks after Darren Donahue was fired, Red

25       Robin found that you were qualified enough to be a

WITNESS:  KATE HERSEL   2/14/2018

Page 30

1   Q   And do you recall, I represented to you that Darren

2       was fired on June 15, 2015.

3           Do you remember the weeks that led up to his

4       termination?

5   A   Not in detail, no.

6   Q   Okay.  I'm going to hand you a calendar.  And you can

7       show your counsel.  I just kind of --

8           MR. BLANKENSHIP:  I wrote some

9       information on hers, just so you can see, filled

10      in on, under the 8th, I have got, that's --

11  Q   (By Mr. Blankenship) June 8th was when Darren Donahue

12      was questioned by Harold Hart and Marilee Smith.

13  A   Uh-huh.

14  Q   And on the 15th, he was terminated.

15          Prior to that time, do you recall having a

16      meeting with Harold Hart, where you -- where Harold

17      Hart was interviewing you about you potentially

18      becoming an AGM?

19  A   Yes.

20          MS. MORISSET:  Hold on.

21          Object as to form.

22  Q   (By Mr. Blankenship) And can you -- do you remember

23      about when that was, on the calendar, if you look at

24      that?

25  A   It's about the same time frame, because I believe it

**Harvard Bell 206-629-8773 www.harvardbell.com**

WITNESS: KATE HERSEL    2/14/2018

Page 31

1     was within a week or two of him being fired that I

2     had the interview with Harold.

3  Q  Do you remember it being a Thursday or Friday, before

4     the time frame?

5  A  I don't remember exact dates.  That is three years

6     ago.

7  Q  Would you have remembered it better in July of 2015

8     than you remember it now?

9  A  Probably.

10            MS. MORISSET:  Object as to form.

11 A  Yes.

12 Q  (By Mr. Blankenship) Okay.  And do you remember

13    speaking with an investigator from my office,

14    sometime around the time that Mr. Donahue was

15    terminated?

16 A  Yes, someone called me.

17 Q  And do you remember giving a recorded statement to

18    that person?

19 A  Yes.

20 Q  Okay.  Would it refresh your recollection if I were

21    to play the recorded statement for you?

22 A  I -- that's fine, yes.  Yeah.

23 Q  Okay.

24            MR. BLANKENSHIP:  And although I'm going

25    to play it off my computer, why don't we mark, as

WITNESS: KATE HERSEL   2/14/2018

Page 33

1              MR. BLANKENSHIP:  I have to be careful

2          how I ask this.

3              MS. MORISSET:  Yeah, you do.

4          Sorry.  I was about to make an objection, but

5          Scott caught it.

6              MR. BLANKENSHIP:  Yeah, I know you well

7          enough to know.

8    Q    **(By Mr. Blankenship) About how much time do you think**

9         **you spent talking to Ms. Morisset?**

10   A    Maybe 30 minutes combined, somewhere in there.

11   Q    **Have you spoken to any other lawyers --**

12   A    No.

13   Q    **-- that represent Red Robin?**

14   A    No.

15             MR. BLANKENSHIP:  Okay.  We are going to

16         do a little audio test here before I play the

17         whole thing.

18                  (Audio Recording played for test)

19                      (Discussion off the record)

20             THE VIDEOGRAPHER:  We are on.

21   Q    **(By Mr. Blankenship) Okay.  Before I start, you**

22        **recall talking to one of my investigators, right?**

23   A    **Yes.**

24   Q    **And did you -- do you feel as though you are able to**

25        **speak your mind freely about what --**

**Harvard Bell 206-629-8773 www.harvardbell.com**

**WITNESS: KATE HERSEL     2/14/2018**

Page 34

1   A   Okay.

2   Q   **And you feel that you are able to answer the**

3       **questions accurately and truthfully?**

4   A   Back then I would have remembered more than I do now,

5       because it's been so long, but, yes.

6   Q   Okay.  **Did you feel remotely pressured by him?**

7   A   No.   I -- I felt like I was, kind of, in a hard

8       place, just because I work for the company, and

9       don't -- but I care for Darren, so it was, kind of, a

10      hard spot to be in.

11  Q   Okay.  **And, you know, basically, we heard a little**

12      **snippet of it, but you were basically driving, and he**

13      **was talking to you over the phone, right?**

14  A   Uh-huh, yes.

15  Q   **And if you had wanted to hang up the phone, you could**

16      **have, right?**

17  A   Yes.   Yes.   And I only know part of situation of what

18      happened, so I only heard what I -- or what I

19      presume, from being in that interview with Harold,

20      and then what happened after.   So I don't know,

21      100-percent, the reasons.   I don't -- the company

22      doesn't tell you the reasons.   I just know what

23      happened that day, and from there on, so.

24  Q   Okay.  **That is fair.**

25          **And do you understand that the law protects you**

**WITNESS:  KATE HERSEL    2/14/2018**

Page  35

1      from any retaliation --

2    A   Yes.

3    Q   -- for basically testifying on behalf of someone

4        that, you know, is bringing a discrimination case?

5    A   Yes.

6    Q   Okay.  So you understand that you can speak freely

7        here, without fear of retaliation?

8    A   Yes.

9    Q   Okay.

10   A   Or else, just not be working, right?

11              MR. BLANKENSHIP:  You can call me if

12       something happens.  Okay?  All right.

13              MS. MORISSET:  Yes:  The law protects you

14       from retaliation.

15              THE WITNESS:  I like vacations.

16              MR. BLANKENSHIP:  All right.  Well, let

17       me -- let's get started on the taped statement.

18

19          RECORDED-AUDIO PLAYBACK STARTED

20              "Q.  All right.  Am I talking too loud,

21       or not loud enough; can you hear me all right?

22              "A.  Yeah, you are fine.

23              "Q.  Okay.  And you are in the car with

24       hands free, and you are safe.  Is that correct?

25              "A.  Yes.

**WITNESS:  KATE HERSEL    2/14/2018**

Page 36

1              "All right.  I do need to say that my

2      name is Greg Roth; I'm the legal investigator at

3      the Blankenship Law Firm, in Seattle, Washington.

4          "Today is the 9th of July 2015.  It's

5      approximately ten minutes in front of 6:00 p.m.

6          "I am speaking with Ms. Kate Hersel.

7          "Did I get that right?

8              "A.  Yes.

9              "Q.  Is it Hersel?

10             "A.  Yes.

11             "Q.  H-E-R-S-E-L?

12             "A.  Yes.

13             "Q.  All right.  And Ms. Hersel, do I

14     have your voluntary consent to take your taped

15     statement today?

16             "A.  Yes.

17             "Q.  All right.  And you are aware that

18     we are exploring, potentially, having Darren

19     -- I'm losing his last name -- let's see --

20     Darren Donahue as a client.  And I was just doing

21     some preliminary investigation in an employment

22     matter versus Red Robin's Restaurant.

23         "You are aware that we may be representing

24     Darren; is that correct?

25             "A.  Yes.

**WITNESS:  KATE HERSEL     2/14/2018**

Page 37

1           "Q.  All right.  And you had formerly

2   worked with him.  As you are aware, he has been

3   recently terminated.

4       "You formerly worked with him at Red Robin,

5   at the Auburn, Washington location for

6   approximately five years?

7           "A.  Not at Auburn, but I worked over a

8   span of five years with him.  In Auburn, it was

9   about two and a half years.

10          "Q.  Okay.  And prior to that, what

11  location did you work with him at?

12          "A.  Lakewood, Washington.

13          "Q.  All right.  And did he -- was he

14  the -- was he a general manager there, and did he

15  hire you?

16          "A.  Yes, he was actually my hiring

17  manager, our GM.

18          "Q.  All right.  And did he train you,

19  help train you, or was it somebody else who

20  trained you?

21          "A.  It was Darren.

22          "Q.  All right.  And you worked -- since

23  you have worked with him for some total of five

24  years, were you able to form an opinion of his

25  abilities, as general manager?

Page 38

1          "A.  Oh, yes.  He is, by far, one of the
2    top GMs I have ever worked with, and that is why
3    I chose to transfer with him, to Auburn.
4          "Q.  All right.  So you think he did well
5    for the bottom line of both stores where you and
6    he had worked?
7          "A.  Oh, absolutely.  At both stores I
8    was with him, we were the top stores in the
9    region, and in the top three of the company, so,
10    yeah, absolutely.
11          "Q.  And did it appear that upper
12    management was pleased, at least initially, at
13    the Lynnwood -- you started out at Lynnwood; is
14    that correct?
15          "A.  Lakewood.
16          "Q.  'Lakewood,' rather.
17          "At the Lakewood location, did it appear that
18    upper management was pleased with Mr. Donahue's
19    service?
20          "A.  Yeah.  I always thought they were.
21    Yeah, at Lakewood especially.  And then Auburn, I
22    know he was switched to regional a couple of
23    times, but I always thought he did an awesome
24    job.  And he definitely proved himself.
25          "Even being out as much as he was, he still

WITNESS:  KATE HERSEL    2/14/2018

Page 39

1          proved himself with his numbers.

2                    "Q.   And do you think he increased

3          revenue when he moved to the Auburn location,

4          was --

5                    "A.   Yes.

6                    "Q.   Go ahead.

7                    "A.   Yes.   Yes, he did.

8               "The only time it dropped was when another GM

9          took over for a short period of time when he was

10         out, and then our numbers dropped; but then he

11         got them back as soon as he came back."

12                    RECORDED-AUDIO PLAYBACK STOPPED

13

14    BY MR. BLANKENSHIP:

15    Q    All right.   So I had asked you about that today.

16    A    Uh-huh.

17    Q    Did that refresh your recollection, that the numbers

18         dropped, when there was another GM --

19    A    Yes.

20    Q    -- and came back when Darren Donahue --

21    A    Yes.

22    Q    -- when Darren Donahue --

23    A    I forgot somebody even came in for a little bit.

24         Because usually it was shorter spans, where I would

25         just work his shifts for him, so I forgot about that.

**Harvard Bell 206-629-8773 www.harvardbell.com**

**WITNESS: KATE HERSEL    2/14/2018**

Page 44

1          he had cancer, yes.

2                "He went to Auburn before I did; and then I

3          requested a transfer shortly after.

4                   "Q.  All right.  And we spoke a little

5          bit earlier, and you said that -- you said that

6          he was -- initially, when he had first discovered

7          that he had cancer, that he was -- he had missed

8          some work; is that right?

9                   "A.  He did initially.  He was out -- I

10         want to say it was, like, six months, he was out.

11               "And then he came back, briefly.  And then he

12         was out a little bit more.

13               "So off and on for, like, a couple of years,

14         he was out a good bit.  And then he came back.

15         And every time he seemed like he came back, he

16         had to be out again.  And so it was just, kind

17         of, up and down with him, on his health.

18               "And then he finally got better.  I think he

19         hasn't been out of work since six months, I want

20         to say; and then he just found out he has to have

21         surgery again in September.  Because he just told

22         me that he had to be out again; that is why he

23         was training me to take over --

24                   "Q.  Okay.

25                   "A.  -- while he was out.

WITNESS:  KATE HERSEL    2/14/2018

Page  45

1              "Q.   So you were going to take over for

2      him as interim general manager?

3              "A.   Yeah, just for while he was out for

4      the month with his surgery.   And then that is

5      when I told Harold that Darren was going be to

6      out.   And that is why we were in a hurry and

7      trained me.   And he was totally shocked about

8      that, I guess you could say.

9              "Q.   So just to be clear, Darren Donahue

10     had told you that he was going -- he had -- well,

11     first of all, after intermittently missing quite

12     a bit of work, dealing with his cancer, there was

13     like six months straight when he didn't miss any

14     work, and --

15             "A.   Yes.

16             "Q.   And then he informed you that he had

17     gone to the physician, and to his oncologist or

18     whoever the medical expert he is dealing with,

19     and he was told he needed a hernia surgery.

20             "A.   Yes.

21             "Q.   All right.   And you were in a

22     meeting with, is it Harold Hunt?

23             "A.   Yeah, Harold Hart.

24             "Q.   'Hart,' I beg your pardon; the

25     regional manager, Harold Hart.   And this

**WITNESS:  KATE HERSEL     2/14/2018**

Page 46

1    was -- was this fairly recent?  Was it last

2    month; or how long ago was it?

3        "A.  Yeah.  It was, like, July -- it was

4    right before I went on vacation.  So I went on

5    vacation July 17th -- I'm sorry; June 17th.  So

6    it was, like, June 11th, somewhere in there.  It

7    was, like, the week before I went on vacation.

8        "Q.  Okay.  And you were in a meeting

9    with Harold Hart, the regional manager.  And was

10   it -- I mean, was it a meeting, or were you just

11   having a conversation with him, or when did

12   you --

13       "A.  It was actually an interview.

14       "Actually, it might have been before that.  I

15   kind of remember:  Darren was let go that

16   Tuesday, and I left that Wednesday.  So it was

17   the Thursday before, is when I was in the meeting

18   with Harold.

19       "Q.  Okay.

20       "A.  So --

21       "Q.  In June?

22       "A.  Yeah.  There was -- in June, yes.

23       RECORDED-AUDIO PLAYBACK STOPPED

24

25   BY MR. BLANKENSHIP:

WITNESS:  KATE HERSEL    2/14/2018

Page  47

1    Q    Okay.  So you think it was Thursday before, the

2        meeting with Harold, in June -- let me have that

3        document back.

4                    MR. BLANKENSHIP:  I'm going to mark it as

5            Exhibit 125.

6                                (Exhibit No. 125 marked)

7    Q    (By Mr. Blankenship) So let me hand this back to you,

8        Exhibit 125.

9            So on there I have got "Darren Donahue's

10       termination," on the 15th, 2015.

11           Do you remember a time when Harold Hart and

12       Marilee Smith came in and questioned Darren Donahue?

13   A    I was not there that day.

14   Q    Do you know, did you speak to Harold Hart before he

15       questioned Darren Donahue about, you know, this whole

16       thing with the timecard issue?

17                   MS. MORISSET:  Object as to form.

18   A    I don't know if it was before or after.  Because I

19       said on there, it was the Thursday before they let

20       him go, so I don't know if it was the 11th or

21       the 4th.  I mean --

22   Q    (By Mr. Blankenship) Well, so -- okay.  So was --

23       were Darren and Harold Hart cordial and just getting

24       along great when you had the interview?

25   A    Yes.

WITNESS:  KATE HERSEL    2/14/2018

Page  48

1    Q    Okay.

2    A    Yes, I thought so.

3    Q    And had you heard anything about this whole thing,

4         with respect to Christopher Ferguson, basically, you

5         know, swiping in on the badge card, and Darren being

6         accused, with the date that you interviewed with

7         Harold Hart?

8    A    I -- I knew the situation of that before, just

9         because I was there.  But I did not hear it from

10        Harold or anything, or anything about Marilee and him

11        coming in, about it.

12   Q    Okay.  But when Harold Hart met with you and

13        interviewed you.  Tell me about that:  Where were you

14        when that occurred?

15   A    I was at Auburn, in Red Robin, and we were sitting at

16        one of the booths, just talking, and he was

17        interviewing me.

18   Q    Okay.  And he was interviewing you for...?

19   A    An AGM position.

20   Q    Okay.

21             MS. MORISSET:  Can we just stop for just

22        a quick second?

23             THE VIDEOGRAPHER:  The time is 10:03, and

24        we are going off the record.

25                                    (Off the record)

WITNESS: KATE HERSEL    2/14/2018

Page 49

```
 1                    THE VIDEOGRAPHER:  The time is 10:05 and
 2            we are back on the record.  Please continue.
 3    Q    (By Mr. Blankenship) Okay.  So the timing of when
 4         Harold Hart interviewed you is important.  And I want
 5         to ask you some contextual questions.
 6              So Darren Donahue was in the restaurant that
 7         day, right?
 8    A    When I was being interviewed?
 9    Q    Yes.
10    A    I believe so.
11    Q    Okay.
12    A    I believe so.
13    Q    And you were being interviewed by Harold Hart, the
14         regional operations director, for -- you were being
15         interviewed for, I think you said, the
16         assistant-manager position?
17    A    Yes.
18    Q    It's also called the "AGM," right?
19    A    Yes.
20    Q    And here is what I'm trying to figure out:  I know
21         that you knew about what happened with the badge
22         swipe before, and with -- the gentleman's name was
23         Christopher Ferguson; because that all happened back
24         in the fall the year before, right?
25    A    Yes.  I knew about the situation, just because I was
```

**WITNESS:  KATE HERSEL    2/14/2018**

Page 50

1     there, but Darren was off when it happened.  It was

2     on the weekend.  And he came in and couldn't clock

3     in.  Something happened with his transfer; it

4     wouldn't work, his -- so one of the managers had him

5     run under her.

6                    MS. MORISSET:  Move to strike the

7         non-responsive part of the answer.

8    Q   (By Mr. Blankenship) Okay.  And so you said that one

9        of the -- so, basically, you didn't think that Darren

10       knew anything about -- that this guy swiped in with

11       her manager's badge swipe; is that your recollection?

12   A   Not to my knowledge, just because he wasn't there on

13       the weekend.

14            Whether they let him know, I don't know that.

15            So I just know he wasn't there at the time,

16       because it was just Renato and Katie -- or and

17       Kathryn there, at the time.

18   Q   Okay.  So when we are going back to early June, what

19       I'm trying to figure out, was there, you know -- at

20       some point you learned -- did Darren tell you that he

21       was questioned about what had happened back in the

22       fall, by Harold Hart and Marilee Smith?

23   A   Not -- I can't remember the time frame.  He did tell

24       me, but I think it was after he was let go; I think

25       it was the time he told me.

WITNESS:  KATE HERSEL    2/14/2018

Page 51

1   Q   Okay.

2   A   I don't think it was before.   But I can't remember

3       exactly when, if it was before or after --

4   Q   Okay.

5   A   -- but I know he did tell me at some point.

6   Q   All right.   So at the time, though, did it appear

7       that Mr. Hart and Mr. Donahue were interacting

8       pleasantly, prior to you getting interviewed?

9   A   Yes, I thought so.

10  Q   And Mr. Donahue has testified that happened prior to

11      him, basically, hearing anything about happened with

12      Christopher Ferguson.

13          And so what I'm asking you is, given that, do

14      you believe it was before Darren Donahue was

15      questioned; when you say "Wednesday or Thursday,"

16      would you mean the first week of June?

17                  MS. MORISSET:   Object as to form.

18  A   I know it was before he was let go.   I don't know the

19      exact dates, but I don't remember hearing anything

20      about Marilee or Harold, then, at the interview, or

21      any time before, so most likely it was before.   But I

22      can't tell you 100-percent sure.

23  Q   (By Mr. Blankenship) I mean, Darren and Harold seemed

24      to be cordial at that point, right?

25  A   Yeah, they seemed to be.

Page 52

1          MR. BLANKENSHIP:   Okay.   Let's go back on

2     the recorder -- go back on the tape.

3

4          RECORDED-AUDIO PLAYBACK STARTED

5          "Q.   And so you were, sort of,

6     interviewing for a different position?

7          "A.   Yeah, for AGM; and Darren -- so I

8     could take over for him when he was out on leave.

9          "Q.   Okay.   You were interviewing for --

10          "A.   Well, Harold was telling me he

11     wanted me to wait until September for training.

12     And I told him that Darren wanted me to do it in

13     August, because I was going to take over for him

14     in September, because he was going to be out.

15      "And Harold said he didn't realize he was

16     going to be out.

17          "Q.   So Harold Hart was pretty surprised

18     when you had informed him that Mr. Donahue was

19     going to be out in September for hernia surgery?

20          "A.   Yes.   Yes.   He didn't know at all.

21     And he was like, 'Oh, really?'

22      "So I am, like, 'yes.'

23          "Q.   He indicated he didn't know.   Did he

24     act surprised?

25          "A.   Yes.   He was very surprised.   He was

**WITNESS:  KATE HERSEL    2/14/2018**

Page 53

1    like, 'Oh, really?'  Just kind of like -- I don't

2    know.  The look on his face was just like, 'Oh.'

3         Like it almost, like -- I don't want to like,

4    state what -- he was just almost like, 'Oh,

5    really?  Again?'  Like, I was --

6              "Q.  And it came as if --

7              "A.  And I told him, I was like, 'I

8    didn't rat you out.  I'm sorry.'

9              "Q.  Because you weren't aware that

10   Darren Donahue had -- had not informed the

11   regional manager, Harold Hart?

12             "A.  I had no idea, or I wouldn't have

13   said anything.

14        "I assumed they knew, because he was trying

15   to push for me to train, and that is why I

16   assumed they knew.

17             "Q.  And what did Harold Hart say about

18   your training then; did he say you could

19   accelerate and start it earlier?

20             "A.  Yes, I train in two weeks, so yeah.

21             "Q.  How soon after Harold Hart finding

22   out that Darren Donahue was, again, going to miss

23   work due do his cancer, a surgery related to his

24   cancer, how soon after that was Darren Donahue

25   fired?

1            "A.   Like not even a week and a half, a

2       week.   Because I want to say it would have been

3       exactly a week, because he came in, looking for

4       Darren that next Friday when I was there; and he

5       was annoyed that Darren wasn't there.   And I -- "

6            RECORDED-AUDIO PLAYBACK STOPPED

7

8   BY MR. BLANKENSHIP:

9   Q    Okay.   So does that help establish, you said -- you

10       said, "like, not even a week and a half, a week,

11       because I want to say it would have been exactly a

12       week, because he came looking for Darren the next

13       Friday when I was there."

14           The next Friday, if it was exactly a week, it

15       would be -- Darren was fired on Monday.   And I can

16       tell you the testimony has been that they tried to

17       fire him --

18   A    The Friday before.

19   Q    Yeah, the 12th.

20   A    The -- Friday the 12th.   So then it would have been

21       Thursday the 4th then.

22   Q    Do you mind writing on the exhibit, that that was the

23       day that you spoke to Harold Hart about Darren's

24       surgery?

25           And then you think it was the next Friday

WITNESS:  KATE HERSEL    2/14/2018

Page 58

1          So, you know, the fact that someone didn't come

2     on Saturday to do the -- kind of, message to you,

3     that --

4  A   "Let's get through the busy weekend."

5  Q   All right.

6               MR. BLANKENSHIP:   So let's go back on the

7     tape.

8

9               RECORDED-AUDIO PLAYBACK STARTED

10               "Q.   All right.   And Ms. Hersel, could

11     you describe a little bit about -- because I

12     think that you were made aware by Darren, the

13     reason that they gave for firing him.   And can

14     you -- can you speak a little bit to that issue,

15     the --

16               "A.   Yes.

17               "Q.   Okay.

18               "A.   Yes.   There was a guy named Michael

19     (sic) Ferguson, I want to say, was his name.   It

20     was back in, I want to say, November.   He came to

21     work, transferred to us from the Pier.   He was

22     with us not even a week or two.

23         "He wasn't in the system, because somebody in

24     corporate messed up the transfer and transferred

25     him to New York instead of us, so we had no way

**Harvard Bell 206-629-8773 www.harvardbell.com**

**WITNESS:  KATE HERSEL    2/14/2018**

Page 59

```
 1          to put him in the system until that was dealt
 2          with.
 3               "And it was a weekend, so we couldn't do
 4          anything.  So the manager on shift let him run
 5          under their number.  And it happened twice, under
 6          their number.
 7               "And Darren, anyway, doesn't work weekends,
 8          so he wasn't there on a Saturday/Sunday, when it
 9          happened.
10               "And so it was -- Kathryn and Renato were the
11          two managers that let him work under their
12          numbers.  And Darren had no knowledge of it, and
13          didn't even know, because he wasn't there.
14               "And then, that is what they came back with,
15          saying that that was the reason he was being
16          fired, because that was unprofessional, that he
17          should never let team members work without being
18          clocked in."
19                    RECORDED-AUDIO PLAYBACK STOPPED
20
21   BY MR. BLANKENSHIP:
22   Q    All right.  So who told you about the reason they let
23        Darren Donahue go; was it Harold Hart?
24   A    Darren.
25   Q    Okay.
```

**WITNESS:  KATE HERSEL    2/14/2018**

Page 72

1          are back on the record.  Please continue.

2   Q   (By Mr. Blankenship) All right.  So I wanted to just

3       ask you:  Do you remember about what time of day on

4       June 4th that you had the interview with Harold Hart;

5       June 4, 2015?

6   A   I think it was afternoon.

7   Q   Okay.

8   A   I think.

9   Q   The middle of the day?

10  A   Middle of the day.

11  Q   Okay.

12  A   I think it was around 1:00 or 2:00, somewhere around

13      there.

14  Q   Okay.  And you testified that Mr. Hart seemed

15      surprised and concerned when he heard that?

16  A   Yes, I felt like he was -- he was shocked.

17  Q   And then you said something about "ratting

18      out" -- ratting somebody out; do you feel like -- you

19      used those words.

20          Do you feel like you were ratting out Darren

21      Donahue to a certain extent?

22  A   I was joking with him, saying, "Sorry I ratted you

23      out," so, yeah.

24  Q   All right.  So I want to ask you a little bit about

25      your MS.

WITNESS:  KATE HERSEL    2/14/2018

Page 73

1        **Does it -- does it have restrictions; are there**
2        **any restrictions associated with you having MS?**
3    A   Not as of now.
4            When I first got diagnosed, I had a lot of
5        symptoms.  And I went through all the testing, all
6        that.  And they put me on medication.  And when I had
7        the medication, it made me really sick, like I could
8        almost not function.
9            But I pushed through work every day, because I
10       did not want to tell anybody I had MS.  So I would
11       just have to sit down all day; almost passed out.
12       Like, it was bad.
13           And if I went back now, I would probably tell
14       them, "I need time off."
15           But I don't know.  I guess in my mind, I
16       thought, with this situation with him, I didn't want
17       anybody to know I was sick, so I didn't tell anybody.
18   Q   **Okay.  So --**
19               MS. MORISSET:  I move to strike the
20       non-responsive part of the answer.
21               MR. BLANKENSHIP:  And I oppose "the
22       non-responsive part" of the objection.
23           I was asking you -- we can go into it again;
24       but what she is doing is objecting that you are
25       going beyond my question, but I can go back and

**WITNESS: KATE HERSEL     2/14/2018**

Page 74

1           just ask you about it.

2    Q   (By Mr. Blankenship) So you basically, initially,

3        when you had MS, you took medications that gave you

4        some pretty significant symptoms; is that right?

5    A   Yes.

6    Q   And tell me what some of the -- what the symptoms

7        caused you, as far as difficulties with what?

8    A   I would get really light-headed, dizzy, almost pass

9        out, get very nauseous; and I just got sick from it

10       basically.

11   Q   And did it affect your balance or anything?

12   A   Yes.  I would be walking and I would have to sit

13       down.

14   Q   And I believe you said that you hid this from Red

15       Robin, right?

16   A   I did, for a while, yes.

17   Q   And that was because you were afraid that you would

18       get fired or retaliated against if you were part of

19       that?

20   A   I think, in the back of my mind, yes; I didn't want

21       anyone to know I was sick and couldn't do my job.

22   Q   And you mentioned what happened to Darren Donahue.

23           With respect to Darren Donahue, you saw Harold

24       Hart learn, on June 4th, that Darren was going out on

25       a surgery --

WITNESS:  KATE HERSEL    2/14/2018

Page 75

1    A    Uh-huh.

2    Q    -- and then he was fired within a week and a half or

3         so, right?

4    A    Uh-huh.

5    Q    Is that a "yes"?

6    A    Yes.

7                    MR. BLANKENSHIP:   And so could you speak

8             up just a little bit, just so we can get a clear

9             record?

10   Q    (By Mr. Blankenship) Okay.  So that, basically -- to

11        you, did it look like Darren Donahue was fired in

12        part because he went on a leave or was -- on a

13        medical issue?

14   A    Yes, from my -- I didn't know the whole situation of

15        everything, so from my understanding that is what I

16        thought it was, just with the time frame of

17        everything; that is what I thought.

18   Q    Okay.  Has someone from Red Robin told you

19        differently, that basically -- ever explained to you

20        why they claim they fired Darren Donahue?

21   A    No, because they really can't tell you,

22        so nobody -- I don't even think I have talked to

23        Harold since.

24   Q    Is it true that no one from HR or anyone from Red

25        Robin ever interviewed you, and asked you -- prior to

WITNESS: KATE HERSEL   2/14/2018

1    you don't get around to looking at the Captain's Log;

2    has that ever occurred?

3  A   I'm sure it's happened before.  I try to make a point

4    to make sure I check it every day, just because, as a

5    general manager, I feel like I could have missed

6    something when I was off the past couple of days, or

7    just trying to catch up.

8        Which is what I said, I wish my managers left

9    notes like this, because they don't, so I miss a lot;

10   notes that they could have put in, so.

11  Q   I don't want to put words in your mouth at all, but

12   it sounds to me like the time you were involved with

13   the situation with Chris Ferguson didn't seem like

14   any big -- it didn't seem like an urgent issue, or a

15   policy violation; am I right?

16  A   I think it was so long ago, it was before it was

17   really a big thing; like, it wasn't known that it was

18   so bad to let somebody -- just manually clock them

19   in, and let them swipe.

20       But I think since then a lot of GMs have been

21   let go for situations like changing times or

22   different things, so they are a little more focused

23   on it now, to where they are cracking down on all the

24   little things now.

25  Q   You would agree, though, there is a difference

**WITNESS: KATE HERSEL    2/14/2018**

Page 109

1  between changing time and creating a situation where

2  an employee is not getting paid, versus basically

3  swiping them in so they can work?

4  A  Yes, I agree; because I have done it in my store

5  since.

6  Q  And I want to follow up on that.

7        So you had testified, when being questioned by

8  your counsel, your lawyer, she was asking you about

9  the -- about how you said that you have had times

10  where somebody couldn't swipe in?

11  A  Uh-huh.

12  Q  And that you needed to use somebody else's swipe to

13  get them on the system?

14  A  Yes.

15  Q  Can you tell us about that?

16  A  So I had one girl, her name was Christy, she

17  transferred from Kennewick.  And it was probably a

18  two-week span, we could not get her to clock in.

19  They just couldn't get the transfer to work and we

20  had to send her home every day.

21        So finally I got in touch with Matt and -- or

22  HR, I think it was Marilee at the time; and said, "We

23  are going to lose her.  We can't just keep sending

24  her home."

25        So they -- in the whole e-mail strand -- I still

**WITNESS: KATE HERSEL    2/14/2018**

Page 110

1   have it saved in my GM box, because -- what --

2   retaliation -- I guess, what could happen to me, by

3   letting her do it.

4        But I let her clock in under another server,

5   manually clocked her, in the back, so she still got

6   paid, did the credit card adjustment to where she got

7   paid, her tips went to her card, versus that.

8        And I have the whole strand from HR and

9   Darren -- or not Darren, sorry; Matt, from doing

10   that.

11  Q   Okay.  **And so could you -- is that something that you**

12      **have preserved at this point?**

13  A   I believe so.  It's in my GM e-mail.

14  Q   Okay.

15  A   Because I was worried, and I made sure I saved it,

16      just because it wouldn't come back to me.  Because I

17      talked to payroll, and they are like, "You can't do

18      that," after talking to HR and Matt; and I was like,

19      "Whoa, I have the strand here," so "They said I

20      could," so.

21  Q   Okay.  **So basically you were allowed to do almost**

22      **exactly what Darren Donahue was supposedly fired for**

23      **letting managers do; whether or not you knew it, it's**

24      **basically the same thing, right?**

25                  MS. MORISSET:  Object as to form.

WITNESS:  KATE HERSEL    2/14/2018

Page 111

1    Q    (By Mr. Blankenship) Except that you got HR's
2         buy-off, right?
3    A    I got approval from my ROD and HR.
4    Q    And effectively if you are a server you need a number
5         in order to just even serve, right?
6    A    Yes.
7    Q    I mean, you can't, basically, sell the burgers and
8         the fries --
9    A    Yes.
10   Q    -- and the milkshakes without having a badge that
11        swipes in, right?
12   A    Yes.
13   Q    And so with respect to Chris Ferguson -- what I'm
14        just trying to understand is -- and I'm going back to
15        the Captain's log:  If there is a big issue that is
16        going on at the restaurant when you are general
17        manager, that people are concerned about, do you have
18        to read the Captain's Log to know about it, or would
19        somebody typically tell you?
20   A    Most likely they would tell you, but you should read
21        the Captain's log as well.
22   Q    And to your understanding -- I mean, you just had Red
23        Robin's lawyer showing you a document, it's Exhibit
24        55, and it shows -- it's got evidence here that you
25        supposedly, "Kate Hersel," she had you read it out

Page 123

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON )
                        ) ss.
3    COUNTY OF MASON     )

4        I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
5    oaths and affirmations in and for the State of Washington,
     do hereby certify:
6
         That the annexed and foregoing deposition transcript
7    of the witness named herein was taken Stenographically
     before me and reduced to a typed format under my direction;
8    that the transcript is a full, true and complete transcript
     of the proceedings, including all questions, objections,
9    motions and exceptions of counsel, made and taken at the
     time of the foregoing proceedings, to the best of my
10   abilities;

11       That I am not a relative, employee, attorney or
     counsel of any party to this action or relative or employee
12   of any such attorney or counsel, and that I am not
     financially interested in the said action or the outcome
13   thereof;

14       That the witness, before examination, was by me duly
     sworn, and the transcript was made available to the witness
15   for reading and signing upon completion of transcription,
     unless indicated herein the waiving of signature;
16
         I further certify that I am sealing the deposition in
17   an envelope with the title of the above cause and the name
     of the witness visible, and I am delivering the same to the
18   appropriate authority;

19       I further advise you that as a matter of firm policy,
     the Stenographic notes of this transcript will be destroyed
20   three years from the date appearing on this Certificate
     unless notice is received otherwise from any party or
21   counsel hereto on or before said date;

22       IN WITNESS WHEREOF, I have hereunto set my hand on
     this 27th day of February 2018 at Shelton, Washington.
23

24
                          _____
25                        Michelle L. Patton, CCR # 2500

# Exhibit H

April 3, 2008

Darren Donahue

Dear Darren,

As a follow-up to your discussion with Julie Andrews we are pleased to extend to you an offer of employment as a Manager in Training for Red Robin International, Inc.  The conditions of the offer are as follows:

- Monthly wages totaling $1250.00 per week will be paid based on a pre-scheduled fifty-five hour workweek while in training. This is calculated at an hourly wage of 20.00 per hour. Forty hours will be paid at the regular rate, and the additional fifteen hours per week will be paid at one and a half your regular hourly rate, or at $30.00 per hour. If your time at work varies from the fifty-five hour guideline, your pay will be adjusted accordingly.  After training is complete, your annualized salary will be $65,000.

- Your start date will be Tuesday, April 8, 2008.  Training will take place at the Bellevue Red Robin.

- You are eligible for health and welfare benefits on the first day of the month following your date of promotion. This includes health, dental, vision, flexible spending accounts and company paid short-term and long-term disability, basic life and accidental death & dismemberment insurance.  You are also eligible for an employee assistance program.

- You are eligible for a quarterly bonus potential based on restaurant performance as outlined in the Restaurant Operations Compensation Plan.

DONAHUE 02569

- Eligibility in the Employee Stock Purchase Plan. You must be continuously employed for at least one year as of the first date of the open enrollment period, and must customarily work at least 20 hours per week.

- You will accrue vacation of two (2) weeks after one year of service, three (3) weeks after five years of service pursuant to company policy (which may be amended from time to time).

- You are eligible for the Company 401(k) program, and can enroll immediately if not already participating. Your participation in the Plan is subject to all of the terms of the plan, including the company matching contribution. Red Robin contributes a matching contribution of 25% up to the first 4% of your pre-tax compensation deferral. Depending on your compensation level, you may become eligible for participation in the Deferred Compensation Plan.

We greatly look forward to having you join Red Robin and becoming a valued member of our team. We recognize that you retain the option, as does Red Robin, of ending your employment with Red Robin at any time, with or without notice and with or without cause. As such, your employment with Red Robin is at will and neither this letter nor any other oral or written representation may be considered a contract for any specific period of time. Your at will status can only be changed in writing, signed by the CEO or President of Red Robin International, Inc. This offer is also contingent upon your completion of the Red Robin employment application form and satisfactory review of background check materials, even if that review is not complete until after you start work. Red Robin also has the right to alter the terms of your employment at anytime, including the provision of benefits outlined above.

We are truly excited to have you join our Red Robin team. In the spirit of "seeking knowledge" we hope that both you and Red Robin grow from this relationship. Please feel free to contact me at 303-846-5422 or Julie Andrews at 877-334-6475 if you have any questions. We look forward to hearing from you regarding your decision on this offer.

Sincerely,

Tracey Sibelius
Team Member Recruitment Manager

cc: Julie Andrews, Sr. Regional Recruiting Manager NW

I agree to the terms of employment set forth above. Prior to your start date, please sign and fax to 720-493-2658 or mail back in the enclosed envelope to: Noelle Wilson.

_____          _____
Signature - Darren Donahue                              Date

DONAHUE 02570

# Exhibit I

## Filed Under Seal

# Exhibit J

UW Medicine
SCHOOL OF MEDICINE

January 13, 2012

To Whom It May Concern:

Darren Donahue is under my care at the University of Washington Medical Center. He is being treated with radiation therapy for cancer of the bladder. Because of his recent surgery and radiation therapy, he should rest at home until Feb. 13, 2012, at which point he will be safe to return to work. He should restrict himself to lifting 20 pounds or less until March 15, 2012. He should stand for no longer than three hours per day until March 1, 2012.

Let me know if I can be of any further assistance in this matter.

Sincerely,

Michael Gensheimer M.D.
Resident Physician in Radiation Oncology
Phone: 206-598-4101

**Department of Radiation Oncology**
1959 NE Pacific St.   Box 356043   Seattle, WA 98195-6043   206-598-4100   Fax 206-598-6218

# Exhibit K

TM: Darren Donahue

*Note:  This agreement applies to restricted work assignments made as a result of a personal injury, illness or other reasons underlated to on-the-job-injuries.*

Dear Darren,

In certain circumstances Team Members may be offered temporary restricted work assignments or alternative jobs.  These assignments are made with the following conditions in mind: 1) staffing levels, 2) availability of modified duty work, 3) a Team Member's physical restrictions, and 4) the number of other Team Members who may already be on a restricted work assignment. These assignments are never guaranteed, are granted based upon business need as well as manager's approval and may be ended at any time.

If you are unable to return to work after your temporary assignment, you may be eligible for additional leave of absence time.  Please speak to your manager or Human Resources to determine if you are eligible.

In order for a restricted work assignment or alternative job to be granted you must provide your manager with a letter from your physician which outlines your physical restrictions.  All Company and restaurant policies apply while you are on temporary assignment.  Please sign on the signature line below indicating that you understand the terms of your restricted work assignment.

Your current restrictions are no standing for more than 4 hours at a time without a 15 minute break in between, and to not lift greater than 20 lbs.

Date assignment begins:   <u>February 13, 2012</u>
Date assignment ends.     <u>March 1, 2012 for the standing restriction</u>
                          <u>March 15 for the lifting restriction</u>

DARREN J DONAHUE                               2-13-12
Print  Team Member Name        Team Member Signature        Date

HAROLD HART                                    2-13-12
Print: Manager Name            Manager Signature            Date

RR_000027

# Exhibit L



# Exhibit M

## POSITION DESCRIPTION

| | | | |
|---|---|---|---|
| **Position Title:** | General Manager | **Job Code:** | |
| **Department:** | Operations | **Grade:** | |
| **Reports To:** | Regional Operations Director | **Status:** | Exempt |

### SUMMARY

Responsible for total operations of single Red Robin restaurant including building sales all aspects of profit and loss, hiring and training of both management and hourly team, daily execution of safety/sanitation, quality food preparation and guest service. Responsible for cleanliness, repair and maintenance of the building and equipment. The GM is responsible for these areas whether on or off the premises. Responsible for communicating and administering all company policies and procedures.

### ESSENTIAL FUNCTIONS

- Effectively and efficiently manage restaurant by following the best practices of the Company and Brand Equity Standards to ensure Guest satisfaction and profit maximization
- Manage all restaurant operations including scheduling, planning and forecasting while upholding and championing standards, product quality and cleanliness
- Optimize profit by ensuring that labor is scheduled efficiently and food and supplies are ordered to maintain appropriate inventory
- Prepare reports and analyze metrics to identify opportunities and act promptly to correct
- Builds year over year sales by promoting restaurant locally, ensuring guest satisfaction and prompt problem resolution
- Exemplify and recognize legendary acts of leadership and quality to ensure 100% Guest satisfaction
- Ensure the environment in the restaurant supports our core values of honor, integrity, seeking knowledge, and having fun
- Exercise good judgment and decision making in escalating concerns and aggressively resolve issues
- Responsible for compliance with OSHA, local health and safety codes as well as Company safety and security policies. Emphasize safety, sanitation and security awareness, and ensure that Team Members are properly trained to create safe situations
- Ensure adherence to Company cash handling and payment processing procedures
- Conduct line checks in accordance with Company standards
- Maintain adequate staffing levels and responsible for the selection, on boarding and retention of Team Members through motivation, recognition, coaching and development.
- Require operational excellence and develop management staff in all areas of restaurant leadership and Company standards
- Set performance expectations and monitor training process to ensure quality of training
- Regularly measure and evaluate service standards by using various feedback tools to develop and implement plans for continuous service improvement
- Adhere to Federal, State and local laws in addition to Company policy (regulate compliance with work authorization/ liquor service/wage and hour laws and, where applicable, break requirements), holds team members and managers accountable to these standards
- Prepare and conduct performance appraisals and one to ones with management staff and Team Members and take any necessary disciplinary action in line with Company standards
- Responsibly delegate and follow up on tasks while remaining accountable overall for restaurant and Team Members .



Exhibit No.: 85
Deponent: Rivera
Date/RPR: 2/8/18
Hunter + Geist, Inc. mh

- Ensure Company standards on equipment, facility, and grounds are maintained by using a preventative maintenance program
- Ensure complete and timely execution of corporate & local restaurant marketing programs
- Directly supervise up to 4 salaried managers, and managerial authority for approximately 100 Team Members and their development
- Champion and adhere to all Company standards and policies including the Code of Conduct, Attendance and Uniform and Appearance policy
- Resolution oriented/ protects Company assets; prevent/diffuse situations that create potential risks to the organization
- Be a mentor and devote time to training, coaching and developing others by adapting to individual learning styles and motivational needs

## ADDITIONAL FUNCTIONS
- Perform all FOH/ HOH functions including food preparation, cooking, cleaning, serving and greeting Guests
- Other duties as assigned by supervisor

## REQUIREMENTS
- Must be at least 21 years of age
- Minimum of 2 years full service restaurant experience at a Kitchen Manager or Assistant General Manager level required
- State and local alcohol enforcement, where applicable
- Record of maintaining high standards in restaurant cleanliness, sanitation, food quality, and guest satisfaction
- High school diploma or equivalent required, some college preferred
- Passion for the business and compassion for people
- Highly-Energetic, self motivated, goal oriented and dependable
- Excellent oral and written communication skills, and outstanding leadership, interpersonal and conflict resolution skills
- Basic business math and accounting skills, and strong analytical/decision-making skills
- Basic personal computer literacy
- Must be able to work a flexible schedule including opening, closing, weekends and holidays
- Must be willing to work 55 hours per week. Reliable transportation required
- Serv Safe Certified
- P&L and Sales Building experience preferred

## PHYSICAL DEMANDS

| Daily Activities | Average Hours per day |
|---|---|
| Sitting | up to 5 hours |
| Walking | up to 10 hours |
| Standing | up to 10 hours |
| Bending | up to 10 hours |
| Squatting | up to 8 hours |
| Climbing | up to 8 hours |
| Kneeling | up to 8 hours |
| Twisting | up to 8 hours |
| Repetitive use of hands | up to 10 hours |
| Simple grasping with hand | up to 10 hours |
| Power grasping with hand | up to 10 hours |

RR_000031

20 Mar. 15. 2013ɔ 1:43PM Robin 213 263-804-6571                    No. 3512    P. 4

| | |
|---|---|
| Pushing & Pulling | |
| Reaching | up to 8 hours |
| Lifting | up to 10 hours |
| 0-10 lbs. | |
| 11-25 lbs. | up to 10 hours |
| 26-75 lbs. | up to 10 hours |
| Carrying | up to 10 hours |
| 0-10 lbs. | |
| 11-25 lbs. | up to 10 hours |
| 26-75 lbs. | up to 10 hours |
| Working around equipment and machinery | up to 10 hours |
| Exposure to extremes in temperature | up to 10 hours |
| (walk-in freezer/ kitchen line) | up to 4 hours |
| Frequent hand washing required | |

NOTE: This job description is not intended to be an exhaustive list of all duties, responsibilities or qualifications associated with the job.

---

I CAN MEET THE ESSENTIAL FUNCTIONS OF THE POSITION WITH OR WITHOUT ACCOMMODATION. SHOULD I REQUIRE
ACCOMMODATION I WILL CONTACT THE HUMAN RESOURCES DEPARTMENT,

Team Member _____        Date   3-12-13

---

RR_000032

# Exhibit N



RED ROBIN INTERNATIONAL, INC.
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

January 11, 2012

Darren Donahue

RE: Expiration of your approved leave time

Dear Darren:

Your approved leave of absence expired as of December 1, 2011, and we provided additional time off work to determine if further leave would be a reasonable accommodation allowing you to return to work in the near future. We are unable to extend further time off work, thus your employment with Red Robin is terminated effective January 11, 2012.

If your situation changes in the future and you're able to perform job duties with or without reasonable accommodation, you are free to reapply.

We wish you a speedy recovery and the best in your future career. If you have any questions please feel free to call me at (303) 846-6074 or email LOA@redrobin.com.

Sincerely,

Tara Jurhs
Benefits Administrator

redrobin.com

# Exhibit O

| | |
|---|---|
| **From:** | Tara Jurhs |
| **Sent:** | Wednesday, January 18, 2012 3:11 PM |
| **To:** | Claire Simpson |
| **Cc:** | Julie Rivera |
| **Subject:** | RE: Darren Donahue Letters |

Hi, Claire,

I tried to reach him by phone & by mail (both email & hard copy), but I never received a response. If he's back in contact, I'm more than happy to reopen this & reach back out to him.

**From:** Claire Simpson
**Sent:** Wednesday, January 18, 2012 2:03 PM
**To:** Tara Jurhs
**Cc:** Julie Rivera
**Subject:** FW: Darren Donahue Letters

Hey Tara,

Why did we sent Darren the auto term letter?  We knew he was out with cancer- did we already do the accommodation process?

Thanks!

c

**From:** Harold Hart
**Sent:** Wednesday, January 18, 2012 2:59 PM
**To:** Claire Simpson
**Subject:** Fwd: Darren Donahue Letters

Hi Claire need your help on this ASAP. Please call me. 253-310-5207

Harold Hart

Begin forwarded message:

> **From:** "gina.donahue@comcast.net" <gina.donahue@comcast.net>
> **To:** "Harold Hart" <hhart@redrobin.com>
> **Cc:** "Darren Donahue" <ajtdonahue@yahoo.com>
> **Subject: Darren Donahue Letters**
>
> Thanks for all your help.
>
> Please let me know if I need to do anything further.
>
> Darren

1

# Exhibit P

THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON - AT SEATTLE

| | |
|---|---|
| DARREN DONAHUE,<br><br>               Plaintiff,<br><br>   vs.<br><br>RED ROBIN INTERNATIONAL INC., et al.<br><br>               Defendants. | NO. 2:17-cv-00023 JLR<br><br>PLAINTIFF'S FIRST REQUESTS FOR ADMISSION AND <u>ANSWERS</u> <u>THERETO</u> |

**TO:    Defendants Red Robin International, Inc., Red Robin Gourmet Burgers, Inc., and Harold Hart;**

**AND TO:    Catharine Morisset, attorney for Defendants.**

## **INSTRUCTIONS**

Pursuant to Federal Rules of Civil Procedure 26 and 36, you are hereby served with the following Requests for Admission. You are requested to answer the following Requests for Admission in writing and under oath within the space provided or using additional space, if necessary, and thereafter to serve a copy of same upon counsel for Plaintiff within thirty (30) days after service thereof. If the response to any of these requests is anything other than an unqualified admission of the facts stated in the request, the response shall admit each fact that is true and qualify or deny the remainder of the fact stated in the request. All the facts forming

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 1

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1

2 **REQUEST FOR ADMISSION NO. 23.:** Admit that, according to the Audit Report

3 produced at RR 006469-6543, Mr. Donahue's card was not used to purchase any food for

4 customers on October 12, 2014, October 17, 2014, October 18, 2014 and October 19, 2014.

5 **RESPONSE**:   Deny.   Admit that RR _006469-6543 shows no activity for Mr.

6 Donahue's manager identification number for October 12, 2014, October 17, 2014, October 18,

7 2014 and October 19, 2014.

8

9 **REQUEST FOR ADMISSION NO. 24.:** Admit that the document produced by

10 Defendants identified as RR 006612 is a record of an act, condition, or event that was made in

11 the regular course of business, at or near the time of the act, condition, or event, thus falling

12 within the regularly conducted activity exception to the hearsay rule.

13 **RESPONSE**:   Admit that RR 00612 is a business record, and admit it is an exception

14 to the hearsay rule if offered to prove there was no activity under Darren Donanhue's

15 identification number on this report.

16

17 **REQUEST FOR ADMISSION NO. 25.:** Admit that the document produced by

18 Defendants identified as RR_006612 is a true and correct copy of the "Server Sales Report" for

19 Darren Donahue on "10/17/2014."

20 **RESPONSE**:   Admit that document produced by Defendants identified as

21 RR_006612 is a true and correct copy of the "Server Sales Report" dated 10/17/14 for Darren

22 Donahue's identification number."

23

24 **REQUEST FOR ADMISSION NO. 26.:** Admit that the document produced by

25 Defendants identified as RR 006612 reflects all food and beverage sales using Darren

26 Donahue's swipe card on October 17, 2014.

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND ANSWERS (17-00023) –
Page 9

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

1    **RESPONSE:** Admit that the lack of activity on the audit report shows that nothing was

2  ordered using Darren Donahue's swipe card.

3

4

5    **REQUEST FOR ADMISSION NO. 27.:** Admit that the document produced by

6  Defendants identified as RR_006612 reflects that Darren Donahue's swipe card was not used

7  to make any purchases on October 17, 2014.

8    **RESPONSE:** Admit.

9

10    **REQUEST FOR ADMISSION NO. 28.:** Admit that Christopher Ferguson did not use

11  Darren Donahue's swipe card to make purchases in the Auburn restaurant on October 17, 2014.

12

13    **RESPONSE:** Admit that the Aloha records do not reflect that Christopher Ferguson

14  used Darren Donahue's manager identification to make food sales purchases in the Auburn

15  restaurant on October 17, 2014.

16

17    **REQUEST FOR ADMISSION NO. 29.:** Admit that Christopher Ferguson did not use

18  Darren Donahue's swipe card to make purchases in the Auburn restaurant on any day that Mr.

19  Ferguson worked at the Auburn restaurant.

20    **RESPONSE:** Admit that the Aloha records do not reflect that Christopher Ferguson

21  used Darren Donahue's manager identification to make food sales purchases in the Auburn

22  restaurant from October 12-19, 2014.

23

24

25

26

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 10

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

**REQUEST FOR ADMISSION NO. 34.:** Admit that Darren Donahue's assigned identification number was not 75547.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 35.:** Admit that Darren Donahue's Team Member identification number was 166280.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 36.:** Admit that, according to that the document produced by Defendants identified as RR_006545, Darren Donahue did not approve Christopher Ferguson's time card for the date range of "10/06/2014 — 10/12/2014."

**RESPONSE:** Admit that the document RR_006545 does not reflect an entry under Mr. Donahue's Team Member identification number.

**REQUEST FOR ADMISSION NO. 37.:** Admit that, according to that the document produced by Defendants identified as RR 006545, Darren Donahue did not approve Christopher Ferguson's time card for the date range of "10/13/2014 — 10/19/2014."

**RESPONSE:** Deny that Plaintiff did not ever approve time worked for Mr. Ferguson for that date range for payroll purposes.  Admit that the document RR 006545 does not reflect an entry under Mr. Donahue's Team Member identification number.

**REQUEST FOR ADMISSION NO. 38.:** Admit that Defendants' Auburn restaurant was designated a "training" restaurant during the year of 2013.

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 12

FPDOCS 33785934.1

1   **RESPONSE**:  Admit that the Auburn restaurant was designated a training restaurant in

2   2012 or 2013.

3

4

5   **REQUEST FOR ADMISSION NO. 39.**:  Admit that Mr. Donahue was designated a

Training General Manager during the year of 2013.

6

7   **RESPONSE**:  Admit that Mr. Donahue was designated a Training General Manager

8   during the years 2012 or 2013.

9

10   **REQUEST FOR ADMISSION NO. 40.**:  Admit that, in order to be eligible for the

11   designation of Training General Manager, a General Manager had to obtain formal training,

12   including a multi-week course.

13

14   **RESPONSE**:  Deny there was a "formal" or multi week "course."  Admit there was an

evaluation and approval process that included an education session and required completion of

15   training on the coaching model for the managers, and trainers.

16

17

18   **REQUEST FOR ADMISSION NO. 41.**:  Admit that Mr. Donahue took the course to

19   become a Training General Manager in 2012.

20   **RESPONSE**:  After reasonable inquiry, Defendants have been unable to confirm when

21   Mr. Donahue completed the education session and training for managers and trainers.

22

23

24   **REQUEST FOR ADMISSION NO. 42.**:  Admit that Defendants asked Mr. Donahue

25   to work as the General Manager of the Bellevue restaurant in 2013.

26

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 13

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1    **RESPONSE**: Deny.  Plaintiff offered to help and Defendant Red Robin agreed; he was

2  asked to assist temporarily.

3

4
      **REQUEST FOR ADMISSION NO. 43.**: Admit that Defendants asked Mr. Donahue
5
   to work as the General Manager of the Bellevue restaurant in 2013 in order to improve the
6
   Bellevue restaurant's performance.
7
      **RESPONSE**: Deny.  Admit Mr. Donahue was asked to help improve the Bellevue
8
   restaurant's staffing levels and assist with getting the restaurant on track.
9

10

11     **REQUEST FOR ADMISSION NO. 44.**: Admit that Mr. Donahue worked as the
12  General Manager for the Bellevue restaurant for less than two months in 2013.
13
      **RESPONSE**: Admit Mr. Donahue assisted at the Bellevue restaurant for less than two
14
   months in 2013.
15

16

17     **REQUEST FOR ADMISSION NO. 45.**: Admit that under Mr. Donahue's
18  management, the Bellevue restaurant's performance improved.
19
      **RESPONSE**:  Objection: vague and ambiguous. Defendants are unable to admit or
20
   deny because it is unclear what is meant by "performance" or "improved performance."
21
   Defendants do admit that Mr. Donahue helped improve staffing levels, which improved the
22
   restaurant's general performance.
23

24

25

26

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 14

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1    **REQUEST FOR ADMISSION NO. 46.:** Admit that Defendants award Mr. Donahue

2    with a bonus and iPad due to the improved results for the Bellevue restaurant under his

3    management.

4    **RESPONSE**: Admit that Plaintiff received a bonus for the assistance he provided with

5    regards to the Bellevue restaurant.

6

7

8    **REQUEST FOR ADMISSION NO. 47.**: Admit that the document produced by

9    Plaintiff identified as DONAHUE 02055-56 is a true and correct copy of an email exchange

10   between Darren Donahue and Regional Operations Director Erik Yates.

11   **RESPONSE**:   Defendants have been unable to confirm or deny the document's

12   authenticity apart from Mr. Donahue's testimony.  However, at this time, Defendants have no

13   reason to doubt its authenticity.

14

15   **REQUEST FOR ADMISSION NO. 48.**: Admit that the document produced by

16   Plaintiff identified as DONAHUE 02055-56 reflects that, on October 8, 2013, Mr. Donahue

17   asked Mr. Yates for permission to apply for a promotion to the Regional Operations Director

18   position.

19

20   **RESPONSE**:  Deny.   Admit that Plaintiff asked Mr. Yates for his "support to pursue

21   the ROD position open in Sacramento."

22

23   **REQUEST FOR ADMISSION NO. 49.:** Admit that the document produced by

24   Plaintiff identified as DONAHUE 02055-56 reflects that, on October 9, 2013, Regional

25   Operations Director Erik Yates wrote to Mr. Donahue, "I have spoken to Roger and we both

26   agree you may apply."

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 15

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1    **RESPONSE**:  Admit that it is a business record, but deny that all of the statements

2    contained within it are an exception to the hearsay rule if offered for the truth of the matter

3    asserted.

4

5    **REQUEST FOR ADMISSION NO. 99**.: Admit that the image of the IT incident report

6    produced by Defendants at RR_004707-708 reflects that Auburn Manager Kathryn Matteson

7    contacted IT on October 17, 2014 with the short description: "Christopher ferguson has been

8    removed from our system . . ."

9

10   **RESPONSE:**  Admit.

11

12   **REQUEST FOR ADMISSION NO. 100.:** Admit that the image of the IT incident

13   report produced by Defendants at RR_004707-708 reflects that Auburn Manager Kathryn

14   Matteson contacted IT on October 17, 2014 with the short description: "Christopher ferguson

15   has been removed from our system . . ."

16   **RESPONSE**:  Admit that the image of the IT incident report produced by Defendants

17   at RR_004707-708 reflects that Auburn Manager Kathryn Matteson contacted IT on October

18   17, 2014 and contains the short description: "Christopher ferguson has been removed from our

19   system . . ."

20

21

22   **REQUEST FOR ADMISSION NO. 101.**: Admit that the image of the IT incident

23   report produced by Defendants at RR_004707-708 reflects under "Additional comments

24   (SHARED)" that Auburn Manager Kathryn Matteson reported Christopher Ferguson was

25   "[n]ever fully transferred to our restaurant. Not fully sure where his paperwork is."

26   **RESPONSE**:  Admit.

PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION AND <u>ANSWERS</u> (17-00023) –
Page 30

FISHER & PHILLIPS LLP
1201 THIRD AVENUE, SUITE 2750
SEATTLE, WA 98101
Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

1    **RESPONSE**:  Deny.

2

3    DATED this 22nd day of February, 2018:

4

5                                            By _____

6                                            Catharine M. Morisset, WSBA #29682
                                             FISHER & PHILLIPS LLP
7                                            *Attorneys for Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S FIRST REQUESTS FOR                    FISHER & PHILLIPS LLP
ADMISSION AND <u>ANSWERS</u> (17-00023) –           1201 THIRD AVENUE, SUITE 2750
Page 40                                           SEATTLE, WA 98101
                                                  Phone: (206) 682-2308 Fax: (206) 682-7908

FPDOCS 33785934.1

# Exhibit Q

## Manager

**\*\*This form should be used for all Restaurant Managers and Home Office Team Members below Director level with direct reports\*\***

| Name: | Darren Donahue | | Position: | General Manager |
| --- | --- | --- | --- | --- |
| **Most Recent Hire Date:** | 4/8/2008 | | **Restaurant/Department:** | Auburn Super Mall # 213 |

| | |
| --- | --- |
| **Team Member ID:** | 166280 |
| **Review Type:** | Year End 2012 |
| **Reviewer/Supervisor Name:** | Erik Yates |

**Philosophy:** Red Robin views the Performance Review process as an honest discussion between you and your supervisor regarding your job performance. This process is a formal opportunity for you to be certain your performance is aligned with the goals and objectives of the Company. The Competency Summary is designed to provide feedback relating to individual strengths and development opportunities. The review should reflect a sound and objective assessment of your job performance and responsibilities for the review period.

**Performance Rating Definitions:** Evaluate the Team Member on each section based on the following:

**(E) Exceeding – Consistently Exceeds Performance Expectations (4 points)**
- Team Member is clearly and consistently exceeding performance objectives
- Team Member has developed skills and abilities to exceed the demands of the job

**(P) Performing – Consistently Meets (and sometimes exceeds) Performance Expectations (3 points)**
- Team Member's performance is solid and consistently meets (and sometimes exceeds) performance objectives
- Team Member has developed skills and abilities to effectively meet job requirements

**(U) Underperforming – Needs Improvement to Meet Performance Expectations (2 points)**
- Team Member's performance sometimes meets performance objectives
- Team Member needs to work on improving and developing skills and abilities to consistently meet job requirements

**(D) Deficient – Not Meeting Performance Expectations (1 point)**
- Team Member does not meet job requirements and performance is below established standards
- Team Member is not demonstrating the skills and/or abilities to successfully perform the job

**Instructions:** Select the appropriate rating from the drop down box and press Tab to calculate the number of points for each rating. IMPORTANT: You must press the Tab key after selecting the rating for the points and total score to calculate correctly.

In the *Supporting Comments* section, provide specifics and examples for each rating given.

| Competencies | Rating | Points | Supporting Comments |
| --- | --- | --- | --- |
| ***UNDERSTANDING AND EVOLVING THE RED ROBIN BRAND AND PROCESSES***<br>- Identifies opportunities and needs for the Brand.<br>- Implements organizational strategies to further improve the Brand.<br>- Champions change initiatives and ensures the team is fully bought in and engaged in implementation.<br>- Demonstrates professionalism and personal integrity. | Exceeding | 4 | I strive for best in class results at all times.<br><br>I look to improve my restaurant, my region, and my pod.<br><br>Auburn raises the bar on professionalism. |
| ***LEADING AND MOBILIZING THE ORGANIZATION***<br>- Leverages departmental and team needs and capabilities.<br>- Attracts, selects and develops top performers.<br>- Leverages capabilities across the team.<br>- Motivates others by creating a culture of high performance. | Exceeding | 4 | We look to leverage our team by allowing them to be in the Driver's Seat of their careers.<br>We hire goal oriented people who want more out of life.<br>We crosstrain in all departments.<br>We promote a "best in class" mentality. |
| ***ENGAGING AND WINNING WITH OTHERS***<br>- Develops synergistic relationships with peers and internal customers.<br>- Collaborates with peers and internal customers to create solutions that best serve the Guest.<br>- Offers advice and assists peers in accomplishing their goals.<br>- Develops a team with Guest centric mentality and sets clear expectations for Guest support and engagement. | Exceeding | 4 | Region 9 is tight among it's GM's and there is a feeling of family among the group.<br>I reach out to my fellow region 9 managers on a regular basis to collaborate.<br>I am a mentor to a couple of the GM's in our region. |

RR_000098

| | | | |
|---|---|---|---|
| **PERSONAL LEADERSHIP AND TEAM CONTRIBUTIONS**<br>• Positively impacts the business through sound and timely decision making.<br>• Communicates effectively and influences other in the department and team.<br>• Demonstrates poise and courage when faced with opposition.<br>• Responds professionally to pressure and stress. | Exceeding | 4 | We moved the bar at Auburn this year dramatically. Scorecard results have improved.<br>I willing to have the tough conversations to get everyone on the same page. |
| **DRIVING AND DELIVERING RESULTS**<br>• Supports a culture of high performance and accountability for achieving results.<br>• Sets objectives and goals that positively impact the direction and results of the department and team.<br>• Sets a good example to the department and team by working hard and achieving consistent results.<br>• Critically evaluates own performance and the performance of direct reports to constantly improve performance. | Performing | 3 | We promote a best in class attitude and strive for best in class results.<br>Goals have been set for departments and team, results are improved but not where we need them to be.<br><br>I try to set an example of what a manager should be.<br>I am my own biggest critic. |

| | | |
|---|---|---|
| **Total Points:** | 19 | *Total Points should equal the sum of all 5 competencies above. Pressing the Tab key after selecting the rating on each competency will ensure an accurate calculation of Total Score.* |
| **# of Lines:** | 5 | |
| **Total Score:** | 3.8 | |

Based on the Total Score, select the Overall Performance Rating using the scale below:

| | |
|---|---|
| 3.60 to 4.00 = Exceeds<br>2.61 to 3.59 = Performing<br>1.00 to 2.60 = Underperforming | **Overall Performance Rating**<br><br>**Exceeds** |

**Competency Summary:** Use the area below for comments. Both the Team Member and the supervisor should indicate strengths and development opportunities and identify the competency that is impacted. Action plan steps should identify specific, measurable actions that support the development opportunities.

**Self Comments**

**Strengths:**
Team player, communication with team, goal setting, best in class mentality

**Development Opportunities:**
BER knowledge, corporate communication

**Action Plan Steps:**
Continue to train MIT's and gain knowledge along with them.

**Supervisor Comments**

**Strengths:**
A high commitment to excellence in his results, leverages others around him to seek knowledge when there is he wants to be better at. Darren is a role model for his peers and has many great ideas.p

**Development Opportunities:**
Needs to ensure excellent results in his managers 18steps especially with HOH systems, ie labeling, food quality, and cleanliness.Inspect what you expect.Assume positive intent with corporate support and partner with them.

**Action Plan Steps:**

**Acknowledgements:** Team Member's signature indicates knowledge and understanding of the contents of the performance summary. The summary has been reviewed with the Team Member and the Team Member has been given the opportunity to comment.

Team Member's Signature                                    1-23-13
                                                                          Date

Supervisor's Signature                                       1-23-13
                                                                          Date

Once you have completed the performance review and discussed it with your Team Member both of you need to sign it. Scan the signed copy to yourself and save to a location on the computer you can easily remember. **NAME** the file as *LastName_FirstName_YearEnd2012.doc* (for example: Brown_Charlie_YearEnd2012.doc) and click the **SAVE** button.

When all reviews are complete, **COMPOSE** a new e-mail in Outlook to performancemgmt@redrobin.com. Select **ATTACH FILE** and find your saved files, select files and click the **INSERT** button. Click on the **SEND** button to send.

RR_000099

# Exhibit R

## Accommodations needed for Darren Donahue because of permanent hernia.

| Position Title: | General Manager | Department: | Operations |
|---|---|---|---|
| Reports to: | Regional Operations Director | | |

| | Accommodation |
|---|---|
| **SUMMARY:** | None |
| **ESSENTIAL FUNCTIONS:** | None |
| **ADDITIONAL FUNCTIONS:** | 4 hours then 1/2 hour off feet...Repeat |
| **REQUIREMENTS:** | None |

**PHYSICAL DEMANDS:**

| Daily Activities: | Requirement | Accommodation |
|---|---|---|
| Sitting | up to 5 hours | None |
| Walking | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| Standing | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| Bending | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| Squatting | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Climbing | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Kneeling | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Twisting | up to 8 hours | 4 hours then 1/2 hour off feet...Repeat |
| Repetitive use of hands | up to 10 hours | None |
| Simple grasping with hand | up to 10 hours | None |
| Power grasping with hand | up to 10 hours | None |
| Pushing & Pulling | up to 8 hours | No more than 20 pounds...4 hours then 1/2 hour off feet...Repeat |
| Reaching | up to 10 hours | None |
| **Lifting:** | | |
| 0 - 10 lbs. | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| 11 - 25 lbs | up to 10 hours | No more than 20 pounds...4 hours then 1/2 hour off feet...Repeat |
| 26 - 75 lbs | up to 10 hours | Do not attempt. |
| **Carrying:** | | |
| 0 - 10 lbs. | up to 10 hours | 4 hours then 1/2 hour off feet...Repeat |
| 11 - 25 lbs | up to 10 hours | No more than 20 pounds...4 hours then 1/2 hour off feet...Repeat |
| 26 - 75 lbs | up to 10 hours | Do not attempt. |

RR_000033

20 Mar. 15. 2013) 1:43PM Robin 213 253-804-6571                    No. 3512   P. 6

## PHYSICAL DEMANDS: Continued

| | | |
|---|---|---|
| Working around equipment and machinery | up to 10 hours | None |
| Exposure to extremes in temperature (walk-in freezer / kitchen line) | up to 4 hours | None |
| Frequent hand washing required | | None |

I CAN MEET THE ESSENTIAL FUNCTIONS AND REQUIREMENTS OF THE POSITION WITHOUT ACCOMMODATION. I DO REQUIRE THE ACCOMMODATIONS LISTED ABOVE IN ORDER TO MEET THE ADDITIONAL FUNCTIONS AND PHYSICAL DEMANDS OF THE POSITION.

Team Member _____                    Date    3·12-13

DUE TO DARREN DONAHUE'S PHYSICAL CONDITION RESULTING FROM SURGERY TO REMOVE HIS BLADDER, I FEEL THE ACCOMMODATIONS LISTED WITHIN ARE NECESSARY FOR HIM TO COMPLETE THE TASKS DESCRIBED IN THE POSITION DESCRIPTION.

Physician _____                    Date    3|15|13

Jay J. Liao, M.D.
Assistant Professor
Department of Radiation Oncology

**UW Medicine ~ School of Medicine**
1959 NE Pacific Street ~ Box 356043 ~ Seattle, WA 98195-6043 ~ (206) 598-4100 ~ Fax (206) 598-3766

RR_000034

# Exhibit S

**From:** Julie Rivera <jrivera@redrobin.com>
**Sent:** Tuesday, March 26, 2013 12:40 PM
**To:** Leave Of Absence
**Cc:** Julie Rivera
**Subject:** RE: Accommodations - Darren Donahue

Sounds good Tara!

Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*It's always the right time to do the right thing."*
*-Martin Luther King Jr.*

**From:** Leave Of Absence
**Sent:** Tuesday, March 26, 2013 11:13 AM
**To:** Julie Rivera
**Cc:** Leave Of Absence
**Subject:** RE: Accommodations - Darren Donahue

I reached him today. Restrictions are permanent and are no >20 lb lifting & taking a half hour to sit & prop his feet up every 4 hours. I would say it's reasonable to accommodate – if there are no concerns on your end, I'll create an accommodation letter.

Tara Jurhs
Leave of Absence
Red Robin International, Inc.
(303) 846-6074 (phone)
(720) 493-2733 (fax)
LOA@redrobin.com

**From:** Julie Rivera
**Sent:** Sunday, March 24, 2013 9:25 PM
**To:** Leave Of Absence
**Cc:** Julie Rivera
**Subject:** RE: Accommodations - Darren Donahue

1

RR_000035

Hi Tara.

Please try again tomorrow morning...Monday mornings are usually a guarantee to reach the GM.  Let me know and I will intervene if you still have no luck.

Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*"It's always the right time to do the right thing."*
            *-Martin Luther King Jr.*

---

**From:** Leave Of Absence
**Sent:** Friday, March 22, 2013 4:52 PM
**To:** Julie Rivera
**Cc:** Leave Of Absence
**Subject:** RE: Accommodations - Darren Donahue

Hi, Julie,

I haven't been able to reach him. I've left messages on Wednesday & today on his cell, and I tried him at the restaurant today but was told he was too busy at that moment to speak with me.

Tara Jurhs
Leave of Absence
Red Robin International, Inc.
(303) 846-6074 (phone)
(720) 493-2733 (fax)
LOA@redrobin.com

---

**From:** Julie Rivera
**Sent:** Friday, March 22, 2013 7:34 AM
**To:** Leave Of Absence
**Cc:** Tara Jurhs; Julie Rivera
**Subject:** RE: Accommodations - Darren Donahue

Hi Tara.

2

RR_000036

Please let me know where we are at on this and how your conversations with Darren went.

Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*"It's always the right time to do the right thing."*
*-Martin Luther King Jr.*

**From:** Julie Rivera
**Sent:** Monday, March 18, 2013 7:23 PM
**To:** Leave Of Absence
**Cc:** Erik Yates; Leave Of Absence
**Subject:** Re: Accommodations - Darren Donahue

believe they are permanent but please verify with him.

Thanks.
JR

On Mar 18, 2013, at 7:19 PM, "Leave Of Absence" <LOA@redrobin.com> wrote:

Hi, Julie,

I wouldn't have a problem allowing someone with these physical issues returning to a temporarily restricted role, but I don't see in here if the restrictions are temporary or permanent. Do we know if this is supposed to be permanent? If we don't know, is Darren working tomorrow for me to call him? Thanks!

Tara Jurhs
Leave of Absence
Red Robin International, Inc.
(303) 846-6074 (phone)
(720) 493-2733 (fax)
LOA@redrobin.com

**From:** Julie Rivera
**Sent:** Friday, March 15, 2013 2:42 PM
**To:** Tara Jurhs
**Cc:** Leave Of Absence; Erik Yates; Julie Rivera
**Subject:** Accommodations - Darren Donahue

3

RR_000037

Hi Tara.

We had some concerning conversations with Darren a couple weeks ago regarding possible restrictions so I sent him the job description and asked him to review with his doctor. Attached is what he has given us today. Can you please review this, provide any thoughts and document accordingly with Darren?


Thanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com

*"It's always the right time to do the right thing."*
*-Martin Luther King Jr.*

4

# Exhibit T



On Wednesday, October 9, 2013 9:54 AM, Erik Yates <eyates@redrobin.com> wrote:
Darren

I have spoken to Roger and we both agree you may apply.

Erik

Erik Yates
Red Robin Gourmet Burgers
eyates@redrobin.com
206-409-6597


On Oct 8, 2013, at 10:28 PM, "darren donahue" <ajtdonahue@yahoo.com> wrote:

Hi Erik,

I appreciate everything you have done for me over the last few years.  Your
support has been exactly what I have needed during this challenging time.  I
feel together we have partnered to achieve some great results.  I really like
working for Red Robin and would love to finish my career here.

I feel I can impact the company at the next level now.  I would like your
support to pursue the ROD position open in Sacramento.  I don't want to
leave Washington, but the timing here is not my favor.

Thank you for your consideration,

Darren

# Exhibit U

# Filed Under Seal

# Exhibit V

RR 000100

| Name: | Darren Donahue | Position: | GM |
|---|---|---|---|
| Date of Hire: | 4-8-2008 | Restaurant/Department: | Auburn |
| Completion Date: | 1-7-14 | Supervisor Name: | Erik Yates |

**Behavior Competency #1 – Accountability**

**Personal Leadership and Team Contributions**

**Metrics:**
Solves problems and makes decisions, including the insights of others when needed.  Communicates effectively and influences others. Maintains a balance between flexibility and taking a firm stance on issues.  Demonstrates poise and courage when faced with opposition. Responds professionally to pressure, stress and work demands.

**Results:** Does Not Meet Expectations
Darren was instrumental at providing great leadership and contributions when asked to support in Bellevue and did an incredible job at getting us staffed.Thank you.  Has a very high aptitude for influencing others in the region and is a mentor to many in the division, however has struggled at finding ways to influence his own managers to deliver the results and is intimidating to where they are reluctant to voice their opinion without fearing backlash from him. Darren's leadership style seems to have changed to having high expectations for his managers however doesn't appear to be coaching/teaching and utilizing the coaching model including the feedback steps. He seems to just expect his managers to "do it" and "do it" the right way. His responses to the pressure of work demands has continuously worsened

**Behavior Competency #2 – Innovation**

**Understands and Evolves the Red Robin Brand and Processes**

**Metrics:**
Adapts to changing needs and demands of the business. Overcomes barriers and obstacles to ensure success. Seeks and identifies opportunities to improve processes, methods and systems. Ensures consistent execution of the Red Robin brand promise by following established process and procedure, modeling Core Values and demonstrating professionalism.

**Results:** Does Not Meet Expectations
Would like to see you respond more positively with the high work demands and focus your energy on "how your going to get the results through your team. You have inspired so many managers/Team members in your restaurants throughout the years and would like to see that again. I am hoping the conference this year will provide you some guidance/inspiration as I know you are disappointed in the results/performance of your restaurant. Darren is always trying to look for new ways to improve processes, methods, and systems but tends to want to do things outside of the SOP without first asking for my approval. Darren needs to ensure he is following all systems and processes of Red Robin.  Auburn has had continuous issues in my visits on both cleanliness of the restaurnat as well as labeling and following proper shelf lives of raw product and has been coached on this on several occasions throughout the year. Would like to see Darren get innovative on how to get the best out of his managers other than hoping they will take his lead. How can you get your managers inspired this year? Darren needs to ensure that all emails/Correspondence to the corporate office are professional, Darren tends to react with his emotions and needs to take the needed time as to not be condascending in his remarks.

**Goal #1:**

**Descrip:** Drive Guest frequency to retain and increase "heavy user" Gu...
Red Robi... Royalty program differentiates our brand from the competition. The expectations is that every Guest/table is asked if they are a Red Robin Royalty member at the beginning of their experience, informed of the program and its benefits if they are not and receive credit for their experience prior to leaving.

**Metrics:**
> Royalty Registrations
> Royalty Sales as a Percentage of Total Sales
> Increased Guest Counts

**Results: Exceeds Expectations**
Royalty sales as percentage of total sales= Green every period of the year.
**Increased guest counts= 2.26%, -.23, 2.5% and Q4 6.19%, nice job finishing the year strong**

---

**Goal #4:**

**Description: Fuel the growth of the Company through successful talent management and new restaurant openings where applicable.**
Red Robin expects all supervisors to actively develop Team Members by ensuring all training and development tools available are used and that additional initiative is taken to ensure continued development. NRO's are an opportunity to make an impression on a community. The teams and preparation are a top priority. Talent management, bench strength development and strategic people planning are all expectations of the leaders in our Company.

**Metrics:**
> Manager Staffing Levels
> Bench Strength
> NRO sustained opening week sales
> Seasoned GM's identified
> Normalization of key operations metrics
> Guest Voice score of 80% or better

**Results: Does Not Meet Expectations**
This is an area that our region as a whole has struggled with. Not having our own GM's to promote as well as a bench of mids/AKM's with a clear development path to help strengthen the company/TM's in restaurants that have a desire to move up. We need to do a better job at the development of our high level TM's and managers.

In addition, our ability to execute the key operations metrics when it comes to the BTI standard changes needs improvement. See attached

**Exceeds Expectations**
- Team Member is clearly and consistently exceeding performance objectives
- Team Member has developed skills and abilities for exceeding the demands of the job

**Meets Expectations**
- Team Member's performance is solid and consistent, it meets and sometimes exceeds performance objectives
- Team Member has developed skills and abilities for effectively meeting job requirements

**Does Not Meet Expectations**
- Team Member's performance sometimes meets performance objectives
- Team Member needs to work on improving and developing skills and abilities to consistently meet job requirements

**Overall Performance Rating**
Does Not Meet Expectations

**Acknowledgements:** Team Member's signature indicates knowledge and understanding of the contents of the performance summary. The summary has been reviewed with the Team Member and the Team Member has been given the opportunity to comment.

**Descri...on:** Deployment, implementation and adoption of Team Member F...ndations, Brand Transformation, Triple R Service & Labor Management initiatives.

Throughout 2013, restaurants had the responsibility of deploying critical initiatives. Meeting expectations is defined by thoroughly preparing yourself and your Team Members by following all provided training, ensuring policies and procedures are properly communicated and trained, and following through with the initiative until adoption is assured.

**Metrics:**
- CLC Certification
- CLC Pars
- Completed Team Member Surveys
- Guest Voice
- BER Metrics
- Team Member Staffing Levels
- Variance to Standard Hours

**Results:** [Does Not Meet Expectations]

CLC's= With a couple of people leaving us, we are down to just 5 CLC's (Will, Sam, Tiffany, Emily, and John.) Let's get a few more for the next bootcamp.

Guest Voice- 8 Periods of green, 2 yellow, and 2 red for the year. Some great results in the middle of the year.

BER- Passed

Staffing levels- Darren has always been able to maintain a high staffing level in his restaurant and typically has great retention. Turnover results=YTD, 2 periods of yellow in p.1 and p2 followed by 5 green, but has seen a decline from period 8-12 with 5 consecutive periods of red.

Variance to standard hours- P.12= 103% P.13= 102%

## Goal #2:

**Description:** Drive PPA, recapture "Burger Authority" and evolve service by successfully deploying the Brand Transformation Initiative.

Meeting expectations is described by thoroughly embracing Triple R Service standards, leveraging the Coaching Model and consistently holding Team Members to the standards until full adoption is evident. Food preparation and execution meets all presentation standards, PTA's are at nine minutes or less and quality exceeds expectations of our Guests.

**Metrics:**
- PPA Increase
- Appetizer and Dessert Order Rate
- Beverage Order Rate
- Sales Increase Over Prior Year
- Overall Guest Satisfaction
- Negative Guest Complaints
- BER Metrics

**Results:** [Meets Expectations]

PPA increase:+$.57/ 4.4%

App and Dessert Rate= 6 Green/6 yellow for the year.

Bev order rate 6/8 periods green for the year. Great job.

Sales increase over prior year Q.1= +3.55% Q2= +4.10% Q3= +6.04% Q4= +10.14%, Nice job!

Guest voice- 8 Green periods, 2 yellow, and 2 red periods for the year, again the middle half of the year was your best results.

Negative guest comlaints- 4 Green, 7 Yellow, and 1 red for the year.

BER: Passed, big focus again this year with BTI execution and adherence.

## Goal #3:

Team Member Signature

Supervisor's Signature

Date  1-10-14

Date  1-10-14

Once you have completed the performance review and discussed it with your Team Member both of you need to sign it. Scan the signed copy to yourself and save to a location on the computer you can easily remember. **NAME** the file as *LastName_FirstName_YearEnd2013* (for example: Brown_Charlie_YearEnd2013) and click the **SAVE** button.

When all reviews are complete, **COMPOSE** a new e-mail in Outlook to performancemgmt@redrobin.com. Select **ATTACH FILE** and find your saved files, select files and click the **INSERT** button. Click on the **SEND** button to send.  *Send only finalized and signed reviews to Performance Management.*

**Team Member Comments:**

INTOLESSING TEAM I WONT FROM A LEADER EXCEEDS EXPECTATIONS IN EVERY CATEGORY TO DOES NOT MEET EXPECTATIONS IN ANY ALMOST EVERY CATEGORY THIS YEAR.

FOR SUCH A POOR PERFORMING GM, HIGHLIGHTS THIS YEAR WERE

1. NUMBER 1 RESTAURANT ON THE SCORECARD DURING PERIOD 5.

2. TOP RESTAURANT IN REGION ON SCORECARD FOR 2013.

3. WAS #2 IN NORTHWEST FOR THE YEAR UNTIL MANAGEMENT TEAM WAS CHANGED.

4. TRAINED 5 MANAGERS AS TRAINING RESTAURANT

5. PROMOTED 4 TM TO MANAGEMENT

6. SUPPORTED 2 NRO's WITH 4 TRAINER.

I APPRECIATE THE CRITIQUE AND WILL ASPIRE TO IMPROVE.

# Exhibit W

**Goldfarb, Judy**

| | |
|---|---|
| **From:** | GM AuburnOutletCollection <gm213@redrobin.com> |
| **Sent:** | Saturday, January 11, 2014 8:26 AM |
| **To:** | Julie Rivera |
| **Subject:** | RE: I feel I am being retaliated against. |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Thank you.

---

**From:** Julie Rivera
**Sent:** Saturday, January 11, 2014 7:27 AM
**To:** GM AuburnOutletCollection
**Cc:** 'ajtdonahue@yahoo.com'; Julie Rivera
**Subject:** RE: I feel I am being retaliated against.

Hi Darren.

Sorry I was unable to get back to you yesterday due to meetings but I did get your message. I will give you a call on Monday morning to discuss this.


 hanks.
Have a great day!

Julie Rivera, PHR
Director of Human Resources
**Red Robin International, Inc.**
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
O: 303-846-5484
F: 720-554-8411
C: 720-244-5534
jrivera@redrobin.com


*"It's always the right time to do the right thing."*
                    *-Martin Luther King Jr.*

---

**From:** GM AuburnOutletCollection
**Sent:** Saturday, January 11, 2014 12:44 AM
**To:** Julie Rivera
**Cc:** 'ajtdonahue@yahoo.com'
**Subject:** I feel I am being retaliated against.

. ii Julie,

I have attached my year end reviews for 2012 and 2013.

1

Exhibit No.: 102
Deponent: Rivera
Date/RPR: 2/8/8
Hunter + Geist, Inc.

At the end of 2012, Erik had me rated as exceeding expectations in every category.  On the attached review the final category is marked meets expectations because I talked him down to that.

Through the first half of this year, Auburn was the number 1 ranked restaurant in region 9 and the Northwest division.  At that point, I offered my services to help in Bellevue because I had heard from managers working there that things were really bad.  Erik confirmed that and agreed that I should go and help.  I feel the results in Bellevue were what was needed and after 5 weeks returned back to Auburn on July 29th.

While I was away, Rachel Philbrook was moved to Auburn to support the acting GM Travis Degraffenreid.

I came back to hear that there was a lot of unprofessionalism between the two and not a lot of support.  The restaurant morale was way down, my manager Kelly Regalado, who loved Red Robin when I went to Bellevue, suddenly could not stand working here.  Before I left to Bellevue, Kelly told me, "How ever much they pay you; it needs to be more".  The turnover rate had gone from the best in our region to the worst and we went from a 19 on the scorecard to an 11.

I had to start over and build back up the restaurant.

During this time, my hernia was really starting to act up and my surgeons felt it was time to operate.  So, in mid October, I went under the knife and because of the complications due to my previous cancer, I was out for 4 weeks.  During that time, Rachel Philbrook was put in charge of the restaurant by Erik and myself.  She had told me that she was all in for Red Robin and was looking forward to my return so she could be continue to be developed by me.  Two weeks into my absence, Rachel put in her two week notice.  The managers here all feel she did not finish well and showed no leadership.  That is what I came back to in mid November.

Again, in my absence, we lost a number of TM's and do poor handling of NTM's we lost a couple who only went through orientation, thus again killing our turnover rate.  As we rolled into the golden times morale was not where it needed to be.  I did my best to hire and motivate, but we were a manager down until period 13 week 2 and were busy.

When I returned from my surgery, I put in for an exception on the 3rd quarter bonus.  I kept trying to get Erik's help on this, but I felt he did not want to help me.  I have supporting emails on my home computer where I let him know that I did not feel he was supportive.  After about 2 ½ weeks of trying to figure out how to do the exception (I had never done one before), Erik submitted it.  To this day, I have not heard yes or no.

I think that is where Erik started to change his opinion of me.

Last week, I reached out to Harold Hart for advice because I felt that Erik's personal issues were affecting his work and our relationship.  He recommended that I reach out to Roger.  I knew I had my review scheduled so I decided to wait and tell Erik my feelings.  At my original evaluation on Tuesday, January 7, 2014, I started to tell Erik how I have been disappointed recently by our relationship and the performance of some of my managers.  I told him that I felt that he was not as responsive to me as he used to be and that I had reached out to Harold for advice.  We talked about a lot of things including transferring one of the managers on my team.  We were to have a conference call today and look at moving some managers around.

On my day off on Thursday, I received a text from Erik saying he would like to do my evaluation on Friday at 9am and that Harold Hart would be joining him.  I thought that odd because Harold was not with him on Tuesday when he came in to do my review.  My wife and I joked, that I was getting fired (apparently, not too far from the truth).

Back to the End of Year Evaluation;

I was absolutely floored by this evalution, Erik knew I would be so he brought Harold to do it with him.  I am 100% positive he changed it from Tuesday until Friday.  So, voicing my opinion and telling him my frustrations with him, cost me on my evaluation.  At this point, I would like to review some facts that I have email support if you would like it.

1. Auburn Red Robin was the best in Region 9 on the scorecard for 2013, not mentioned in my review.
2. Auburn Red Robin was the most profitable restaurant in Region 9 for 2013.
3. In late June of this year, I was asked to help get Bellevue back on it's feet.
4. We trained 5 managers in 2013…not in my evaluation.
5. We promoted a TM to management in 2013 (Cassidy Bailey), not mentioned in my review.
6. Promoted a manager to AGM in 2013, not mentioned in my review.
7. We were the only training restaurant in the region, not mentioned in my review.

2

RR_000113

8. I was asked to mentor Des Moines in May of this year by Erik, not mentioned in my review.
9. I am currently mentoring 3 GM's and am reached out to by many.
10. In **October of 2013**, I was given approval from Erik and Roger to apply for a Rod position in Sacramento. Why would they give a poor performer approval?
11. In **December of 2013**, Erik and Marilee Smith were trying to set Auburn up for recertification as a training restaurant. Why would he want such a mean, "intimidating" GM to be a training GM.

If my leadership was so deplorable as stated in my revised evaluation, starting when I returned from Bellevue as Erik has stated, why would points 10 and 11 be on my list?

This evaluation came out of nowhere and was driven as a way to get back at me for going to Harold for advice.

In the leadership section of the evaluation he states, "Has a very high aptitude for influencing others in the region and is a mentor to many in the division, however **has struggled at finding ways to influence his own managers to deliver the results and is intimidating to where they are reluctant to voice their opinion without fearing backlash from him."** I would like this investigated. This is a random, inflammatory comment that is ridiculous. Please interview my managers and see if this is true.

He goes on to say, "He just seems to expect his managers to "do it" and "do it" the right way. That is not my opinion and I do not appreciate him putting the two words "do it" in quotations as if that is my recognized style.

I would like to see, if possible, IT pull my review as it sat on Tuesday, January 7th, before I voiced my disappointment in our relationship, and see the difference as to how it reads now.

There had to be a reason why all of a sudden Harold had to be at my evaluation today and did not need to be there on Tuesday. If it changed in the 3 days that would surely show retaliation because the evaluation is based on last year.

Thank you for your time.

Respectfully,

Darren Donahue

3

# Exhibit X

**From:**    Roger Byers(/O=RED ROBIN GOURMET BURGERS/OU=FIRST ADMINISTRATIVE
            GROUP/CN=RECIPIENTS/CN=RBYERS93895590)
**To:**    Julie Rivera
**CC:**
**BCC:**
**Subject:**    Re: I feel I am being retaliated against.
**Sent:**    01/11/2014 07:00:00 AM 0000 (GMT)
**Attachments:**

---

He is full of ….. Scorecard is not even part of the review. It is about potential and initiatives we rolled out this year. He can't take the fact that he did not do well this year. His review was written and ready to deliver and it did not change. Maybe we should tell him that Harold won't even take him…he needs to go.

I am going to give hime to Matt and let him work him out.

Sorry for yelling .

Roger Byers
Regional Vice President
NW/ Chicago Division
Red Robin Gourmet Burgers
Cell: 503.705.6612
mailto:rbyers@redrobin.com

This email transmission is intended only for the use of the person to whom it is addressed and may be privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, please delete this message and notify the sender via e-mail as soon as possible.

> On Jan 11, 2014, at 7:32 AM, "Julie Rivera" <jrivera@redrobin.com> wrote:
>
> FYI….see below and attached.
>
> Do not share this wi

RR_009257

# Exhibit Y

## Case: RB426 - E-mail
## Roger Byers
## Treatment

### Case Snapshot

**Opened:** 1/11/2014
**Days open:** 26
**Last modified:** 5/12/2014 9:20 PM
**Date closed:** 2/6/2014 1:00 AM
**Intake method:** E-mail
**Status:** Closed
**Alert:** None

### General Case Information

**Case number:** RB426
**Received/Reported date:** 1/11/2014
**Language:** English
**Assigned tier:** Roger Byers
**Creator:** Rivera, Julie jrivera@redrobin.com

**Issue**
**Primary issue:** Treatment
**Summary:** GM alleges ROD is retaliating against him by giving him a poor performance review. He alleges this is due to him expressing concern that the ROD was not focused and ineffective due to personal issues.

### Case Details

**Reported tier information**
**Case type:** Allegation
**Intake method:** E-mail

**Location**
**Location/Address:** Auburn Super Mall - 213
1002 Super Mall Way
**City:** Auburn
**State/province:** WA
**ZIP/postal code:** 98001
**Country:** USA

**Reporter contact information**
**Reporter anonymous:** No
**Reporter first name:** Darren
**Reporter last name:** Donahue

**Case Information**
**Please identify the person(s) engaged in this behavior:** Erik Yates
**Do you suspect or know that a supervisor or management is involved?** Yes
**If yes, then who?** Erik Yates, ROD
**Is management aware of this problem?** Don't Know / Don't Wish To Disclose
**How long do you think this problem has been going on?** 1 to 3 months



Exhibit No.: 53
Deponent: Simpson
Date/RPR: 2/7/18
Hunter + Geist, Inc.

**How did you become aware of this violation?** It happened to me
**Details:** Allegation that ROD Erik Yates is retaliating against GM Darren Donahue because he has questioned his effectiveness due to personal issues.

**Legacy information**

## Assignments & Access

**Case assignee(s):** Means, Rochelle; Redmond, Saundra; Rivera, Julie; Simpson, Claire; Webber, Kellye
**Restricted access:** None
**Case access list:** Brooks, Karen; Clouser, Greg; Cooney, Cathy; Everett, June; Foley, Lenee; Fountain, Kate; Jenson, Sara; Johnson, John; Kaplan, Michael; Lowery, Teri; Pagnotta, Jamie; Reynolds, Rene; Rivera, Julie; settles, diane; Simpson, Claire; Sullivan, Shellie; Timmerman, Joan

## Participants

| Name | Relationship | Role | Results | Notes |
|------|-------------|------|---------|-------|
| Darren Donahue | General Manager | Reporter | Coaching and counseling | |
| Erik Yates | ROD | Implicated Person | Coaching and counseling | |

## Items

None

## Attachments

None

## Synopsis

**Outcome of case**
**Primary outcome:** Investigated
**Secondary outcome 1:** Frivolous/Unfounded
**Secondary outcome 2:** Pending
**Action taken:** Coaching and Counseling

**Additional details**
**Potential next steps:** Will move Auburn under another ROD.
**Synopsis notes:** Retaliation allegation is unfounded however, GM is aware of many personal issues ROD is having which makes the ability to performance manage the GM difficult and ineffective.

## Tasks

None

## Case Notes

None

## Related Cases

**Cases marked as related to this case**
None

**Cases in which this case has been marked as related**
None

# Exhibit Z

| From: | AuburnOutletCollection #213 |
| Sent: | Tuesday, January 14, 2014 10:59 AM |
| To: | Julie Rivera |
| Cc: | GM AuburnOutletCollection |
| Subject: | YTD results for Region 9 |

| Restaurant Name | ROD | RVP | P-13 2012 | P-1 2013 | P-2 2013 | P-3 2013 | P-4 2013 | P-5 2013 | P-6 2013 | P-7 2013 | P-8 2013 | P-9 2013 | P-10 2013 | P-11 2013 | P-12 2013 | P-13 2013 | Rolling 13 Period Average | | YTD Average | | 3 Period Average | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 213 Auburn Super Mall | Erik Yates | Roger Byers | 16.00 | 14.00 | 13.00 | 21.00 | 22.00 | 17.00 | 19.00 | 18.00 | 12.00 | 14.00 | 15.00 | 15.00 | 12.00 | 13.00 | 15.77 | 49 | 15.77 | 49 | 13.33 | 170 |
| 133 Woodinville | Erik Yates | Roger Byers | 17.00 | 13.00 | 18.00 | 13.00 | 19.00 | 14.00 | 16.00 | 16.00 | 15.00 | 15.00 | 13.00 | 16.00 | 16.00 | 15.50 | 15.35 | 72 | 15.35 | 72 | 15.83 | 36 |
| 166 Kent | Erik Yates | Roger Byers | 14.50 | 14.50 | 16.50 | 15.50 | 15.00 | 18.00 | 12.00 | 14.00 | 14.00 | 13.50 | 13.00 | 15.00 | 14.58 | 114 | 14.58 | 114 | 13.83 | 146 |
| 200 Parkway Plaza | Erik Yates | Roger Byers | 11.00 | 15.50 | 14.50 | 14.50 | 15.50 | 15.00 | 16.00 | 15.00 | 10.00 | 13.00 | 11.00 | 13.00 | 13.00 | 12.50 | 13.73 | 167 | 13.73 | 167 | 12.83 | 198 |
| 134 Redmond TC | Erik Yates | Roger Byers | 16.00 | 20.00 | 11.00 | 17.00 | 17.00 | 14.00 | 9.00 | 11.00 | 12.00 | 11.00 | 10.00 | 14.50 | 12.50 | 11.50 | 13.12 | 206 | 13.12 | 206 | 12.83 | 198 |
| 168 Des Moines | Erik Yates | Roger Byers | 16.00 | 15.00 | 14.00 | 13.00 | 16.00 | 13.00 | 12.00 | 9.00 | 12.00 | 13.00 | 9.00 | 14.00 | 10.50 | 13.50 | 12.62 | 231 | 12.62 | 231 | 12.67 | 206 |
| 83 Bellevue Square | Erik Yates | Roger Byers | 5.00 | 10.00 | 12.00 | 12.00 | 11.00 | 13.00 | 7.00 | 3.00 | 7.00 | 7.00 | 9.00 | 10.50 | 8.00 | 5.50 | 8.85 | 319 | 8.85 | 319 | 8.00 | 322 |

Hi Julie,

Here is the scorecard for the year in Region 9.

Auburn is the only restaurant Green for the year.

I would bet I received the worst evaluation in my region.

I am done now.

Thanks again.

Darren

RR_008707

# Exhibit AA

# Filed Under Seal

# Exhibit BB

# Filed Under Seal

# Exhibit CC

# Filed Under Seal

# Exhibit DD



RED ROBIN INTERNATIONAL, INC.
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

**To:**     Darren Donahue, GM
**From:**  Harold Hart, ROD
**CC:**    Rochelle Means, RHRM & Harold Hart, ROD
**Date:**  March 27, 2014
**RE:**    Written Warning

This is a written warning which will be placed in your personnel file. This document confirms that we have discussed and reviewed the performance issues listed below. In order for you to continue employment as a Manager at Red Robin we must see immediate and sustained improvement in the areas listed.

As you are aware, last Thursday, March 20, 2014, you received a restaurant Q/A visit and as a result, the restaurant's Beautification was well below RR standards of 80%. In addition to an unacceptable low Q/A score, multiple safety and sanitations violations were identified. Restaurant cleanliness did not meet acceptable standards and upon review, it was apparent that as a GM, you did not effectively address the critical areas consistently by following through on issues that should have been identified during line checks and walk through. The multitude of sanitation issues is not acceptable and must improve to Company standards immediately.

As a GM and leader in your restaurant, you have a direct responsibility to ensure your Managers and TM's are following up on critical issues and are consistently making sure the restaurant meets the acceptable standards of Red Robin. You need to better hold your Managers accountable for failing to do the basic functions of their job. The condition you have allowed the restaurant to operate in creates a considerable negative impact on the guest perception of our brand.

Red Robin's expectation is that you will immediately work to correct the identified issues during the Q/A. Your team will have 30 days to get the restaurant clean and to the level of 80% or better for Beautification walk thru, and all steritech violations noted during the Q/A inspection. Failure to do so may result in further disciplinary action, up to and including termination.

By signing this document, you are acknowledging that you have read and understand the contents of this document and received a copy for your records.

_____          3.27.14
Darren Donahue, GM                              Date

_____          3/27/14
Harold Hart, ROD                                     Date

redrobin.com

RR_000111

# Exhibit EE

# Filed Under Seal

# Exhibit FF

| | |
|---|---|
| **From:** | darren donahue(ajtdonahue@yahoo.com) |
| **To:** | Leave Of Absence; Monica Thorson; Harold Hart; Rochelle Means |
| **CC:** | |
| **BCC:** | |
| **Subject:** | Re: Did not get paid |
| **Sent:** | 8/4/2014 06:48:47 PM 0000 (GMT) |
| **Attachments:** | |

Hi Megan,

I am not sure why you are not in the loop with when I returned back to work. I communicated with Reed Group and they have all my paperwork. Is that not the proper channel?

I returned to work on 6/30/14, and worked for 3 days. I went back on leave on 7/3/14 because I had to be rushed to the emergency room for pancreatitis. I was out until 7/13/14 which Reed Group was aware of. I worked from 7/14/14 to 7/27/14 until I left for surgery to remove my gall bladder. I am currently out until 8/11/14. I will work until 8/19/14. On 8/20/14 I will be having surgery to remove a hydrocele. I will return from that surgery within a week. Hopefully, that is it!

I hope this clears things up.

Thanks,
Darren

---

**From:** Leave Of Absence <LOA@redrobin.com>
**To:** Monica Thorson <mthorson@redrobin.com>; Leave Of Absence <LOA@redrobin.com>; darren donahue <ajtdonahue@yahoo.com>; Harold Hart <hhart@redrobin.com>; Rochelle Means <RMeans@redrobin.com>
**Sent:** Monday, August 4, 2014 9:20 AM
**Subject:** RE: Did not get paid

Darren-
We were not aware you had returned to work. Please provide the date you returned from the 4/16/2014 leave. You are not eligible for the leave requested from 7/28/2014-8/10/2014. Please see attached.
Megan-
Please pay Darren as he indicates below.
Thanks!
*Red Robin Leave of Absence*

**From:** Monica Thorson
**Sent:** Monday, August 04, 2014 9:57 AM
**To:** Leave Of Absence
**Subject:** FW: Did not get paid
Can you please help.

RR_003289

**Thank you,**
**Monica Thorson**
*Payroll/Unemployment Specialist*
Red Robin Gourmet Burgers, Inc.
6312 S. Fiddlers Green Circle
Suite 200 N
Greenwood Village, CO 80111
Direct: 303.846.5426
Fax: 303.846.6073
E-Mail: mthorson@redrobin.com



**From:** darren donahue [mailto:ajtdonahue@yahoo.com]
**Sent:** Monday, August 04, 2014 9:50 AM
**To:** Harold Hart
**Cc:** Rochelle Means; Monica Thorson
**Subject:** Did not get paid

Hi HH,

I did not get paid for the last pay period 7/14 to 7/27/14. I worked both weeks. I talked to Monica Thorson in payroll and she said that she still shows me on leave from April 16, 2014. Until I am taking off leave, she will show zero hours for me. I should be on leave as of 7/28/14.

I called Tara Juhrs and she is no longer with LOA and directed me to Brittany at (855) 856-5445 option 4. I tried a couple of the options at that number and they lead you to a busy signal.

Can you help?

I appreciate it.

Thanks,

Darren

RR_003290

# Exhibit GG

# Filed Under Seal

# Exhibit HH

# Filed Under Seal

# Exhibit II

# Filed Under Seal

# Exhibit JJ

RR 000104

**General Manager Goal Management and Appraisal Scorecard**

| Name: | Darren Donahue | Position: | General Manager |
|---|---|---|---|
| Date of Hire: | 4/2008 | Restaurant/Department: | Auburn #213 |
| Completion Date: | 12/2014 | Supervisor Name: | Harold Hart |

**Behavior Competency #1: Accountability**

**Personal Leadership and Team Contributions**

**Metrics:**
Solves problems and makes decisions, including the insights of others when needed. Communicates effectively and influences others. Maintains a balance between flexibility and taking a firm stance on issues. Demonstrates poise and courage when faced with opposition. Responds professionally to pressure, stress and work demands.

**Results: [Meets Expectations]**
Darren meets problems head on and communicates effectively to resolve issues at the restaurant level, sometimes tend to communicate aggressively with support teams

**Behavior Competency #2 : Innovation**

**Understands and Evolves the Red Robin Brand and Processes**

**Metrics:**
Adapts to changing needs and demands of the business. Overcomes barriers and obstacles to ensure success. Seeks and identifies opportunities to improve processes, methods and systems. Ensures consistent execution of the Red Robin brand promise by following established process and procedure, modeling Core Values and demonstrating professionalism.

**Results: [Exceeds Expectations]**
Darren has tremendous passion and only wants the best for the Brand. He has been a leader helping newer GM's adapt to changing demands of the brand.

**Goal #1: People/Culture: Achieve Manager and Team Member Turnover Goals**

**Description: Growing Our People - Build our Bench for Growth and Creating the Right Climate**
Throughout 2014, GM's had the responsibility of deploying critical initiatives. Meeting expectations is defined by fully staffing the restaurants, thoroughly preparing yourself and your teams by following all provided training for Team Member Elevations, and developing our Managers through Management Foundations and ongoing development.

**Metrics:**
- Reduce Manager turnover to Division goal
- Team Member staffing levels – 100%
- Team Member turnover – 60%
- Reward & recognition plan for Team Members quarterly
- Exit interview reviews held quarterly

**Results: [Does Not Meet Expectations]**
Manager and TM turnover are Red, Staffing levels are at 100%, Quarterly Reward and recognition plan is a huge focus for Darren as well as exit interviews to understand T/O

**Goal #2:** ...d/Sales: Achieve Sales over Budget and 85% NRO Sales Reten...

**Description: Growing Our Brand – Drive Guest Frequency to Retain and Increase "Heavy User" Group**
Meeting expectations is described by thoroughly embracing Triple R Service standards, properly training Team Members, leveraging the Coaching Model and consistently holding Team Members to the standards until full adoption is evident. Food preparation and execution meets all presentation standards.

**Metrics:**
- Guest Voice – Overall Satisfaction (Green Scorecard)
- Royalty Sales as a Percentage of Total Sales (Green Scorecard)
- Negative Guest Complaints (Green Scorecard)

**Results:** <u>Does Not Meet Expectations</u>
GV and Negative Complaints are Yellow with a Green Royalty Sales %

**Goal #3: Profit/Results: Execute Balanced Approach to Achieve Budgeted NIBO-X and 30% Capture Rate**

**Description: Growing our Culture – Strengthen our Culture to Deliver on Accountability, Innovation and Results**
Red Robin expects our Leadership to share the vision, have game changing conversations, and involve the team in solutions.

**Metrics:**
- Scorecard Performance (Green Overall)
- NIBO-X (Achieve Budget)
- Capture Rate – 30%

**Results:** <u>Exceeds Expectations</u>
Green Scorecard, Green NIBO X and Green Capture Rate

**Exceeds Expectations:**
- Team Member is clearly and consistently exceeding performance objectives
- Team Member has developed skills and abilities to exceed the demands of the job

**Meets Expectations:**
- Team Member performance is solid and consistently meets (and sometimes exceeds) performance objectives
- Team Member has developed skills and abilities to effectively meet job requirements

**Does Not Meet Expectations:**
- Team Member's performance sometimes meets performance objectives
- Team Member needs to work on improving and developing skills and abilities to consistently meet job requirements

**Overall Performance Rating**

**Meets Expectations**

**Acknowledgements:** Team Member's signature indicates knowledge and understanding of the contents of the performance summary. The summary has been reviewed with the Team Member and the Team Member has been given the opportunity to comment.

_____  
Team Member's Signature            Date   12-3-14

_____  
Supervisor's Signature              Date   12-3-14

Once you have completed the performance review and discussed it with your Team Member both of you need to sign it. Scan the signed copy to yourself and save to a location on the computer you can easily remember. **NAME** the file as **LastName_FirstName_YearEnd2C14** (for example: Brown_Charlie_YearEnd2014) and click the **SAVE** button.

Page 2 of 3

When all reviews are complete, **COMPOSE** a new e-mail in Outlook to performancemgmt@redrobin.com. Select **ATTACH FILE** and find your saved files, select files and click the **INSERT** button. Click on the **SEND** button to send.   *Send only finalized and signed reviews to Performance Management.*

**Team Member Comments:**

# Exhibit KK

7/12/2017                                                     Print

| Subject: | RE: conversation regarding your review |
|----------|----------------------------------------|
| From: | GM AuburnOutletCollection (gm213@redrobin.com) |
| To: | hhart@redrobin.com; |
| Cc: | ajtdonahue@yahoo.com; |
| Date: | Tuesday, December 16, 2014 6:25 PM |

Hi Harold,

I love being a GM.  The results produced by the Auburn Red Robin are among the best in the country.  The Auburn Red Robin I'm pretty sure will be the only location in Washington that is green on the scorecard for both of the years 2013 and 2014.  For all the change and new initiatives that is a pretty good accomplishment.  Since taking over this location that was ranked 321 in 2012 when I came back from my cancer treatment we have positioned ourselves in the top 50 of the company.  We have been number 1 for a few periods and even for a quarter last year.  This year we will finish around number 15 for the year and the only Green restaurant in Region 1.  We make tens of thousands of dollars more than we did with the previous GM.

The cost of living keeps going up, especially in Washington .  My income if I get a 2.5% raise this year will have averaged an increase of 1.25% over the last 2 years.  We have made Red Robin a lot of money and I don't get much of an increase for the results produced.

This year we passed all 3 Steritech and both BER's.

**Addressing the review:**

Behavior Competency #1: Accountability

Personal Leadership and Team Contributions

1. Contributed my third GM to region 4 ½ in 2014.
2. Only Washington Red Robin to be green on Scorecard in 2013 & 2014.
   - That is responding to the pressures and stress of work.
3. Supported Bonney Lake NRO with a trainer, Katrina Wilkerson, who ended up transferring there.
4. Responded to your request to go door to door to find a cook and bartender for Bonney Lake by getting one of each for them.
5. Number 1 in the company on scorecard during period 12.

I feel this is a category that could have been rated higher than meets expectations.  That is a lot of contribution to the team.

Goal #1:  People/Culture:  Achieve Manager and Team Member Turnover Goals

EXHIBIT
16
1-18-18
Hart, H.
PENGAD 800-631-6989

about:blank                                                                                      1/4

**DONAHUE 02674**

Print

Description: Growing Our People – Build our Bench for Growth and Creating the Right Climate

Throughout 2014, GM's had the responsibility of deploying critical initiatives.  Meeting expectations is defined by fully staffing the restaurants, thoroughly preparing yourself and your teams by following all the provided training for Team Member Elevations, and developing Managers through Management Foundations and ongoing development.

Metrics:

1.  Reduce Manager Turnover to Division goal.

    - - All managers that were termed at Auburn in 2014 except Kelly Regalado, had nothing to do with Auburn

    - Luke Prieb was transferred here even though he was not meeting expectations in Kent and had serious issues there.

    - Kelly Regalado was fired for policy violations when I was on LOA.

    - Patrick (not sure of last name), I never worked with; he gave 2 weeks notice when he got here from Covington .

    - Greg Church handed me his 2 week notice the day he got here from South Puyallup .

    - James Keegan had already been interviewing for other jobs when he arrived here from Bonney Lake . He didn't feel he could get promoted at Red Robin.

2.  Team Member staffing levels – 100%.

    - Goal Accomplished.

3.  Team Member turnover – 60%

    - Yellow for the year.

4.  Reward & recognition plan for Team Members quarterly

    - Auburn TM's won TMOQ for Region 1 two times in 2014.

    - Monthly TMOM program is strong and will improve in 2015.

5.  Exit interview reviews held quarterly.

    - Green

We not only follow the Team Member Elevations training format, we revamped it in Auburn and rolled our program out to the rest of region 4 ½.  We have made an impact on 2 regions in this area!

I don't understand the Does Not Meet Expectations rating in this category.  If I was yellow in TM turnover and had no other accomplishments in this area, I still think Meets Expectations is more appropriate.  With Auburn 's accomplishments I think Exceeds Expectations should be considered.

I got the same rating as someone who was red in turnover, does not follow the training program, does not reward or recognize their team members, and runs short staffed.  That doesn't seem right to me.

DONAHUE 02675

Print

Goal #2 Brand/Sales: Achieve Sales over Budget and 85% NRO Sales Retention

**\*\*\* We will achieve Sales over Budget for the year 2014.  Goal Accomplished!**

Description: Growing Our Brand – Drive Guest Frequency to Retain and Increase "Heavy User" Group.

Metrics:

1.  Guest Voice – Overall Satisfaction (Green Scorecard) - We are Yellow for the year.

2.  Royalty Sales as a Percentage of Total Sales (Green Scorecard) – We are Green for the year.

3.  Negative Guest Complaints (Green Scorecard) – We are Yellow for the year.

So the goal is to beat budgeted sales, we did that!  I have embraced Triple R Service standards and work tirelessly to bring team to hit expectations.  If you look at the results, Auburn is one of the best.  Our Order Rates are very green.  This team must Recommending specific beverages, appetizers and deserts to achieve the results we do.  We passed food presentation standards in BER.

I received Does Not Meet Expectations in a category where we accomplished the goal.  I received the same rating as someone who did not hit budgeted sales, was red in Guest Voice, red in Royalty, and red in Guest Complaints.

We even try to help other restaurants with their order rates by making recommendations and giving them ideas.

I feel I should have been rated Exceeds Expectations in this category.

I feel my review could have been rated Exceeds Expectations.  Results don't lie.  I received Exceeds Expectations in 2012 and I think this year was just as good if not better.  I have been green every year I have been with Red Robin and turned around 4 locations.  I try to downplay accomplishments because I don't like the limelight.  I hate that I am writing this letter explaining my results.

Harold, how could I feel appreciated when lead your region in results, but I get the same review?  I am told that I am not eligible to be promoted and put in the 7 box.  I guess I am not a good enough performer to be in the 4 box?

We will finish the year 20 points ahead of any other restaurant in region 1, and my assessment and my review tell me that Red Robin considers me average.

This is why I am unhappy and feel not appreciated.

Thank you for your time,

3/4

DONAHUE 02676

7/12/2017                                                Print

Darren

**From:** Harold Hart [mailto:hhart@redrobin.com]
**Sent:** Tuesday, December 16, 2014 8:33 AM
**To:** GM AuburnOutletCollection
**Subject:** conversation regarding your review

Hi Darren

I was thinking about our conversation last night and I think what will help me better understand the issue, is if you would put it in writing. I'm still un clear of your statement that you are unhappy and feel not appreciated. If you can please send that to me today this would be helpful. I have scheduled a ROD visit tomorrow in Auburn , I think that this might be too early to talk further about this and you might want to take more time, if so I'm happy to schedule an additional visit with you to discuss.

Thanks in advance

HH

Harold Hart

Regional Operations Director

Region 1

NW Division

253-310-5207

**Success is the sum of small efforts, repeated day in and day out.**

**Robert Callier**

about:blank                                                                    4/4

DONAHUE 02677

# Exhibit LL

| From: | GM AuburnOutletCollection |
|---|---|
| **Sent:** | Monday, February 2, 2015 3:06 PM |
| **To:** | Harold Hart |
| **Cc:** | Rochelle Means |
| **Subject:** | RE: Special Needs TM - Job Code 70 |

This brings tears to my eyes.  It is a sad day.  As the parent of a child with Down syndrome, it breaks my heart.
Darren

**From:** Harold Hart [mailto:hhart@redrobin.com]
**Sent:** Monday, February 02, 2015 9:42 AM
**To:** GM Kennewick; GM Yakima; GM BonneyLake; GM AuburnOutletCollection; GM Puyallup; GM Federalway; GM South Puyallup
**Subject:** FW: Special Needs TM - Job Code 70
**Importance:** High

Team
Please reach out if you have questions?  This needs to be done within two weeks, can be done sooner than later.
HH

**From:** Rochelle Means
**Sent:** Wednesday, January 28, 2015 3:36 PM
**To:** Craig Ollis; Erik Yates; Harold Hart; Matt Distler; Sean McFall; Shane Plant
**Cc:** Rochelle Means; Tim Mei
**Subject:** Special Needs TM - Job Code 70
**Importance:** High

Hello ROD's,

Okay team, it has taken me a while to complete this email, as I wanted to make sure I included all of the needed information to empower the **GM's** on the action required.  Please read the attached email and feel free to forward it to your restaurants for follow up.  Please make sure only the GM's are having the conversations and following the below. Even if you do not have a restaurant that has a Special Needs TM, I would encourage you to still forward the email, in case they get calls or questions about hiring a Special Needs TM or to support a program of such.

If you have any questions, please do not hesitate to reach out.

Hello team,
Many of our restaurants throughout the organization have been fortunate to have the support of our Special Needs TM's, to support the business.
Since implementing the partnership of this program, we have had many RR operational initiatives and rollouts i.e. Watson and the Silverware Program.  As a result of these changes, we have made the decision to eliminate the Special Needs programs(TM's) in your restaurants.  Attached is a report for 2014 and the most recent in 2015 of TM's that may fall in this category (regretfully is not based on the new ROD alignment, however you can locate the TM by name and restaurant).

Outside of the Maintenance job code, we do not have a specific job code identifying the TM's and the job functions they support or are responsible for in the restaurants – which are functions and responsibilities that are usually outside of the published RR Host/Busser or Server job description.  We know that many of you have long time relationships with your TM's and this is may be a difficult conversation to prepare to have, however it is necessary

1

EXHIBIT
6
1-18-18
Hart, H.

RR_000655

and actions will be required by you to make sure we make this transition as smooth as possible for the TM, their coach, their organization and you.

Now, if you have a TM that can perform t*he functionalities detailed in our job description* and your restaurant is in need of hiring, we can consider keeping the TM, however we will need to update their job code in the system. If this is your situation, please reach out to me to discuss next steps prior to making any decisions or changes with the TM.

Below, you will need to follow the below as it is detailed, any issues that are situational must be discussed with me ASAP.

### So what is next for you and the TM?

1. **Scheduling the meeting:**
   Schedule a meeting with the TM and their coach, program representative and or parent. Please do not have this conversation with the TM only (NO EXCEPTIONS). It is best to schedule the meeting during non-peak hours as you want to give the meeting your full attention as it is a sensitive matter for all parties involved. The meeting needs to be in the dining areas, as coaches, program representatives and or parents are not allowed in the back office.

2. **Conversations:**
   Explain why we have made the decision and this is not in any way a reflection of their performance or lack of contributions to the restaurant. Inform them that we are sensitive to their need to prepare for this change and as a result, if needed, we can give the TM a week notice before their last day of employment. If it is determined a 2 week notice is not required and you can agree on a soon last day (before the 2 weeks), no problem. You are welcome to let them know, if our business needs change, we will be sure to keep the TM in mind. If you are asked for additional time, please let them know you will look into it and contact me so we can talk it through. When possible, include the TM in the conversation as much as possible, remember this is about them – so including them when possible goes a long way. If you have a coach, parent or representative that is possibly challenging the companies decision or is asking for more information in writing or verbally, please get their contact information and let them know you have someone contact them about their concerns. Immediately contact me, provide me with the details and I will connect with them. If they insist on getting a contact name and # from you, please provide them with mine (but only after you have followed the above).

3. **Separation:**
   If the TM is earning RR wages, you will need to follow RR's separation process (separation documentation and separation meeting and payment (for those applicable).
   *In the separation documentation, you will state "based on the needs of the business, the TM's job has been eliminated, effective xx/xx/xxxx.*
   If the coach or representative request a letter of reference or recommendation, please let me know and we can work on accommodating the request. However, we need to make sure the language in the letter is consistent with our separation practices. Make sure the TM signs the separation documentation and be sure they get a copy.

While this is a needed business decision, we want to make sure these conversations are done with respect, dignity and in a timely manner. Some conversations will be fairly easy and others possibly not so much because of how long the TM has been with us, but please know, we are going to do all we can to give the TM the best opportunity possible and within business reasons to move them forward.

I have been asked, can you do something nice (cake, small celebration, etc.) for the TM on or before their last day, and in advance we are saying…..***absolutely you can,*** as I am sure it will go a long way with the TM and their representative. We only ask that you keep the business peak hours in mind and make sure it is attention the TM feels comfortable with having by their peers.

RR_000656

If there is anything I can do to further support your efforts, please do not hesitate to reach out.

**Rochelle D. Means**
West Division Human Resource Manager | Red Robin International, Inc.
6312 S. Fiddlers Green Circle, Suite 200N
Greenwood Village, CO 80111
**Remote Office: 909.272.8919| Email:** rmeans@redrobin.com
This email transmission is intended only for the use of the person to whom it is addressed and may be privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, please delete this message and notify the sender via e-mail as soon as possible.

RR_000657

# Exhibit MM

**From:**   Julie Rivera(/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS
/CN=78590635A3D44CF58A6E73F3D7B041B3-JULIE RIVER)
**To:**   Claire Simpson
**CC:**
**BCC:**
**Subject:**   RE: TM Spreading False information about Me and trying to rally troops to back her.
**Sent:**   3/20/2015 05:08:41 PM 0000 (GMT)
**Attachments:**

That is interesting!!
Thanks.
Have a great day!
~Julie
Julie Rivera, PHR
C: 720-244-5534
jrivera@redrobin.com
*"It's always the right time to do the right thing."*
*-Martin Luther King Jr.*
*The information contained in this transmission contains attorney-client privileged and attorney work-product confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of this original message.*

**From:** Claire Simpson
**Sent:** Friday, March 20, 2015 8:34 AM
**To:** Julie Rivera
**Subject:** RE: TM Spreading False information about Me and trying to rally troops to back her.
His linked in says he works at a car dearship. I was hopeful.

**From:** Julie Rivera
**Sent:** Friday, March 20, 2015 8:32 AM
**To:** Claire Simpson
**Subject:** Re: TM Spreading False information about Me and trying to rally troops to back her.
Why is he still here!

iPhone thumbs....excuse any typos

On Mar 20, 2015, at 8:11 AM, Claire Simpson <csimpson@redrobin.com> wrote:

Don't you miss Darren?
**From:** GM AuburnOutletCollection [mailto:gm213@redrobin.com]
**Sent:** Thursday, March 19, 2015 7:24 PM
**To:** HR Advisor
**Cc:** GM AuburnOutletCollection
**Subject:** TM Spreading False information about Me and trying to rally troops to back her.
Hi
On Thursday night 3/12/15 at 8:30 the shift went the wrong direction.
Here are my notes from the shift:
"

Things were great until 8:30 when we mysteriously ended up on a 2 floor. By the time I got back to the floor after giving the cooks breaks there was kaos and upset guests everywhere. I made the servers who were standing around watching Olivia and Kym getting killed reengage and get back out and help the guests. I pulled Pairy back on in section 6 and sat her 5 more tables until things were back under control at about 9pm. Very disappointing and unneccessary.

Maybe my worst shift at Red Robin. I suck! D2

I had just returned to the floor, from giving 2 breaks to cooks in the HOH. When I stepped back on the floor I could tell things



were not good. I didn't understand why since we were on a 4 floor an there were about 14 tables in the restaurant. I quickly found out that my mid-manager had phased to a 2 floor and the remaining servers were obviously overwhelmed....especially Kym. There were still 3 other servers finishing side work. I was immediately hit with a reopen check for some mistake and another phased server asking me if the server who I transferred her table to was going to offer dessert to the table. What? This is from when I went from a 5 floor to a 4 floor before I gave HOH breaks.

I then noticed how stressed Kym was and how my mid manager had run over to take the order of a table that had been sitting for at least 5 minutes. I started aggressively going to each of the tables to make sure they were being taken care of. I noticed that table 58 had not been greeted and ran got Mallory REDACTED to greet them. I brought my section 5 server back on because she is the one I trust the most to focus on the guests and not worry about what time she would be getting off the clock (Pairy). I had to do another comp do to lack of attention and was very frustrated because there were 2 servers doing sidework and not helping as the others were struggling. When I did the comp I was in a hurry to get back to the guests and was having difficulty pressing the right button on the terminal. I also wanted to show some emotion to get the team back in service mode. I aggressively pushed the exit button with 2 fingers and walked away saying, "this is pathetic!"

Today, Monday, March 16, 2015, I receive word from my KM Renato, that Mallory was telling everyone that I punched the terminal and told her, "You are pathetic".

This is not true. She asked at least one TM, one that was not even there (Debbie REDACTED to back up her story to "HR". Mallory has been counseled two times recently for altercations with an expo (Jasmine REDACTED I truly feel she is trying to divert her shortcomings by attacking me.

Anyway, I would like her to stop spreading exaggerations and falsehoods about me.

Thanks,

Darren Donahue
GM ~ Auburn Outlet Collection # 213
Mallory REDACTED (253) 797-REDACTED
Debbie REDACTED (253) 797-REDACTED
Pairy REDACTED (858) 335-REDACTED
Kym REDACTED (253) 737-REDACTED
Olivia REDACTED (253) 217-REDACTED
Kristina REDACTED (206) 856-REDACTED Olivia's Trainee
Jasmine REDACTED (206) 981-REDACTED
Richard REDACTED (206) 419-REDACTED Mid Manager on duty
Branden REDACTED (253) 680-REDACTED Busser on duty
Farren REDACTED (425) 829-REDACTED Server on duty
Will REDACTED (253) 590-REDACTED Expo on duty

RR_002735

# Exhibit NN

**From:**      Mara Coursey(/O=RED ROBIN GOURMET BURGERS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MCOURSEY)
**To:**         AuburnOutletCollection #213
**CC:**
**BCC:**
**Subject:**   RE: Christopher **REDACTED**
**Sent:**      11/4/2014 11:27:13 PM 0000 (GMT)
**Attachments:** Kronos_Punch Edit Request Form.pdf;

*Thanks for your help with this Darren!! Here is a Punch Edit form if needed.*
Thanks,
Mara Coursey
Payroll Specialist
Red Robin Gourmet Burgers, Inc.
mcoursey@redrobin.com
Phone : 303-846-6191
Fax : 303-846-6073

**From:** Mara Coursey
**Sent:** Tuesday, November 04, 2014 11:56 AM
**To:** AuburnOutletCollection #213; Henrietta #481
**Subject:** Christopher **REDACTED**

*Hello,*

*I just received a call from Christopher**REDACTED**, TM# 119631. He said he is missing hours from the dates below:*

*10/12/14 missing 4 hours*

*10/17, 10/18, 10/19 - He stated that he was working with Darren and Katherine. He used a managers key to work as a server when he was not able to clock in.*

*I will need Punch Edits from the restaurant that he worked at during those days. He also stated that he is termed, but I am still showing him as active. He needs to be termed in HR Manager.*

*Please advise.*

*Thanks,*

*Mara M Coursey*

*Corp Payroll Specialist*

*Red Robin Gourmet Burgers, Inc*

*6312 S. Fiddlers Green Circle*

*Suite 200 N*

*Greenwood Village, CO 80111*



*Phone : 303 846 6191*

*Fax : 303 846 6073*

# Exhibit OO

**From:**      Megan Mantelli(mmantelli2@redrobin.com)
**To:**        AuburnOutletCollection #213; Mara Coursey; Payroll Support
**CC:**
**BCC:**
**Subject:**   RE: Christopher REDACTED
**Sent:**      11/11/2014 11:37:58 PM 0000 (GMT)
**Attachments:** Kronos_Punch Edit Request Form.pdf;

Hi Darren,
We will need punch edit forms for these hours. One for each day worked along with the clock in and out times. Please let us know if you have additional questions on this.
Thanks,
*Megan Mantelli, FPC*
*Payroll Specialist*
*Red Robin Gourmet Burgers, Inc.*
*mmantelli2@redrobin.com*
*Phone: 303-846-6103*
*Fax: 303-846-6073*

**From:** AuburnOutletCollection #213 [mailto:#213@redrobin.com]
**Sent:** Tuesday, November 11, 2014 4:32 PM
**To:** Mara Coursey
**Cc:** Megan Mantelli
**Subject:** RE: Christopher REDACTED
Hi Mara,
Chris is missing 15 hours. I am fine with that number.
Can you pay him under TM meetings please?
Thanks,
Darren

**From:** Mara Coursey
**Sent:** Tuesday, November 04, 2014 3:33 PM
**To:** AuburnOutletCollection #213
**Subject:** RE: Christopher REDACTED
*Thank you*
Thanks,
Mara Coursey
Payroll Specialist
Red Robin Gourmet Burgers, Inc.
mcoursey@redrobin.com
Phone : 303-846-6191
Fax : 303-846-6073

**From:** AuburnOutletCollection #213
**Sent:** Tuesday, November 04, 2014 4:28 PM
**To:** Mara Coursey
**Subject:** RE: Christopher REDACTED
Hi Mara,
I left him a message.
Darren

**From:** Mara Coursey
**Sent:** Tuesday, November 04, 2014 10:56 AM
**To:** AuburnOutletCollection #213; Henrietta #481

**Subject:** Christopher **REDACTED**

*Hello,*

*I just received a call from Christopher* **REDACTED** *TM# 119631. He said he is missing hours from the dates below:*

*10/12/14 missing 4 hours*

*10/17, 10/18, 10/19 - He stated that he was working with Darren and Katherine. He used a managers key to work as a server when he was not able to clock in.*

*I will need Punch Edits from the restaurant that he worked at during those days. He also stated that he is termed, but I am still showing him as active. He needs to be termed in HR Manager.*

*Please advise.*

***Thanks,***

***Mara M Coursey***

***Corp Payroll Specialist***

***Red Robin Gourmet Burgers, Inc***

***6312 S. Fiddlers Green Circle***

***Suite 200 N***

***Greenwood Village, CO 80111***



***Phone : 303 846 6191***

***Fax : 303 846 6073***

# Exhibit PP

# Filed Under Seal

# Exhibit QQ

| | |
|---|---|
| **From:** | Randy Barrett |
| **Sent:** | Thursday, June 11, 2015 5:35 PM |
| **To:** | Kate Fountain |
| **Subject:** | RE: Team Member Info |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Sorry for the delay in response Kate!

I needed the assistance of our IT Application Support team to gain visibility of tickets back that far.

Please let me know if you you wish to review the details of this ticket.

***Randy Barrett***
Manager of IT Support Services
Red Robin Gourmet Burgers
rbarrett@redrobin.com
Phone 303.846.6166
Fax 303.846.2710





RR_004707

**‹ ≡   Incident - INC609773 [Text_search view]** 🏷️

| | |
|---|---|
| **Number** | INC609773 |
| **Source** | Self Service ▼ |
| **Opened by** | 213 |
| **Caller** | 213 |
| **Location** | Auburn |
| **State / Province** | Washington |
| **User ID** | auburnsupermall |
| **Email** | #213@redrobin.com ✉️ |
| **Business phone** | 253-804-6550 |
| **Caller's name** | Kathryn matteson |
| **Alternate phone** | |
| **Urgency** | 4 - Low ▼ |
| **Impact** | Single User - Restaur ▼ |
| **Priority** | 4 - Low ▼ |

**Short description**   Christopher ferguson has been removed from our system

**Work notes**

**Additional comments (SHARED)**

---

**2014-10-17 13:53:16** - **213**
Never fully transferred to our restaurant. Not fully sure where his paperwork is

⊞  Activity »

⊞ **2014-10-17 14:09:53 Monica Thorson**  - Changed: Assigned to, Incident state, Item, Item detail

⊞ **2014-10-17 14:09:13** INC609773 - Christopher ferguson has been removed from our system  - Email Sent

⊞ **2014-10-17 13:54:13** Incident INC609773 has been assigned to group Payroll  - Email Sent

⊞ **2014-10-17 13:54:13** Your ticket INC609773 has been assigned to Payroll.  - Email Sent

⊞ **2014-10-17 13:54:04 Andrew Van Byssum**  - Changed: Assignment group, Reassignment count

⊞ **2014-10-17 13:53:43** Incident INC609773 has been assigned to group .it Support Services  - Email Sent

⊞ **2014-10-17 13:53:43** Thank you for contacting .it Support. Your ticket is INC609773  - Email Sent

⊞ **2014-10-17 13:53:15 213**  - Changed: Assignment group, Additional comments (SHARED), Impact, Incident state, Opened by, Priority, Re

---

**From:** Kate Fountain
**Sent:** Wednesday, June 10, 2015 6:11 PM

2

RR_004708

**To:** Randy Barrett
**Subject:** Re: Team Member Info

Yes sir :)

Sent from my iPhone

On Jun 10, 2015, at 6:03 PM, Randy Barrett <rbarrett@redrobin.com> wrote:

> Thanks for the response Kate.
>
> Just for clarity – We looking at Auburn Super Mall #213?
>
> **Randy Barrett**
> Manager of IT Support Services
> Red Robin Gourmet Burgers
> rbarrett@redrobin.com
> Phone 303.846.6166
> Fax 303.846.2710
> **<image001.jpg>**

**From:** Kate Fountain
**Sent:** Wednesday, June 10, 2015 6:01 PM
**To:** Randy Barrett
**Subject:** Re: Team Member Info

Hi Randy,
I apologize, I should have clarified further. I'm specifically looking for dates between late September 2014 to late October 2014.

Thank you,
Kate

Sent from my iPhone

On Jun 10, 2015, at 5:56 PM, Randy Barrett <rbarrett@redrobin.com> wrote:

> Hi Kate,
>
> Would you have date range of when communication may have been received?
>
> In review of tickets submitted in Service Now, I'm not seeing anything in recently.
>
> Also, a ticket may have been re-assigned to another department? (Payroll, F&B, etc.)
>
> We're happy to review further is you're able to provide any additional information.
>
> Thank you!
>
> **Randy Barrett**
> Manager of IT Support Services
> Red Robin Gourmet Burgers
> rbarrett@redrobin.com

3

Phone 303.846.6166
Fax 303.846.2710
<image002.jpg>

---

**From:** Kate Fountain
**Sent:** Wednesday, June 10, 2015 5:14 PM
**To:** it Support Services
**Subject:** Team Member Info

Hi IT,
Can you please tell me if you have ever received communication from the restaurant Auburn for Team Member Christopher Ferguson. If so can you please send all communications my way?

Thank you,

Kate Fountain
Human Resources Generalist
6312 S. Fiddlers Green Circle | Suite 200 North
Greenwood Village, CO 80111
P: 303-846-6058
F: 720-493-2608
kfountain@redrobin.com

<image003.png> YUMMM! ®

*Have a Team Member relations question or concern? Call Advisor Services at 1-888-733-7621 or email hradvisor@redrobin.com for assistance.*

RR_004710

# Exhibit RR

From:     Tim Mei(/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
                 (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5123FD009F134DF7A84AF28329986D7B-TIM MEI)
To:        Claire Simpson
CC:       Harold Hart; Marilee Smith
BCC:
Subject:   RE: Auburn
Sent:      6/12/2015 04:58:38 PM 0000 (GMT)
Attachments:001 (2).pdf;

Thanks - this helps my thinking a lot. The working of 4 shifts without clocking-in between 10/12 and 10/17, with no
reaching out to IT to get it fixed in the system until 10/17 is the strong point. Follow up that with poor tracking of hours,
and not ensuring that the TM got paid and ==we're in a good spot.== ==Harold also feels like this might be the 'Golden Ticket', so==
==probably time to punch it==
He's going to call you.
Thanks!

**Tim Mei**
**Regional Vice President**
**Red Robin Gourmet Burgers+Brew**
509.280.9947

From: Claire Simpson
Sent: Friday, June 12, 2015 8:43 AM
To: Tim Mei; Harold Hart
Cc: Kate Fountain
Subject: Auburn

So the IT ticket was from 10/17, all of these shift edits for time not logged that had been worked are prior


EXHIBIT
27
1-18-18
Hart, H

RR_001991

# Exhibit SS

| | |
|---|---|
| **From:** | Claire Simpson(/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=55E6469757C8487F904941FBD426A577-CLAIRE SIMP) |
| **To:** | Cathy Cooney; Julie Rivera |
| **CC:** | |
| **BCC:** | |
| **Subject:** | Fwd: Exit Statement from GM Darren Donahue |
| **Sent:** | 6/20/2015 02:00:08 PM 0000 (GMT) |
| **Attachments:** | |

Good morning!

We knew this GM would be complaining. He was terminated as it was only recently brought to our attention he allowed a tm to work off the clock for four shifts and then didn't pay him. He was eventually paid when he complained to payroll and the whole situation only came to hrs attention when another restaurant recently wanted to rehire this person. We also did discuss with legal and Julie prior to separation. Please let me know if you need anything further.

Sent from my iPhone

Begin forwarded message:

> **From:** darren donahue <ajtdonahue@yahoo.com>
> **Date:** June 20, 2015 at 12:45:32 AM MDT
> **To:** <scarley@redrobin.com>, <dpost@redrobin.com>
> **Cc:** <tmei@redrobin.com>, <csimpson@redrobin.com>, <hhart@redrobin.com>, <msmith@redrobin.com>
> **Subject: Exit Statement from GM Darren Donahue**
>
> Dear Steve and Denny,
>
> After 7 years of working extremely hard and producing spectacular results for Red Robin, I was let go on Monday.
>
> I am writing to you as a way of closure for me.
>
> My Red Robin career bio:
>
> GM Tacoma 9/2008 - 5/2009:
> * - Directed team from number 49 on the bottom 50 list to number 19 in the company and number 1 in the NW in 7 months.
>
> GM Lakewood Towne Center 5/2009 - 6/2011:
> * - Possibly the best opening ever in RR history. Normalized in 13 weeks. Beat comp store budget in first year. 2010 Most profitable RR in sales class and number 4 for the year in Guest Voice. We were around number 3 in company rank when initial scorecard ranking came out.
>
> In July of 2011 I was moved to Auburn, but shortly after arriving I was diagnosed with stage 3 bladder cancer (never smoked) and had to have my bladder and prostate removed and went through 7 weeks of radiation and 5 months of rehabilitation. I returned to Red Robin on February 12th, 2012.
>
> GM Auburn Outlet Collection 2/2012 - 6/2015:
> *- Directed team from number 331 on the scorecard (out of 337) to number 49 in 2013, number 13 in 2014, and currently number 4 in 2015 and number 1 in the Mei Division.
>
> During my career at Red Robin I have mentored many GM's and managers and developed 3 managers to GM.

I have promoted many TM's to manager and been a Training GM. I have been a presenter at TLFG's on many occasions.

My ethics have not been called into question...until now.

I was let go for something that happened in October of 2014...that is 8 months ago!!! Everything about the termination letter I received is falsified and despicable.

It starts out by saying that "I admitted to having failed a number of critical Company policies." I NEVER admitted to failing any Company policies. When Harold Hart and Marilee Smith approached me at Auburn on Monday, June 8th unannounced at 1:30pm, Harold started asking me very accusatory questions about a TM who worked at Auburn for 7 shifts back in October of last year. I told him that I vaguely remember the TM, who was borrowed from the Pier. He asked me, "Why did you transfer him to New York?" and "Why did you ask payroll to put his missing hours into TM meetings?" and "Why did you allow him to work on a manager's key?"

After having time to research these questions I came up with the following answers, which were to the best of my recollection.

We borrowed the TM from the Pier, when the Pier shut down. He was able to clock in on his own from Tuesday, October 7, 2014 to Saturday, October 10, 2014 (3 shifts). When he came into work on Sunday, October 11, 2014, he was no longer in the system. I did not work that day. The managers on duty could not find him in our system. They decided without consulting me to have him work on a manager key. They were not trying to do anything unethical, they were just trying to let a TM earn money since he drove all the way to Auburn and him not being in the system was not his fault (or ours).

The following day, Monday, I did not see the note in the managers log, that he was unable to clock in and no one mentioned it to me. I was not there again when he worked his last 2 shifts and was not able to clock in (Tuesday October 14th and Wednesday October 15th...I believe). The next time I saw the TM, he handed me a 2 week notice and we never saw him again. All of this can be verified by Kate Hersel, Renato Velasco, and Kathryn Matteson...current managers at Auburn. At no time did I allow him to clock in under a manager key. If you ask the TM, he will tell you that he doesn't even remember working with me at all.

The "Conclusion of Investigation" goes on to say that "By your own admission you failed to pay a Team Member in line with company policy and the law for multiple shift, and when the Team Member brought the error forward one month later you attempted to pay him under the incorrect job code to benefit your restaurant's financials.

I never admitted this! I was alerted by Mara Coursey that a TM had contacted her and said he was missing hours. I believed the TM was telling the truth and agreed to pay him for the hours. This was now period 12 and the hours took place in period 11. If I was to pay him under the server department we would have lost half a point on the scorecard for period 12. If the hours were properly placed in period 11, it would have not affected us at all. So, in an effort to accurately represent the restaurant results, and in NO WAY, SHAPE, or FORM "benefit your restaurant financials", I asked Megan Mantelli (Lead Payroll Specialist) if we could put the hours under TM Meetings. If she had said, "No", I would have been fine with it. I was in no way cheating! How does putting a minimum wage TM hours under TM meetings benefit our financials?

It doesn't, they are both payroll sections of the P & L and both contribute equally to the NIBO-C calculation. The scorecard is not a financial. If the hours were put under Server, we would have been misrepresenting our results for period 12. I felt it was the ethically correct way to do it and Megan must have agreed.

The "Conclusion of Investigation" states, "As you are aware, as the General Manager you are ultimately responsible for appropriate timekeeping in your building as you approve all timecards." Agreed. I never approved a timecard for the TM in question. He disappeared from our system. If you go back in Kronos you can see that his timecard was approved by TM# 75547 which I believe is probably Rick Blankenship. It was not approved by TM # 166280, which is me.

I was accused of transferring this TM to New York to help lower my turnover rate. Which I chuckled about when accused, because I would never do anything like that.

I have since figured out why. If you go back in Kronos to the timecard that ends on 10/19/14, you will see that when Angie O'Connor added hours to his timecard she put in restaurant #213 which is Auburn, but by mistake she put NY as the state instead of WA. An honest mistake that I am sure she will not be termed for. I have records of this if you would like me to furnish them, but I am sure you can look it up on your own.

Mara Coursey, Megan Mantelli, and Angie O'Connor all knew about this in October of last year. None of them thought enough about it to say anything to me or HR. I'm sure they believed (correctly) that this was an honest mistake. I believe that the TM was transferred by the Pier to the wrong location.

So in summary, I do not agree with anything stated in this "Conclusion of Investigation".

About a month ago, Harold Hart informed me that he might need help with Kennewick because two of the managers there informed him that the GM forced them to pad their inventory. Even though this was verified the GM received only a write up. It seems more egregious than trying to help a TM be able to pay their bills.

I swear that all I have stated here is the truth. I would be willing to take a lie detector test to back up my statement. I believe that the conclusion of this investigation was decided before the investigation even happened.

I am an honest man who has worked very hard for this company and supports a wife and 3 kids. I have a disability caused by my cancer and have worked the better part of the last 4 years with a hernia that is next to impossible to fix. I give my time to anyone that asks of me and am a role model for my team, family, and community.

I make mistakes. Being terminated on Monday for these allegations was unjustified and undeserved.

Sincerely,

Darren Donahue

RR_003201

# Exhibit TT

**From:** Leave Of Absence(/O=RED ROBIN GOURMET BURGERS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NEW_LEAVEOF_ABSENSE)
**To:** Harold Hart; Leave Of Absence
**CC:** Rochelle Means; Tim Mei
**BCC:**
**Subject:** RE: Preliminary Scorecard Checks - P9 2014
**Sent:** 9/18/2014 03:23:40 PM 0000 (GMT)
**Attachments:**

Harold-

Our records indicate that his last leave was 7/28-8/10. Rochelle has been very close to this case as well and may have more detail.
*Red Robin Leave of Absence*

**From:** Harold Hart
**Sent:** Wednesday, September 17, 2014 10:04 AM
**To:** Leave Of Absence
**Cc:** Rochelle Means; Tim Mei
**Subject:** FW: Preliminary Scorecard Checks - P9 2014
Good Morning team

Can you provide me with how many weeks was Darren Donahue off in Period 9 and on LOA. He is the GM of Auburn #213.

Thanks in advance

HH

**From:** Tim Mei [mailto:tmei@redrobin.com]
**Sent:** Wednesday, September 17, 2014 4:30 AM
**To:** Harold Hart
**Subject:** FW: Preliminary Scorecard Checks - P9 2014
Harold,

Do you know for certain that Darren went through the LOA process? Can LOA provide any details for finance?

Thanks!

**Tim Mei**
**Regional Vice President**
**Red Robin Gourmet Burgers+Brew**
509.280.9947

**From:** Matthew Chaffee
**Sent:** Tuesday, September 16, 2014 11:24 AM
**To:** Matthew Tryhane; Harold Hart
**Cc:** Tim Mei; Patrick Hutchinson; Jaime Benson; Jessica McCleave
**Subject:** RE: Preliminary Scorecard Checks - P9 2014
Matt and Harold,

I don't show any HR transactions for Darren which would show he was on leave in P9. You may want to check with HR Benefits, they may have additional information I can't see.

Thanks!

Matthew Chaffee
Payroll Systems Manager
Red Robin Gourmet Burgers, Inc.
Phone (303) 846-6041

**From:** Matthew Tryhane
**Sent:** Tuesday, September 16, 2014 12:11 PM
**To:** Harold Hart; Matthew Chaffee
**Cc:** Tim Mei; Patrick Hutchinson; Jaime Benson; Jessica McCleave
**Subject:** RE: Preliminary Scorecard Checks - P9 2014
Harold,



EXHIBIT
*12*
*1-18-18*

PENGAD 800-631-6989

Darren did not show up on my LOA report from payroll and we show 160 regular hours for him in period 9.
Matt C.- Do you have any insight on this situation? Should 2 weeks of regular hours for one manager be removed from Auburn?
-Matt

**From:** Harold Hart
**Sent:** Tuesday, September 16, 2014 11:47 AM
**To:** Matthew Tryhane
**Cc:** Tim Mei
**Subject:** Fwd: Preliminary Scorecard Checks - P9 2014
Hi Matthew
I have confirmed that Darren the GM was out 2 weeks on LOA. We will need an additional 100 hours of mid. Thanks HH

Sent from my iPhone

Begin forwarded message:

> **From:** Matthew Tryhane <MTryhane@redrobin.com>
> **Date:** September 16, 2014 at 7:11:44 AM PDT
> **To:** Harold Hart <hhart@redrobin.com>
> **Cc:** GM AuburnOutletCollection <gm213@redrobin.com>, Patrick Hutchinson <PHutchinson@redrobin.com>
> **Subject:** RE: Preliminary Scorecard Checks - P9 2014
>
> Harold,
> I am showing 96 manager shifts worked by the following Managers:

| Sum of Hours | Column Labels | |
|---|---|---|
| Row Labels | Regular | Grand Total |
| DEGRAFFENREID, TRAVIS D | 160 | 160 |
| DONAHUE, DARREN J | 160 | 160 |
| KEEGAN, JAMES | 160 | 160 |
| MATTESON, KATHRYN | 160 | 160 |
| VELASCO, RENATO T | 128 | 128 |
| Grand Total | 768 | 768 |

> I show Auburn only earned 4.5 floor supervisor shifts based on the 96 shifts worked out of the 100.5 shifts needed at this location. It appears everything was calculated properly on my end. Let me know if you have any questions.
> -Matt

**From:** Harold Hart
**Sent:** Monday, September 15, 2014 4:54 PM
**To:** Matthew Tryhane
**Cc:** GM AuburnOutletCollection
**Subject:** Re: Preliminary Scorecard Checks - P9 2014
Hi Matt
Auburn
Was down a manager and should have credit for mid mgr line
HH

Sent from my iPhone

On Sep 15, 2014, at 3:28 PM, "Matthew Tryhane" <MTryhane@redrobin.com> wrote:

> Here is a preview of the P&L. Let me know if you have any questions.

Regards,
Matt

**From:** Harold Hart
**Sent:** Monday, September 15, 2014 9:45 AM
**To:** Patrick Hutchinson
**Cc:** Matthew Tryhane; GM AuburnOutletCollection
**Subject:** FW: Preliminary Scorecard Checks - P9 2014
Hi Patrick and Matt
Can you look into NIBO for #213, as you can see below not accurate.
Thanks HH

**From:** AuburnOutletCollection #213
**Sent:** Monday, September 15, 2014 8:40 AM
**To:** Harold Hart
**Subject:** RE: Preliminary Scorecard Checks - P9 2014
Hi,
Why are we waiting? My budget in Cognos is 26.04%...Shouldn't we alert someone that showing a budget of 29.73% is incorrect.
If my budget is not correct in Cognos I would like to know what my budget really is. I cannot afford to miss another bonus.
Thanks,
Darren

**From:** Harold Hart
**Sent:** Monday, September 15, 2014 8:17 AM
**To:** AuburnOutletCollection #213
**Subject:** RE: Preliminary Scorecard Checks - P9 2014
We will see when the P&L comes out

**From:** AuburnOutletCollection #213
**Sent:** Saturday, September 13, 2014 3:39 PM
**To:** Harold Hart
**Subject:** RE: Preliminary Scorecard Checks - P9 2014
Hi HH,
My budgeted Nibo-X was 26.04% for period 9...not 29.73%. I am betting they did not give us credit for Marshall.
Help.
Thanks,
Darren

**From:** Harold Hart
**Sent:** Friday, September 12, 2014 11:05 PM
**To:** Region List - 01 Harold Hart; Region List - 09 Erik Yates; Region List - 08 TBD
**Cc:** GM Wenatchee; GM Kennewick; GM Yakima
**Subject:** FW: Preliminary Scorecard Checks - P9 2014
Teams
Please check for accuracy and let your ROD of any mistakes.
Thanks HH, Shane and Erik

**From:** Matthew Tryhane
**Sent:** Friday, September 12, 2014 4:12 PM
**To:** All Regional Vice Presidents; All Regional Operations Directors
**Cc:** Jani Palomino; Jessica Elliott; Tara Jurhs; Deena DePhilips; Gina Fielding; Matthew Chaffee; Jaime Benson; Hannah Hicks; Erin Greene; Peter Owens; Danielle Hatfield; Jimmy Brown

**Subject:** Preliminary Scorecard Checks - P9 2014

Hello all,

Please find attached the preliminary scorecard for P8. Like previous periods, supporting files and this preliminary view of the scorecard can be found at http://restaurants.redrobin.com. Look for the "Period 9-2014 Scorecard Files" folder under the Ops-Scorecard reports folder though I have provided the turnover reports. All of the new Scorecard metrics are included.

**Please Note:** *NIBO-X% Variance to Budget* has been included in the preliminary scorecard.

Please let us know if you have any questions. Also, *all adjustment requests must be submitted by close of business on Tuesday (9/16)* to be included in the Period 9 Scorecard release.

Regards,

Matt

Matthew Tryhane, FP&A

Red Robin International, Inc.

6312 S. Fiddler's Green Circle, Suite 200N

Greenwood Village, CO 80111

mtryhane@redrobin.com

**303-846-5491**

<Side by Sides - PL Actual vs Budget P9 2014 (9_15_14)-Auburn Super Mall.pdf>

RR_003460

# Exhibit UU

**From:**     Harold Hart(/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
              (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C1DCB120017043099066BD927908C9FA-HAROLD HART)
**To:**       Claire Simpson
**CC:**
**BCC:**
**Subject:**  Re: Darren Donahue's Statement on Chris REDACTED
**Sent:**     6/11/2015 09:40:55 PM 0000 (GMT)
**Attachments:**

Perfect. No I will term tomorrow at 8 AM
Thanks Hh

Sent from my iPhone

On Jun 11, 2015, at 1:36 PM, Claire Simpson <csimpson@redrobin.com> wrote:

> If you'd like to pause until IT can give us a definite let me know. I am sat next to Megan right now and she is
> absolutely confident there was no prior contact
>
> C

**From:** Harold Hart
**Sent:** Thursday, June 11, 2015 2:31 PM
**To:** Claire Simpson
**Subject:** Re: Darren Donahue's Statement on Chris REDACTED
Just covering bases

Sent from my iPhone

On Jun 11, 2015, at 1:11 PM, Claire Simpson <csimpson@redrobin.com> wrote:

> I don't know how we could tell. The only things I could think of would be alarm code or manager
> swipes. Don't know if we still have that data. I don't question he was aware, do you?

**From:** Harold Hart
**Sent:** Thursday, June 11, 2015 2:02 PM
**To:** Claire Simpson
**Subject:** Re: Darren Donahue's Statement on Chris REDACTED
I don't keep them. Wondering from payroll standpoint he was working during this time
with Chris

Sent from my iPhone

On Jun 11, 2015, at 10:52 AM, Claire Simpson <csimpson@redrobin.com> wrote:

> Sorry, bit slow. What period do you need me to check? I don't have manager
> schedules, do you have them historically?
> C

**From:** Harold Hart
**Sent:** Thursday, June 11, 2015 11:38 AM
**To:** Claire Simpson



EXHIBIT
26
1-18-18
Hart, H

**Subject:** Re: Darren Donahue's Statement on Chris REDACTED
Hi Claire
Will u make sure Darren was working during this period? Hh

Sent from my iPhone

On Jun 11, 2015, at 8:37 AM, Claire Simpson <csimpson@redrobin.com>
wrote:

> Just FYI, Kate please can you place in the investigation file.
> Thanks!
>
> **From:** AuburnOutletCollection #213 [mailto:#213@redrobin.com]
> **Sent:** Wednesday, June 10, 2015 7:49 PM
> **To:** Claire Simpson
> **Cc:** GM AuburnOutletCollection
> **Subject:** Darren Donahue's Statement on Chris REDACTED
> Hi Claire,
> I have nothing new to show you.
> No separation notice...although, I did not separate him, nor could I as
> he was not in our system.
> I am pretty sure he was never a TM at Auburn...only a borrowed TM.
> As far as contacting someone when he could not clock in...I am sure I
> did.
> I am sure I talked to Mara, Megan, and pretty sure I talked with Angie
> as well.
> I don't have any sent or deleted emails before April of this year. It
> looks like I cleared out things on April 12th.
> It doesn't matter to me that there is not a ticket...I know we did
> (Kathryn remembers making a call as well).
> When the pier transferred TM's as they were closing, they made some
> mistakes.
> We were transferred a Brandon REDACTED who never worked here, there
> are plenty of emails about that.
> I think someone in payroll made a mistake when trying to get Brandon
> out of our system.
> REDACTED and REDACTED are right next to each other in the alphabet.
> I don't feel there has been much assuming positive intent towards
> me...The questions Harold asked me were pretty accusatory.
> I know he was reading them off an email.
> As I explained to Harold, when I was alerted that Chris REDACTED was not paid
> properly, I worked with Mara and Megan to rectify the mistake.
> In 7 years as a GM in this company, you would be hard pressed to
> find anyone who felt that I paid them incorrectly, because it is
> important to me to get TM's paid correctly.
> Why did I ask to have him paid under TM Meetings?
> The hours took place in period 11 and it was now period 12. If the
> hours were to go back to period 11 and be reported that way I would
> have been all for it. He earned those hours in period 11 they should
> count against the restaurant in period 11. Since that was not the case,
> reporting hours in period 12 that were not earned in that period is
> inaccurate reporting and would have changed the actual results of the
> restaurants scorecard. So I asked if the hours could go under a
> different payroll category that would still affect NIBO-C and not

misrepresent the period 12 restaurant results. I would think that if I was out of line, someone of Megan's experience and level would have corrected me.

It is sad to me that something that happened 8 months ago is being put to me so hard. I don't remember all the details clearly, so I am trying my best.

The intent on my end was ethical and positive and shows caring towards a TM, who by no fault of his or ours came to work and could not clock in.

I guarantee that mistakes were made by the Pier, Auburn, and Payroll, **none** with negative intent.

I hope this helps you.

Darren Donahue

# Exhibit VV



RED ROBIN INTERNATIONAL, INC.
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

**To:**  **Darren Donahue, General Manager**
**From: Harold Hart, ROD**
**CC:**  **Marilee Smith, HRBP; Tim Mei, RVP**
**Date: June 15, 2015**
**RE:**  **Conclusion of Investigation**

Prior to the recent investigation, there has been past performance concerns documented. On July 5, 2013 you received a Review of Policy on Cash Handling Procedures. You have also received a written warning on October 13, 2013 for failing to meet Red Robin's Sanitation Standards as well a written warning on March 20, 2014 for failing Beautification Requirements within your restaurant.

During a recent Company investigation you admitted to having failed to follow a number of critical Company policies. As you are aware, as the General Manager you are ultimately responsible for appropriate timekeeping in your building as you approve all timecards. By your own admission you failed to pay a Team Member in line with the company policy and the law for multiple shift, and when the Team Member brought the error forward one month later you attempted to pay him under the incorrect job code to benefit your restaurant's financials. Additionally, you knowingly allowed this Team Member to work off the clock with a manager swipe card (a significant violation) and did not enable him to declare tipped income, as it is required by law.

The Red Robin Team Member Handbook includes the following in its prohibited conduct policy:

*In order to ensure orderly operations and provide the best possible work environment, Red Robin expects Team Members to follow rules of conduct that will protect the interests and safety of all Team Members and Guests. It is not possible to list all the forms of behavior that are considered unacceptable in the work place, but those listed below are some examples of conduct that may result in disciplinary action, up to and including termination of employment.*

- *Violation of any Company rule or policy... falsifying information or data requested by the Company, including records of time worked.*
- *Failure to clock in and out properly for a shift; using any Team Member ID number other than your own.*
- *Falsification and/ or unauthorized editing of hours works.*

This type of behavior is highly inappropriate, against Company policy and the law.

In light of the above referenced unacceptable payroll practices, as well as your previous disciplinary action, we have lost confidence in your ability to act as a Manager with Red Robin. Accordingly, your final paycheck will be issued in line with state law. If applicable, group benefits with the company will continue until June 30, 2015 after that time you will be eligible for COBRA benefits should you choose to elect them.

Exhibit No: 46
Deponent: Simpson
Date/RPR: 2/7/18
Hunter + Geist, Inc.          RR_003686



RED ROBIN INTERNATIONAL, INC.
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

By signing below, you are acknowledging that you have read and understand the content of this document and have received a copy for your records.

_____        6·15-15
Darren Donahue, GM                       Date

_____        6-15-15
Harold Hart, ROD                         Date

MATT DISTLER   WAS PRESENT
ROD

redrobin.com

# Exhibit WW



**REDACTED**

401813

1730

RED ROBIN INTERNATIONAL, INC.
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

To: ████████ , General Manager
From: Jeff Baranco, ROD
CC:   Marilee Smith, HRBP; Tim Mei, RVP
Date: August 19th, 2015
RE:   Written Warning

This is a written warning and will be placed in your Team Member file.

During a recent audit it was determined that you had made several time card edits that reduced worked time from Team Members.  You have been unable to provide a reasonable explanation about why these edits occurred or any documentation that would support your actions.  This creates considerable legal risk for the Company, impacts the TMs paychecks and cannot be tolerated.  Red Robin takes these issues very seriously and as such it is necessary to review with you our policies.

The Red Robin Team Member Handbook includes the following in its prohibited conduct policy:
*In order to ensure orderly operations and provide the best possible work environment, Red Robin expects Team Members to follow rules of conduct that will protect the interests and safety of all Team Members and Guests.  It is not possible to list all the forms of behavior that are considered unacceptable in the work place, but those listed below are some examples of conduct that may result in disciplinary action, up to and including termination of employment:*

- *Violation of any Company rule or policy... falsifying information or data requested by the Company, including records of time worked.*
- *Failure to clock in and out properly for a shift; using any Team Member ID number other than your own.*
- *Falsification and/ or unauthorized editing of hours works.*

In addition, the Timekeeping and Meal/ Rest Breaks policy states:
*It is everyone's responsibility to maintain an accurate accounting of hours worked.  It is illegal and against Company policy to allow or require a Team Member to work "off the clock", or to adjust a Team Member's hours unless a mistake has been made.  All Team Members are entitled to their breaks, wages and compensation they have earned.  Additionally, Team Members are prohibited from volunteering to work without pay.  The following circumstances include but are not limited to violations of this policy and will be subject to disciplinary action up to and including termination.*

- *Adjusting hours to avoid break thresholds*
- *Not providing meal and/or rest breaks as required by state and federal law*
- *Reducing/ editing hours to avoid overtime*
- *Allowing, encouraging or requiring Team Members to work off the clock*
- *Clocking in and/ or working under another Team Member's identification number*
- *Permitting or encouraging team Members to clock in under the wrong job code*
- *Failure to clock in or out properly*
- *Otherwise taking action that makes the Company's time records inaccurate*



Exhibit No.: 74
Deponent: Simpson
Date/RPR: 2/7/18
Hunter + Geist, Inc. (M)

redrobin.com



**RED ROBIN INTERNATIONAL, INC.**
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

It is essential that as a General Manager with Red Robin you comply with all Company policies as well as the law. All hours that hourly Team Members work must be on the clock and accounted for appropriately, unauthorized editing of time cards is not permitted and you should not share your system logins with anyone. Should you feel your login has been compromised you should change your password immediately as well as contact IT and your supervisor.

As a reminder, Red Robin will not tolerate retaliation against any Team Member for bringing forward concerns in good faith. As written in the Red Robin Team Member Handbook, our anti-retaliation policy states:

*Red Robin prohibits retaliation against any individual who reports discrimination or harassment, or a violation of company policies or procedures, or participates in an investigation of such reports. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination, or a violation of company policies or procedures is a serious violation of this policy and, like harassment or discrimination itself, shall be subject to disciplinary action up to and including termination.*

Failure to adhere to Company policies, practices and standards may result in further disciplinary action up to and including termination. By signing below, you are acknowledging that you have read and understand the content of this document and have received a copy for your records.

_____     8·31·15
                                     Date

_____     9/31/15
Jeff Baranco, ROD                    Date

redrobin.com

# Exhibit XX

# Filed Under Seal

# Exhibit YY



**RED ROBIN INTERNATIONAL, INC.**
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

| To: | ██████████ GM |
|-----|----|
| **From:** | **Harold Hart, ROD** |
| **CC:** | **Marilee Smith, HRBP** |
| **Date:** | **April 24, 2015** |
| **RE:** | **Final Written Warning** |

This document is considered a **Final Written Warning** and will be placed in your personnel file. This document confirms that we have discussed and reviewed the performance issues listed below and the change of your employment status.

On April 20, 2015 you failed to exercise integrity. On that morning's inventory after you had inputted all of your numbers, you added additional inventory to create a number that would create a better result for your Period 4 scorecard. You provided instruction and guidance to your managers of what changed in the inventory and then let them know what they needed to make up the following period. Your instruction and guidance was in direct violation of company policy.

As a Red Robin GM, you are expected to model the behavior and be the example you are required to hold others accountable to.   It is your direct responsibility support and inforce integrity with all Red Robin tools and processes.

In the Team Member Handbook (page 16) it states that falsification of records is grounds for disciplinary action up to and including termination, today's documentation is your Final Written Warning.


**DISCIPLINARY ACTION**
Red Robin expects high-quality work from its Team Members. If disciplinary action is necessary, Red Robin may, at Management's discretion, issue a verbal warning, a written warning, a suspension, a demotion, or discharge. Red Robin may endeavor, in its sole discretion, to provide Team Members with an opportunity to correct performance deficiencies. **However, there are no standard series of disciplinary steps that Red Robin must follow. Red Robin has not adopted a progressive discipline system and does not adopt a progressive discipline system if it provides a Team Member with the opportunity to correct performance deficiencies. Conduct that is deemed inappropriate may lead to immediate discharge without prior notice. Further, employment with Red Robin is at the mutual consent of Red Robin and the Team Member, and either party may terminate the "at-will" relationship at any time, with or without cause or advance notice.** Red Robin's disciplinary procedures are not meant to imply anything that might conflict with the "employment at will" policy.

By signing below, you are acknowledging that you have read and understand the content of this document and that you have received.

Please scan a signed copy to msmith2@redrobin.com
This document will be retained in your personnel file



**RED ROBIN INTERNATIONAL, INC.**
6312 S. Fiddler's Green Circle #200N
Greenwood Village, CO 80111
303.846.6000

_____

_____                                    _____
GM Name (Print)                                                                                           Date


_____
GM Name (Signature)


 _____                                   _____
ROD Name (Signature                                                                                    Date


Please scan a signed copy to msmith2@redrobin.com
This document will be retained in your personnel file