UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DARREN DONAHUE, | CASE NO. C17-0023JLR |
| Plaintiff, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| RED ROBIN INTERNATIONAL, INC., et al., | (PROVISIONALLY FILED UNDER SEAL) |
| Defendants. | |

## I.   INTRODUCTION

Before the court are two motions:  (1) Defendants Red Robin International, Inc., Red Robin Gourmet Burgers, Inc., and Harold Hart's (collectively, "Red Robin") motion for summary judgment (RR Mot. (Dkt. # 29)), and (2) Plaintiff Darren Donahue's motion for partial summary judgment (Plf. Mot. (Dkt. # 32)).  The court has considered the motions, all submissions filed in support of or in opposition to the motions, the relevant

//

ORDER - 1

1  portions of the record, and the applicable law.  Being fully advised,[1] the court GRANTS

2  in part and DENIES in part both motions.[2]

3  ## II.   BACKGROUND

4  **A.   Red Robin**

5  Red Robin operates more than 400 casual dining restaurants across the United

6  States and Canada.  (Simpson Decl. (Dkt. # 30-1) ¶ 3.)  Under Red Robin's Timekeeping

7  Policy, all Red Robin employees, or Team Members ("TMs"), have the "responsibility to

8  maintain an accurate accounting of hours worked."  (*Id.* ¶ 6, Ex. B at 31.)  All TMs are

9  prohibited from (1) allowing, encouraging, or requiring TMs to work off the clock, (2)

10  clocking in and/or working under another TMs' identification number, and (3) taking any

11  action that renders Red Robin's time records inaccurate.  (*Id.* ¶ 6.)  General Managers

12  ("GMs") are not only charged with following these rules, but they must also ensure that

13  all of the TMs at the restaurant they manage—including assistant managers and servers—

14  follow these rules.  (*Id.* ¶ 7.)

15  //

16  //

17  //

---

18  [1] No party asked for oral argument on either motion.  (*See* RR Mot.; Plf. Mot.)  The court
19  does not consider oral argument to be useful for its disposition of these motions.  *See* Local
   Rules W.D. Wash. LCR 7(b)(4).

20  [2] In addition to his motion, Mr. Donahue filed a surreply in which he asks the court to
   strike exhibit B to the declaration of Roger Byers (Byers Decl. (Dkt. # 59) ¶ 8, Ex. B) and exhibit
21  B to the declaration of Matt Distler (Distler Decl. (Dkt. # 60) ¶ 5, Ex. B).  (*See* Surreply (Dkt.
   # 68) at 1.)  The court found it unnecessary to rely upon these exhibits in resolving Red Robin's
22  motion, and even if the court had considered these exhibits, they would not have altered the
   court's determination.  Accordingly, the court denies Mr. Donahue's request as moot.

**B.    Mr. Donahue's Employment History with Red Robin**

Red Robin hired Mr. Donahue in 2008 as an Assistant GM in Training.  (Donahue Decl. (Dkt. # 44) ¶ 4; 1st Goldsworthy Decl. (Dkt. # 33) ¶ 3, Ex. B ("Donahue Dep.")[3] at 7:11-15, 42:3-18; *id.* ¶ 9, Ex. H).)  After completing his training, Mr. Donahue was promoted to a full-time GM.  (Donahue Decl. ¶ 5; *see* 1st Goldsworthy Decl. ¶ 2, Ex. A ("Dunivan Decl.") ¶¶ 5, 7.)  As a GM, Mr. Donahue took charge of an entire restaurant, and he managed several different restaurants in Western Washington over the course of his tenure with Red Robin.  (Donahue Decl. ¶ 5.)  Mr. Donahue also helped turn several restaurants from bottom ranked entities to successful operations that were ranked near the top nationally of Red Robin's internal scoring system.  (*See* Donahue Decl. ¶¶ 7-18; Dunivan Decl. ¶¶ 8, 16, 21.)  In 2011, Mr. Donahue became GM for Red Robin's Auburn restaurant.  (Plf. Mot. at 1.)

In September 2011, Mr. Donahue was diagnosed with Stage 3 bladder cancer.  (Plf. Resp. at 2; 1st Goldsworthy Decl. ¶ 11, Ex. J.)  He underwent surgery to remove his bladder and replace it with an external bladder that was connected through a tube running through a stoma in his abdomen.  (Donahue Dep. at 76:13-77:11.)  After surgery, he received radiation and rehabilitation therapies.  (1st Goldsworthy Decl. ¶ 11, Ex. J.)  Due to his diagnosis and treatment, Mr. Donahue took medical leave under the Family

//

---

[3] Portions of Mr. Donahue's deposition appear multiple places in the record.  (*See* 1st Goldsworthy Decl. ¶ 3, Ex. B; Morisset Decl. (Dkt. # 30-6) ¶ 3, Ex. A.)  The court, however, will simply refer to Mr. Donahue's deposition transcript as "Donahue Dep." regardless of where it appears in the record.

1   Medical Leave Act ("FMLA") beginning in September 2011, and he returned to his job at

2   Red Robin in February 2012.  (*Id.* ¶ 13, Ex. L.)

3          Upon returning to work in February 2012, Mr. Donahue required certain

4   accommodations, including a 20-pound lifting restriction and a prohibition against

5   standing for longer than three hours without an opportunity to sit down and rest.  (*Id.*)

6   Red Robin approved both the lifting and standing restrictions.  (*Id.* ¶ 12, Ex. K; *see*

7   Rivera Decl. ¶ 3, Ex. A ("Rivera Dep.")[4] at 82:18-23; 84:10-20.)  However, Mr. Donahue

8   testified in his deposition that Red Robin did not engage with him to determine how he

9   could implement these accommodations.  (Donahue Dep. at 78:9-80:23.)  He testified

10  that Red Robin did not provide him the additional help he needed to consistently

11  implement his lifting and standing restrictions.  (*Id.*)

12         In 2012 and 2013, Red Robin designated Mr. Donahue a Training GM and the

13  Auburn restaurant that he managed a training restaurant.  (1st Goldsworthy Decl. ¶ 17,

14  Ex. P at 12-13.)  In early 2013, Mr. Donahue received an overall rating of "Exceeds

15  Expectations" for the 2012 year from his immediate supervisor, Regional Operations

16  Director ("ROD") Erik Yates.  (*Id.* ¶ 18, Ex. Q.)  Red Robin also asked Mr. Donahue to

17  help improve the struggling Bellevue, Washington restaurant.  (Donahue Dep. at

18  234:6-10; Donahue Decl. ¶ 17.)  Mr. Donahue spent five weeks hiring and training a new

19  team at the Bellevue restaurant and earned a bonus for his success.  (Donahue Decl. ¶ 17;

20

21          [4] Portions of Ms. Rivera's deposition appear in multiple places in the record.  (*See* Rivera
    Decl. ¶ 3, Ex. A; 1st Goldsworthy Decl. ¶ 6, Ex. E; 2d Goldsworthy Decl. ¶ 6, Ex. E.)  The court,
22  however, will simply refer to Ms. Rivera's deposition transcript as "Rivera Dep." regardless of
    where it appears in the record.

1st Goldsworthy Decl. ¶ 17, Ex. P at 14-15.)  In October 2013, Red Robin cleared Mr.

Donahue to apply for a promotion to ROD.  (1st Goldsworthy Decl. ¶ 21, Ex T.)

In March 2013, Mr. Donahue was diagnosed with a permanent hernia related to

his previous cancer treatment.  (RR Mot. at 10.)  As a result, he again required ongoing

accommodations restricting the length of time he could stand without a rest period and

limiting how much he could lift.  (*See* 1st Goldsworthy Decl. ¶ 19, Ex. R.)  Red Robin

approved his request for these accommodations.  (*Id.* ¶ 20, Ex. S (attaching an email

string indicating that Red Robin approves Mr. Donahue's requested accommodations);

Rivera Decl. ¶ 9, Ex. E (attaching the same email string and an unsigned

accommodations agreement).)

In October 2013, Mr. Donahue took a second FMLA leave for a hernia repair

surgery.  (Donahue Dep. at 229:23-230:16; 1st Goldsworthy Decl. ¶ 13, Ex. L.)  Red

Robin granted his request for FMLA leave.  (Riviera Decl. ¶ 11, Ex. G.)  Mr. Donahue

returned to work towards the end of November or early December 2013.  (Donahue Dep.

at 229:23-230:16; 1st Goldsworthy Decl. ¶ 13, Ex. L.)

On January 10, 2014, ROD Yates gave Mr. Donahue a "Does not Meet

Expectations" rating for the preceding year.  (1st Goldsworthy Decl. ¶ 23, Ex. V.)  Mr.

Donahue received this review less than two months after returning from leave for his

hernia repair surgery.  (*See id.*)  On January 14, 2014, Mr. Donahue complained in an

email to Red Robin's Human Resources ("HR") Director Julie Rivera that he was "being

retaliated against," but he did not expressly tie this charge to his use of accommodations

or any of his FMLA leaves.  (*See id.* ¶ 24, Ex. W.)  Ms. Rivera forwarded Mr. Donahue's

1    email to Regional Vice President ("RVP") Roger Byers, who responded that Mr.

2    Donahue "is full of . . ." and "needs to go."  (*Id.* ¶ 25, Ex. X (ellipses in original).)  On

3    the same day, Ms. Rivera generated an "EthicsPoint" complaint, in which she

4    summarized Mr. Donahue's retaliation complaint and concluded it was "frivolous" and

5    "unsubstantiated."  (*Id.* ¶ 26, Ex. Y.)

6        In February 2014, RVP Byers and ROD Harold Hart visited the Auburn restaurant

7    and told Mr. Donahue that he was not allowed to discuss his 2013 performance review

8    with anyone again.  (Donahue Dep. at 216:16-217:4.)  Mr. Donahue asked if he could

9    still apply for the promotion that had been cleared in October 2013, and Mr. Byers

10   responded, "[N]ot for a long time."  (*Id.* at 217:6-8.)  On Red Robin's March 2014

11   "People Report," Mr. Donahue was downgraded from promotable to "maintain in

12   position," and his "status code" was marked red, which indicates "real risk."  (1st

13   Goldsworthy Decl. ¶ 29, Ex. BB.)

14       On March 20, 2014, Red Robin conducted a "Quality Assurance" visit to the

15   Auburn restaurant, which Mr. Donahue failed.  (*Id.* ¶ 31, Ex. DD.)  Red Robin issued a

16   written warning to Mr. Donahue and warned him that he and his team had 30 days to

17   make the necessary improvements and to correct the violations.  (*Id.*)  Otherwise, he

18   might face "further disciplinary action, up to and including termination."  (*Id.*)

19       Mr. Donahue required four additional, separate hospitalizations in 2014.  (*See id.*

20   ¶ 13, Ex. L.)  Each hospitalization required a leave of absence, which Red Robin granted.

21   (*Id.*)  Mr. Donahue was on medical leave from April 16, 2014, through mid-July 2014,

22   and he also took three other short medical leaves in July, August, and December 2014.

1   (*Id.*)  Mr. Donahue admits that Red Robin granted all of the medical leaves he requested,

2   with the exception of a September 2015 leave he first requested in early June 2015

3   because he was terminated on June 15, 2015.  (Donahue Dep. at 88:2-89:2.)

4        Despite Mr. Donahue's medical leaves and accommodations, the Auburn

5   restaurant again achieved the highest rating of "green" on Red Robin's "Scorecard" for

6   almost all of 2014.  (1st Goldsworthy Decl. ¶ 28, Ex. AA.)  Indeed, the Auburn restaurant

7   was the only restaurant in the region to achieve a "green" ranking in both 2013 and 2014.

8   (*See id.* ¶¶ 22, 27, Exs. U, Z.)  ROD Hart admitted during his deposition that from 2014

9   through his termination in June 2015, Mr. Donahue was a "top performer" on Red

10  Robin's scorecards.  (*Id.* ¶ 4, Ex. C ("Hart Dep.")[5] at 142:22-143:16.)  Nevertheless, Mr.

11  Donahue's "Readiness Code" on the "People Report" remained at "Maintain in Position,"

12  rather than at one of the codes indicating that he would be "Ready for Promotion" within

13  one, six, or 12 months; his "Status Code" was listed as either "Real Risk" or "Substantial

14  Risk" on the same report.  (*Id.* ¶¶ 34-36, Exs. GG, HH, II.)  In addition, in December

15  2014, ROD Hart rated Mr. Donahue's performance as "Meets Expectations," rather than

16  "Exceeds Expectations" as was the case in 2012.  (*Compare id.* ¶ 18, Ex. Q (attaching

17  2012 performance review) *with id.* ¶ 37, Ex. JJ (attaching 2014 performance review).)

18  Mr. Donahue's performance rating as "Meets Expectations" had the potential to affect his

19  income and any raise for the year.  (Hart Dep. at 239:3-9.)

20  //

21
22       [5]Portions of Mr. Hart's deposition appear in multiple places in the record.  (*See* 1st Hart Decl. ¶ 3, Ex. A; 1st Goldsworthy Decl. ¶ 4, Ex. C.)  The court, however, will simply refer to Mr. Hart's deposition transcript as "Hart Dep." regardless of where it appears in the record.

1   On December 16, 2014, the same day he received his 2014 performance review,

2   Mr. Donahue emailed ROD Hart detailing the reasons he believed he deserved an

3   "Exceeds Expectations" review.  (Goldsworthy Decl. ¶ 38, Ex. KK.)   ROD Hart reported

4   Mr. Donahue's concerns to Red Robin's new RVP Tim Mei.  (Hart Dep. at

5   238:6-242:25.)

6   On March 19, 2015, Mr. Donahue emailed Red Robin's "HR Advisor" describing

7   a shift that had gone poorly and complaining about a fellow employee who Mr. Donahue

8   stated was "[s]preading [f]alse [i]nformation" about him.  (1st Goldsworthy Decl. ¶ 40,

9   Ex. MM.)  Following this email, Employee Relations Manager Clarie Simpson and HR

10   Director Rivera had a private email exchange in which Ms. Simpson stated to Ms. Rivera:

11   "Don't you miss Darren?"  (*Id.*)  Ms. Rivera responded:  "Why is he still here?"  (*Id.*)

12   **C.   Red Robin Terminates Mr. Donahue**

13   The incident which Red Robin asserts precipitated Mr. Donahue's termination

14   involved TM Chris Ferguson, who usually worked at another location but was

15   temporarily assigned to work shifts at the Auburn restaurant.  (1st Goldsworthy Decl. ¶ 8,

16   Ex. G ("Hersel Dep.")[6] at 58:10-59:18.)  TM Ferguson apparently used a manager's key

17   to work as a server at the Auburn restaurant when he was unable to clock into work.

18   //

19   //

20

21   [6] Portions of Mr. Hersel's deposition appear in multiple places in the record.  (*See* Morisset Decl. ¶ 10, Ex. H; 1st Goldsworthy Decl. ¶ 8, Ex. G.)  The court, however, will simply

22   refer to Mr. Hersel's deposition transcript as "Hersel Dep." regardless of where it appears in the record.

1  (Simpson Decl. ¶ 4, Ex. A ("Simpson Dep.")[7] at 132:22-134:21, 168:8-13, 334:6-337:12;

2  Mantelli Decl. ¶ 7, Ex. A; Hersel Dep. at 58:6-59:24.)  The parties are in dispute

3  concerning whether Mr. Donahue was the manager on duty at the time.  (*Compare* Hersel

4  Dep. at 58:6-59:24 (indicating that Mr. Donahue was not on duty); Donahue Decl. ¶ 23

5  ("I was not working that day."), *with* RR Mot. at 9 (citing Morisset Decl. ¶¶ 6-7, Exs. D,

6  E) ("The dates on the punch edit forms matched dates that [Mr. Donahue] worked,

7  according to the Auburn manager schedule.")).)

8        On November 4, 2014, TM Ferguson reported to Red Robin's Payroll Department

9  ("Payroll") that he had not been paid for all the hours he worked in October 2014.

10  (Mantelli Decl. (Dkt. # 30-5) ¶ 7.)  On the same day, Payroll reached out to the Auburn

11  restaurant about the issue.  (*Id.*)  Mr. Donahue responded by calling TM Ferguson to

12  determine what had happened and how many hours he was missing.  (Donahue Decl.

13  ¶ 29.)  On November 11, 2014, Mr. Donahue emailed Payroll, stating:  "Chris is missing

14  15 hours.  I am fine with that number.  Can you pay him under TM meetings please?"

15  (Mantelli Decl. ¶ 7; *see also* 1st Goldsworthy Decl. ¶¶ 41-42, Exs. NN, OO; *see also*

16  Donahue Decl. ¶¶ 31-32.)  Payroll responded that it would "need punch edit forms for

17  these hours."  (1st Goldsworthy Decl. ¶ 42, Ex. OO.)  When Mr. Donahue learned that

18  TM Ferguson could not be paid under the "Team Meetings" category, he completed the

19  //

20

21        [7] Portions of Ms. Simpson's deposition appear in multiple places in the record.  (*See*
Simpson Decl. ¶ 4, Ex. A; 1st Goldsworthy Decl. ¶ 5, Ex. D.)  The court, however, will simply
22  refer to Ms. Simpson's deposition transcript as "Simpson Dep." regardless of where it appears in
the record.

1   necessary paperwork to pay TM Ferguson under the "Server" category.  (Donahue Dep.

2   at 161:8-162:21; Donahue Decl. ¶¶ 30-32.)

3          On or about June 4, 2015, ROD Hart was in the Auburn restaurant to interview

4   TM Kate Hersel for a management position.  (Hersel Dep. at 30:15-31:19, 33:21-39:19,

5   44:18-48:19, 50:18-54:21.)  TM Hersel told ROD Hart that she wanted to complete

6   management training by September 1, 2015, so that she would be available to help Mr.

7   Donahue while he was out on leave for a surgical repair of his hernia.  (*Id.*; *see also*

8   Donahue Dep. at 89:3-91:11.)  TM Hersel testified that ROD Hart was visibly surprised

9   when she told him that Mr. Donahue would require another medical leave in September

10  2015.  (Hersel Dep. at 52:17-53:13.)  After her interview, TM Hersel told Mr. Donahue

11  about her exchange with ROD Hart and stated that she did not mean to get Mr. Donahue

12  in trouble.  (Donahue Dep. at 90:4-13.)

13         Mr. Donahue had not yet submitted a written request for a medical leave in

14  September 2015 at the time TM Hersel spoke to ROD Hart.  (*Id.* at 91:22-92:5.)

15  Nevertheless, following TM Hersel's interview, Mr. Donahue immediately spoke to ROD

16  Hart about his intention to schedule a hernia operation in September 2015 and his need to

17  take a four to six week medical leave to recuperate.  (*Id.* at 90:14-91:8.)  Mr. Donahue

18  testified that ROD Hart appeared "taken back" when Mr. Donahue informed him of his

19  need for an additional medical leave in September 2015.  (*Id.* at 91:1-18.)

20         On or about June 2 or 3, 2015, Red Robin's corporate HR Department in Denver

21  learned that TM Ferguson had not been paid until November 2014 for multiple shifts that

22  he had worked in October 2014 at the Auburn restaurant.  (Simpson Decl. (Dkt. # 30-1)

1    ¶ 10 ("The investigation that . . . led to [Mr. Donahue's] termination was prompted by an

2    email sent the evening of June 2, 2015, from the GM of Red Robin's Pier 55 location to

3    corporate [HR]."); *id.* ¶¶ 11-12, Ex. F (indicating that the report was "[r]eceived" or

4    "[r]eported" on June 3, 2015, and an investigation was "[o]pened" on June 4, 2015), Ex.

5    G; Mantelli Decl. (Dkt. # 30-5) ¶¶ 7-8; Simpson Dep. at 147:11-24.)  On June 4, 2015,

6    Red Robin entered an "EthicsPoint" investigation into its "system" concerning the

7    incident involving TM Ferguson's delayed payment.  (Simpson Dep. at 147:11-24.)  In

8    his deposition, ROD Hart admitted that he did not learn about TM Ferguson's untimely

9    payment until after Mr. Donahue had informed him about his need for a September 2015

10    medical leave.  (Hart Dep. at 292:11-23.)

11         On June 8 or 9, 2015, ROD Hart returned to the Auburn restaurant with Marilee

12    Smith, an HR representative, to interview Mr. Donahue concerning the incident involving

13    TM Ferguson's missing time and late payment from October and November 2014.  (1st

14    Hart Decl. ¶¶ 8-9, Ex. D; Smith Decl. (Dkt. # 30-4) ¶ 3.)  On June 12, 2015, RVP Mei

15    sent an email to Claire Simpson, Red Robin's Manager of Employee Relations, indicating

16    that he believed Red Robin was "in a good spot" to terminate Mr. Donahue.  (1st

17    Goldsworthy Decl. ¶ 45, Ex. RR.)  RVP Mei also remarked that ROD Hart "feels like this

18    might be the 'Golden Ticket', so [it was] probably time to punch it."  (*Id.*)

19         Following Red Robin's investigation, Red Robin terminated Mr. Donahue on June

20    15, 2015.  (*See* 1st Hart Decl. ¶¶ 12-13, Ex. G; Simpson Decl. ¶¶ 10, 15, Ex. J.)  ROD

21    Hart communicated this decision to Mr. Donahue both in person and in writing.  (1st Hart

22    Decl. ¶¶ 12-13, Ex. G.)  Red Robin explained in a memorandum to Mr. Donahue that his

1  failure to pay TM Ferguson timely and accurately in line with Red Robin's policy for

2  multiple shifts was a significant violation, and when TM Ferguson raised the error a

3  month later, Mr. Donahue compounded the error by asking to use the incorrect code to

4  benefit his restaurant's Scorecard.  (*Id.* ¶ 13, Ex. G; Simpson Decl. ¶ 15, Ex. J.)

5     On June 19, 2015, Mr. Donahue submitted an "exit statement" to Red Robin in

6  which he disputes many of the assertions in Red Robin's June 15, 2015, memorandum to

7  him.  (Morisset Decl. ¶ 8, Ex. F (attaching Mr. Donahue's June 19, 2015, email).)  Mr.

8  Donahue's exit statement did not affect Red Robin's decision to terminate his

9  employment.  (RR Mot. at 9.)

10  **D.     Red Robin's Treatment of Other Non-Disabled GMs**

11        1.  Idaho GM

12     On August 19, 2015, Red Robin issued a written warning to a GM in Idaho for

13  making "several time card edits that reduced work time for [TMs]."  (1st Goldsworthy

14  Decl. ¶ 50, Ex. WW.)  The GM was editing time cards and not paying TMs for time they

15  had worked.  (*Id.* ¶ 7, Ex. F ("Mei Dep.")[8] at 298:20-300:24.)  Ms. Simpson admitted that

16  the Idaho GM's actions could be considered to be stealing from the affected employees

17  and was time card fraud.  (Simpson Dep. at 376:1-3, 377:9-11.)  As a consequence of his

18  actions, Red Robin did not terminate the Idaho GM's employment, but rather issued him

19  a written warning.  (*Id.* at 376:4-13.)  Red Robin suggests that this Idaho GM is not

20  //

21

22        [8] Portions of Mr. Mei's deposition appear in multiple places in the record.  (*See* 1st
   Goldsworthy Decl. ¶ 7, Ex. F; Morisset Decl. ¶ 9, Ex. G.)  The court, however, will simply refer
   to Mr. Mei's deposition transcript as "Mei Dep." regardless of where it appears in the record.

"similarly situated" to Mr. Donahue because he lacked experience and familiarity with Red Robin's time keeping policies and procedures.  (RR Reply (Dkt. # 58) at 7.) However, the testimony Red Robin cites in support of this proposition merely suggests that this fact might be true rather than substantiating it.  (*See id.* (citing Simpson Dep. at 374:25-377:22, 379:13-20).) [9]

 2.  GM Hersel

 GM Hersel testified that one of the employees at her restaurant, who had transferred from another Red Robin restaurant, experienced a similar inability to log into Red Robin's system to work as a server.  (Hersel Dep. at 109:6-24.)  After sending the server home every day for approximately two weeks as a result of this problem, GM Hersel received HR's approval to "let [the employee] clock in under another server."  (*Id.* at 109:25-111:3.)  Although GM Hersel has a serious medical condition—namely, multiple sclerosis ("MS"), Mr. Donahue argues that she is still a valid comparator because GM Hersel did not inform Red Robin's HR Department about her condition because she was concerned she might be terminated like Mr. Donahue.  (*Id.* at 73:1-17; 74:14-75:17.)

---

[9] Ms. Simpson testified as follows:

Q:  So even though there were bad time edit practices that we showed earlier that actually resulted in time being taken away from employees that we can see as stealing time, because it wasn't malicious, they just received written warnings?

A:  I believe this was an acquisition restaurant who maybe hadn't had the same training as a seven-year GM.

(Simpson Dep. at 379:13-20.)

1    Red Robin argues that GM Hersel is not "similarly situated" with Mr. Donahue

2    because she followed the proper procedures concerning her TM's inability to log in for

3    work and obtained prior approval from her supervisors for her actions in resolving the

4    issue.  (*See* RR Reply at 7.)  Red Robin also argues that she is not outside Mr. Donahue's

5    protected class because she has MS, which she shared with her immediate supervisor,

6    Matt Distler.  (Hersel Dep. at 77:4-78:17.)

7        3.   Kennewick GM

8    On April 24, 2015, Red Robin issued a final written warning to a GM in

9    Kennewick, Washington for "add[ing] inventory to create a number that would create a

10   better result for [his restaurant's] Period 4 scorecard."  (1st Goldsworthy Decl. ¶ 52, Ex.

11   YY.)  The Kennewick GM reported to ROD Hart.  (Hart Dep. at 283:4-289:12.)  Red

12   Robin managers acknowledged that the Kennewick GM's inventory manipulation is a

13   form of dishonesty or an issue of integrity, but Red Robin did not terminate the

14   Kennewick GM for it.  (*Id.* at 285:8-15; Morisset Decl. ¶ 9, Ex. G (Mei Dep.) at 292:6-

15   13).)  Red Robin argues that this GM is not comparable to Mr. Donahue because his

16   "inventory-related misconduct had nothing to do with a failure to ensure that a server was

17   paid accurately and on time for multiple days."  (RR Reply at 7.)

18       4.   GMs Terminated for Payroll and Timekeeping Violations

19   In 2014, Red Robin reaffirmed its commitment to accurate and compliant payroll

20   practices by requiring its restaurant GMs and RODs to review and individually

21   acknowledge Red Robin's Wage and Hour Compliance Policy.  (Simpson Decl. ¶ 8, Ex.

22   C.)  Mr. Donahue signed the acknowledgement on March 17, 2014.  (*Id.*)  In 2015, Red

ORDER - 14

1    Robin terminated several long-tenured GMs across the country after investigations

2    discovered that they had violated this policy.  (*Id.* ¶ 9.)  Policy violations varied but

3    included entering time to non-productive labor, not having appropriate justifications for

4    time card edits, and failing to terminate TMs in a timely manner from company records in

5    an attempt to manipulate a restaurant's turnover statistics.  (*Id.*)  Red Robin asserts that it

6    terminated 21 GMs between January and August 2015, including Mr. Donahue, for

7    "integrity issues."  (*Id.*, Ex. D; *see also* Rivera Decl. (Dkt. # 30-3) ¶ 7, Ex. C.)  Red

8    Robin argues that Mr. Donahue ignores these GMs who, like him, were terminated for

9    payroll and timekeeping violations.  (RR Reply at 7.)

10                           **III.    ANALYSIS**

11   **A.    Summary Judgment Standard**

12           Summary judgment is appropriate if the evidence, when viewed in the light most

13   favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

14   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

15   P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*,

16   477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

17   there is no genuine issue of material fact and that he or she is entitled to prevail as a

18   matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, the

19   non-moving party "must make a showing sufficient to establish a genuine dispute of

20   material fact regarding the existence of the essential elements of his case."  *Galen*, 477

21   F.3d at 658.

22   //

1    The purpose of summary judgment is to pierce the pleadings and to assess the

2    evidence in order to see whether there is a genuine need for trial.  *Matsushita Elec. Indus.*

3    *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In resolving a summary judgment

4    motion, the evidence of the opposing party is to be believed, *Anderson v. Liberty Lobby,*

5    *Inc.*, 477 U.S. 242, 255 (1985), and all reasonable inferences that may be drawn from the

6    facts placed before the court must be drawn in favor of the opposing party, *Matsushita*,

7    475 U.S. at 587.  However, the court may not weigh evidence or make credibility

8    determinations in analyzing a motion for summary judgment because these are "jury

9    functions, not those of a judge."  *Liberty Lobby*, 477 U.S. at 255.

10   The Ninth Circuit Court of Appeals sets a high standard for granting summary

11   judgment in employment discrimination cases.  *Schnidrig v. Columbia Mach., Inc.*, 80

12   F.3d 1406, 1410 (9th Cir. 1996).  The Ninth Circuit cautions that "very little evidence" is

13   needed "to survive summary judgment in a discrimination case, because the ultimate

14   question is one that can only be resolved through a searching inquiry—one that is most

15   appropriately conducted by the fact-finder, upon a full record."  *Id.* (internal quotation

16   marks omitted).

17   **B.    Red Robin's Motion for Summary Judgment**

18   Red Robin moves for summary judgment on all of Mr. Donahue's claims,

19   including (1) violation of the FMLA, 29 U.S.C. § 2615(a) and Washington's Family

20   Leave Act ("WFLA"), RCW 49.78.300; (2) disability-based employment discrimination

21   under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, and

22   Washington's Law Against Discrimination ("WLAD"), RCW 49.60.180; (3) retaliation

under the ADA and WLAD; (4) hostile work environment under WLAD; and (5) failure

to accommodate his disability under the ADA or WLAD.  (*See generally* RR Mot.)  The

court will address each claim in turn.

    1.  <u>FMLA</u>

       Mr. Donahue alleges that Red Robin's "adverse actions against [him], including

terminating his employment, constituted unlawful interference with his rights under [the]

FMLA and [WFLA], and retaliation for engaging in protected activity" under the same

statutes.  (FAC (Dkt # 3) ¶ 37.)  Red Robin moves for summary judgment on both Mr.

Donahue's interference and retaliation claims.  (RR Mot. at 12-15.)  The "WFLA mirrors

the provisions of the FMLA[,] . . . [a]nd as RCW 49.78.410 provides, 'This chapter must

be construed to the extent possible in a manner that is consistent with similar provisions,

if any, of the [FMLA].'"  *Washburn v. Gymboree Retail Stores, Inc.*, No. C11-822RSL,

2012 WL 3818540, at *9 (W.D. Wash. Sept. 4, 2012).  Thus, the court considers Mr.

Donahue's FMLA and WFLA interference and retaliation claims together.

       It is "unlawful for any employer to interfere with, restrain, or deny the exercise or

the attempt to exercise" any substantive right guaranteed by the FMLA.  29 U.S.C.

§ 2615(a)(1).  To prove an FMLA interference claim, Mr. Donahue must show "(1) he

was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3)

he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to

take leave, and (5) his employer denied him FMLA benefits to which he was entitled."

*Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014) (internal

quotation marks omitted) (quoting *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th

1   Cir. 2011)).  To make an interference claim based on termination, Mr. Donahue must

2   show "by a preponderance of the evidence that her taking of FMLA-protected leave

3   constituted a negative factor in the decision to terminate her.  [He] can prove this

4   claim . . . by using either direct or circumstantial evidence."  *See Bachelder v. Am. W.*

5   *Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001).  The Ninth Circuit does not apply the

6   burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),

7   to FMLA interference claims.  *Sanders*, 657 F.3d at 778 ("In this circuit, we have

8   declined to apply the type of burden shifting framework recognized in McDonnell

9   Douglas to FMLA "interference" claims."); *Perez-Denison v. Kaiser Found. Health Plan*

10  *of the Northwest*, 868 F. Supp. 2d 1065, 1080 (D. Or. 2012).

11          Under the FMLA, it is also "unlawful for any employer to discharge or in any

12  other manner discriminate against any individual for opposing any practice made

13  unlawful" by the FMLA.  *See* 29 U.S.C. § 2615(a)(2); *Sanders*, 657 F.3d at 777.  An

14  allegation under this section is known as a "discrimination" or "retaliation" claim.

15  *Sanders*, 657 F.3d at 777.  To establish an FMLA retaliation claim, Mr. Donahue must

16  "show (1) he availed himself to a protected right under the FMLA, (2) he was adversely

17  affected by an employment decision, and (3) there is a causal connection between the two

18  actions."  *Imeson v. Eagle View Techs., Inc.*, No. C13-468 MJP, 2014 WL 1047165, at *4

19  (W.D. Wash. Mar. 14, 2014); *Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264,

20  1269 (W.D. Wash. 2013) (citing *Wash. v. Fort James Operating Co.*, 110 F. Supp. 2d

21  1325, 1331 (D. Or. 2000)).  District courts in the Ninth Circuit have applied the

22  *McDonnell Douglas* framework in analyzing FMLA claims for retaliation under 29

1    U.S.C. § 2615(a)(2).[10]  *See Bushfield v. Donahoe*, 912 F. Supp. 2d 944, 953 (D. Idaho

2    2012).

3        a.  *Notice*

4        Red Robin argues that Mr. Donahue's verbal notification to ROD Hart that he

5    intended to take medical leave in September 2015 for surgery to repair his hernia is

6    insufficient to support either the fourth element of Mr. Donahue's interference claim—

7    whether he provided sufficient notice of his intent to take leave—or the first element of

8    Mr. Donahue's retaliation claim—whether he availed himself to a protected right under

9    the FMLA.  (RR Mot. at 13 ("[A]t the time of his termination, he had not provided

10

---

11        [10] The Ninth Circuit has not decided whether the *McDonnell Douglas* burden shifting
     framework is applicable to an FMLA retaliation claim.  *Bachelder*, 259 F.3d at 1125 n.11

12   ("Whether or not the *McDonnell Douglas* anti-discrimination approach is applicable in cases
     involving the 'anti-retaliation' provisions of FMLA, is a matter we need not consider here.").

13   The Ninth Circuit has acknowledged, however, that most circuits that have considered the issue
     have applied some version of the *McDonnell Douglas* burden shifting framework to FMLA
     retaliation claims.  *Sanders*, 657 F.3d at 777.

14
         In *Sanders*, the Ninth Circuit described the *McDonnell Douglas* burden shifting

15   framework, as follows:

16       [T]he plaintiff first must establish a "prima facie case of discrimination or
         retaliation."  *Metoyer v. Chassman*, 504 F.3d 919, 931 n.6 (9th Cir. 2007).  If the

17       plaintiff establishes a prima facie case, the burden then shifts to the defendant to
         articulate "a legitimate, nondiscriminatory reason for the adverse employment

18       action."  *Fonseca v. Sysco Food Servs. of Ariz., Inc*., 374 F.3d 840, 849 (9th Cir.
         2004).  If the employer articulates a legitimate reason for its action, the plaintiff

19       must then show that the reason given is pretextual.  *See Pottenger v. Potlatch Corp*.,
         329 F.3d 740, 746 (9th Cir. 2003).  "[A] plaintiff can prove pretext either (1)

20       indirectly, by showing that the employer's proffered explanation is unworthy of
         credence because it is internally inconsistent or otherwise not believable, or (2)

21       directly, by showing that unlawful discrimination more likely motivated the
         employer."  *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002) (internal
         quotation marks omitted).

22   657 F.3d at 777 n.3.

1    sufficient notice of his intent to take FMLA and failed to avail himself of FMLA

2    rights.").)  The court disagrees.  In order to trigger FMLA rights, "[e]mployees need only

3    notify their employers that they will be absent under circumstances which indicate that

4    the FMLA might apply."  *Bachelder*, 259 F.3d at 1130.  Indeed, the federal regulations

5    provide for verbal notification.  29 C.F.R. § 825.302(c) ("An employee shall provide at

6    least verbal notice sufficient to make an employer aware that the employee needs FMLA-

7    qualifying leave, and the anticipated timing and duration of the leave.").

8          Nevertheless, Red Robin protests that Mr. Donahue neither "contact[ed] HR to

9    request leave" nor "initiate[d] any FMLA paperwork."  (RR Mot. at 13.)  "An employer

10   may require an employee to comply with the employer's usual and customary notice and

11   procedural requirements for requesting leave, absent unusual circumstances."  29 C.F.R.

12   § 825.302(d).  However, FMLA-protected leave may not be delayed or denied where the

13   employer's policy requires notice to be given sooner than the 30 days advance notice

14   required in § 825.302(a).  *See id.*  Here, there is no dispute that in early June 2015, Mr.

15   Donahue placed ROD Hart on notice verbally of his need for a September 2015 medical

16   leave.  (Donahue Dep. at 90:14-91:8; *see* Hart Dep. at 292:18-23.)  There is also no

17   dispute that Red Robin terminated Mr. Donahue on June 15, 2015.  (1st Hart Decl.

18   ¶¶ 12-13; Simpson Decl. ¶¶ 10, 15, Ex. J; Donahue Decl. ¶ 18.)  Thus, Red Robin cannot

19   rely on Mr. Donahue's failure to provide written notice of his need for a medical leave,

20   because such notice would not have been required under 29 C.F.R. § 825.302(d) until 30

21   days prior to Mr. Donahue's requested leave—sometime in August 2015, approximately

22   two months after Mr. Donahue's termination.

1    Further, "[i]n all cases, the employer should inquire further of the employee if it is

2    necessary to have more information about whether FMLA leave is being sought by the

3    employee, and obtain the necessary details of the leave to be taken." 29 C.F.R.

4    § 825.302(c). Here, Mr. Donahue testified that ROD Hart acknowledged his request for

5    medical leave in September 2015, but did not talk with him about filling out any of the

6    company's paperwork.[11]  (*See* Donahue Dep. at 90:18-91:24.)  Thus, based on the facts in

7    the record, a reasonable jury could conclude that Mr. Donahue gave sufficient notice of

8    his intent to take an FMLA leave and availed himself of a protected right under the

9    FMLA.[12]

10   //

11   //

12   //

13   ---
     [11] ROD Hart testified that he told Mr. Donahue, "Well, you know the drill:  Contact
     Leave of Absence.  And I just need to know the dates that you are going to be gone."  (Hart Dep.
     at 293:3-4.)  Nevertheless, a reasonable jury could credit Mr. Donahue's testimony that ROD
     Hart did not ask for any further information concerning the medical leave he needed in
     September 2015, and discredit ROD Hart's testimony. *See Kansas v. Ventris*, 556 U.S. 586, 594,
     n.* (2009) ("Our legal system . . . is built on the premise that it is the province of the jury to
     weigh the credibility of competing witnesses.").  Thus, it would be improper to enter summary
     judgment.

     [12] Red Robin's reliance on *Escriba v. Foster Farms Poultry Farms, Inc.*, 743 F.3d 1236,
     1243 (9th Cir. 2014), is misplaced.  Red Robin argues that, under *Escriba*, an employee's mere
     reference to an FMLA-qualifying reason for leave does not trigger FMLA protections or rise to
     the level of notice required under the FMLA.  (*See* RR Mot. at 13.)  The issue in *Escriba*,
     however, was whether the employee could bring an FMLA interference claim even though she
     had specifically declined to take FMLA leave.  *See* 743 F.3d at 1243.  The Ninth Circuit's
     holding in that case is simply that "an employee can affirmatively decline to use FMLA leave,
     even if the underlying reason for seeking the leave would have invoked FMLA protection."  *Id.*
     at 1244.  Here, whether Mr. Donahue provided adequate notice to Red Robin is a question of fact
     for the jury.  *See Chatila v. Scottsdale Healthcare Hosps.*, 701 F. App'x 639, 641 (9th Cir. 2017)
     (reversing the district court's grant of summary judgment for the employer and holding that
     whether the employee requested FMLA leave was a triable issue of fact).

ORDER - 21

1              *b.  The Reason for Mr. Donahue's Termination*

2          Red Robin also argues that it had a legitimate reason to terminate Mr. Donahue's

3   employment, and so both his FMLA interference and retaliation claims fail.  (RR Mot. at

4   13-15.)  To withstand summary judgment on his FMLA interference claim, Mr. Donahue

5   must demonstrate a triable issue of fact that his "taking of FMLA-protected leave

6   constituted a negative factor in the decision to terminate [him]."  *Bachelder*, 259 F.3d at

7   1124.  Indeed, "[t]he question is not whether [Red Robin] had additional reasons for the

8   discharge," but only whether Red Robin "used as a negative factor" in Mr. Donahue's

9   discharge Mr. Donahue's previous FMLA leaves and/or his request for an additional

10  FMLA leave in September 2015.  *See id.* at 1131.  Mr. Donahue can demonstrate a triable

11  issue of fact on this issue "by using either direct or circumstantial evidence."  *Id.* at 1124.

12         As noted above, district courts in the Ninth Circuit use the *McDonald Douglas*

13  framework in analyzing FMLA retaliation claims.  *See Bushfield*, 912 F. Supp. 2d at 953.

14  Using the *McDonnell Douglas* framework, the evidence before the court is sufficient to

15  withstand Red Robin's motion for summary judgment with respect to Mr. Donahue's

16  claim.  In other words, a reasonable jury could conclude that (1) Red Robin used Mr.

17  Donahue's FMLA leave as a negative factor in its decision to terminate him, and (2) that

18  Red Robin's proffered reason for Mr. Donahue's discharge was pretextual.

19         First, there is temporal proximity between Mr. Donahue's notification to ROD

20  Hart concerning his need for additional medical leave and the initiation of the EthicsPoint

21  investigation on which Red Robin based Mr. Donahue's termination—the failure to

22  timely pay TM Ferguson in October 2014.  *See Law v. Kinross Gold U.S.A., Inc*, 651 F.

1   App'x 645, 648 (9th Cir. 2016) (citing *Pagel v. TIN Inc*., 695 F.3d 622, 631 (7th Cir.

2   2012) ("Suspicious timing may be circumstantial evidence of a causal link between

3   exercise of FMLA rights and an adverse employment action."); *Villiarimo v. Aloha*

4   *Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (stating that "causation can be

5   inferred from timing alone where an adverse employment action follows on the heels of

6   protected activity").  Although Red Robin argues that its HR Department learned of the

7   circumstances underlying the investigation on June 2, 2015—two days before Mr.

8   Donahue's notification (*see* Simpson Decl. ¶ 9), there is evidence indicating that Red

9   Robin did not open its EthicsPoint investigation or at least enter the investigation into its

10  system until June 4, 2015—the same day that Mr. Donahue informed ROD Hart about his

11  need for additional medical leave.  (*See* Simpson Decl. ¶ 11, Ex. F; Simpson Dep. at

12  147:11-24.)  Further, ROD Hart testified that he did not learn about the facts underlying

13  the investigation until after Mr. Donahue had informed him of his need for additional

14  medical leave.  (Hart Dep. at 292:11-23.)  Thus, there is circumstantial temporal evidence

15  from which a jury could conclude that the Red Robin launched its EthicsPoint

16  investigation into the October/November 2014 incident involving TM Ferguson, at least

17  in part, in response to Mr. Donahue's request for medical leave.

18      But temporal proximity is not the only evidence that the EthicsPoint investigation

19  was connected to Mr. Donahue's FMLA leave request.  Mr. Donahue offers testimony

20  concerning ROD Hart's shock or surprise when he learned from TM Hersel that Mr.

21  Donahue would need an additional four to six weeks of medical leave in September 2015

22  and TM Hersel's report to Mr. Donahue that she did not mean to get him in trouble with

1  ROD Hart.[13]  (Hersel Dep. at 52:17-53:13; Donahue Dep. at 90:4-13, 91:1-18.)  In

2  addition, Mr. Donahue points to the June 12, 2015, email string between Mr. Mei and

3  Ms. Simpson in which Mr. Mei states that he believes that the investigation places Red

4  Robin "in a good spot" to terminate TM Ferguson, and that ROD Hart "feels like this

5  might be the 'Golden Ticket', so [it is] probably time to punch it."  (1st Goldsworthy

6  Decl. ¶ 45, Ex. RR.)  A reasonable jury could conclude based on testimony concerning

7  ROD Hart's reaction and the language used in the referenced email string that Red

8  Robin's EthicsPoint investigation was a pretext for Mr. Donahue's termination, masking

9  other less legitimate reasons underlying the termination—such as Mr. Donahue's need for

10  another FMLA leave.

11      There is also evidence that Red Robin's explanation concerning Mr. Donahue's

12  termination is not credible.  For example, there is evidence that Mr. Donahue had an

13  exemplary record as a GM at Red Robin and the restaurants he managed received

14  excellent ratings until after his second FLMA leave in 2013.  (*See supra* § II.B.)  In

15  addition, there is evidence that Mr. Donahue was not working at the time TM Ferguson

16  was permitted to clock in under a manager's key and thus is being held accountable for

17  another's error.[14]  (Hersel Dep. at 58:6-59:24; Donahue Decl. ¶ 23.)

18

19      [13] ROD Hart testifies that he was not surprised to learn of Mr. Donahue's need for
    another medical leave in September 2015.  (1st Hart Decl. ¶ 3, Ex. A (Hart Dep.) at 292:24-
20  293:5; 294:13-17.)  Nevertheless, a reasonable jury could credit testimony to the contrary and
    conclude that he was.

21      [14] Red Robin insists that Mr. Donahue was working on the days TM Ferguson clocked in
    under another employee's time card.  (*See* Reply at 3 (citing evidence indicating that Mr.
22  Donahue worked with TM Ferguson at the Auburn store).)  Red Robin's argument in its reply

1    Lastly, Mr. Donahue presents evidence of other Red Robin employees who he

2    asserts are similarly situated but who Red Robin treated more leniently.  *See supra*

3    §§ II.D.1-3.  Red Robin asserts that these other employees' situations are not similar to

4    Mr. Donahue's situation.  (RR Reply at 6-7.)   But generally, whether comparator

5    employees are similar to the plaintiff is a question of fact for the jury.  *Hawn v. Exec. Jet*

6    *Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (citing *Beck v. United Food &*

7    *Commercial Workers Union Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007)); *see also*

8    *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 660 (9th Cir. 2002), *as*

9    *amended* (July 18, 2002) (paraphrasing *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54

10   (2d Cir. 2001), and remarking on the "minimal showing necessary to establish co-

11   workers were similarly situated").   In the court's view, a reasonable jury could conclude

12   that the identified comparators were similarly situated to Mr. Dnoahue.

13       Taken together, the evidence Mr. Donahue marshals in response to Red Robin's

14   motion is sufficient to raise triable issues of fact and to withstand summary judgment on

15   both his FMLA interference and retaliation claims.  At trial, Mr. Donahue's evidence

16   may be insufficient to persuade a jury.  But weighing both sides' evidence on Mr.

17   Donahue's FMLA claims and making credibility determinations are tasks for the jury.

18   *See Liberty Lobby*, 477 U.S. at 255 ("Credibility determinations, [and] the weighing of

19   evidence . . . are jury functions, not those of a judge.").   Accordingly, the court denies

20   Red Robin's motion for summary judgment of Mr. Donahue's FMLA claims.

21

22   ─────────────────────
memorandum merely highlights that summary judgment is not appropriate on this claim due to
the genuine factual disputes at issue.

1          2.  Discrimination under the ADA and WLAD

2          Both the ADA and the WLAD prohibit an employer from discriminating "against

3   a qualified individual with a disability because of the disability." *Nunes v. Wal-Mart*

4   *Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12112(a)); *Grill v.*

5   *Costco Wholesale Corp.*, 312 F. Supp. 2d 1349, 1354 (W.D. Wash. 2004) ("Washington

6   state courts have noted that state law relating to disability discrimination substantially

7   parallels federal law, and courts should look to interpretations of federal

8   antidiscrimination laws, including the ADA, when applying the WLAD.")  A prima facie

9   case of disparate treatment disability discrimination under the WLAD has four elements:

10  "(1) the employee is disabled; (2) the employee is doing satisfactory work; (3) the

11  employee suffered an adverse employment action; and (4) the employee was discharged

12  under circumstances that raise a reasonable inference of unlawful discrimination."

13  *McElwain v. Boeing Co.*, 244 F. Supp. 3d 1093, 1097-98 (W.D. Wash. 2017) (citing

14  *Callahan v. Walla Walla Housing Auth.*, 110 P.3d 782, 786 (Wash. Ct. App. 2005)).

15  Similarly, under the ADA, to state a prima facie case the plaintiff must show that (1) he is

16  a disabled person within the meaning of the ADA; (2) he is a qualified individual,

17  meaning he can perform the essential functions of her job; and (3) the defendant

18  terminated him because of his disability.  *Nunes*, 164 F.3d at 1246.  The plaintiff's

19  disability need not be the sole factor behind the adverse action but must be a motivating

20  factor.  *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005).  The *McDonnell*

21  *Douglas* burden shifting analysis applies to Mr. Donahue's ADA and WLAD claims.  *See*

22  *//*

*Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1175 (9th Cir. 1998); *Scrivener v. Clark Coll.*, 334 P.3d 541, 544 (Wash. 2014).

Red Robin asserts that it is entitled to summary judgment on both Mr. Donahue's ADA and WLAD claims because Mr. Donahue cannot meet his prima facie burden of demonstrating "that he was performing satisfactorily." (RR Mot. at 15.) Specifically, Red Robin argues that Mr. Donahue's "failure to ensure all [TMs] working in his restaurant were paid accurately and on time means that he cannot show he was performing satisfactorily, and his disability discrimination claim should be dismissed." (*Id.* at 16.)

Mr. Donahue provides substantial evidence that he was capable of performing the essential functions of his job both before and after he acquired bladder cancer and needed standing and lifting accommodations. *See supra* § II.B. Indeed, he provides evidence that he excelled at his job. For example, as discussed above, he helped improve several restaurants from near-bottom to near-top ranked Red Robin restaurants. (Donahue Decl. ¶¶ 7-18.) And in 2012 and 2013, Mr. Donahue was designated a Training GM, and the Auburn restaurant he managed was designated a training restaurant. (1st Goldsworthy Decl. ¶ 17, Ex. P at 12-13.) Mr. Donahue provides evidence that his reviews only began to decline following his second FMLA leave for a hernia repair surgery. *See supra* § II.B.

The Ninth Circuit has recognized that a plaintiff's burden at the prima facie stage is not onerous, *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010), and the necessary evidence is minimal, *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225

F.3d 1115, 1124 (9th Cir. 2000).  Indeed, the requisite degree of proof to establish a

prima facie case of discrimination on summary judgment "does not even need to rise to

the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885,

889 (9th Cir. 1994).  Based on the foregoing facts, the court concludes that there is a

genuine issue of material fact as to whether Mr. Donahue has established his prima facie

case concerning the second element of both his ADA and WLAD claims—that he was

performing his job satisfactorily.[15]

Red Robin's argument goes more to the second step in the analysis of Mr.

Donahue's claim—the *McDonnell Douglas* burden shifting.  Once Mr. Donahue

establishes his prima facie case, the burden shifts to Red Robin to articulate a legitimate,

non-discriminatory reason for its termination decision.  *Raytheon v. Hernandez*, 540 U.S.

44, 49 n.3 (2003); *Garcia v. Qwest Corp.*, No. CV07-999-PHX-LOA, 2008 WL 5114317,

at *8 (D. Ariz. Dec. 4, 2008).  If Red Robin proffers such a reason, "the presumption of

intentional discrimination disappears, but the plaintiff can still prove disparate treatment

by, for instance, offering evidence demonstrating that the employer's explanation is

pretextual."  *See Raytheon*, 540 U.S. at 49 n.3.  In this instance, Red Robin offers the

legitimate, nondiscriminatory reason that Mr. Donahue failed "to ensure all [TMs]

//

---

[15] As discussed above, because Mr. Donahue has made a sufficient showing to survive summary judgment on his ADA claim, he has made a sufficient showing to survive summary judgment on his WLAD claim as well.  *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1136 n.10 (9th Cir. 2001); *Gough v. PeaceHealth St. Joseph Med. Ctr.*, No. 2:12-CV-00346-RAJ, 2013 WL 1148748, at *8 n.18 (W.D. Wash. Mar. 19, 2013); *Ogden v. Pub. Util. Dist. No 2 of Grant Cty.*, No. 16-35295, 2018 WL 2244706, at *1 (9th Cir. May 16, 2018) ("[The plaintiff's] related state claim arises under [WLAD], which is construed analogously with the ADA.").

1    working in his restaurant were paid accurately and on time." (RR Mot. at 16.)  However,

2    for all the reasons that the court concluded there was triable issue concerning whether the

3    EthicsPoint investigation was a pretext in the context of his FMLA claims, *see supra*

4    § III.B.1.b, the court likewise concludes with respect to Mr. Donahue's ADA and WLAD

5    discrimination claims that a jury question exists.  Accordingly, the court denies Red

6    Robin's motion for summary judgment on these claims.

7         3.  Retaliation under the ADA and WLAD

8         Red Robin moves for summary judgment of Mr. Donahue's claim for retaliation

9    under the ADA and WLAD.  (RR Mot. at 16-18.)   The Ninth Circuit has recognized that

10   the framework to analyze Title VII retaliation claims applies equally to the ADA and

11   WLAD.  *Barnett v. U.S. Air, Inc*., 228 F.3d 1105, 1121 (9th Cir. 2000) (adopting Title

12   VII analysis for the ADA), *vacated on other grounds*, 535 U.S. 391 (2002); *Stegall v.*

13   *Citadel Broad. Co*., 350 F.3d 1061, 1065 (9th Cir. 2003) (utilizing Title VII analysis for

14   WLAD).  To establish a prima facie case of retaliation under this framework, Mr.

15   Donahue must demonstrate: (1) that he engaged in a protected activity, (2) that he was

16   thereafter subjected to adverse employment action, and (3) that a causal link exists

17   between the protected activity and the adverse employment action.  *Stegall*, 350 F.3d at

18   1065-66.  A causal link can be established by direct evidence or inferred from

19   circumstantial evidence, such as the temporal proximity between the protected activity

20   and the employment decision or the employer's knowledge that the employee engaged in

21   protected activities.  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

22   *//*

1       Red Robin argues that Mr. Donahue "cannot demonstrate a causal connection

2   between his alleged [June 2015] communication [concerning his need for an additional

3   medical leave in September 2015] and his termination."  (RR Mot. at 16.)  First, Mr.

4   Donahue does not rely solely on his request for additional leave in September 2015 or his

5   June 2015 termination as the basis for his retaliation claim.  He also asserts that he

6   received poor performance reviews and written warnings following his second FMLA

7   leave and on-going requests for accommodations.  *See supra* § II.B.  Indeed, following

8   his second FMLA leave and his request for lifting and standing accommodations, Mr.

9   Donahue's annual performance reviews went from "Exceeds Expectations" to "Does Not

10  Meet Expectations" and "Meets Expectations."  *See id.*  ROD Hart acknowledges in his

11  deposition that a "Meets Expectations" review could impact Mr. Donahue's potential

12  raise.  (Hart Dep. at 239:3-9.)  In addition, a Red Robin manager withdrew permission for

13  Mr. Donahue to apply for a promotion.  (*See* Donahue Dep. at 216:1-217:8.)  Red Robin

14  never addresses this additional evidence, and this fact alone constitutes grounds to deny

15  its motion for summary judgment.  (*See* RR Mot. at 16-18; RR Reply at 8.)

16      Second, for all of the reasons stated with regard to Mr. Donahue's FMLA claims,

17  Mr. Donahue presents sufficient evidence to create a triable issue of fact concerning

18  whether Red Robin's stated reason for his termination was pretextual.  *See supra*

19  § III.B.1.b.  Accordingly, the court denies Red Robin's motion for summary judgment on

20  Mr. Donahue's ADA and WLAD retaliation claims.

21  //

22  //

1        4.  <u>Hostile Work Environment under WLAD</u>

2        WLAD prohibits employers from creating a hostile work environment predicated

3    on disability-based harassment.[16]  *Rodel v. Roundup Corp.*, 59 P.3d 611, 618 (Wash.

4    2002).  "[A] plaintiff in a disability based hostile work environment case must prove (1)

5    that he or she was disabled within the meaning of the antidiscrimination statute, (2) that

6    the harassment was unwelcome, (3) that it was because of the disability, (4) that it

7    affected the terms or conditions of employment, and (5) that it was imputable to the

8    employer."  *Id.* at 616.  "Of the fourth element, whether the conduct affected the terms

9    and conditions of employment, . . . the harassment must be sufficiently pervasive so as to

10   alter the conditions of employment and create an abusive working environment."  *Id.* at

11   617 (internal quotations and alterations omitted).  Behavior that is "merely offensive" but

12   not "so extreme as to amount to a change in the terms and conditions of employment" is

13   insufficient to escape summary judgment.  *Davis v. City of Seattle*, 343 F. App'x 230,

14   232 (9th Cir. 2009) (citing *Adams v. Able Bldg. Supply, Inc.*, 57 P.3d 280, 283-84 (Wash.

15   Ct. App. 2002), and *Wash. v. Boeing Co.*, 19 P.3d 1041, 1049 (Wash. Ct. App. 2001)).

16       Red Robin challenges only the fourth element of Mr. Donahue's claim.  (RR Mot.

17   at 22.)  The court agrees that summary judgment on Mr. Donahue's hostile work

18   environment claim is warranted.  To prevail on his claim, Mr. Donahue must show that

19   Red Robin subjected him to "discriminatory intimidation, ridicule, and insult" of such

20

21       [16] The Ninth Circuit has yet to recognize a hostile work environment claim based on disability under the ADA.  *See Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003).

22   Mr. Donahue appears to base his hostile work environment claim solely on WLAD.  (*See* Plf. Resp. at 20-21.)

ORDER - 31

1    "sever[ity] or pervasive[ness] [as] to alter the conditions of the victim's employment and

2    create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22

3    (1993) (internal quotation marks omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*,

4    477 U.S. 57, 65-67 (1986). Mr. Donahue argues that Red Robin "began targeting [him]

5    immediately after his second protected medical leave in October 2013." (Plf. Resp. at

6    21.) He points to poor performance reviews, written warnings about the restaurant he

7    managed, and rescinded promotion opportunities—all of which culminated in his June

8    2015 termination. (*See id.*) The actions upon which Mr. Donahue relies for his hostile

9    work environment claim closely track the actions that underlie his ADA and WLAD

10   discrimination and retaliation claims. *See supra* §§ III.B.2, 3. But Mr. Donahue cannot

11   base his hostile work environment claim on the same acts upon which he bases his

12   discrimination and retaliation claims. As one court has persuasively explained:

13            Plaintiff should not be permitted to bootstrap his alleged discrete acts of
              discrimination and retaliation into a broader hostile work environment

14            claim. . . . Discrete acts constituting discrimination or retaliation claims . . .
              are different in kind from a hostile work environment claim that must be

15            based on severe and pervasive discriminatory intimidation or insult. . . . The
              dangers of allowing standard disparate treatment claims to be converted into

16            a contemporaneous hostile work environment claim are apparent. Such an
              action would significantly blur the distinctions between both the elements

17            that underpin each cause of action and the kinds of harm each cause of action
              was designed to address. . . . A hostile work environment . . . must be based

18            on one unlawful employment practice of pervasive, insulting, discriminatory
              conduct that makes the plaintiff's day-to-day work environment severely

19            abusive. . . . Therefore, cobbling together a number of distinct, disparate acts
              will not create a hostile work environment. For example, if an employee is

20            discriminatorily denied ten promotions over a period of time, that pattern of
              conduct may give rise to ten separate claims under Title VII, but it would not

21            create a hostile work environment claim based on pervasive intimidation,
              insult and ridicule.

22

ORDER - 32

1    *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 81-82 (D.D.C. 2007) (alterations, citations, and

2    internal quotation marks omitted); *see also Smith v. Small*, 539 F. Supp. 2d 116, 138

3    (D.D.C. 2008) ("[I]nsofar as Plaintiff attempts to base his hostile work environment

4    claim on his [compressed work schedule] revocation and AWOL charge, he cannot

5    simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work

6    environment claim."). For this reason, the court agrees that summary judgment on Mr.

7    Donahue's hostile work environment claim is warranted.

8         But even if Mr. Donahue could "simply regurgitate" his retaliation or

9    discrimination claims to support his hostile work environment claim, *see Smith*, 539 F.

10   Supp. 2d at 138, his effort here fails given the facts in this case. His claim consists of a

11   handful of discrete instances of alleged discrimination or retaliation over a period of

12   nearly a year and a half. *See supra* § II.B. These incidents simply do not translate into

13   the kind of pervasive, insulting, and discriminatory conduct that makes the plaintiff's

14   day-to-day work environment severely abusive. *See Nat'l R.R. Passenger Corp. v.

15   Morgan*, 536 U.S. 101, 117 (2002); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S.

16   75, 81 (1998). Accordingly, the court grants Red Robin's motion for summary judgment

17   of Mr. Donahue's hostile work environment claim.

18        5.  Failure to Accommodate under the ADA and WLAD

19        Mr. Donahue asserts a claim against Red Robin for failure to accommodate his

20   disabilities and failure to engage in the required interactive process. (FAC ¶ 25.b.) Red

21   Robin argues that it is entitled to summary judgment on this claim because it granted Mr.

22   Donahue the lifting, standing, and medical leave accommodations he requested and

1  fulfilled its obligations to participate in the required interactive process.  (RR Mot. at

2  22-24.)

3        A prima facie case for failure to accommodate under both the ADA and WLAD

4  requires Mr. Donahue to show that (1) he is disabled; (2) he is qualified for the job in

5  question and capable of performing it with reasonable accommodation; (3) the employer

6  had notice of his disability; and (4) the employer failed to reasonably accommodate his

7  disability.  *See McDaniels v. Grp. Health Co-op.*, 57 F. Supp. 3d 1300, 1314-15 (W.D.

8  Wash. 2014) (citing *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237

9  (9th Cir. 2012); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088-89 (9th Cir. 2002);

10  *Davis v. Microsoft Corp.*, 70 P.3d 126, 131 (Wash. 2003)).  If an employee identifies a

11  disability that may require accommodation, the employer has a mandatory duty under the

12  ADA to engage in a good faith interactive process of identifying essential and

13  nonessential job tasks and possible accommodations; assessing the reasonableness and

14  effectiveness of the accommodations; and implementing the most appropriate

15  accommodation that does not impose an undue hardship on the employer.  *Barnett*, 228

16  F.3d at 1114.  "Employers should 'meet with the employee who requests an

17  accommodation, request information about the condition and what limitations the

18  employee has, ask the employee what he or she specifically wants, show some sign of

19  having considered employee's request, and offer and discuss available alternatives when

20  the request is too burdensome.'"  *Id.* at 1115 (quoting *Taylor v. Phoenixville Sch. Dist.*,

21  184 F.3d 296, 317 (3d Cir. 1999)).

22  //

ORDER - 34

1    Red Robin argues that it granted Mr. Donahue all of his requests for medical leave

2    and for standing and lifting restrictions.  (RR Mot. at 9-11.)  Indeed, the court found no

3    evidence in the record that Red Robin denied any such requests—except, arguably, Mr.

4    Donahue's last request for medical leave due to his termination.  (*See* Donahue Dep. at

5    88:2-89:2.)  Mr. Donahue's claim, however, rests largely on his contention that Red

6    Robin failed to engage in the interactive process when Mr. Donahue was unable to

7    implement the lifting and standing accommodations to which Red Robin had agreed.

8    (*See* Plf. Resp. at 20.)  Mr. Donahue testified that he told ROD Hart and RVP Mei that he

9    was having difficulty implementing his standing and lifting restrictions.  (Donahue Dep.

10   at 78:9-80:24, 81:20-83:22.)  Specifically, Mr. Donahue complained that there was not

11   enough staff in the restaurant to ensure that he did not have to lift items that were too

12   heavy (*id.* at 78:9-79:10), and he did not have enough flexibility as a GM to assign more

13   people to the restaurant during the times he needed them to avoid heavy lifting (*id.* at

14   79:11-80:23).[17]  He testified that he suggested Red Robin maintain an additional manager

15   in his restaurant or promote him as options to ease the physical demands of his job.  (*Id.*

16   at 83:10-13, 217:9-19.)

17         Contrary to Mr. Donahue's testimony, ROD Hart testified that, as a GM, Mr.

18   Donahue was "in charge," "would have [had] direct access and control" to avoid lifting,

19

20         [17] In moving for summary judgment, Red Robin argues that Mr. Donahue's testimony
     regarding other employees' non-availability to help him move inventory "defines [sic]
21   credibility."  (*See* RR Mot. at 23-24.)  However, it is axiomatic that witness credibility
     determinations are for the jury, *see Ventris*, 556 U.S. at 594, n.*, and in resolving a summary
22   judgment motion, the court is to believe the evidence of the opposing party, *Liberty Lobby*, 477
     U.S. at 255.

ORDER - 35

1    and "would have [had] plenty of people around him" to do any necessary lifting.  (Hart

2    Dep. at 188:15-23.)  When asked if he had taken "any special effort" to speak with

3    anyone about assisting Mr. Donahue with lifting, he responded:  "No.  I think the only

4    thing I told [Mr. Donahue] is not to lift."  (*Id.* at 188:24-198:3.)  HR Director Rivera

5    testified similarly.  When asked if she knew what actions Red Robin took to ensure that

6    Mr. Donahue received his accommodations, she responded:  "[Mr.] Donahue was the

7    general manager of his location.  He controlled his own schedule.  He controlled his

8    entire day."  (Rivera Dep. at 86:19-25.)

9           The court agrees with Red Robin that it was not required to hire additional

10   employees or promote Mr. Donahue as reasonable accommodations.  *See Burch v. City of*

11   *Nacogdoches*, 174 F.3d 615, 612 (5th Cir. 1999) ("The ADA does not require an

12   employer to . . . hire new employees [as an accommodation].");  *Gomez v. Am. Bldg.*

13   *Maint.*, 940 F. Supp. 255, 260 (N.D. Cal. 1996) ("[A]n employer not be required to offer

14   a promotion solely as a reasonable accommodation to an individual with a disability.").

15   Nevertheless, if Mr. Donahue could not implement the standing and lifting restrictions

16   that Red Robin approved, then the approved restrictions are not accommodations.  *See*

17   *Reed v. Kindercare Learning Ctrs., LLC*, No. C15-5634BHS, 2016 WL 7231454, at *7

18   (W.D. Wash. Dec. 14, 2016) ("It is not an accommodation if it is not available for the

19   individual when needed.  There is no authority for the proposition that an employer can

20   engage in an interactive process, secure an accommodation, and then either restrict access

21   or preclude access to that accommodation.").  Further, in responding to Mr. Donahue's

22   suggestions for additional staff or a promotion, Red Robin should have "show[ed] some

1  sign of having considered [Mr. Donahue's] request[s], and offer[ed] and discuss[ed]

2  available alternatives" to Mr. Donahue's overly burdensome requests.  *See Barnett*, 228

3  F.3d at 1115.  At the very least, the evidence in the record creates material questions of

4  fact for trial.  Accordingly, the court denies Red Robin's motion on Mr. Donahue's

5  failure to accommodate claim.

6          In sum, the court denies Red Robin's motion for summary judgment on Mr.

7  Donahue's FMLA and WFLA claims, his ADA and WLAD discrimination claims, and

8  his ADA and WLAD failure to accommodate claims.  *See supra* §§ III.B.1-3, 5.

9  However, the court grants Red Robin's motion for summary judgment on Mr. Donahue's

10  WLAD hostile work environment claim.  *See supra* § III.B.4.

11  **C.      Mr. Donahue's Motion for Summary Judgment**

12          Mr. Donahue moves for summary judgment of Red Robin's affirmative defenses

13  1-5 and 9-11.  (*See generally* Plf. Mot.)  On April 5, 2017, Mr. Donahue served Red

14  Robin with following interrogatory:

15          If **Defendants** contend that **Defendants** are not liable to Plaintiff for
        damages, state the factual basis **and** circumstances for such contention(s)

16          **and** identify with particularity all facts which **you** contend support **or relate
        to** any affirmative defenses (Note:  If you fail to list specific facts or objects

17          as to any affirmative defense, Plaintiff will move to dismiss the affirmative
        defense based on your answer to this interrogatory.).

18
19  (2d Goldsworthy Decl. (Dkt. # 33) ¶ 2, Ex. A ("Interrogatory No. 11") (bolding in

20  original).)  On May 5, 2017, Red Robin responded that "Defendants' actions did not

21  violate the law and it had legitimate business reasons for terminating Plaintiff's

22  employment."  (*See id.*)  Red Robin also referred Mr. Donahue to the witnesses and

1   documents that it produced in its Initial Disclosures.  (*See id.*)  The court now addresses

2   Mr. Donahue's motion.

3       1.  Standard

4       As a threshold matter, Red Robin argues that the court should consider Mr.

5   Donahue's motion as a motion to strike its affirmative defenses under Federal Rule of

6   Civil Procedure 12(f) rather than as a motion for summary judgment under Rule 56.  (*See*

7   RR Resp. (Dkt. # 64) at 8-9.)  However, in *Whittlestone, Inc. v. Handi-Craft Co.*, the

8   Ninth Circuit signaled that a motion for summary judgment under Rule 56 is the proper

9   vehicle for a dispositive motion concerning affirmative defenses at this stage in the

10  proceedings.  618 F.3d 970, 974 (9th Cir. 2010) ("Were we to read Rule 12(f) in a

11  manner that allowed litigants to use it as a means to dismiss some or all of a

12  pleading . . . , we would be creating redundancies within the Federal Rules of Civil

13  Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later

14  stage in the proceedings) already serves such a purpose.").  Accordingly, the court will

15  apply a summary judgment standard to Mr. Donahue's motion.

16      2.  Affirmative Defenses Nos. 9 and 11:  Laches, Waiver, and Contributory
          Negligence

17

18      In its response to Mr. Donahue's motion, Red Robin agrees to strike affirmative

19  defense number nine, which assets the defense of contributory negligence, and number 11

20  as to the defenses of laches and waiver.  (RR Resp. at 1 n.2 ("Defendants agree to strike

21  affirmative defenses Nos. 9 and 11 as to laches and waiver").)  Accordingly, the court

22  grants Mr. Donahue's motion as to these two affirmative defenses.

3. Affirmative Defense No. 3:  Undue Hardship

Mr. Donahue seeks summary judgment on Red Robin's affirmative defense number three, which states:  "Pending discovery of his asserted disability and need for accommodation, [Mr. Donahue's] alleged accommodation may be proven an undue hardship."  (Plf. Mot. at 8-9; Ans. (Dkt. # 12) at 8.)  In her deposition, HR Director Rivera acknowledged that she did not think that Mr. Donahue's requested lifting and standing accommodations were an undue hardship on Red Robin.[18]  (*See* Rivera Dep. at 85:24-89:4.)  However, during the course of his deposition, Mr. Donahue indicated that he had also asked Red Robin to maintain an additional manager in his restaurant or promote him as ways to ease the physical demands of his job.  (Donahue Dep. at 83:10-13, 217:9-19; *see also* Plf. Mot. at 2 (indicating that Mr. Donahue needed additional, unspecified accommodations to "actually adhere to [his] medical restrictions").)  As noted above, courts have concluded that the ADA does not require such accommodations.  *See Burch*, 174 F.3d at 612; *Gomez v. Am. Bldg. Maint.*, 940 F. Supp. at 260.  Accordingly, the court denies Mr. Donahue's motion for summary judgment on affirmative defense number three.

//

//

//

---

[18] Mr. Donahue argues that Ms. Rivera's statement was a binding admission as to all accommodations Mr. Donahue requested.  (*See* Plf. Reply (Dkt. # 71) at 6.)  However, the context of her testimony is about Mr. Donahue's request for lifting and standing accommodations only (*see* Rivera Dep. at 85:24-89:4), and thus, the court does not interpret her statement to extend beyond those restrictions.

1    4.   Affirmative Defenses Nos. 1, 2, and 10:  Good Faith and Punitive Damages

2    In his complaint, Mr. Donahue seeks punitive damages but cites no statutory or

3    other legal authority in support of his claim.  (*See* FAC ¶¶ 3, G (Prayer for Relief).)

4    "Punitive damages are available under Title VII where the employer 'engaged in a

5    discriminatory practice or discriminatory practices with malice or with reckless

6    indifference to the federally protected rights of an aggrieved individual.'"[19]  *Rosas v.*

7    *Chipotle Mexican Grill, Inc.*, No. SACV1202189JLSRNBX, 2014 WL 12637412, at *3

8    (C.D. Cal. July 22, 2014) (quoting 42 U.S.C. § 1981a(b)(1)).  Mr. Donahue moves for a

9    summary judgment ruling on Red Robin's affirmative defenses one, two and 10 "that

10   [Red Robin] cannot assert a 'good faith' affirmative defense to punitive damages."[20]

11   (Plf. Mot. at 11.)  The court denies Mr. Donahue's motion.

12   First, Mr. Donahue brings a claim for retaliation under the ADA.  (*See* FAC ¶¶ 2,

13   15, 18, 25.d, 25.i, 26.a, 35-37.)  This claim survives Red Robin's motion for summary

14

15   [19] "Common law agency principles apply in determining an employer's vicarious liability
16   for punitive damages."  *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 542-43 (1999)
     ("The Restatement of Agency places strict limits on the extent to which an agent's misconduct
17   may be imputed to the principal for purposes of awarding punitive damages[.]"); *E.E.O.C. v.*
     *U.S. Bakery, Inc.*, No. CV 03-64-HA, 2004 WL 1774214, at *9 (D. Or. Aug. 9, 2004) ("To
     succeed on a claim for punitive damages [under Title VII], the plaintiff must . . . prove that
18   liability is properly imputed to the employer." ) (citing *Kolstad*, 527 U.S. at 534-35)).

19   [20] In affirmative defense number one, Red Robin asserts that it "acted with *bona fide*
     reasons for believing that [its] conduct complied with the law and without malice or recklessness
20   toward [Mr. Donahue's] legal rights, so that [Red Robin] cannot be held liable for punitive,
     exemplary, or liquidated damages."  (Ans. at 8.)  In affirmative defense number two, Red Robin
21   asserts that its "actions or omission [sic] were taken in good faith and the honest belief that
     its actions complied with the law."  (*Id.*)  Finally, in affirmative defense number 10, Red Robin
22   asserts that "its actions . . . were reasonable and . . . taken in good faith for legitimate,
     non-discriminatory business reasons."  (*Id.* at 9.)

1    judgment.  *See supra* § III.B.3.  But the ADA does not allow a claim for punitive—or

2    even compensatory—damages for a retaliation claim.  *See Alvarado v. Cajun Operating*

3    *Co.*, 588 F.3d 1261, 1270 (9th Cir. 2009) ("We . . . hold that punitive and compensatory

4    damages are not available for ADA retaliation claims.").  On this basis alone, the court

5    denies Mr. Donahue's motion for summary judgment on affirmative defenses one, two

6    and 10.

7         Second, good faith is a defense that may reduce additional liability for liquidated

8    damages in a FMLA suit.  *See* 29 U.S.C. § 2617(a)(1)(A)(iii).  Likewise, compensatory

9    and punitive damages for failure to accommodate are improper if "the covered entity

10   demonstrates good faith efforts to identify and make a reasonable accommodation that

11   would provide such individual with an equally effective opportunity and would not cause

12   an undue hardship on the operation of the business." 42 U.S.C. § 1981a(3).  Thus, the

13   question before the court is whether there is enough evidence of good faith in the record

14   for Red Robin to assert such a defense.  The court concludes that there is.

15        Red Robin presents ample evidence of good faith, including its approval of

16   numerous accommodations for Mr. Donahue.  Mr. Donahue acknowledges that, except

17   for the September 2015, medical leave that he anticipated taking at the time Red Robin

18   terminated his employment, Red Robin granted him every medical leave he requested.

19   (Donahue Dep. at 88:2-89:2.)  Moreover, Red Robin granted Mr. Donahue the standing

20   and lifting accommodations he requested following his surgeries.  (1st Goldsworthy Decl.

21   ¶ 12, Ex. K; Rivera Dep. at 82:18-23, 84:10-20.)  Although Mr. Donahue argues that Red

22   Robin failed to engage in the required interactive process to determine how he could

1   implement these accommodations, a reasonable jury could conclude that this failure, if

2   credited, was mere negligence—a conclusion that would not support the imposition of

3   punitive damages.  *See Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir.

4   1998), *opinion amended on denial of reh'g*, 156 F.3d 988 (9th Cir. 1998) (concluding that

5   punitive damages may not be awarded in a Title VII action where the employer's

6   discriminatory conduct is merely negligent).

7          Finally, with respect to Mr. Donahue's ADA discrimination claim, Mr. Donahue

8   argues that he is entitled to summary judgment on Red Robin's affirmative defense

9   regarding punitive damages because the three managers involved in Mr. Donahue's

10  termination—ROD Hart, RVP Mei, and Ms. Simpson—were "sufficiently senior to be

11  considered proxies" of Red Robin.  (*See* Plf. Mot. at 9-11.)   As the Supreme Court has

12  explained, assuming that Mr. Donahue can establish the necessary factual predicate for an

13  award of punitive damages, "an employer may not be vicariously liable for the

14  discriminatory employment decisions of managerial agents where those decisions are

15  contrary to the employer's good-faith efforts to comply with Title VII."  *Kolstad*, 527

16  U.S. at 545.  Thus, an employer "may now establish an affirmative defense to punitive

17  damages liability when they have a bona fide policy against discrimination, regardless of

18  whether or not the prohibited activity engaged in by their managerial employees involved

19  a tangible employment action."  *Passantino v. Johnson & Johnson Consumer Products*,

20  212 F.3d 493, 516 (9th Cir. 2000) (discussing *Kolstad* in the context of a Title

21  //

22  //

1   VII/WLAD sex discrimination case).  Red Robin has such a policy.[21]  (Simpson Decl.

2   ¶ 6, Ex. B at 12-13.)  However, this affirmative defense to punitive damages is not

3   available if the managerial employees "who engage in illegal conduct are sufficiently

4   senior to be considered proxies for the company."  *Passantino*, 212 F.3d at 517.  Mr.

5   Donahue contends that he is entitled to summary judgment on this affirmative defense

6   because there is no genuine factual dispute that the three managers involved in Mr.

7   Donahue's termination were "sufficiently senior . . . [to be] treated as the corporation's

8   prox[ies] for purposes of liability."  (Plf. Mot. at 10 (citing *Passantino*, 212 F.3d at 516).)

9        The court disagrees.  Although there is no doubt that the three employees were at

10  the managerial level, Red Robin demonstrates that there are a material questions of fact

11  as to whether any of the employees could be considered a "proxy" for Red Robin.  Such a

12  determination is "a fact-intensive inquiry," *Kolstad*, 527 U.S. at 543, and thus generally

13  appropriate to send to the jury, *see Alvarado v. Fed. Express Corp.*, 384 F. App'x 585,

14  590-91 (9th Cir. 2010) (remanding as error the district court's failure to properly instruct

15  the jury on the employer's affirmative defense to punitive damages); *E.E.O.C. v. Evans*

16  *Fruit Co*., No. CV-10-3033-LRS, 2013 WL 3817372, at *1 (E.D. Wash. July 22, 2013)

17  (leaving to the jury the question of whether it found by a preponderance of the evidence

18  that an employee was a "proxy" of the defendant employer).  As Red Robin points out

19  (*see* RR Resp. at 14-15), none of the three decision-makers were corporate officers of the

20  //

21        _____

     [21] To avail itself of this affirmative defense, "an employer must show not only that it has

22  adopted an anti-discrimination policy, but that it has implemented that policy in good faith."
     *Passantino*, 212 F.3d at 517.

1    company such that they were indisputably Red Robin's "proxies." *See Faragher v. City*

2    *of Boca Raton*, 524 U.S. 775, 789 (1998) (noting that the president of a corporation is

3    "indisputably within that class of an employer organization's officials who may be

4    treated as the organization's proxy").

5          Further, at the time Red Robin terminated Mr. Donahue, there were over 50

6    RODs, like ROD Hart.  (2d Hart Decl. (Dkt. # 65) ¶ 2.)  ROD Hart reported to a Regional

7    VP, one of whom over time was Mr. Mei.  (*Id.* ¶ 3.)  RVP Mei was one of eight RVPs.

8    (*Id.* ¶ 3.)  He in turn reported to the VP of Operations, who in turn reported to Red

9    Robin's Chief Executive Officer ("CEO").  (*Id.*)  Ms. Simpson, who held the position of

10    Employee Relations Manager, was outside of Mr. Donahue's reporting chain.  (2d

11    Simpson Decl. (Dkt. # 66) ¶ 3.)  She reported to the VP of HR, who in turn reported to

12    the Chief People Officer, who in turn reported to the CEO.  (*Id.* ¶ 2.)  The court

13    concludes that there are genuine factual issues concerning whether these three managers

14    were sufficiently senior to be considered "proxies" for Red Robin.  Accordingly, for all

15    of the reasons stated herein, the court denies Mr. Donahue's motion for summary

16    judgment on Red Robin's affirmative defenses one, two and 10, as those affirmative

17    defenses relate to the issue of a good faith defense to punitive damages.

18          5.  Affirmative Defense No. 11:  Equitable Estoppel

19          In affirmative defense number 11, Red Robin asserts that Mr. Donahue's "claims

20    may be barred by the doctrine[] of estoppel."  (Ans. at 9.)  Mr. Donahue moves for

21    summary judgment on this affirmative defense.  (Plf. Mot. at 12-13.)  Red Robin argues

22    that by signing certain accommodations agreements with Red Robin, Mr. Donahue is

1    estopped from thereafter attempting to engage in the interactive process to identify and

2    implement appropriate reasonable accommodations.  (RR Resp. at 15-16.)  The court

3    disagrees and grants Mr. Donahue's motion concerning the affirmative defense of

4    equitable estoppel.

5         Once a disabled employee has given an employer "notification of [his] disability

6    and the desire for accommodation," *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir.

7    2002) (citing *Barnett*, 228 F.3d at 1114), "there is a mandatory obligation to engage in an

8    informal interactive process 'to clarify what the individual needs and identify the

9    appropriate accommodation,'" *id*. (quoting *Barnett*, 228 F.3d at 1112).  Further, the duty

10   to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.'"  *Humphrey*

11   *v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001) (quoting *McAlindin v. Cty. of*

12   *San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999)).  "Thus, the employer's obligation to

13   engage in the interactive process extends beyond the first attempt at accommodation and

14   continues when the employee asks for a different accommodation or where the employer

15   is aware that the initial accommodation is failing and further accommodation is needed."

16   *Id.* at 1138.  This arrangement actually benefits the employer "by avoiding the creation of

17   a perverse incentive for employees to request the most drastic and burdensome

18   accommodation possible out of fear that a lesser accommodation might be ineffective."

19   *Id.*

20        Because engaging in the interactive process is a mandatory obligation, the court

21   agrees with Mr. Donahue that—by signing an accommodations agreement with Red

22   Robin—he is not estopped from arguing that Red Robin failed to re-engage in the

1   interactive process after he apprised them that he was unable to fully implement the

2   accommodations.  Accordingly, the court grants Mr. Donahue's motion for summary

3   judgment concerning Red Robin's assertion of equitable estoppel in affirmative defense

4   number 11.

5         6.   Affirmative Defense No. 11:  Statute of Limitations

6         Mr. Donahue moves for summary judgment of Red Robin's statute of limitations

7   affirmative defense.  (Plt. Mot. at 13-14.)  Mr. Donahue raises timely claims.  However,

8   as Red Robin also correctly points out, Mr. Donahue also alleges specific events that

9   occurred outside of both the WLAD and ADA statutes of limitations.  (RR Resp. at 17-

10   18.)  The WLAD limitations period is three years.  *Antonius v. King Cty.*, 103 P.3d 729,

11   732 (Wash. 2004) (citing RCW 4.16.080(2)).  Mr. Donahue filed his complaint on

12   January 5, 2017 (*see* Compl. (Dkt. # 1)), and thus the limitations period extends back to

13   January 5, 2014.[22]  Under the ADA, discriminatory actions must have occurred within the

14   300 days before Mr. Donahue filed his EEOC charge on December 7, 2015, or no earlier

15   than February 10, 2015.  *See Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2016

16   WL 4472930, at *5 (W.D. Wash. Mar. 7, 2016) (citing 42 U.S.C. § 2000e-5(e)) ("If the

17   alleged discrimination occurred in a state with its own anti-discrimination agency and

18   

19       [22] Mr. Donahue does not argue for equitable tolling of the limitations period.  (*See* Plf.
    Mot. at 14; Plf. Reply at 8-9.  In addition, the court grants summary judgment on Mr. Donahue's

20   hostile work environment claim.  *See supra* § III.B.4.  Thus, Mr. Donahue may not rely on a
    "continuing hostile work environment" to recover on acts occurring outside the limitations

21   period.  (*See* Plf. Reply at 9); *see also Morgan*, 536 U.S. at 122 ("A charge alleging a hostile
    work environment claim . . . will not be time barred so long as all acts which constitute the claim

22   are part of the same unlawful employment practice and at least one act falls within the time
    period.").

1   enforcement mechanism, referred to in this context as a "deferral state," the charge must

2   be filed within 300 days of the underlying, allegedly unlawful employment practice.").

3   Red Robin identifies numerous discrete acts or events that otherwise might be allegedly

4   actionable, save for the fact that they occurred outside one or both of the foregoing

5   statutes of limitations.  (*See* RR Resp. at 17-18); *see also supra* § II.  Accordingly, the

6   court denies Mr. Donahue's motion for summary judgment on Red Robin's statute of

7   limitations affirmative defense.[23]

8        7.   Affirmative Defenses Nos. 4 and 5:  Misclassified Affirmative Defenses

9        In affirmative defense number five, Red Robin asserts that Mr. Donahue "was not

10  a qualified individual with a disability."  (Ans. at 8.)  In affirmative defense number four,

11  Red Robin asserts that Mr. Donahue "failed to request a reasonable accommodation or

12  cooperate with [Red Robin] in the interactive process."  (*Id.*)  Mr. Donahue moves for

13  summary judgment arguing that these affirmative defenses "seek to demonstrate that [Mr.

14  Donahue] has not met his burden of proof" and are therefore not proper affirmative

15  defenses.  (Plf. Mot. at 15-16.)  Mr. Donahue also argues that there are no material

16  factual disputes on these issues, thus warranting summary judgment on that ground as

17  well.

18  //

19        [23] Red Robin argues that because some of the alleged actions fall outside the applicable

20  limitations period, Mr. Donahue "cannot offer these allegations as admissible evidence in
    support of [his] WLAD and ADA claims."  (RR Resp. at 18.)  The court's ruling today is not an
    evidentiary one.  The court will decide on the admissibility of evidence in the context of the

21  parties' motions in limine.  (*See, e.g.*, Def. MIL (Dkt. # 75) at 2 (seeking the exclusion of
    "[e]vidence of alleged discrimination, retaliation, or leave interference outside the applicable

22  limitations period").)

ORDER - 47

1    Preliminarily, the court notes that Red Robin "does not contest that [Mr. Donahue]

2    has a disability." (RR Resp. at 20.) Thus, to the extent that affirmative defense number

3    five could be construed as denying this fact, the court grants Mr. Donahue's motion. Red

4    Robin argues, however, that the true import of affirmative defense number five is

5    contained in the words "qualified individual." (*See id.*) Red Robin argues that this

6    affirmative defense goes to whether Mr. Donahue "was qualified for his position and

7    performing satisfactory work." (*Id.*)

8    Generally, "[a]ffirmative defenses plead matters extraneous to the plaintiff's prima

9    facie case, which deny plaintiff's right to recover, even if the allegations of the complaint

10   are true." *Fed. Deposit Ins. Corp. v. Main Hurdman*, 655 F. Supp. 259, 262 (E.D. Cal.

11   1987); *see also Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A

12   defense which demonstrates that plaintiff has not met its burden of proof is not an

13   affirmative defense."). Mr. Donahue has the burden to demonstrate both that he was

14   qualified for his position and performing satisfactory work, *see McElwain*, 244 F. Supp.

15   3d at 1097-98; *Nunes*, 164 F.3d at 1246, and that Red Robin failed to provide him a

16   reasonable accommodation and failed to engage in the required interactive process,

17   *Zivkovic*, 302 F.3d at 1088, *see also Snapp v. United Transp. Union*, --- F.3d ----, No. 15-

18   35410, 2018 WL 2168653, at *5-8 (9th Cir. May 11, 2018). Specifically, in *Zivkovic*, the

19   Ninth Circuit held that a defendant's "attempt to prove that it provided accommodation

20   merely negates an element that [the plaintiff] was required to prove and therefore was not

21   an affirmative defense required to be pled in [the defendant's] answer." 302 F.3d at

22   1088. Both affirmative defenses number four and five negate elements of Mr. Donahue's

1    claim and thus are not required to be pled as affirmative defenses.  Nevertheless, the

2    court denies Mr. Donahue's to strike these affirmative defenses.  Instead, the court "will

3    simply consider them not as affirmative defenses, but as general denials or objections."

4    *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, No. 08-MD-1919 MJP,

5    2011 WL 1158387, at *2 (W.D. Wash. Mar. 25, 2011).

6        With respect to affirmative defense number four, Mr. Donahue also argues that

7    Red Robin "has admitted that [Mr. Donahue] did request reasonable accommodations and

8    thus no set of facts exist from which a reasonable jury could conclude that [Red Robin

9    was] unaware of [its] duty to accommodate." (Plf. Mot. at 16.)  Red Robin acknowledges

10   that Mr. Donahue's standing and lifting restrictions were mutually agreed to and

11   reasonable.  (RR Resp. at 19 (citing Rivera Decl. ¶ 10, Ex. F).)  However, Mr. Donahue

12   also asserts that he could not fully implement these accommodations and that Red Robin

13   failed to adequately engage in the required interactive process to resolve this problem.

14   *See supra* § III.B.5.  The court has already concluded that the evidence in the record

15   creates triable material dispute of fact on this issue.  *See id.*  Accordingly, neither Red

16   Robin nor Mr. Donahue is entitled to summary judgment on this issue.

17       In addition, with respect to affirmative defense number five, Mr. Donahue posits

18   that Red Robin's argument regarding Mr. Donahue's qualifications or poor performance

19   "is nothing more than a re-hash of [its] argument that [its] pretext for terminating Mr.

20   Donahue was legitimate." (Plf. Reply at 10.)  Once again, the court has already

21   concluded that there are genuine factual disputes concerning the legitimacy of Red

22   Robin's reasons for termination.  *See supra* § III.B.1.b.  Indeed, the court expressly noted

1    that "weighing the evidence both sides present . . . and making credibility determinations

2    are tasks for the jury alone." *See id.*  Thus, the entry of summary judgment in favor of

3    either Red Robin or Mr. Donahue on this issue is inappropriate.  Accordingly, the court

4    denies Mr. Donahue's motion, except to the extent that affirmative defense number five

5    could be construed as contesting that Mr. Donahue has a disability.

6        In sum, the court grants Mr. Donahue's motion for summary judgment on (1)

7    affirmative defense number five but only to the extent that it could be construed as

8    contesting that Mr. Donahue has a disability, (2) affirmative defense number nine, which

9    asserts contributory negligence, and (3) affirmative defense number 11 as to laches,

10   waiver, and equitable estoppel.  *See supra* §§ III.C.2, 5, 7.  The court denies the

11   remainder of Mr. Donahue's motion.  *See supra* §§ III.C.3-4, 6-7.

12                              **IV.    CONCLUSION**

13       As discussed above, the court GRANTS in part and DENIES in part both Red

14   Robin's motion for summary judgment (Dkt. # 29) and Mr. Donahue's motion for partial

15   summary judgment (Dkt. # 32).  Specifically, the court DENIES Red Robin's motion for

16   summary judgment on Mr. Donahue's claims (1) under the FMLA and WFLA; (2) for

17   discrimination under the ADA and WLAD; (3) for retaliation under the ADA and

18   WLAD; and (4) for failure to accommodate under the ADA and WLAD.  The court

19   GRANTS Red Robin's motion for summary judgment on Mr. Donahue's WLAD hostile

20   work environment claim.  The court GRANTS Mr. Donahue's motion for summary

21   judgment on affirmative defenses numbers 5 (only to the extent only it could be

22   construed as contesting that Mr. Donahue has a disability), 9 (for contributory

1   negligence), and 11 (for laches, waiver, and equitable estoppel).  The court DENIES the

2   remainder of Mr. Donahue's motion for summary judgment.

3          Finally, this order refers to material that is filed under seal.  Accordingly, the court

4   DIRECTS the clerk to provisionally file this order under seal as well.  The court

5   ORDERS counsel to meet and confer regarding the need for redaction, if any, and to

6   jointly file a statement on the docket within seven (7) days of the date of this order

7   indicating any such need.

8          Dated this 30th day of May, 2018.

9

10

11  JAMES L. ROBART
    United States District Judge

12

13

14

15

16

17

18

19

20

21

22